**FILED**

SEP 2 6 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN SOCIETY FOR THE PREVENTION**<br>**OF CRUELTY TO ANIMALS,**<br>1755 Massachusetts Ave. N.W.<br>Washington, D.C. 20036, | ) <br> ) <br> ) <br> ) <br> ) |
| **ANIMAL WELFARE INSTITUTE,**<br>1686 34th Street, N.W.<br>Washington, D.C. 20007, | ) <br> ) <br> CASE NUMBER  1:03CV02006 |
| **THE FUND FOR ANIMALS,**<br>8121 Georgia Ave., N.W.<br>Suite 301<br>Silver Spring, Maryland 20910 | JUDGE: Emmet G. Sullivan<br><br>DECK TYPE: General Civil<br><br>DATE STAMP: 09/**26**/2003 |
| **TOM RIDER,**<br>600 East Holland Street<br>Washington, Illinois 61571, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) <br> ) |
| v. | ) <br> ) |
| **RINGLING BROTHERS AND BARNUM & BAILEY CIRCUS,**<br>8607 Westwood Center Drive<br>Vienna, Va. 22182, | ) <br> ) <br> ) <br> ) |
| **FELD ENTERTAINMENT, INC.,**<br>8607 Westwood Center Drive<br>Vienna, Va. 22182, | ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This is a case under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et

seq., against Ringling Brothers and Barnum & Bailey Circus ("Ringling Bros.") for "taking"

endangered elephants -- i.e. harming, harassing, and wounding endangered elephants -- in

violation of the ESA and the regulations implementing that statute. Ringling Bros. engages in

these unlawful activities by routinely beating elephants to "train" them, "discipline" them, and

keep them under control; chaining them for long periods of time; hitting them with sharp bull

hooks; "breaking" baby elephants with force to make them submissive; and forcibly removing

nursing baby elephants from their mothers before they are weaned, with the use of ropes and

chains. These unlawful actions are done on a routine basis, throughout the country, for the

purpose of making the elephants perform in the circus and otherwise commercially exploiting

these magnificent animals.

### Jurisdiction

2.      This Court has jurisdiction over this case pursuant to 16 U.S.C.§ 1540(g) and

28 U.S.C. § 1331.

### Parties

3.      Plaintiff American Society for the Prevention of Cruelty to Animals ("ASPCA")

is a non-profit membership organization dedicated to eliminating the abuse, neglect, and

exploitation of all animals, including animals used in entertainment. The ASPCA has

approximately 500,000 members and supporters throughout the United States, including

Washington, D.C. It brings this action on its own behalf and on behalf of its members.

4.      The ASPCA spends substantial resources each year on advocating better

treatment for animals held in captivity, including animals used for entertainment purposes. It

routinely sends submissions to the federal government concerning the treatment of captive

animals, and it responds to requests for public comment from the federal government

concerning animal welfare issues. ASPCA's members also routinely comment on such

2

matters.

5.      The ASPCA publishes a magazine, on a quarterly basis, which goes to all of its members, and it operates a website on the world wide web. The magazine and website report on animal welfare issues, including legislative and regulatory matters affecting animals used for entertainment, and they also inform the ASPCA's members about actions that can be taken to promote the protection and humane treatment of animals.

6.      Defendants' unlawful actions in "taking" endangered elephants as described in this Complaint injure the ASPCA and its members. First, defendants' "taking" of elephants without permission from the Fish and Wildlife Service pursuant to the process created by section 10 of the Endangered Species Act violates the ASPCA's and its members' statutory right to obtain the information required and generated by the section 10 process, and to participate in that process. In particular, defendants' unlawful actions further cause the ASPCA and its members injury by depriving the ASPCA of its ability to obtain and disseminate through its newsletter and website information regarding defendants' treatment of endangered elephants who are commercially exploited. In addition, because defendants "take" elephants without permission from the FWS -- and hence without public notice and comment as required by the ESA -- the ASPCA must spend financial and other resources pursuing alternative sources of information about defendants' actions and treatment of elephants in order to obtain such information for use in its work, to disseminate to its members and the public, and to submit comments and other submissions to the agencies with jurisdiction over these matters.

3

7.    If the ASPCA prevails in its claim for relief regarding forfeiture of the endangered elephants in defendants' possession, it will have a statutory right to a reward for furnishing information that leads to such forfeiture, pursuant to the ESA, 16 U.S.C. § 1540(d).

8.    Plaintiff Animal Welfare Institute ("AWI") is a non-profit membership organization dedicated to eliminating the sum total of pain and fear inflicted by people on animals, including animals used for entertainment purposes.  AWI has approximately 20,000 constituents throughout the United States, including Washington, D.C.   It brings this action on its on behalf and on behalf of its members and its board of directors.

9.    AWI spends resources each year on advocating protection for endangered and threatened animals, including better treatment for animals used for entertainment purposes.  It routinely sends submissions to the federal government concerning the treatment of captive animals, and it submits comments in response to the government's requests for public comment concerning animal welfare issues.   AWI's constituents also routinely comment on such matters.

10.    AWI publishes a newsletter, on a quarterly basis, which is disseminated to all of its constituents, and it operates a website on the world wide web.  The newsletter and website report on animal welfare issues, including legislative and regulatory matters affecting endangered and threatened species, including animals used for entertainment purposes, and they also inform AWI's members about actions they can take to promote the protection and humane treatment of these animals.

11.    Defendants' unlawful actions in "taking" endangered elephants as described in this Complaint injure AWI and its members.  Defendants' "taking" of elephants without

4

permission from the Fish and Wildlife Service pursuant to the process created by section 10 of the Endangered Species Act violates AWI's and its members' statutory right to obtain the information generated by the section 10 process, and to participate in that process. In particular, defendants' unlawful actions cause AWI and its members injury by depriving AWI of its ability to obtain and disseminate through its newsletter and website information regarding defendants' treatment of endangered elephants. In addition, because defendants take elephants without permission from the FWS -- and hence without public notice and comment as required by the ESA -- AWI has to spend financial and other resources pursuing alternative sources of information about defendants' actions and treatment of elephants in order to obtain such information for use in its work, to disseminate to its members and the public, and to submit comments and other submissions to the agencies with jurisdiction over these matters.

12.    If AWI prevails in its claim for relief regarding forfeiture of the endangered elephants in defendants' possession, it will have a statutory right to a reward for furnishing information that leads to such forfeiture, pursuant to the ESA, 16 U.S.C. § 1540(d).

13.    Plaintiff The Fund for Animals ("FFA") is a non-profit membership organization dedicated to eliminating the abuse, neglect, and exploitation of animals, including those used for entertainment purposes. FFA has approximately 200,000 members and supporters throughout the United States, including Washington, D.C. It brings this action on its own behalf and on behalf of its members.

14.    FFA spends substantial resources each year on advocating better treatment for animals in the wild and in captivity, including those used in entertainment. It routinely sends submissions to both the United States Department of Agriculture and the Fish and Wildlife

5

Service concerning the treatment of animals, and it responds to requests for public comment from those agencies concerning animal welfare issues. FFA's members also routinely comment on such matters.

15. FFA publishes a newsletter, on a quarterly basis, which goes to all of its members, and it operates a website on the world wide web. The newsletter and website report on animal welfare issues, including legislative and regulatory matters affecting animals used in entertainment, including elephants, and they also inform FFA's members about actions they can take to promote the protection and humane treatment of these animals.

16. Defendants' unlawful actions in "taking" endangered elephants as described in this Complaint injure FFA and its members. Defendants' "taking" of elephants without permission from the Fish and Wildlife Service pursuant to the process created by section 10 of the Endangered Species Act violates FFA's and its members' statutory right to obtain the information generated by the section 10 process, and to participate in that process. In particular, defendants' unlawful actions further cause FFA and its members injury because they deprive FFA of its ability to obtain and disseminate, through its newsletter and website, information regarding defendants' treatment of endangered elephants. In addition, because defendants "take" elephants without permission from the FWS -- and hence without public notice and comment as required by the ESA -- FFA must spend financial and other resources pursuing alternative sources of information about defendants' actions and treatment of elephants in order to obtain such information for use in its work, to disseminate such information to its members and the public, and to submit comments and other submissions to the agencies with jurisdiction over these matters.

6

17.    If FFA prevails in its claim for relief regarding forfeiture of the endangered elephants in defendants' possession, it will have a statutory right to a reward for furnishing information that leads to such forfeiture, pursuant to the ESA, 16 U.S.C. § 1540(d).

18.    Plaintiff Tom Rider worked for Ringling Bros. from June 1997 until November 1999, tending the barns where the elephants were kept and as a "handler" for the elephants. Mr. Rider spent many hours with the elephants, and knows all of the elephants he worked with by name. During his work with the elephants, he grew extremely fond of them, and formed a strong, personal attachment to these animals.

19.    While working for Ringling Bros., Mr. Rider saw several of the other elephant handlers and "trainers" routinely beat the elephants, including the baby elephants, and he saw them routinely hit and wound the elephants with sharp bull hooks. These beatings were done throughout the country, wherever Ringling Bros. trained and performed, including in Washington, D.C. Mr. Rider saw and heard baby elephants cry in pain from their beatings. Mr. Rider also saw the elephants, including the baby elephants, confined and kept in chains each day, for most of the day, each day, throughout the country, including in Washington, D.C. He has seen both the baby elephants and the adult elephants engage in stressful "stereotypic" behavior as a result of defendants' mistreatment of them.

20.    Mr. Rider has a personal and emotional attachment to these elephants, whom he refers to as his "girls." He has been aesthetically and emotionally injured by defendants' unlawful actions towards these animals, and continues to be so injured, knowing that this routine and unnecessary beating, wounding and other mistreatment of the animals continues almost every day.

7

21.    Mr. Rider stopped working in the circus community because he could no longer tolerate the way the elephants were treated by defendants.

22.    Mr. Rider would very much like to visit the elephants in defendants' possession so that he can continue his personal relationship with them, and enjoy observing them. He would also like to work with these animals again. However, he is unable to do so without suffering more aesthetic and emotional injury, unless and until these animals are placed in a different setting, or are otherwise no longer routinely beaten, chained for long periods of time, and otherwise mistreated. If these animals were relocated to a sanctuary or other place where they were no longer mistreated, Mr. Rider would visit them as often as possible, and would seek a position that would allow him to work with his "girls" again.

23.    Because of his close personal relationship with the elephants, Mr. Rider nevertheless still makes efforts to see the animals, and he has been able to observe the elephants he knows, as well as other Ringling elephants, on several occasions during the last couple of years by going to cities where the circus is performing. However, each time he has been able to see the animals, he is aesthetically injured by the demeanor and physical appearance of the animals who appear sad and beaten down, devoid of their spirits, and extremely stressed, and who exhibit stereotypic behavior, such as swaying back and forth. Because of his experience with the circus, Mr. Rider knows that the demeanor and behavior of the elephants, which cause him aesthetic injury, is a result of the way they are mistreated by Ringling Bros. Because of his love of these animals, Mr. Rider continues to visit them, and will continue to do so in the future, even though, each time he does so, he suffers more aesthetic injury.

8

24.     If Mr. Rider prevails in his claim for relief regarding forfeiture of the endangered elephants in defendants' possession, he will have a statutory right to a reward for furnishing information that leads to such forfeiture, pursuant to the ESA, 16 U.S.C. § 1540(d).

25.     Defendant Feld Entertainment is a corporation organized under the laws of Delaware, with its corporate headquarters located in Vienna, Virginia.  It owns defendant Ringling Bros. and is ultimately responsible for the unlawful acts described in this Complaint.

26.     Defendant Ringling Brothers and Barnum & Bailey Circus ("Ringling Bros.") is the entity that Feld Entertainment conducts business under, and it is responsible for the unlawful acts described in this Complaint.  The term "Ringling Bros." as used in this Complaint includes employees of Ringling Bros.

27.     Defendants regularly do business, solicit, and transact business in Washington, D.C., by planning, advertising, and holding their circus for several weeks every year in D.C. Thousands of D.C. residents attend the circuses, and defendants obtain substantial revenue from ticket sales and related concession sales for their circuses held in D.C.

28.     Defendants rent space for their circuses in Washington, D.C., including the D.C. Armory and the MCI Center, and they sell tickets and concessions for their circuses at these locations.

29.     To gain publicity for their circuses and to attract local residents, workers, and visitors, defendants hold parades through downtown Washington, D.C., which includes marching elephants down the streets of D.C.  Defendants also participate in local D.C. community events, including but not limited to activities at the National Zoo.

30.    Defendants advertise their circus annually in Washington, D.C., including in The Washington Post and Washington City Paper, inviting D.C. residents to buy tickets to and attend their circus in D.C.

31.    Defendants maintain a web site on the Internet that is accessible in Washington, D.C. This web site provides D.C. residents information concerning the circus, when the circus will be arriving in D.C., how to buy tickets for the circus, and other related information.  D.C. residents may also purchase circus souvenirs from defendants through defendants' web site.

32.    Through its "Free Ticket For Newborns" program, defendants provide a free ticket to their circus to all newborn babies in Washington, D.C., as well as the rest of the country.  These tickets can be requested in D.C. through the defendants' web site, and are shipped to residents in D.C. upon request.

33.    In coordination with the Immigration and Naturalization Service, defendants host citizenship ceremonies at their circus in Washington, D.C. for children who have become recent U.S. citizens.

34.    Defendants obtain permits from government agencies whose headquarters are located in Washington, D.C., including the Fish and Wildlife Service and the United States Department of Agriculture, and defendants file periodic reports with those agencies.

35.    Defendants maintain the United States Corporation Company as their registered agent in Washington, DC.

10

## Statutory Framework and Facts Giving Rise
## To Plaintiffs' Claims For Relief

### A. Statutory and Regulatory Framework

36. In enacting the ESA, Congress declared that "the United States has pledged itself

as a sovereign state in the international community to conserve to the extent practicable the

various species of . . . wildlife . . . facing extinction." 16 U.S.C. § 1531(a)(4). One of the

stated purposes of the Act is "to provide a program for the conservation of . . . endangered

species and threatened species." 16 U.S.C. § 1531(b).

37. The ESA defines an "endangered species" as "any species which is in danger of

extinction." 16 U.S.C. § 1532(6). A "threatened species" is one that is in danger of becoming

endangered within the foreseeable future. 16 U.S.C. § 1532(20).

38. Section 9 of the ESA prohibits the "taking" of any endangered species. 16 U.S.C.

§ 1538(a). The Act further provides that it is unlawful to "possess, sell, deliver, carry,

transport, or ship" any endangered species that is unlawfully taken, and that it is unlawful to

"deliver, receive, carry, transport, or ship in interstate commerce . . . in the course of a

commercial activity" any endangered species. 16 U.S.C. § 1538(a). These prohibitions apply

to endangered animals bred in captivity, as well as to those in the wild.

39. The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C.

§ 1532(19). The term "harm" includes an act which "kills or injures" an endangered or

threatened animal. 50 C.F.R. § 17.3. The term "harass" includes an "intentional or negligent

act or omission which creates the likelihood of injury [to an endangered or threatened animal]

by annoying it to such extent as to significantly disrupt normal behavioral patters which
include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

40. The ESA provides that all animals taken, possessed, transported, delivered, or
received contrary to the provisions of the Act "shall be subject to forfeiture to the United
States." 16 U.S.C. § 1540(e)(4)(A).

41. The Act further provides that the Secretary of the Department of the Interior "shall
pay . . . a reward to any person who furnishes information which leads to . . . forfeiture of
property for any violation of this [Act] . . .." 16 U.S.C. § 1540(d).

42. Section 10(a)(1)(A) of the ESA authorizes the FWS to issue a "permit" for any act
that is otherwise prohibited by section 9, but only if such act is "for scientific purposes or to
enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).

43. The Act provides that the FWS "shall publish notice in the Federal Register of
each application for an exemption or permit which is made under [section 10]." 16 U.S.C. §
1539(c). "Each notice shall invite the submission from interested persons, within thirty days
after the date of the notice, of written data, views or arguments with respect to the application .
. .." Id.

44. The FWS may grant exceptions under section 10(a) "only if [it] finds and publishes
. . . in the Federal Register that (1) such exceptions were applied for in good faith, (2) if
granted and exercised will not operate to the disadvantage of such endangered species, and (3)
will be consistent with the purposes and policy" of the Act. 16 U.S.C. § 1539(d).

45. The FWS has promulgated general regulations applicable to permits that are
authorized by the ESA. Those regulations provide that captive wildlife subject to a permit

12

must be maintained under "humane and healthful conditions," 50 C.F.R. § 13.41, and that

"[a]ny person holding a permit . . . must comply with all conditions of the permit and with all

applicable laws and regulations governing the permitted activity." 50 C.F.R. § 13.48. One

such law is the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 et seq. The AWA and the

regulations implementing that statute establish additional conditions under which all animals --

including those listed as endangered or threatened under the ESA -- may be used in

entertainment. The AWA is administered by the United States Department of Agriculture

("USDA").

46.     The AWA regulations state that "[p]hysical abuse shall not be used to train,

work, or otherwise handle animals," that "[h]andling of all animals shall be done . . . in a

manner that does not cause trauma, . . . behavioral stress, physical harm, or unnecessary

discomfort," and that "[y]oung or immature animals shall not be exposed to rough or excessive

public handling . . .." 9 C.F.R. § 2.131(a), (b).

47.     The AWA regulations further provide that animals must be provided sufficient

space "to make normal postural and social adjustments with adequate freedom of movement . .

.." 9 C.F.R. § 3.128, 3.137(c).

**B.      Facts Giving Rise To Plaintiffs' Claims**

48.     Asian elephants are listed as endangered animals under the ESA. 50 C.F.R. §

17.11.

49.     Adult Asian elephants weigh between 6,000 - 8,000 pounds, and in the wild live

to be approximately 65 years old or older.

50.     In the wild, Asian elephants walk many miles each day.

13

51.   In the wild, elephants forage for food for approximately 18 hours of each day.

52.   In the wild, baby elephants are not usually weaned from their mothers until they are between 2-4 years old, or older, and, even after that, female elephants remain with their mothers and the other members of their herds for the rest of their lives, while males stay with their families until they are between 9-15 years old.

53.   In the wild, elephants form strong bonds with their family unit. The elephant is one of the few species of ungulates known to live in permanent family groups. Baby elephants stay with their mothers for many years to learn social and other survival skills. Female elephants remain for life with the family of their births.

54.   Elephants are excellent natural swimmers.

55.   Ringling Bros. uses Asian elephants in its circus performances that are held throughout this country, including Washington, D.C., and in other countries.

56.   Ringling Bros. has a permit under the ESA from the Fish and Wildlife Service that allows it to possess, transport, breed, and exhibit Asian elephants.

57.   Ringling Bros.' ESA permit does not allow it to beat elephants.

58.   Ringling Bros.' ESA permit does not allow it to use sharp bull hooks on its elephants for the purpose of training or punishing them.

59.   Ringling Bros.' permit does not allow it to forcibly remove baby elephants from their mothers with the use of ropes and chains.

60.   Ringling Bros.' permit does not permit it to inflict wounds on its elephants for the purpose of training them, punishing them, or keeping them under control.

14

61. Ringling Bros.' permit does not permit it to keep its elephants in chains for up to 20 hours a day, and sometimes longer.

62. Despite the "taking" prohibitions of the ESA, and the prohibitions of the AWA regulations, Ringling Bros. regularly beats and hits the adult elephants in its possession with sharp bull hooks to "train" them, to "control" them, make them perform tricks, "discipline" and punish them. Ringling Bros. engages in this conduct throughout the country, including in Washington, D.C.

63. This treatment inflicts physical injury and wounds on the animals.

64. This treatment inflicts severe psychological injury on the elephants.

65. This treatment significantly disrupts the elephants' normal behavior patterns, including their social relationships with other elephants, and their reproductivity.

66. This treatment has negative impacts on the animals' behavior and demeanor, wherever they perform or are exhibited.

67. Despite the prohibitions of the ESA and the AWA regulations, Ringling Bros. beats and hits its baby elephants, regularly, with sharp bull hooks to "train" them, "control" them, "break" them, make them perform tricks, "discipline" and punish them. It engages in this conduct throughout the country, including in Washington, D.C.

68. This treatment inflicts physical harm and wounds on the baby animals.

69. This treatment inflicts severe psychological damage on the baby elephants.

70. One of the baby elephants who was routinely beaten by Ringling Bros., Benjamin, died in July 1999 while swimming in a pond. He was approximately 4 years old when he died. The United States Department of Agriculture's final "Report of Investigation"

15

concerning the incident concluded that Benjamin's trainer's use of an "ankus" on Benjamin "created behavioral stress and trauma which precipitated in the physical harm and ultimate death of the animal."

71.    On information and belief, the routine beatings of Benjamin were a contributing factor to his death.

72.    In January 1998, another baby elephant in Ringling Bros.' possession, Kenny, died when he was only 3 1/2 years old.

73.    Ringling Bros. made Kenny perform on the day that he died, even though it knew that he was ill. An internal United States Department of Agriculture memorandum stated that the evidence showed that "orders from the attending veterinarian to leave Kenny in his stall during the 3rd performance on the day he died were not followed by the trainers, Mark Oliver Gebel and Gunther Gebel Williams."

74.    On information and belief, Kenny, like other Ringling Bros.' baby elephants, was routinely beaten and hit by Ringling Bros.

75.    Despite the prohibitions of the ESA and the AWA regulations, Ringling Bros. keeps its elephants in chains for long periods of time, up to 20 hours a day, and longer when the elephants are traveling, throughout the country, including in Washington, D.C., and in other countries. It does so for the purpose of maintaining control and dominance over the animals to ensure that the elephants will perform as required by defendants throughout the country, including in Washington, D.C.

76.    The chaining and confinement of elephants for so many hours each day causes them physical discomfort, behavioral stress, and severe psychological harm, and also interferes

16

with their normal postural and social adjustments.

77.     The chaining and confinement of elephants for so many hours each day causes them physical injury, including foot injuries, and significantly disrupts their normal behavioral patterns, including their social relationships with other elephants, and their need to walk long distances each day.

78.     Despite the prohibitions of the ESA and the AWA regulations, Ringling Bros. routinely forcibly removes baby elephants from their mothers with the use of ropes and chains before the animals are even 2 years old, i.e., long before they could normally be weaned from their mothers in the wild.  Ringling Bros. does this to establish dominance and control over the baby elephants in furtherance of its overall objective of ensuring that they will perform as required for the circus throughout the country, including in Washington, D.C.

79.     Despite the prohibitions of the ESA and the AWA regulations, Ringling Bros. inflicts wounds on its baby elephants when it forcibly removes them from their mothers.

80.     In February 1999, while conducting an inspection of one of Ringling Bros.' facilities, two inspectors for the Department of Agriculture observed "large visible lesions" on the rear legs of two baby Asian elephants, Doc and Angelica.  The lesions were approximately 6 inches long and an inch wide.

81.     When the USDA inspectors inquired about these lesions, they were informed by Ringling Bros.' employees that the lesions were caused by rope burns, resulting from the "routine" separation process from the babies' mothers.

82.     The Ringling Bros.' employees further informed the USDA inspectors that the babies had been forcibly weaned from their mothers a month earlier, with the use of a rope .

17

around each of their legs and a chain around their necks.

83.     The baby elephants, Doc and Angelica, were born on May 8, 1997, and June 23, 1997, respectively.  Accordingly, they were less than 2 years old when they were forcibly removed from their mothers by Ringling Bros.

84.     The USDA has informed Ringling Bros. that its treatment of baby elephants violates AWA regulations, and causes "trauma, behavioral stress, physical harm and unnecessary discomfort."

85.     Baby elephants who are beaten, forcibly removed from their mothers, hit with bull hooks, and confined for long periods of time are physically, psychologically, and socially injured.  This treatment has negative impacts on the animals' behavior and demeanor, wherever they perform or are exhibited.

86.     Such treatment of baby elephants also significantly disrupts their normal behavioral patterns, especially their relationships with their mothers and other members of their family unit, which also has negative impacts on the animals' behavior and demeanor wherever they perform or are exhibited.

87.     Baby elephants who die before they reach breeding age do not contribute to the gene pool for the long-term conservation of endangered elephants.

88.     The forcible removal of baby elephants from their mothers causes the mothers severe emotional and psychological injury.

89.     Such treatment of the mothers also significantly disrupts their normal behavioral patterns, especially their relationships with their offspring, their production of milk, and their normal reproductive cycles.

18

90.    The chaining and confinement of the elephants, beatings, forcible separation of babies from mothers, and other mistreatment of the elephants all negatively impact the animals' willingness and ability to breed naturally in captivity.  On information and belief, none of the baby elephants produced by defendants in recent years have been the product of natural breeding.  Instead, they have all been produced through the process of artificial insemination.

91.    Ringling Bros. engages in many of the unlawful actions described in this Complaint throughout the country, including in Washington, D.C.  It engages in all of the unlawful actions described in the Complaint for the purpose of making the animals perform in the circus throughout the country, including in Washington, D.C.

92.    On December 21, 1998 and November 15, 1999, the Performing Animal Welfare Society ("PAWS"), Pat Derby, and Ed Stewart sent letters to Ringling Bros., pursuant to the ESA, 16 U.S.C. § 1540(g), informing Ringling Bros. that its routine beatings of its elephants, its routine use of the bull hook, its chaining of elephants for long periods of time, and its forcible separation of baby elephants from their mothers all constitute the unlawful "taking" of elephants, and otherwise violate the ESA and that statute's implementing regulations.  Letters identifying these violations of the ESA and its implementing regulations were also sent to Bruce Babbitt, Secretary of the Department of the Interior and Jamie Rappaport Clark, Director of the Fish and Wildlife Service, who administer the ESA.  Both letters were received by defendants.

93.    On July 11, 2000, PAWS, Pat Derby, Ed Stewart, the ASPCA, FFA, AWI, and Tom Rider  filed an action against defendants concerning its violations of the ESA.  Performing Animal Welfare Society, et al. v. Ringling Bros., et al, Civ. No. 00-1641.

19

94.     On January 8, 2001, PAWS, Pat Derby and Ed Stewart withdrew from that

lawsuit. Their withdrawal was required as a condition of settling another case that had been

brought by them against Feld under the Racketeer Influenced and Corrupt Practices Act, and,

as stated in the notice of withdrawal, had "nothing to do with the allegations or arguments"

that have been made set forth in the ESA case.

95.     On April 12, 2001, the ASPCA, FFA, AWI, and Tom Rider sent another letter

to defendants providing them of notice of continuing violations of the ESA because of its

"taking" of endangered Asian elephants, including videotaped evidence of young elephants

being struck with bullhooks or clubs and other instruments, and, in one case, being clipped

with a sharp instrument. That notice letter specifically referenced the December 21, 1998 and

November 15, 1999 notice letters that Ringling had already been sent and had already

received, and it expressly incorporated those letters by reference. Copies of the April 12,

2001 letter were sent to the Secretary of the Department of the Interior and the Director of the

Fish and Wildlife Service. A copy was also provided to defendants' attorneys.

### Plaintiffs' Claims For Relief

96.     Ringling Bros.' past and continuing routine beatings of its elephants, including

its baby elephants; its routine use of bull hooks, whips, and other weapons, to train, control,

and punish its elephants, including its baby elephants; its forcible removal of baby elephants

from their mothers; and its chaining and confinement of elephants for many hours each day

violate the "taking" prohibitions of section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), the

prohibition against the "possession" and "transportation" of an endangered species that has

been unlawfully taken, id. § 1538(a)(1)(D), and the prohibitions against the transportation of

endangered species in interstate commerce in the course of a commercial activity, except as permitted by the Fish and Wildlife Service, id. § 1538(a)(1)(E). Defendants' unlawful actions injure plaintiffs in the manner described in paragraphs 3-36.

97. Ringling Bros.' treatment of its elephants is inhumane and unhealthful for the animals, and violates the AWA regulations, and hence its treatment of the animals also violates the permit it was issued by the Fish and Wildlife Service, and the FWS's regulations implementing the ESA, 50 C.F.R. §§ 13.41, 13.48, which require any person holding a permit to comply with "all applicable laws and regulations governing the permitted activity." Defendants' unlawful actions injure plaintiffs in the manner described in paragraphs 3-36.

WHEREFORE, plaintiffs request that this Court enter an order:

1. Declaring that defendants' treatment of its elephants violates the ESA and that statute's implementing regulations;

2. Enjoining defendants from continuing to violate the ESA and that statute's implementing regulations with respect to the elephants in its possession;

3. Enjoining defendants from purchasing, receiving, transporting in interstate commerce, harming, harassing, and "taking" endangered elephants;

4. Enjoining defendants from beating, wounding and injuring endangered elephants, forcibly separating babies from their mothers, and keeping elephants on chains for most of the day, unless and until it obtains permission to do so from the FWS pursuant to the procedural and substantive requirements of section 10 of the ESA;

5. Directing defendants to forfeit possession of the endangered elephants in its possession;

21

6.    Awarding plaintiffs their reasonable attorneys' fees and costs for this action; and

7.    Granting plaintiffs such other and further relief as may be just and proper.

Respectfully submitted,

Katherine A. Meyer
(D.C. Bar No. 244301)

Eric R. Glitzenstein
(D.C. Bar No. 358287)

Jonathan Lovvorn
(D.C. Bar No. 461163)

Kimberly D. Ockene
(D.C. Bar No. 461191)

Meyer & Glitzenstein
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Date:   September 26, 20003

22