UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:03-cv-02006 (EGS/JMF) |
| RINGLING BROS. AND BARNUM & BAILEY CIRCUS, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h), defendant Feld Entertainment, Inc. ("FEI" or "defendant") hereby moves the Court for an order entering summary judgment in favor of defendant and dismissing all claims in this lawsuit by plaintiffs against defendant with prejudice.  As more fully set out in the accompanying Memorandum of Points and Authorities, the exhibits attached thereto, and Defendant's Statement of Material Facts As To Which There Is No Genuine Issue, also submitted herewith, the material facts are undisputed and FEI is entitled to judgment as a matter of law.  Specifically, plaintiffs' claims that FEI is "taking" its Asian elephants in violation of section 9(a)(1)(B) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1538(a)(1)(B) (2000), fail as a matter of law for two reasons.  All of the elephants at issue in this lawsuit are either (i) excluded from the "taking" prohibition of the ESA by the express exception for "pre-Act" species, *see* 16 U.S.C. § 1538(b)(1); 50 C.F.R. § 17.4 (2005); or (ii) were bred in captivity in the United States and currently are subject to a valid captive-bred wildlife permit issued by the United States Fish and Wildlife Service ("FWS"), that

explicitly authorizes FEI to "take" them.   Therefore, the Court should enter summary judgment for defendant, dismissing this case in its entirety with prejudice.

In addition, defendant requests an award of its costs of litigation, including attorney and expert witness fees, in accordance with section 11(g)(4) of the ESA which provides for the award by the Court of such amounts "to any party, whenever the court determines such award is appropriate."  16 U.S.C. § 1540(g)(4).  The propriety of such an award is a matter that can be deferred until the entry of final judgment.

WHEREFORE, defendant respectfully requests that its motion be granted and that the Court enter final judgment in favor of defendant, dismissing all claims in this lawsuit against defendant with prejudice and granting defendant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

John M. Simpson (D.C. Bar #256412)
Joseph T. Small, Jr. (D.C. Bar #926519)
Lisa Zeiler Joiner (D.C. Bar #465210)
Michelle C. Pardo (D.C. Bar #456004)

FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-0200
Facsimile: (202) 662-4643

ATTORNEYS FOR DEFENDANT
FELD ENTERTAINMENT, INC.

Dated: **Sept. 5** , 2006

31184196.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:03-cv-02006 (EGS/JMF) |
| RINGLING BROS. AND BARNUM & BAILEY CIRCUS, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h), defendant Feld Entertainment, Inc. ("FEI" or "defendant")[1] submits this memorandum in support of its motion for summary judgment. Suing under the "citizen suit" provision of section 11(g) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g) (2000), plaintiffs claim that certain of FEI's husbandry practices regarding its Asian elephants violate the "taking" provision of ESA § 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B). According to plaintiffs, these "takings" occur in three principle ways: through (1) use of the guide (or "bull hook," as it has been called) in handling the animals; (2) tethering the animals at various times; and (3) weaning elephant calves from their mothers. *See* Complaint for Declaratory and Injunctive Relief ¶ 1 (Sept. 26, 2003) ("Compl"). Plaintiffs seek declaratory and

---

[1]     FEI is a corporation organized under the laws of the State of Delaware. As used herein, "FEI" refers to Feld Entertainment, Inc. and all corporate predecessors (including subsidiaries) thereof. As so defined, FEI is the entity that acquired and held the Asian elephants at issue in this lawsuit. *See* Defendant's Statement of Material Facts as to Which There is No Genuine Issue ("DSF") ¶ 1. "Ringling Bros. and Barnum & Bailey Circus" is a trade name, not a legal entity, under which FEI produces and presents live circus shows. *Id.* Thus, there is only one legally cognizable defendant (FEI), and granting summary judgment for FEI will terminate this litigation.

injunctive relief, as well as "forfeiture" of the animals in question. *Id.*, pp. 21-22. However, for purposes of the instant motion for summary judgment, the husbandry practices that plaintiffs challenge are neither material nor relevant.    Based on the undisputed material facts in this case, FEI's Asian elephants are not subject to the "taking" prohibition of the ESA as a matter of law.

FEI owns fifty-four (54) Asian elephants.  Thirty-three (33) of these elephants are excluded from the "taking" prohibition of the ESA by the express exception for "pre-Act" species. *See* 16 U.S.C. § 1538(b)(1); 50 C.F.R. § 17.4 (2005); DX 1 at 1-2.[2] Twenty (20) elephants were bred in captivity in the United States and currently are subject to a valid captive-bred wildlife permit issued by the United States Fish and Wildlife Service ("FWS"), that explicitly authorizes FEI to "take" them.  DX 1 at 1-2. One elephant -- Cora -- falls into both categories. *Id.* at 1, 13-14.  As shown by DX 1 hereto, the undisputed evidence in the record establishes the elephants' regulatory status as a matter of law -- as either "pre-Act" or captive-bred.   Thus, even assuming for purposes of summary judgment that the alleged abuses that plaintiffs posit are true (and they are not true), the challenged practices are not, as a matter of law, a "taking" prohibited by the ESA because, either by regulatory exclusion or by permit, none of the animals at issue is subject to the ESA "taking" prohibition.[3]  Therefore, the Court should

---

[2]      "DX" refers to an exhibit submitted herewith by defendant in support of its motion for summary judgment. Those exhibits are listed at the end of this memorandum.

[3]      Although not material to this motion, FEI denies that it abuses, mistreats or harms its Asian elephants in any way.  Plaintiffs have never suggested any cogent reason why FEI would "abuse" the stars of its circus performances. The suggestion that only through abuse can circus elephants be controlled and trained to do tricks simply illustrates plaintiffs' profound ignorance of elephant training and handling procedures. This ignorance is not surprising in light of the fact that none of the institutional plaintiffs apparently has any actual experience with Asian elephants. Moreover, Rider, the paid plaintiff, DX 12 at 45-47, was never an elephant trainer; he watered and cleaned up after the animals, *id.* at 230. That FEI would "abuse" its elephants makes as much sense as Yo-Yo Ma abusing his cello.

enter summary judgment for defendant, dismissing this case in its entirety with prejudice.[4]

## STATEMENT OF FACTS

The Asian elephant, or *elephas maximus*, is a land mammal that has been designated as "threatened with extinction" pursuant to Appendix I of the Convention on the International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), 27 U.S.T. 1087 (July 1, 1975). DSF ¶¶ 4, 5. CITES is an international agreement among governments which aims generally to ensure that international trade in specimens of wild plants and animals does not threaten their survival. *Id.* ¶ 2. In order, *inter alia*, to implement CITES restrictions on trade in exotic endangered species, the United States enacted the ESA, effective December 28, 1973. *Id.* ¶ 3. The United States is a party to CITES, which ultimately took effect on July 1, 1975. *Id.* ¶ 2. FWS, the bureau within the Department of the Interior charged with the administration and enforcement of the ESA, listed the Asian elephant as "endangered" on June 14, 1976. *Id.* ¶ 5.

FEI owns fifty-four (54) Asian elephants – forty-two (42) females and twelve (12) males. DSF ¶¶ 6-8. Some of FEI's Asian elephants perform in FEI's circus shows and travel with three circus units, referred to as the Red Unit, Blue Unit and Gold Unit. *Id.* ¶ 9. Currently, ten (10) elephants are on the Red Unit (Assan, Asia, Baby, Bananna, Banko, Luna, Sarah, Siam II, Toby and Tonka, *id.* ¶ 10); and seven (7) elephants are on the Blue Unit (Bonnie, Juliette, Karen, Kelly Ann, Minyak, Nicole and Sara, *id.* ¶ 11).

---

[4] This is an action for an injunction and for purported "forfeiture" of FEI's Asian elephants. (Forfeiture is not a remedy available to private parties under the ESA.) FEI's motion focuses on the Asian elephants that FEI currently owns because the Court cannot enjoin FEI from action concerning, or order "forfeiture" of, an elephant that is dead or that FEI does not control. Any "taking" claim as to an elephant that is dead or no longer owned by FEI presents no live controversy and therefore is moot. *See ASPCA v. Ringling Bros.*, 317 F.3d 334, 336 (D.C. Cir. 2003) ("[i]n actions for injunctive relief, harm in the past -- as the district court correctly held -- is not enough to establish a present controversy, or in terms of standing, injury in fact").

Those of FEI's Asian elephants that are not on the units are maintained at two locations in Florida. DSF ¶ 9. FEI owns and operates the Ringling Bros. and Barnum & Bailey Center for Elephant Conservation ("CEC"), in Polk County, Florida, which is a 200-acre facility established in 1995 that is dedicated to the conservation, breeding, research and retirement care of FEI's Asian elephants. *Id.* The Two Tails Ranch, in Williston, Florida ("Williston") is a 20-acre facility at which FEI houses some of its retired elephants. *Id.* Currently, twenty-nine (29) elephants reside at the CEC (Alana, Angelica, Aree, Asha, Charlie, Doc "Fish," Emma, Gunther, Icky II, Irvin, Jewell, Josky, Louie, Lutzi, Mable, Mala, Mysore, Osgood, P.T., Rajah, Romeo, Rudy, Sally, Shirley, Sid, Susan, Tova, Vance and Zina, *id.* ¶ 12). One elephant, Casey, who usually resides at the CEC, is currently on loan to the Fort Worth Zoological Park, Forth Worth, Texas. *Id.* ¶ 14. Seven (7) elephants currently reside at Williston (Calcutta I, Cora, India, Prince Tusk, Putzi, Sabu and Siam I, *id.* ¶ 13).

Twenty-one (21) of FEI's elephants were held by FEI on or before June 14, 1976 -- the date on which FWS designated the Asian elephant as "endangered." DSF ¶¶ 5, 15-23. Since June 14, 1976, FEI has been the sole owner or holder of sixteen (16) of these elephants: Assan, Baby, Bananna, Charlie, Cora, India, Jewell, Karen, Louie, Lutzi, Putzi, Siam I, Toby, Sarah, Susan, and Zina. *Id.* ¶¶ 15-18, 20-22. Five (5) of the elephants acquired before June 14, 1976 were also held after that date (before reacquisition by FEI) by other persons or entities (Josky, Mala, Minyak, Sid and Vance, *id.* ¶¶ 19, 20, 23). All of the other holders of these elephants were either circuses, performers or exhibitors of animals. *Id.*

31145751.1

Thirteen (13) elephants born prior to, and held in captivity on or before June 14, 1976, were acquired by FEI after that date:   Alana, Asia, Banko, Calcutta I, Casey, Emma, Icky II, Mysore, Nicole, Rajah, Sally, Siam II and Tova.   DSF ¶¶ 24-31.   All known holders of these elephants on June 14, 1976 and thereafter were either circuses or other persons or entities who held the animals for exhibition purposes.   *Id.*   All of the transactions by which FEI acquired these elephants were either totally intrastate, which required no permit under the ESA, or were under ESA permits issued by FWS to enhance the propagation or survival of the species.   *Id.*

The remaining twenty-one (21) elephants (including Cora) were all bred in captivity in the United States.   DSF ¶¶ 32-46.   Five of these elephants were born either at a zoo or animal exhibition park and were acquired from such entities by FEI (Cora, Sabu, Luna, Tonka and Prince Tusk, *id.* ¶¶ 32-35).   The remaining sixteen (16) captive-bred elephants were acquired by FEI at birth, having been born at an animal exhibition park, the CEC or Williston (Juliette, Romeo, Bonnie, Shirley, Kelly Ann, Angelica, Doc "Fish," Osgood, Gunther, Sara, Asha, P.T., Rudy, Aree, Irvin and Mable, *id.* ¶¶ 36-46).   FEI has been the sole holder of all of these captive-bred elephants since acquiring them.   *Id.* ¶¶ 32-46.

On or about December 21, 1998 and November 19, 1999, certain of the plaintiffs herein sent written communications to the Secretary of the Interior and to the Director of FWS stating plaintiffs' contention that FEI's "routine beatings of its elephants, its routine use of the bull hook, its chaining of elephants for long periods of time, and its forcible separation of baby elephants from their mothers all constitute the unlawful 'taking' of elephants and otherwise violate the ESA and that statute's implementing regulations."

Compl. ¶ 92; DSF ¶ 48.  Plaintiffs made similar allegations in another letter dated April 12, 2001, that also was sent to the Secretary and FWS.  Compl. ¶ 95; DSF ¶ 48.

The practices that plaintiffs complained of -- use of the guide, tethering and weaning -- are all normal and generally accepted husbandry practices employed with respect to Asian elephants held in captivity in the United States and throughout the world. DSF ¶¶ 49, 52-53.  The guide and tethering have been employed by FEI for as long as the company has presented elephants in its circus performances.  *Id.* ¶ 49.  In certain Asian countries in which Asian elephants have been utilized in logging, transportation and other activities, the guide has been used for centuries in handling elephants.  *Id.*  Weaning is an elephant husbandry practice that is followed throughout the world with respect to Asian elephants that are bred in captivity.  *Id.*  Weaning is an elephant husbandry practice that FEI has followed since it began breeding Asian elephants in captivity in the early 1990's. *Id.*

FWS is the federal agency responsible for administering and enforcing the ESA. FWS has issued "Federal Fish and Wildlife Permits" to FEI under 50 C.F.R. § 17.21(g) for captive-bred wildlife (hereinafter "CBW permits") continuously throughout the period from 1979 to the present, including the entire time period in which the instant case (and its predecessor case) have been pending.  DSF ¶ 51.  FWS has issued these permits despite plaintiffs' claims – made known to the Secretary and FWS as early as 1998 – that FEI is allegedly "taking" its Asian elephants.  *Id.* ¶¶ 48, 51.  FWS has never revoked or suspended any of the permits that FWS has issued to FEI under 50 C.F.R. § 17.21(g).  *Id.* ¶ 51.  The most recent of these CBW permits was effective as of February 14, 2006 and expires on February 12, 2009.  *Id.*  That permit contains certain conditions and

authorizations, one of which provides that FEI is "[a]uthorized to take for normal husbandry practices[,] deliver, receive, carry, transport or ship in interstate commerce, for the purpose of enhancement of propagation or survival any Asian elephant (ELEPHAS MAXIMUS) . . . that is bred in captivity in the United States." DX 9.

The Animal and Plant Health Inspection Service ("APHIS") of the United States Department of Agriculture ("USDA") is the federal agency that administers and enforces the federal Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq*. DSF ¶ 54. The AWA and the implementing regulations set standards for the care and maintenance of animals held in captivity by exhibitors, including circuses. *Id.*; 9 C.F.R., Parts 1-3 (2006). All USDA licensees are subject to inspection seven (7) days a week by USDA inspectors who often are licensed veterinarians. *See* 9 C.F.R. § 2.126. APHIS inspectors frequently inspect FEI's facilities for maintaining Asian elephants, including all of the touring circus units, the CEC and Williston. DSF ¶ 54. These inspections occur often as the result of complaints made to APHIS by animal rights and similar groups. *Id.* Plaintiff American Society for the Prevention of Cruelty to Animals ("ASPCA") admits that USDA is well aware of those of FEI's husbandry practices that are challenged in this case, as well as ASPCA's view that such practices violate the AWA. *Id.* However, as of the date of this filing, neither USDA nor APHIS has issued any final agency action finding that FEI's husbandry practices involving the guide, tethering and weaning are in violation of the AWA. *Id.*

## ARGUMENT

### I,   PLAINTIFFS HAVE NO "TAKING" CLAIM

Plaintiffs' strategy in this case is transparent. Plaintiffs do not believe that Asian elephants should be in captivity or be in a circus, zoo or other exhibition facility.

Plaintiffs also know that it would be impracticable, if not impossible, to manage elephants in a traveling circus, or breed them in captivity, without the guide, tethering or weaning. So, by trying to characterize these standard elephant husbandry practices as a "taking" under the ESA, plaintiffs hope the Court will enjoin such practices and thereby force the elimination of elephants from the circus. Why this supposedly would benefit the animals is never explained. No one can make a convincing case anymore for Asian elephants ultimately surviving in the wild, given the precipitous loss of their natural habitat in the last 100 years, poaching, and the human-elephant conflict in Southeast Asian range states. *See* ELEPHANT HUSBANDRY RESOURCE GUIDE at 1-6 (DX 4). Consequently, an institution like FEI which, through its CEC, breeds Asian elephants in captivity and then exhibits some of them in circuses,[5] may well be the species' only realistic chance to avoid extinction. Putting all circus elephants out to pasture in a "sanctuary" somewhere -- which is apparently plaintiffs' idyllic vision -- sounds nice, but is a sure path to extinction. In 50 years or less, all such elephants would be gone. Indeed, in 1997, the Association of Zoos and Aquariums projected an Asian elephant "population crash" in North America within 30 years "if potential founders do not contribute at an accelerated rate." Association of Zoos and Aquariums, *AZA Elephant Masterplan 1979-2002* at 11 (1997) (DX 10).

Plaintiffs' chosen legal vehicle for their "animal rights" agenda – a "taking" claim under the ESA – is a house of cards. For one thing, we are aware of no authority applying the "taking" prohibition in ESA § 9(a) to an Asian elephant or other exotic animal held in captivity in the United States. For another, there is not a shred of evidence in the legislative history of the ESA, or of any amendment to that statute in the 33 years

---

[5]     Fewer than half of FEI's elephants perform in circus shows. DX 1 at 1-2.

since enactment, that Congress had any intention of outlawing circus elephants or believed that the use of Asian elephants in, and breeding them for, a traveling show contributes in any way to the endangerment of such species. Congress passed the ESA primarily to protect the habitat of endangered and threatened native American species. 16 U.S.C. § 1531(b) (purposes of ESA). Exotic species that do not exist in the wild in the United States were relevant only to the extent necessary to carry out the United States' agreement to CITES, *i.e.*, only to prohibit illicit trafficking in such species or their parts. *Id.* The exhibition of Asian elephants in an American circus -- a circus which, in this case, is older than major league baseball -- simply was not the target of the law.

Moreover, FWS, the agency charged by law with administering and enforcing the ESA, has never suggested that FEI is "taking" its Asian elephants through the use of the husbandry practices which plaintiffs challenge in this case and have repeatedly complained about to FWS. And APHIS, having been made fully aware of claims by plaintiffs and other activist groups that use of the guide, tethering and weaning are allegedly "abusive," has never found that any of these practices are a violation of the AWA. Plaintiffs apparently believe that this is all the result of "lax" enforcement (or worse), but the reality is that these agencies simply have concluded that plaintiffs are wrong and that FEI is not violating the ESA or the AWA by the way in which it cares for, maintains and manages its Asian elephants.

Ironically, humane law enforcement agents employed by plaintiff ASPCA are empowered under New York law to investigate and apprehend individuals suspected of animal mistreatment and to obtain search warrants for those purposes. DSF ¶ 50. These agents have had ample opportunity to observe FEI's husbandry practices, including the

guide and tethering, but none of them has cited FEI for mistreatment or cruelty to its Asian elephants. *Id.* In fact, after observing FEI's handling of its Asian elephants, these ASPCA agents have issued written Circus Inspection Reports expressly finding "no . . . mistreatment or cruelty to animals." *Id.*[6]

In any event, the instant motion for summary judgment presents a much more basic, and purely legal, issue: whether FEI's Asian elephants can even be the subject of a "taking" claim. Section 9 of the ESA, 16 U.S.C. § 1538, prohibits certain activities with respect to endangered species. Under section 9(a)(1)(B) -- the prohibition upon which plaintiffs rely -- "it is unlawful for any person subject to the jurisdiction of the United States to . . . take any [endangered] species within the United States . . . ." 16 U.S.C. § 1538(a)(1)(B). To "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). FWS regulations implement the statutory prohibitions and further define the terms "harass" and "harm" contained in the statutory definition of "take." *See* 50 C.F.R. §§ 17.3, 17.21(a)-(f).

There are two exceptions to the section 9(a)(1)(B) "taking" prohibition that are pertinent here. *First*, pursuant to section 9(b) of the ESA and the FWS regulations implementing that provision, so-called "pre-Act" species are excluded from the ESA § 9(a) prohibitions altogether, including the "taking" prohibition. *See* 16 U.S.C. § 1538(b)(1); 50 C.F.R. § 17.4(a). *Second*, ESA § 10(a)(1)(A) empowers the Secretary of the Interior to issue permits for acts that otherwise would violate ESA § 9(a) if such acts,

---

[6]      In discovery, ASPCA produced no such Circus Inspection Reports generated after 1998. DX 12 at 113-14 & Ex. 12 (A00801). However, since 1998, New York has still had an animal cruelty law, FEI's circus units have still played New York venues, but ASPCA agents still have not notified FEI of any purported animal cruelty law violations with respect to FEI's Asian elephants. DSF ¶ 50.

*inter alia*, will "enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A).   In 1979, acting pursuant to this congressional grant of authority, the Secretary (through FWS) promulgated the "captive-bred wildlife" ("CBW") regulation, 50 C.F.R. § 17.21(g), 44 Fed. Reg. 54001, 54007 (Sept. 17, 1979).   That rule creates a safe harbor from any "taking" claim for qualified holders of endangered species bred in captivity in the United States.

As demonstrated below, the undisputed facts show that *all* of FEI's Asian elephants are either "pre-Act" or covered by the CBW rule.   Therefore, none of them can be the subject of a "taking" claim.

This is not to say that the health and welfare of FEI's Asian elephants are not tightly regulated by the federal government or that FEI has *carte blanche* to engage in abusive treatment.   Quite the contrary, as an exhibitor, FEI is subject to an extensive body of regulations promulgated and enforced by APHIS under the AWA that govern every aspect of the animals' lives.   9 C.F.R., Parts 1-3.   These include, but are not limited to, regulations governing the feeding, watering, veterinary care, transportation, ventilation, enclosure size and ambient temperature parameters for all AWA-covered species.   *Id.* Regardless of their regulatory status under the ESA, all of FEI's Asian elephants are subject to the protections of the AWA.   However, the regulation of the day-to-day care of captive endangered species is the domain of APHIS under the AWA.   It is not, and never has been, the province of FWS under the ESA.

There is no private cause of action under the AWA.[7]  Because plaintiffs evidently believe that FWS and APHIS are not doing their jobs, plaintiffs are attempting to invent a cause of action under the "taking" provision of the ESA that would inappropriately force this Court into the role of "Master Elephant Inspector" under the AWA.  Plaintiffs' real complaint is with the legislative and administrative structure created by Congress and two administrative agencies.  However, that is a complaint that should be taken up with Congress and FWS and/or APHIS, none of which is before this Court.  It is not a matter that is properly pursued against a private party who has simply complied with existing law.

## II.   THIRTY-FOUR (34) OF FEI'S ASIAN ELEPHANTS ARE "PRE-ACT" AND ENTIRELY BEYOND THE SCOPE OF THE ESA "TAKING" PROHIBITION

FWS regulations implementing the "pre-Act" exemption to the prohibitions of the ESA provide:

> (a)  The *prohibitions* defined in subparts C and D of this part 17 [which include the "taking" prohibition] *shall not apply to any activity involving endangered* or threatened *wildlife* which was *held in captivity or in a controlled environment on December 28, 1973*:  *Provided,*
>
> (1)  That the purposes of such holding were *not contrary to the purposes of the Act*; and
>
> (2)  That the wildlife was *not held in the course of a commercial activity*.

50 C.F.R. 17.4(a)(1)-(2) (emphasis added).   The statute, which is worded slightly differently, was amended in 1982 to provide (i) that the relevant dates of reference for the exemption are either December 28, 1973 (the effective date of the original ESA) or the

---

[7]   *See Int'l Primate Protection League v. Inst. for Behavioral Res., Inc.,* 799 F.2d 934, 940 (4th Cir. 1986), *cert. denied,* 481 U.S. 1004 (1987); *Moore v. Garner,* 2005 U.S. Dist. Lexis 40643 at *10 (E.D. Tex. 2005); *Whispering Pines Animal Kingdom, LLC v. Kinde,* 2002 U.S. Dist. Lexis 5208 at *14-15 (E.D. Mich. 2002); *Moor-Jankowski v. Bd. of Tr. of NYU,* 1998 U.S. Dist. Lexis 12305 at *21-25 (S.D.N.Y. 1998).

date on which the species is listed as "endangered;" and (ii) that not only the initial, but

subsequent, holdings must not be in the course of a commercial activity.    Section

9(b)(1)(A)-(B) of the ESA provides, in pertinent part that

> [t]he provisions of subsections (a)(1)(A) and (a)(1)(G) of
> this section shall not apply to any fish or wildlife which
> was held in captivity or in a controlled environment on (A)
> December 28, 1973, or (B) the date of publication in the
> Federal Register of a final regulation adding such fish or
> wildlife species to any list published pursuant to section 4
> of this Act:    Provided, that such holding and any
> subsequent holding or use of the fish or wildlife was ***not in
> the course of a commercial activity.***

16 U.S.C. § 1538(b)(1)(A)-(B) (emphasis added).[8]

Thus, under the statute and the regulations, an Asian elephant is not subject to the

"taking" prohibition if (i) it was held in captivity or a controlled environment on June 14,

1976 (the date on which Asian elephants were listed by FWS as "endangered") (the

"triggering date"); (ii) the holding on the triggering date and subsequent holdings (at least

since 1982) were not "in the course of a commercial activity" within the meaning of the

statute and FWS regulations; and (iii) such holdings were not contrary to the purposes of

the ESA.  Thirty-four (34) of FEI's currently held Asian elephants satisfy these standards.

---

[8]    FWS adopted the regulation implementing the "pre-Act" exemption in 1975, *see* 50 C.F.R. § 17.4(a), 40 Fed. Reg. 44411, 44416 (Sept. 26, 1975), and it has remained unchanged since then, *compare id. with* 50 C.F.R. § 17.4(a) (2005). As originally enacted in 1973, ESA § 9(b) exempted "pre-Act" species from section 9 in its entirety. *See* Pub. L. No. 93-205, § 9(b), 87 Stat. 884, 894 (Dec. 28, 1973). Congress amended the pre-Act exclusion in 1982 because it determined that the original language was too broad in that it exempted "pre-Act" species from the CITES and port provisions of section 9(c) and (d): "Section 9 of the Act includes prohibitions in subsection 9(c) that implement . . . CITES as well as the designated port and reporting requirements of subsection 9(d).  The international obligation of the United States to apply CITES to these species should not be over-riden." *Endangered Species Act Amendments of 1982*, S. REP. NO. 97-418, 97th Cong., 2nd Sess. at 24 (May 26, 1982).  However, while the language of the exemption was clarified to preserve the CITES and port requirements, there is no indication that Congress intended in 1982 to subject otherwise exempt "pre-Act" species to the "taking" prohibition of ESA § 9(a). *See* H.R. CONF. REP. NO. 97-835, 97th Cong., 2nd Sess. at 35, *reprinted in* 1982 U.S. CODE CONG. & AD. NEWS 2860, 2876.  To the contrary, pre-Act species continued to be exempt from claims of violations of FWS regulations, and, since those regulations also contained the "taking" prohibition, "pre-Act" species continued to be exempt from "taking" claims.  *Compare* 16 U.S.C. § 1538(a)(1)(G) *with id.* § 1538(b)(1) *and* 50 C.F.R. § 17.24(c).  In addition, the 1982 amendment was not retroactive. *See* Pub. L. No. 97-304, 96 Stat. 1411-27 (Oct. 13, 1982).

For purposes of analysis, these animals fall into three groups: (1) elephants acquired by FEI prior to June 14, 1976 and held continuously by FEI since then; (2) elephants acquired by FEI prior to June 14, 1976 but held in the interim since then by others as well; and (3) elephants acquired by FEI after June 14, 1976. As demonstrated by DX 1 hereto, in all cases these elephants are "pre-Act" and exempt from plaintiffs' "taking" claims.[9]

### A. Elephants Acquired By FEI Prior To June 14, 1976, And Held By No One Else

Assan, Baby, Bananna, Charlie, Cora, India, Jewell, Karen, Louie, Lutzi, Putzi, Sarah, Siam I, Susan, Toby and Zina were all acquired by FEI prior to June 14, 1976 and have been held or owned by FEI, and only FEI, since their acquisition. DX 1 at 8-9, 13, 18-23, 32-33, 37-39, 41-43, 46-47; DSF ¶¶ 15-18, 20-22. Thus, all of these animals were held in captivity or a controlled environment on the triggering date for Asian elephants -- June 14, 1976. *See* 16 U.S.C. § 1538(b)(1)(B); 50 C.F.R. 17.4(a).

Furthermore, even though FEI is an enterprise that produces and presents circus shows for profit, these elephants were not held on the triggering date or thereafter "in the course of a commercial activity." *See* 16 U.S.C. § 1538(b)(1); 50 C.F.R. 17.4(a)(2). The exhibition of endangered species by a for-profit circus is not a "commercial activity" within the meaning of the ESA and the FWS implementing regulations because it does not constitute trafficking in such species.

ESA § 3(2) defines "commercial activity" to mean

---

[9]     DX 1 is a chart that, for ease of reference, collects and summarizes the evidence in the summary judgment record that shows the history of each Asian elephant currently held by FEI and that establishes each animal's regulatory status as either "pre-Act" or "CBW" -- based on the documents produced to plaintiffs in this case, the declarations submitted herewith, publicly available source materials as to which the Court may take judicial notice and other documents submitted herewith. DX 1 is properly received as an evidentiary summary pursuant to Fed. R. Evid. 1006. The evidence contained therein cannot be disputed by plaintiffs.

31145751.1

> all activities of industry and trade, including, but not
> limited to, the buying and selling of commodities and
> activities conducted for the purpose of facilitating such
> buying and selling: Provided, however, that it does not
> include exhibition of commodities by museums or similar
> cultural or historical organizations.

16 U.S.C. § 1532(2). In turn, FWS defined the statutory terms "industry and trade" in

1975 to mean "the actual or intended transfer of wildlife or plants from one person to

another person in the pursuit of gain or profit." 50 C.F.R. § 17.3, 40 Fed. Reg. 44411,

44416 (Sept. 26, 1975). This regulatory definition has remained unchanged. *See* 50

C.F.R. § 17.3 (2005). Thus, under the ESA as interpreted by FWS, "commercial

activity" is limited to actual transfers or trafficking in endangered species. *Id.*; *cf. Lujan

v. Defenders of Wildlife*, 504 U.S. 555, 588 (1992) (Stevens, J., concurring) ("commercial

activity" means to import, export or "otherwise traffic in endangered species").

Shortly after it issued the foregoing regulation in 1975, FWS advised FEI that it

did not need a permit to carry endangered species across state lines because the exhibition

of such animals in a circus was not "commercial activity" within the meaning of the ESA

and the regulations. DX 11 ("[t]he interstate movement of wildlife solely for display or

as trained animal acts will no longer require a permit"). In addition, the FWS regulatory

interpretation of "commercial activity" was brought specifically to Congress' attention in

1976. As FWS officials pointed out in testimony in a congressional hearing:

> [W]e drew the line at the point where the activities
> involved could be said to be a commercial type activity,
> and those things, which in our estimation, such as the
> exhibition of animals, even though for profit, were not a
> commercial activity in the sense of actually dealing with
> the animal.[10]

---

[10]    *Endangered Species Act Implementation and Administration: Hearings before the Subcomm. on
Fisheries and Wildlife and Conservation and the Environment of the House Comm. on Merchant Marine
and Fisheries*, 94th Cong., 1st Sess. at 241 (1975) (statement of R. Parsons, Special Agent in Charge,

Aware of FWS' interpretation, Congress amended the statutory definition of "commercial activity," in 1976 to add the exclusion for commodity exhibitions by museums, etc., but left the agency's definition of "industry and trade" intact. *See* 122 Cong. Rec. 3260 (1976) (Rep. Leggett). Thus, Congress ratified the agency's position that exhibiting endangered species in a circus, as opposed to buying and selling them, is not "commercial activity" under the ESA. *See, e.g., Lorillard v. Pons*, 434 U.S. 575 (1978); *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1570 (D.C. Cir. 1984) (given Congress' understanding of the provision in dispute and the contemporaneous agency interpretation, "it is reasonable to assume that Congress reaffirmed [agency's] understanding of its . . . authority . . ."). Furthermore, FWS' determinations that "commercial activity" under the ESA is limited to actual trafficking in endangered species and that the exhibition of such species in a traveling circus does not constitute "commercial activity," are consistent with CITES: under certain conditions, CITES permits the managing authority of any party state to waive the prohibitions for "specimens which are part of a travelling zoo, circus, menagerie, plant exhibition or other travelling exhibition." CITES, Art. VII.7.

FWS' definition of "industry and trade" and the other regulations adopted by FWS in 1975 are legislative rules issued after a notice-and-comment rulemaking proceeding and therefore are entitled to the highest degree of judicial deference. *E.g., AFL-CIO v. Donovan*, 757 F.2d 330, 343 (D.C. Cir. 1985). FWS' interpretation of "commercial activity" is reasonable and has remained consistent and unchanged for 31

---

Regulations and Rules, Div. of Law Enforcement, FWS). *See also id.* at 295 (FWS defined "the phrase 'industry and trade,' which occurs in the definition of commercial activity in the Act, to mean the actual or intended transfer of wildlife from one person to another in the pursuit of gain or profit. This definition means that commercial activity does not include the holding of an animal for exhibition or even moving an animal in interstate commerce for the purpose of exhibition").

years, which is why Judge Norma Holloway Johnson upheld it against a challenge by animal rights advocates in 1992. *Humane Soc'y of the U.S. v. Lujan*, 1992 U.S. Dist. Lexis 7503 (D.D.C. May 17, 1992) (denying preliminary injunction); *Humane Soc'y of the U.S. v. Lujan*, 1992 U.S. Dist. Lexis 16140 (D.D.C. Oct. 19, 1992) (granting summary judgment for government and FEI), *vacated on other grounds*, 46 F.3d 93 (D.C. Cir. 1995).

This Court has embraced Judge Johnson's decision in the instant case:

> This court has found that the Fish and Wildlife Service's interpretation of "commercial activity" is not unreasonable, accords with the legislative history of the ESA, and has been impliedly ratified by Congress through subsequent amendments to the ESA leaving the definition of "commercial activity" unchanged. *Humane Soc'y of the United States v. Babbitt*, 310 U.S. App. D.C. 228, 46 F.3d 93, 96 (D.C. Cir. 1995) (explaining the district court's application of the ESA's "commercial activity" requirement and vacating the district court's judgment on other grounds).

*ASPCA v. Ringling Bros.*, 233 F.R.D. 209, 214 (D.D.C. 2006).

Accordingly, the elephants discussed here in Part II.A meet the second part of the test for "pre-Act" status: they were held on June 14, 1976, and at all times thereafter, by a circus and, therefore, have not been held "in the course of a commercial activity." 16 U.S.C. § 1538(b)(1); 50 C.F.R. 17.4(a)(2).

Finally, these elephants have not been held for purposes that are contrary to the ESA. 50 C.F.R. 17.4(a)(1). They have been held for exhibition in a circus, and as shown above, neither Congress nor FWS has taken the position that exhibition of Asian elephants in a circus is contrary to the statute. Indeed, in 1993, FWS rejected a suggestion that it adopt a rule that would ban the use of lawfully held endangered species in entertainment. 58 Fed. Reg. 32632, 32634 (June 11, 1993). Thus, the Court should

find that the elephants discussed here in Part II.A are "pre-Act" and therefore not subject to any "taking" claim:  Assan, Baby, Bananna, Charlie, Cora, India, Jewell, Karen, Louie, Lutzi, Putzi, Siam I, Toby, Sarah, Susan and Zina.  DX 1 at 1-2.

> **B.     Elephants Acquired By FEI Prior To June 14, 1976, But Also Held By Other Exhibitors In The Interim**

FEI acquired Josky, Mala, Minyak, Sid, and Vance prior to June 14, 1976, and also held them on that date.  DX 1 at 20-21, 26-28, 40-41, 45-46; DSF ¶¶ 19, 22-23.  Therefore, like the elephants discussed in Part II.A, *supra*, these elephants qualify for the "pre-Act" exemption because, on the triggering date, they were held in captivity by an entity -- FEI -- that was not engaged in "commercial activity" and was not holding them for a purpose contrary to the ESA.  16 U.S.C. § 1538(b)(1)(A)-(B); 50 C.F.R. 17.4(a)(1)-(2).

The difference between this group and the elephants discussed in Part II.A above is that, at various times between 1976 and 1995 when they were reacquired by FEI, these elephants were also held by other persons or entities.  DX 1 at 20-21, 26-28, 40-41, 45-46; DSF ¶¶ 19, 22-23.  However, like FEI, each of these other holders was either a circus, a circus performer or an exhibitor of animals; none of them was an entity whose business was trafficking in endangered species.  *Id.*  Between 1976 and 1995, Josky, Mala, Minyak and Sid were held by Circus World, Inc., in Orlando, Florida, and Roman Schmitt of Tampa, Florida.  DSF ¶¶ 19 & 22.  Circus World, Inc., was an entity that exhibited Asian elephants in circus performances.  *Id.* ¶ 19.  Schmitt was a circus performer and exhibitor of Asian elephants at Busch Gardens, Tampa, Florida.  *Id.*  At certain points between 1976 and 1995, Vance was also held by Schmitt.  *Id.* ¶ 23.  From June 14, 1976 through the present date the only holders of these elephants have been FEI,

Circus World and Schmitt. *Id.* ¶¶ 19, 22 & 23.   ESA § 9(b)(1) contemplates that there

can be multiple holders of a "pre-Act" animal subsequent to the triggering date, provided

that the subsequent holding was not in the course of a "commercial activity." 16 U.S.C. §

1538(b)(1).   Here, the subsequent holders were all exhibitors and therefore were not

engaged in a "commercial activity" under the ESA as interpreted by FWS regulation.

Congress added the "subsequent holding" language to ESA § 9(b)(1) in 1982 in

order to adopt the result in *United States v. Kepler*, 531 F.2d 796, 797 (6th Cir. 1976),

holding that an animal that met the requirements for the "pre-Act" exemption on

December 28, 1973, could lose its exempt status through post-Act activities that require a

permit but that were conduced without one. *See* S. REP. NO. 97-418, *supra* note 8, at 24-

25.   Here, each of the transactions involving these elephants between 1976 and 1995 was

conducted pursuant to a permit issued by FWS under 50 C.F.R. § 17.22 (a) for

"enhancement of propagation or survival" of the species, or were intrastate transactions

that did not require a permit, 16 U.S.C. 1538(a)(1)(E). *See* DX 1 at 20-21, 26-28, 40-41,

45-46; DSF ¶¶ 19, 22-23.   Thus, the exemption remained intact, and the Court should

find that the elephants discussed here in Part II.B are "pre-Act" and therefore not subject

to any "taking" claim: Josky, Mala, Minyak, Sid, and Vance. DX 1 at 1-2.

**C.   Elephants Acquired By FEI After June 14, 1976**

FEI acquired Calcutta I and Mysore in 1986; Casey in 1989; Asia, Emma, Rajah

and Tova in 1990; and Sally in 1995, and has held each such animal continuously since

his or her respective date of acquisition. DX 1 at 6-7, 11-13, 14-15, 28-29, 33-34, 44-45;

DSF ¶¶ 25-31.   Each of these elephants was held by a circus, circus performer or animal

exhibitor on June 14, 1976, *id.*, and each of the successive holders between June 14, 1976

and FEI's acquisition also was a circus, circus performer or animal exhibitor, *id.*

Between 1976 and 1986, the only holders of Calcutta I and Mysore were Dailey Brothers Circus and Buckeye Circus Corporation – entities that exhibited Asian elephants in circus performances.  DSF ¶ 25.  All of Casey's holders between 1976 and 1989 were exhibitors or performers:  Lion Country Safari, "Have Trunk Will Travel," "Trunks and Humps" and Roman Schmitt.  *Id.* ¶ 26.  Between 1976 and 1990, the only holders of Asia, Emma, Rajah and Tova were exhibitors or performers:  "Bobby Moore's Performing Elephants," Vidbel Brothers Circus, Lyle Wesley Rice, Southwick Animal Park, Mendon, Massachusetts, the Miami MetroZoo, the Toledo Zoo and the International Animal Exchange, Ferndale, Michigan (an entity that, among other activities, exhibited elephants and exhibited Emma).  *Id.* ¶¶ 27-30.  Sally's only holders between 1976 and 1989 were Roman Schmitt and Busch Gardens, Tampa, Florida.  *Id.* ¶ 31.  Therefore, as shown above, none of these elephants was held on the triggering date or thereafter "in the course of a commercial activity" or for purposes contrary to the ESA.  Furthermore, each intervening transaction involving such animals was conducted either pursuant to a permit issued by FWS under 50 C.F.R. § 17.22(a) for "enhancement of propagation or survival of the species" or was an intrastate or other transaction not requiring a permit.  DSF ¶¶ 25-31.  Therefore, each of these elephants is "pre-Act" and not subject to any "taking" claim.

FEI acquired Alana, Banko, Icky II, Nicole and Siam II in 1980 and has held each of them continuously since 1980.  DX 1 at 3-4, 9-10, 17-18, 29-30, 39-40; DSF ¶ 24.  These elephants were bred in captivity in Myanmar (formerly Burma) in 1976 or earlier and were held on the triggering date by the Timber Corporation, a government-owned corporation in Myanmar that utilized elephants for logging activities.  *Id.*; DX 5 (FELD

0005516-18). The elephants were third generation born in captivity. DX 5 (FELD 0005514). The Timber Corporation was not a trafficker in endangered species, DSF ¶ 24, and, therefore, as shown above, this holding was not "in the course of a commercial activity" or for purposes contrary to the ESA. Moreover, FEI acquired these elephants pursuant to a permit issued by FWS under 50 C.F.R. § 17.22(a) for "enhancement of propagation or survival of the species." DX 1 at 3-4, 9-10, 17-18, 29-30, 39-40; DSF ¶ 24. These elephants likewise are "pre-Act." Accordingly, the Court should find that the elephants discussed here in Part II.C are "pre-Act" and therefore not subject to any "taking" claim: Alana, Asia, Banko, Calcutta I, Casey, Emma, Icky II, Mysore, Nicole, Rajah, Sally, Siam II and Tova. DX 1 at 1-2.

**D.    FWS Has Confirmed The Exempt Status Of Certain Of FEI's Asian Elephants**

In addition to the undisputed evidence discussed above, which, standing alone, demonstrates the regulatory status of FEI's "pre-Act" elephants, FWS has issued certificates confirming the exempt status of many of these elephants. On February 28, 1997, FWS issued a certificate finding that the following elephants are "pre-Act": Jewell, Karen, Lutzi, Mysore, Putzi, Siam I, Susan and Zina. DX 5 (FELD 0005535-37). Plaintiffs cannot dispute this.

Furthermore, at various times between 1981 and the present, FWS has issued certificates that certain of the elephants are "pre-Convention," *i.e.*, pre-CITES. *See* CITES, Art. VII.2 (where Management Authority issues a certificate that "the specimen was acquired before the provisions of the present Convention applied to that specimen," the CITES prohibitions "shall not apply to that specimen"); 50 C.F.R. § 23.13(c) (CITES prohibitions shall not apply when management authority (FWS) certifies that "the

wildlife . . . was acquired prior to the date the Convention applied to it"). CITES took effect on July 1, 1975, DSF ¶ 2, so an elephant acquired prior to the effective date of CITES necessarily was acquired prior to the ESA triggering date for Asian elephants, *i.e.*, June 14, 1976.  47 Fed Reg. at 24066.  In addition, the issuance of a "pre-Convention" certificate requires FWS to consider whether the wildlife "is to be used for primarily commercial activities," 50 C.F.R. § 23.15(d)(7), which parallels the "commercial activity" component of the statutory and regulatory "pre-Act" exemption, *see* 16 U.S.C. § 1538(b)(1)(A)-(B); 50 C.F.R. § 17.4(a)(1)-(2).  Therefore, due to the parallel nature of the respective criteria, a finding by FWS that an elephant is "pre-Convention" is tantamount to finding that that the elephant is "pre-Act."  FWS has certified that the following FEI elephants are "pre-Convention," thereby further confirming their status as "pre-Act:"   Assan, Asia, Baby, Banfanna, Calcutta I, Emma, Jewell, Karen, Lutzi, Minyak, Mysore, Rajah, Sarah, Susan, Toby and Zina.   DX 5 (FELD 0005242-43, 0005415, 0005135, 0005406, 0005566-68, 0005199, 0005268, 0005321, 0005599, 0005328); DX 7 (pp. 1-6).  Plaintiffs cannot dispute this either.

* * * *

In summary, because the following thirty-four (34) elephants are "pre-Act," the Court should enter summary judgment in favor of FEI and dismiss plaintiffs' "taking" claims with prejudice as to each such animal:  Alana, Asia, Assan, Baby, Banfanna, Banko, Calcutta I, Casey, Charlie, Cora, Emma, Icky II, India, Jewell, Josky, Karen, Louie, Lutzi, Mala, Minyak, Mysore, Nicole, Putzi, Rajah, Sally, Sarah, Siam I, Siam II, Sid, Susan, Toby, Tova, Vance and Zina. DX 1 at 1-2.

### III.   ANY "TAKING" CLAIM AS TO FEI'S CAPTIVE-BRED ELEPHANTS IS DEFEATED BY A PERMIT ISSUED TO FEI BY FWS

####   A.   Evolution of the Captive-Bred Wildlife Regulation

While the ESA prohibits "taking" and certain other activities regarding endangered species, it does not prohibit owning, holding or breeding endangered species in captivity.   Soon after the ESA was passed, lawful holders of captive-bred endangered species (that were not otherwise "pre-Act") encountered the problem that many routine husbandry practices regarding such species could be considered a "taking" under the expansive statutory definition of that term and, thus, could require a permit.   *See* 44 Fed. Reg. 30043, 30044 (May 23, 1979).   To resolve this dilemma, FWS, acting pursuant to the authority of the Secretary of the Interior under ESA § 10 to issue permits for otherwise prohibited "takings," promulgated the captive-bred wildlife ("CBW") regulation.   50 C.F.R. § 17.21(g), 44 Fed. Reg. 54001, 54007 (Sept. 17, 1979).   Permits issued pursuant to section 10 require opportunity for public comment.   16 U.S.C. § 1539(a)(2)(B).   While plaintiffs evidently believe that FWS has failed to observe notice-and-comment requirements in the issuance of FEI's CBW permits, *see* Compl. ¶ 6, FWS complied with these procedures when it adopted the CBW regulation after a full-scale notice-and-comment rulemaking proceeding.   *See* 43 Fed. Reg. 16143 (Apr. 14, 1978); 44 Fed. Reg. 30043 (May 23, 1979); 44 Fed. Reg. 54001 (Sept. 17, 1979).

The CBW regulation, which exists today in essentially the same form as it was adopted in 1979, provides, in pertinent part:

> Notwithstanding paragraphs (b), (c), (e) and (f) of this section [which prohibit, *inter alia*, "taking"], ***any person may take . . . any endangered wildlife that is bred in captivity in the United States*** provided . . . that the following conditions are met:

> (i)   The wildlife is of a species having a natural geographic distribution not including any part of the United States . . .;
>
> (ii)   The purpose of such activity is to enhance the propagation or survival of the affected species;
>
> (iii)   Such activity does not involve interstate or foreign commerce, in the course of a commercial activity with regard to non-living wildlife;
>
> (iv)   Each specimen of wildlife to be re-imported is uniquely identified by a band, tattoo or other means that was reported in writing to [FWS] at a port of export prior to export from the United States; and
>
> (v)   Any person subject to the jurisdiction of the United States who engages in any of the activities authorized by this paragraph does so in accordance with paragraphs (g)(2), (3) and (4) of this section and with all other applicable regulations in this Subchapter B.

50 C.F.R. § 17.21(g)(1) (emphasis added).  Paragraph (g)(2) requires the CBW holder to register with FWS and supply certain information concerning its CBW activities. Paragraph (g)(3) states the criteria for approval of the registration.  *Id.* § 17.21(g)(2)-(3).[11]  Thus, the CBW rule provides a safe harbor from "taking" claims for the activities that a qualified registrant undertakes as to captive-bred species.  That is, the rule expressly authorizes the "taking" of captive-bred endangered species.

The CBW regulation rests upon FWS's view that the purposes of the ESA are to conserve the ecosystems of native endangered species, to provide a conservation program for such species and to implement the United States' agreement to CITES.  43 Fed. Reg. at 16144.  FWS concluded that the best way to serve these purposes is to "conserv[e] species *in the wild* along with their ecosystems."  *Id.* (original emphasis).  Accordingly, while captive-bred endangered species are not exempt from the ESA, FWS determined

---

[11]     Paragraph (g)(3) also imposes recordkeeping and reporting requirements on registrants.  Paragraph (g)(4) states certain requirements that apply in the event that the registrant relinquishes control of species transported in foreign commerce.  50 C.F.R. § 17.21(g)(4).

that they should be regulated "only to the extent necessary to conserve the species."  44

Fed. Reg. at 54002.  FWS concluded further that there was even less reason for rigid

regulation of captive-bred exotic (*i.e.*, non-native) endangered species; such animals are

not found in the wild in the United States, and therefore pose little risk that illegally

caught specimens could be passed off as "captive-bred."  44 Fed. Reg. at 30045-46.

Therefore, the CBW regulation grants holders of captive-bred exotic endangered species

"general permission" (under the conditions specified by the rule) to engage in activities

that otherwise could be a prohibited "taking" without having to apply for and obtain

individual permits for each such activity.  44 Fed. Reg. at 54002.  As FWS explained:

> Considering that persons may be permitted to undertake
> otherwise prohibited activities for the purpose of enhancing
> the propagation or survival of the affected species, the
> Service believes that a wide range of activities involved in
> maintenance and propagation of captive wildlife should
> readily be permitted when wild populations are sufficiently
> protected from unauthorized taking, and when it can be
> shown that such activities would not be detrimental to the
> survival of wild or captive populations of the species.

*Id.*  Because Congress "delegated broad administrative and interpretive power to the

Secretary," the CBW rule is controlling in this case.  *See Babbitt v. Sweet Home Ch. of*

*Comm. for a Greater Oregon*, 515 U.S. 687, 708 (1995) ("[f]ashioning appropriate

standards for issuing permits under § 10 for takings that would otherwise violate § 9

necessarily requires the exercise of broad discretion. . . .  When Congress has entrusted

the Secretary with broad discretion, we are especially reluctant to substitute our views of

wise policy for his").

As shown below, FEI is a qualified registrant with regard to all twenty-one (21) of

its captive-bred Asian elephants.  FEI has registered with FWS under the CBW rule and

has obtained a CBW permit, following a determination by FWS that FEI meets the

31145751.1

conditions specified by the CBW rule. Therefore, FEI is not subject to any of plaintiffs' "taking" claims with respect to those Asian elephants owned or held by FEI that were bred in captivity in the United States.

**B.  FEI's CBW Permit Defeats Plaintiffs' Private Cause Of Action For Any "Taking" Of FEI's Elephants Bred In Captivity In The United States**

FEI currently holds a section 17.21(g) CBW permit: "Federal Fish and Wildlife Permit" No. MA720230-0, issued by FWS on February 14, 2006, which expires on February 12, 2009. DX 9. This permit renewed a prior CBW permit and is one of several that FWS has issued to FEI since 1979. DSF ¶ 51. FEI has had a valid CBW permit at all times since the inception of this lawsuit (and the predecessor lawsuit filed in 2000). *Id.* The current CBW permit is valid and effective. *Id.* FWS has never revoked or suspended any of the CBW permits issued by the agency to FEI. *Id.*

By approving FEI's application, FWS necessarily found that FEI had met the conditions specified by the CBW rule, namely, that: (1) the wildlife involved (Asian elephants) is not native to the United States; (2) FEI's activities will enhance the propagation and survival of the species; (3) the activities will not involve commerce in non-living wildlife; (4) the wildlife is uniquely identified; and (5) FEI had satisfied the registration and other requirements of paragraphs (g)(2)-(4). *See* 50 C.F.R. § 17.21(g)(1)(i)-(v). Accordingly, FWS issued FEI a permit which expressly authorizes the permittee – FEI – "to *take for normal husbandry practices[,]* deliver, receive, carry transport or ship in interstate commerce for the purpose of enhancement of propagation or survival, *any Asian elephant* (ELEPHAS MAXIMUS) . . . *that is born in captivity in the United States.*" DX 9 (emphasis added). This permit applies to all of the twenty-one

(21) FEI Asian elephants that were bred in captivity in the United States.  DX 1 at 4-6, 10-11, 13-14, 16-19, 21-26, 30-32, 34-38, 43-44; DSF ¶¶ 32-46.

By approving FEI's application, FWS necessarily found that normal husbandry practices as applied by FEI to its Asian elephants would "enhance the propagation or survival of the affected species," 50 C.F.R. § 17.21(g)(1)(ii) -- because that criterion is one of the conditions that FWS was required to consider prior to granting FEI's application, *see id.* § 17.21(g)(3).  Accordingly, the only remaining question is whether the husbandry practices that plaintiffs challenge in this case -- use of the guide, tethering and weaning -- are "normal husbandry practices" as referred to in FEI's CBW permit. The facts are undisputed that they are.

### 1.      The guide, tethering and weaning are "normal husbandry practices" covered by FEI's CBW permit

The guide, tethering and weaning clearly are "husbandry practices."  All of these activities fall within standard veterinary definitions of "animal husbandry."  *See* DX 8 (SAUNDERS COMPREHENSIVE VETERINARY DICTIONARY at 63 (2d ed. 1999) (defining "animal husbandry" to include "nutrition, genetics and breeding, housing, handling facilities and techniques, hygiene, sanitation, health maintenance and disease prevention, marketing, preparation for contests, physical and psychological training, culling, management in times of drought or other civil disaster, use of animal experiments and codes of practice for the management and transport of various classes of animals")).

It is equally clear that these husbandry practices are "normal."  The guide, tethering and weaning are standard and generally accepted methods for handling captive Asian elephants in circuses, zoos and other institutions around the world.  FEI has used the guide and tethering for the more than 100 years in which Asian elephants have

appeared in FEI's shows and has weaned Asian elephants from their mothers since it began breeding Asian elephants in captivity. DSF ¶ 49. All of these activities are recognized by industry standards as normal and generally accepted husbandry practices with respect to captive Asian elephants. *Id.*; ELEPHANT HUSBANDRY RESOURCE GUIDE at 65-70, 148-49 (DX 4).

In short, while plaintiffs evidently have some kind of philosophical objection to the guide, tethering and weaning, there is no question that such practices are normal husbandry practices with respect to captive-bred Asian elephants in circuses, zoos and other institutions. DSF ¶ 50; DX 4 at 65 ("[t]he guide is used in many facilities throughout the elephant management continuum"); *id.* at 67 ("[l]eg restraints or tethers are an acceptable and necessary tool in the management of captive elephants"); *id.* at 149 ("[s]eparation and weaning of young domestic animals is a common practice. . . . Elephant calves are no exception . . .").[12] And FEI has been explicitly authorized by the CBW permit issued by FWS to engage in such practices with respect to Asian elephants bred in captivity in the United States -- even if assuming for purposes of this motion that the practices could be characterized as a "taking" as defined by the ESA. DX 9. In other words, the CBW permit provides FEI with a safe harbor for any claim that it is "taking" its captive-bred Asian elephants and is an absolute defense to plaintiffs' "taking" claims. 50 C.F.R. § 17.21(g)(1).

The validity of FEI's CBW permit -- which plaintiffs apparently question -- cannot be raised in this case. FWS is not a party, and it is elementary that agency action

---

[12]     Indeed, the anti-circus propaganda of one plaintiff, the Animal Protection Institute, characterizes the guide as a "standard" practice. *See* http://www.api4animals.org/facts?p=427&more=1.

cannot be challenged in a suit to which the agency in question is not a party.[13]  *Bennett v. Spear*, 520 U.S. 154, 173 (1997); *see also Auer v. Robbins*, 519 U.S. 452, 459 (1997) (stating that "there is no basis for the court to set aside the agency's action prior to any application for relief addressed to the agency itself," where the claim was that an agency's action was arbitrary and capricious);  *Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 100 (D.D.C. 2004) ("the appropriate way to challenge a longstanding regulation as violative of a statute is to file a petition for amendment or rescission and then challenge the denial of that petition") (citing *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213-14 (D.C. Cir. 1996)).

### 2. Plaintiffs cannot sue FEI under ESA § 11(g) for alleged permit violations

Plaintiffs apparently anticipated this roadblock, and instead of directly challenging the validity of FEI's permit, they contend that FEI's husbandry practices are not authorized by the permit.  *E.g.*, Compl. ¶ 59 (the CBW "permit does not allow [defendant] to forcibly remove baby elephants from their mothers").  That is, plaintiffs evidently contend that the guide, tethering and weaning -- as FEI has employed them -- are not "normal husbandry practices" within the scope of the CBW permit.  This claim is not correct, but even assuming its truth for purposes of this motion, plaintiffs cannot raise it in a "citizen suit" under section 11(g) of the ESA.  ESA § 11(g) authorizes a private suit only for violations of the ESA or the regulations issued under the ESA.  It says nothing about private suits for another private party's alleged violation of a *permit*.  16 U.S.C. § 1540(g).

---

[13] Typically, when a party takes issue with the way a regulation is enforced, it brings an action against the agency itself, not those who are governed by the regulation.  *See, e.g.*, *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998); *The Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005).  Plaintiffs know this but chose not to do so.

31145751.1

The omission of permit violations by Congress from ESA § 11(g) was intentional. ESA § 11(g) was patterned after a provision contained in the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1415(g)(1). *See* H.R. REP. NO. 93-412 at 19 (1973). However, while the latter statute does include permit violations within the scope of a private citizen suit, ESA § 11(g) does not. Instead, Congress decided to remedy ESA permit violations *exclusively* by government enforcement action: (i) by action of the Secretary of the Interior to impose civil penalties under ESA § 11(a), 16 U.S.C. § 1540(a), after the Secretary has pursued an elaborate administrative procedure against the permittee, *see* 50 C.F.R., Part 11; (ii) through administrative or judicial seizure or forfeiture action by the Secretary under ESA § 11(e), 16 U.S.C. § 1540(e); 50 C.F.R., Part 12; or (iii) in a criminal prosecution by the United States under ESA § 11(b), 16 U.S.C. § 1540(b). Private parties have no role in the enforcement of ESA permits. *Environmental Protection Information Ctr. v. FWS*, 2005 U.S. Dist. Lexis 30843 at *22 (N.D. Cal. 2005) ("[p]laintiffs may not seek permit enforcement directly under ESA"); *Atlantic Green Sea Turtle v. County Council*, 2005 U.S. Dist. Lexis 38841 at *43-44 (M.D. Fla. 2005) (dismissing a "citizen suit" claim that a private party was violating a permit issued by FWS; "the ESA's citizen suit provision provides, in relevant part, for suits to enjoin violations only of the ESA and related regulations. The ESA, itself, simply does not provide a private enforcement mechanism covering the terms and conditions of incidental take permits").

Accordingly, even if plaintiffs could muster the evidence to do so (which they cannot), they cannot engender a debate about the "normalcy" of FEI's husbandry practices in order to create an issue of fact. Any claim by plaintiffs that FEI's husbandry

practices are not "normal" is a claim that FEI is violating its permit, but whether or not FEI is violating its permit is a question that the Court has no jurisdiction or authority to consider under ESA § 11(g). Only the Secretary of the Interior is authorized to pursue such an action.

Plaintiffs' other effort to boot-strap themselves into a cause of action likewise fails. Plaintiffs claim that, because ESA § 11(g) refers to violations of the regulations, plaintiffs may sue for violations of two of FWS' general permit regulations: (1) 50 C.F.R. § 13.41, which requires animals held under permits to be maintained in "humane and healthful conditions;" and (2) 50 C.F.R. § 13.48, which requires permittees to comply with "all applicable laws and regulations governing the permitted activity." Compl. ¶ 45. However, these regulations apply to FEI only by virtue of the CBW permit and are conditions of that permit. DX 9. As the court in *Atlantic Green Sea Turtle* ruled, determining whether these regulations have been observed would be determining whether permit conditions have been observed, and determining whether permit conditions have been observed cannot be done in a citizen suit under ESA § 11(g):

> The Conservationists correctly point out that a regulation requires "any person holding a permit under [the ESA] and any person acting under authority of such permit [to] comply with all conditions of the permit and with all applicable laws and regulations governing the permitted activity." 50 C.F.R. § 13.48. That point is to no avail. *No injunction would be available to enforce such a general requirement because it would require nothing less than the Court to police the County's permit compliance. The ESA places that duty exclusively on the Secretary. Id. §* 1540(a), (e). Furthermore, it is the executive (not the judicial) branch that is generally charged with such duties. See U.S. CONST. Art. II § 3.

2005 U.S. Dist. Lexis 38841 at *44 n.8 (emphasis added).

Plaintiffs have made the Secretary and FWS aware of plaintiffs' allegations that FEI's use of the guide, tethering and weaning are a "taking" under the ESA.  DSF ¶ 49. However, neither the Secretary nor FWS has ever indicated to FEI that they agree with plaintiffs or taken any action to revoke or suspend FEI's CBW permit.  *Id.* ¶ 52.  While plaintiffs evidently disagree with the Secretary and FWS on this point, neither the Secretary nor FWS is a party to this case, and, even if they were, their decisions not to pursue any form of enforcement action against FEI would not be judicially reviewable. *Heckler v. Chaney*, 470 U.S. 821, 834-35 (1985).  *See also Block v. SEC*, 50 F.3d 1078, 1081 (D.C. Cir. 1995); *Save Energy Coalition v. NRC*, 866 F.2d 1473, 1476 (D.C. Cir. 1989); *Environmental Protection Information Ctr.*, 2005 U.S. Dist. Lexis  at *25-31; *Atlantic Green Sea Turtle*, 2005 U.S. Dist. Lexis at *51-52.  Plaintiffs are inappropriately attempting to evade this established limit on judicial review.

Furthermore, "humane and healthful conditions" under 50 C.F.R. § 13.41 are judged by reference to the standards prescribed by the AWA, as administered by APHIS. From the inception of the CBW program in 1979, FWS has made it clear that the care and maintenance of wildlife subject to CBW registration would be governed by AWA standards, which FWS concluded "are generally adequate to ensure proper care of wildlife."  44 Fed. Reg. at 30046.  *See also* 44 Fed. Reg. 54002, 54003 (Sept. 17, 1979) (final CBW regulation retained USDA standards as the baseline in order to "avoid[] the need for developing detailed federal standards for the maintenance and propagation of various types of wildlife . . .").  Section 13.41 was adopted in 1989 against this backdrop, 54 Fed. Reg. 38142, 38150 (Sept. 14, 1989), leaving undisturbed FWS's longstanding

31145751.1

practice of relying upon the AWA, as administered by APHIS, for ensuring that the care and maintenance of captive-bred wildlife is adequate.

In 1998, FWS applied this approach to all captive endangered species when it amended the regulatory definition of "harass" within the definition of "take." That rulemaking was prompted by concern that routine animal husbandry activities conducted by persons lawfully in possession of captive wildlife might constitute harassment under a literal application of the then-existing definition of "harass." 63 Fed. Reg. 48634, 48638 (Sept. 11, 1998). Thus, "harass" in the regulations was amended to explicitly *exclude* "[a]nimal husbandry practices that meet or exceed the minimum standards and care under the Animal Welfare Act." 50 C.F.R § 17.3, 63 Fed. Reg. at 48639 (definition of "harass"). FWS reiterated that, "[t]o evaluate facilities and care provided by [CBW] applicants, the Service will continue to consult with experts such as . . . [APHIS] which is charged with administering the Animal Welfare Act . . . ." *Id.* at 48636. Consequently, a party that engages in generally accepted animal husbandry practices with respect to captive or captive-bred wildlife that comply with the AWA is not "harassing," and therefore not "taking," that wildlife. Stated differently, AWA-compliant husbandry practices are "humane and healthful" within the meaning of the general permit condition set forth in 50 C.F.R. § 13.41.

Through complaints by plaintiffs and other animal rights groups, as well as its own inspections, APHIS has been well aware of the three husbandry practices at issue here, but has never issued a final agency decision that FEI's use of the guide, tethering or weaning violates the AWA. DSF ¶ 54. While plaintiffs evidently disagree with APHIS's actions in this regard, *see* DX 12 at 20-23, they have no recourse in the present suit:

neither APHIS nor USDA is a party to this case, and even if they were, their enforcement decisions would not be judicially reviewable either. *Heckler*, 470 U.S. at 834-35; *Moor-Jankowski v. Bd. of Tr. of NYU*, 1998 U.S. Dist. Lexis 4006 at *10-12 (S.D.N.Y. 1998) (USDA decision not to take enforcement action is not judiciously reviewable); *Animal Legal Defense Fund, Inc. v. Glickman*, 943 F. Supp. 44, 62-63 (D.D.C. 1996) (same), *vacated on other grounds*, 130 F.3d 464 (D.C. Cir. 1997).[14]

Plaintiffs also get nowhere by claiming that, since 50 C.F.R. § 13.48 requires FEI to comply with other applicable laws, including the AWA, plaintiffs can sue FEI under ESA § 11(g) for what they claim are FEI's AWA violations. *See* Compl. ¶ 45. There is no private cause of action under the AWA, and section 13.48 does not create one. Nor is there any indication that Congress, which has never enacted a private cause of action in the AWA itself, intended to create a private cause of action to enforce the AWA under the guise of a "citizen suit" brought pursuant to the ESA. To the contrary, the ESA states that "[n]othing in this Act . . . shall be construed as superseding or limiting in any manner the functions of the Secretary of Agriculture under any other law relating to . . . possession of animals . . . ." 16 U.S.C. § 1540(h). Thus, it is clear that Congress confined the power to enforce the AWA solely to the USDA. The AWA cannot be enforced through private action under the ESA, which is what plaintiffs are improperly trying to do here.[15]

---

[14]     In fact, USDA has ruled, in a case not involving FEI, that an elephant handler's use of a guide to control the animal, even when such use caused a bleeding wound, was not a violation of the AWA. *See In re John F. Cuneo, et al.*, AWA Docket No. 03-0023, Secretary of Agriculture, Decision and Order as to James G. Zajicek (May 2, 2006), *affirming* Chief Administrative Law Judge, Decision as to James G. Zajicek (Aug. 17, 2005) (DX 13).

[15]     Plaintiffs' insinuation that APHIS does not enforce the AWA against circuses (which plaintiffs evidently hope will persuade the Court to usurp APHIS' functions) is not accurate. *See In re John D. Davenport d/b/a King Royal Circus*, 57 Agric. Dec. 189, 1998 USDA Lexis 166 (1998) (imposing civil penalties and license revocation on circus operator for AWA violations with respect to his elephants).

31145751.1

There is no dispute that the following Asian elephants owned by FEI were born and bred in captivity in the United States:  Angelica, Aree, Asha, Bonnie, Cora (also "pre-Act"), Doc "Fish," Gunther, Irvin, Juliette, Kelly Ann, Luna, Mable, Osgood, P.T., Prince Tusk, Romeo, Rudy, Sabu, Sara, Shirley, and Tonka.  *See* DX 1 at 1-2.  All of these elephants are subject to FEI's CBW permit.  DX 9.  Therefore, the Court should grant summary judgment on plaintiffs' "taking"  claims with respect to all of these animals.

## CONCLUSION

Defendant's motion for summary judgment should be granted.  The Court should enter final judgment for defendant, dismissing all of the plaintiffs' claims with prejudice.

Respectfully Submitted,

John M. Simpson (D.C. Bar #256442)
Joseph T. Small, Jr. (D.C. Bar #926519)
Lisa Zeiler Joiner (D.C. Bar #465210)
Michelle C. Pardo (D.C. Bar #456004)

FULBRIGHT & JAWORSKI L.L.P.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-0200
Facsimile: (202) 662-4643

ATTORNEYS FOR DEFENDANT
FELD ENTERTAINMENT, INC.

Dated: **Sept. 5**, 2006

**EXHIBIT LIST**

| <u>Exhibit ("DX") No.</u> | <u>Description</u> |
|---|---|
| 1. | Regulatory Status of Asian Elephants Currently Owned by Feld Entertainment, Inc. – Summary and Detail. |
| 2. | Declaration of Gary Jacobson (8-31-06). |
| 3. | Declaration of Jerome S. Sowalsky (9-5-06). |
| 4. | ELEPHANT HUSBANDRY RESOURCE GUIDE (title page, preface, pp. 1-6, 65-70, 148-49). |
| 5. | Composite exhibit of documents produced to plaintiffs in discovery that are cited in DX 1, organized by "FELD" or "FEI" "Bates number." |
| 6. | Portions of ASIAN ELEPHANT NORTH AMERICAN REGIONAL STUDBOOK, 1 JANUARY 2003- 30 APRIL 2005 cited in DX 1 and introductory and explanatory sections. |
| 7. | Composite exhibit of other documents cited in DX 1. |
| 8. | SAUNDERS COMPREHENSIVE VETERINARY DICTIONARY (2d ed. 1999) (title page, p. 63). |
| 9. | Federal Fish and Wildlife Permit No. MA720230-0 (2-14-06). |
| 10. | Association of Zoos and Aquariums, *AZA Elephant Masterplan 1979-2002* (1997) (title page, pp. 11-13). |
| 11. | Letter from C. R. Bavin to FEI (11-4-75). |
| 12. | Deposition of Lisa Weisberg (July 19, 2005) (pp. 21-23, 45-47, 105-40, 230 and Exhibits 12-18 (A00801, A00804-06, A00819-40)). |
| 13. | *In re John F. Cuneo, et al.*, AWA Docket No. 03-0023, Secretary of Agriculture, Decision and Order as to James G. Zajicek (May 2, 2006), *affirming* Chief Administrative Law Judge, Decision as to James G. Zajicek (Aug. 17, 2005). |

31145751.1

- 36 -

14.                         Deposition of Troy J. Metzler (7-25-06) (pp. 30-31,
                            43-44, 49, 52).