**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ )<br>AMERICAN SOCIETY FOR THE          )<br>PREVENTION OF CRUELTY            )<br>TO ANIMALS, *et al.*,            )<br>                                 )<br>          Plaintiffs,            )<br>                                 )<br>     v.                          )<br>                                 )<br>RINGLING BROTHERS AND BARNUM      )<br>& BAILEY CIRCUS, *et al.*,        )<br>                                 )<br>          Defendants.            )<br>_____)  | Civ. Action No. 03-2006 (EGS) |

**MEMORANDUM OPINION**

Plaintiffs American Society for the Prevention of Cruelty to Animals, Animal Welfare Institute, The Fund for Animals, Tom Rider, and Animal Protection Institute[1] have filed a lawsuit under the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. § 1531 *et seq.*, against Ringling Brothers and Barnum & Bailey Circus and Feld Entertainment, Inc. ("FEI")[2] for "taking" Asian elephants in violation of the ESA.  Pending before the Court is

_____

[1] The Animal Protection Institute was not a party to the original Complaint.  However, they joined in the lawsuit via a Supplemental Complaint filed on October 27, 2005, which the Court granted leave to file on February 23, 2006.  The Animal Protection Institute raises the same claim as the original plaintiffs.  All references to the Complaint refer to the original Complaint unless otherwise indicated.

[2] Ringling Brothers and Barnum & Bailey Circus is a trade name under which FEI presents circuses.  It is not a legal entity.  *See* Def.'s Statement of Material Facts ¶ 1.  Accordingly, FEI is the only defendant in this case.

defendant's Motion for Summary Judgment.  Upon consideration of the motion, response and reply thereto, applicable law, and the entire record, the Court **grants in part and denies in part** defendant's motion.  The Court grants summary judgment to defendant as to the elephants subject to a captive-bred wildlife permit and denies summary judgment as to the elephants for which defendant claims a "pre-Act" exemption.

## I.    BACKGROUND

Plaintiffs allege that FEI routinely beats elephants, chains them for long periods of time, hits them with sharp bull hooks, breaks baby elephants with force to make them submissive, and forcibly removes baby elephants from their mothers before they are weaned.  Compl. ¶ 1.  Plaintiffs claim that this conduct violates the take provision of the ESA, *see* 16 U.S.C. § 1538.

On September 5, 2006, defendant FEI filed a motion for summary judgment arguing that plaintiffs' claim that FEI is "taking" Asian elephants in violation of section 9(a)(1)(B) of the ESA, 16 U.S.C. § 1538(a)(1)(B), fails as a matter of law for two reasons.  FEI argues that all of the elephants at issue in this lawsuit either (1) fall under the "pre-Act" species exemption to the ESA, *see* 16 U.S.C. § 1538(b)(1); 50 C.F.R. 17.4; or (2) were bred in captivity in the United States and are subject to a valid captive-bred wildlife ("CBW") permit issued by the United States Fish and Wildlife Service ("FWS").

## II.   STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F. 3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005).  "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Colbert v. Potter*, 471 F.3d 158, 164 (D.C. Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[S]ubstantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

Ordinarily, summary judgment is "proper only after the plaintiff has been given adequate time for discovery."  *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988).  As a general rule, "decision by summary judgment is

disfavored when additional development of facts might illuminate the issues of law requiring decision." *Nixon v. Freeman*, 670 F.2d 346, 362 (D.C. Cir. 1982).  Rule 56(f) of the Federal Rules of Civil Procedure provides a mechanism for a party opposing a motion for summary judgment to indicate that they have not had adequate discovery to be able to respond to the motion.  Rule 56(f) states that

> Should it appear from the affidavits of a party
> opposing the motion [for summary judgment] that the
> party cannot for reasons stated present by affidavit
> facts essential to justify the party's opposition, the
> court may refuse the application for judgment or may
> order a continuance to permit affidavits to be obtained
> or depositions to be taken or discovery to be had or
> may make such other order as is just.

Fed. R. Civ. P. 56(f).  "[T]he purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Mkt. Group, Inc.*, 2003 U.S. Dist. LEXIS 11791, at *7 n.5 (D.D.C. Mar. 18, 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).  Insufficient time or opportunity to engage in discovery is sufficient cause to defer decision on a summary judgment motion.  *Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005).  A party making a Rule 56(f) request, however, "must 'state[] concretely' why additional discovery is needed to oppose a motion for summary judgment." *Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006) (quoting

*Strang v. United States Arms Control & Disarmament Agency*, 864
F.2d 859, 861 (D.C. Cir. 1989)); *see also Byrd v. United States
EPA*, 174 F.3d 239, 248 (D.C. Cir. 1999) (finding that a party
seeking further discovery under Rule 56(f) has to state "what
facts he intended to discover that would create a triable issue
and why he could not produce them in opposition to the motion").
Conclusory allegations without any supporting facts are not
sufficient to justify additional discovery. *Messina*, 439 F.3d at
762.

## III. ANALYSIS

Plaintiffs allege that defendant is "taking" Asian elephants
in violation of Section 9 of the Endangered Species Act. *See* 16
U.S.C. § 1538.  Section 9 of the Act makes it unlawful, with
certain exceptions, for any person subject to the jurisdiction of
the United States to "take" any endangered species of fish or
wildlife "within the United States or the territorial sea of the
United States."  16 U.S.C. § 1538(a)(1)(B).  To "take" an
endangered species means to "harass, harm, pursue, hunt, shoot,
wound, kill, trap, capture, or collect, or to attempt to engage
in any such conduct."  16 U.S.C. § 1532(19).  FWS regulations
further define "harass" as used in the definition of "take" in
Section 9 to mean "an intentional or negligent act or omission
which creates the likelihood of injury to wildlife by annoying it
to such an extent as to significantly disrupt normal behavioral

patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. When applied to "captive wildlife," the definition of "harass" does not include (1) "[a]nimal husbandry procedures that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act"; (2) "[b]reeding procedures"; and (3) "[p]rovisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife." *Id*. The term "harm" as used in Section 9(a)(1)(B) of the Act means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id*.

Defendant argues that all the elephants at issue in this suit are either (1) excluded from the taking prohibition in Section 9 of the ESA by the Act's exemption for "pre-Act" species, *see* 16 U.S.C. § 1538(b)(1); 50 C.F.R. § 17.4; or (2) were bred in captivity in the United States and are subject to a valid CBW permit, which explicitly authorizes FEI to "take" the elephants.

**A.    Applicability of Pre-Act Exemption to the Take Prohibition**

Section 9(b) of the Act provides that the provisions of subsections (a)(1)(A) and (a)(1)(G) of the Act do not apply to any fish or wildlife which was held in captivity or in a controlled environment on December 28, 1973 or the date of publication in the Federal Register of the final regulation adding such species to the list of endangered species, provided that "such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity."  16 U.S.C. § 1538(b)(1).[3]  The Asian elephant (elephas maximus) was listed as an endangered species by FWS pursuant to Section 4 of the ESA on June 14, 1976.  *See* 48 Fed. Reg. 24062, 24066 (June 14, 1976); 50 C.F.R. § 17.11.  Section 9(a)(1)(A) prohibits the import of endangered species into or export of endangered species from the United States.  16 U.S.C. § 1538(a)(1)(A).  Section 9(a)(1)(G) makes it unlawful to "violate any regulation pertaining to such species or to any threatened species of fish

---

[3] The ESA defines commercial activity as "all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: [p]rovided, however, [t]hat it does not include exhibition of commodities by museums or similar cultural or historical organizations."  16 U.S.C. § 1532(2).  FWS regulations define "industry or trade" as used in the definition of commercial activity to mean "the actual or intended transfer of wildlife or plants from one person to another person in the pursuit of gain or profit."  50 C.F.R. § 17.3.

or wildlife listed pursuant to section 4 of this Act [16 U.S.C.
§ 1533] and promulgated by the Secretary pursuant to authority
provided by this Act."

The regulations promulgated by FWS provide that the
prohibitions laid out in Subparts C and D of Part 17 of Title 50,
Chapter I, Subchapter B "shall not apply to any activity
involving endangered or threatened wildlife which was held in
captivity or in a controlled environment on December 28, 1973,"
provided that (1) "the purposes of such holding were not contrary
to the purposes of the Act," and (2) "the wildlife was not held
in the course of commercial activity."  50 C.F.R. § 17.4.
Subpart C of Part 17 applies to endangered species and Subpart D
applies to threatened species.  Section 17.21 of Subpart C, which
governs endangered species such as Asian elephants, provides that
except as provided in Subpart A (which includes 50 C.F.R.
§ 17.4), or under permits issued pursuant to sections 17.22 or
17.23, "it is unlawful for any person subject to the jurisdiction
of the United States to commit, to attempt to commit, to solicit
another to commit or to cause to be committed, any of the acts
described in paragraphs (b) through (f) of this section in regard
to any endangered wildlife."  50 C.F.R. § 17.21.  Paragraph (c)
of section 17.21 provides that it is "unlawful to take endangered
wildlife within the United States, within the territorial sea of
the United States, or upon the high seas."  50 C.F.R. § 17.21(c).

8

Although acknowledging that the statute is worded "slightly differently" than the regulations, defendant reads that statute and regulations together to provide that an Asian elephant is not subject to the "taking" prohibition if (1) the elephant was held in captivity or a controlled environment on June 14, 1976 (the date the Asian elephant was added to the endangered species list; (2) the holding on the triggering date and subsequent holdings were not "in the course of commercial activity"; and (3) the holdings were not contrary to the purposes of the ESA.  *See* Def.'s Mot. for Summ. J. at 15.  Defendant argues that 34 of its elephants meet these standards and should be designated as "pre-Act" elephants that are exempt from the taking prohibition in the ESA.

Plaintiffs counter that the "pre-Act" exemption does not apply to the "take" prohibition of Section 9 of the ESA.  Section 9(b)(1) of the statute, which contains the relevant "pre-Act" exemptions states as follows:

> The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 4 of this Act [16 U.S.C. § 1533(c)]: Provided, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity.  With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in

the Federal Register of a final regulation adding such
fish or wildlife species to any list published pursuant
to subsection (c) of section 4 of this Act [16 U.S.C. §
1533(c)], there shall be a rebuttable presumption that
the fish or wildlife involved in such act is not
entitled to the exemption contained in this subsection.

16 U.S.C. § 1538(b)(1).  Plaintiffs read the plain language of
the statute to state that Section 9 contains a "grandfather
clause" or "pre-Act" exemption only as to subsections (a)(1)(A)
and (a)(1)(G) of the statute (which cover imports, exports, and
violations of regulations).  Plaintiffs argue that neither
subsection (A) nor subsection (G) includes the "take" provision
in Section 9, which is found in subsection (B).  *See* 16 U.S.C.
§ 1538(a)(1)(B).  Plaintiffs further argue that the regulation,
50 C.F.R. § 17.4, conflicts with the plain language of the
statute.

Under the familiar *Chevron* doctrine, "if the intent of
Congress is clear, that is the end of the matter; for the court,
as well as the agency, must give effect to the unambiguously
expressed intent of Congress."  *Chevron USA, Inc. v. Natural Res.
Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  "If 'Congress
has not directly addressed the precise question at issue,' and
the agency has acted pursuant to an express or implicit
delegation of authority, the agency's interpretation of the
statute is entitled to deference so long as it is 'reasonable'
and not otherwise 'arbitrary, capricious, or manifestly contrary

to the statute.'" *Cellular Telecoms. & Internet Ass'n v. FCC*, 330
F.3d 502, 507 (D.C. Cir. 2003).

Relying on the Supreme Court's decision in *Bennett v. Spear*,
520 U.S. 154, 173 (1997), defendant counters that even if the FWS
regulation exceeds statutory authority, plaintiffs cannot raise
such a claim in a private right of action under the ESA.  *See
id.*, 520 U.S. at 173 (finding that the "citizen suit" provision
of Section 11(g) of the ESA is a means by which "private parties
may enforce the substantive provisions of the ESA against
regulated parties . . . but it is not an alternative avenue for
judicial review of the Secretary's implementation of the
statute").  Defendant argues that plaintiffs' regulatory
"invalidity" argument can only be brought under the
Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 704.

Neither *Bennett* nor any other case cited by defendant
addresses the issue of whether plaintiffs can raise a *Chevron*
challenge to a regulation that appears to contradict a statute.
As the citizen suit provision of the ESA gives plaintiffs
authority to challenge a taking and defendant has raised the
regulation as a defense to their taking, plaintiffs are not
prohibited from raising a *Chevron* challenge to the regulation.
*See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d
930, 947 (D.C. Cir. 2004) (citing with approval decisions from
other circuits holding that challenges to agency policies may be

aired in lawsuits where the agency is not a defendant, "to the extent that the defendant . . . attempts to justify its actions by reference to those policies").  Defendant has not cited any cases, and the Court is not aware of any, where any court has said that a plaintiff cannot raise a *Chevron* challenge to a regulation that clearly conflicts with a statute in a suit against a private party.

Applying the *Chevron* Step I analysis to Section 9(b)(1) of the ESA, the Court finds that the statute is unambiguous and therefore controls.  The intent of Congress is clear that the "pre-Act" exemption only applies to otherwise prohibited imports and exports of endangered species, 16 U.S.C. § 1538(a)(1)(A), and violations of "any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 4 of this Act [16 U.S.C. § 1533] and promulgated by the Secretary pursuant to authority provided by this Act," 16 U.S.C. § 1538(a)(1)(G).  By specifically referencing subsections (a)(1)(A) and (a)(1)(G) as the subsections to which the "pre-Act" exemption applies, the Court assumes that Congress intended to exclude subsections (a)(1)(B) through (a)(1)(F).  *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" (quoting *Botany Worsted Mills v. United States*, 278 U.S. 282, 289

(1929))); *Ethyl Corp. v EPA*, 51 F.3d 1053, 1061-62 (D.C. Cir. 1995) (applying the familiar maxim of statutory construction *expressio unius est exclusio alterius*, meaning, "mention of one thing implies exclusion of another thing." (citation and internal quotation marks omitted)).

Moreover, Section 9(b)(1) of the ESA as originally passed in 1973 provided a wholesale "pre-Act" exemption for all of the prohibitions outlined in all subsections in Section 9(a)(1). *See* Pub. L. No. 93-205, 87 Stat. 884, 894 (Dec. 28, 1973).[4] Congress amended the statute in 1982 to provide that the exemption only applies to the prohibitions outlined in subsections (a)(1)(A) and (a)(1)(G).[5] "When Congress acts to amend a statute, [the Court] presume[s] it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a

---

[4] Section 9(b)(1) of the 1973 version of the statute provided:

> The provisions of this section shall not apply to any fish or wildlife held in captivity or in a controlled environment on the effective date of this Act if the purposes of such holding are not contrary to the purposes of this act; except that this subsection shall not apply in the case of any fish or wildlife held in the course of a commercial activity.

Pub. L. No. 93-205, 87 Stat. 884, 894 (Dec. 28, 1973).

[5] Section 9(b)(1) of the 1982 version of the statute is the same as the Section 9(b)(1) that is in force today. *Compare* Pub. L. No. 97-304, 96 Stat. 1411, 1426-27 (Oct. 13, 1982) *with* 16 U.S.C. § 1538(b)(1).

statute we are obliged to give effect, if possible, to every word Congress used."). Had Congress intended the "pre-Act" exemption to continue to apply to the taking prohibition in Section 9(a)(1)(B) and the other subsections excluded from the amendment, there would have been no reason to amend the statute in 1982.

Defendant tries to resurrect its argument for a "pre-Act" exemption to Section 9's taking provision by manufacturing a statutory ambiguity that does not exist. Defendant argues that if Congress really intended to do away with the "pre-Act" exemption to the taking prohibition in 1982, Congress would have also dropped subsection (a)(1)(G), which prohibits the violation of any regulation promulgated by FWS. Defendant points to FWS regulations that indicate that a holder of a "pre-Act" species is exempt from the taking prohibition. *See* 50 C.F.R. § 17.4 (wholesale "pre-Act" exemption similar to exemption in 1973 version of Section 9 of ESA); 50 C.F.R. § 17.21(c) (taking prohibition). The continued existence of the wholesale "pre-Act" exemption in the regulation before and after the 1982 amendment to the statute is not the "classic case of statutory ambiguity" that defendant advocates. *See* Def.'s Reply at 8. FWS's failure to amend its regulations to conform with the 1982 amendment to the ESA does not equate to a Congressional delegation of authority to FWS to continue in force a regulation that directly conflicts with the plain language of the statute. It would be

14

absurd if an <u>agency</u> could create an ambiguity in a statute by promulgating or continuing in force a regulation that contradicts the plain language of the statute.  Congress's application of the "pre-Act" exemption to FWS regulations generally does not translate into Congress's desire to have the regulatory "pre-Act" exemption apply to the taking prohibition in direct contradiction to the statute.

For the reasons stated above and because there are disputes of fact as to whether defendant is treating its Asian elephants not subject to any permit in a manner that constitutes a "take" under the ESA, the Court **denies** defendant's motion as to any so-called "pre-Act" elephants.

**B.    Permit Exception to the Take Prohibition**

Section 10(a)(1)(A) of the Act gives the Secretary of the Interior the power to issue permits to allow activities that are otherwise prohibited under Section 9 (including taking) "for scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).  In 1979, the Secretary (through FWS) promulgated the "captive-bred wildlife" ("CBW") regulation.  *See* 50 C.F.R. § 17.21(g); 44 Fed. Reg. 54001, 54007 (Sept. 17, 1979).  The CBW regulation states in pertinent part that notwithstanding other prohibitions in the regulations, "any person may take . . . any endangered wildlife that is bred in captivity in the United States provided . . .

15

that . . . [t]he purpose of such activity is to enhance the propagation or survival of the affected species."  50 C.F.R. 17.21(g)(ii).  When used in reference to wildlife in captivity, "enhance the propagation or survival . . . includes but is not limited to the following activities when it can be shown that such activities would not be detrimental to the survival of wild or captive populations of the affected species":

> (a) Provision of health care, management of populations by culling, contraception, euthanasia, grouping or handling of wildlife to control survivorship and reproduction, and similar normal practices of animal husbandry needed to maintain captive populations that are self-sustaining and that possess as much genetic vitality as possible;
>
> (b) Accumulation and holding of living wildlife that is not immediately needed or suitable for propagative or scientific purposes, and the transfer of such wildlife between persons in order to relieve crowding or other problems hindering the propagation or survival of the captive population at the location from which the wildlife would be removed; and
>
> (c) Exhibition of living wildlife in a manner designed to educate the public about the ecological role and conservation needs of the affected species.

50 C.F.R. 17.3.

In addition to the CBW regulation, entities that receive a permit must comply more generally with FWS regulations that apply to all permits issued under the ESA.  *See* 50 C.F.R. § 13.3.  For example, any wildlife "possessed under a permit must be maintained under humane and healthful conditions."  50 C.F.R. § 13.41.  Moreover, any person holding a permit "must comply with

16

all conditions of the permit and with all applicable laws and regulations governing the permitted activity."  50 C.F.R. § 13.48.

Plaintiffs have brought a citizen suit against defendant arguing in part that defendant's treatment of its elephants that are subject to a permit is not in compliance with the terms of the permit.  Specifically, plaintiffs argue that FWS issued permits to defendant in order to "enhance the propagation or survival of the affected species" and defendant's treatment of the elephants contradicts that purpose.  Plaintiffs more generally challenge defendant's alleged violation of 50 C.F.R. § 13.41, which requires that all animals possessed pursuant to a permit be maintained in humane and healthful conditions, and 50 C.F.R. § 13.48, which requires those holding permits to comply with all conditions of the permit and applicable laws and regulations governing the permitted activity.

Defendant counters that the Court has no jurisdiction to decide in a "citizen suit" brought under section 11(g) of the ESA, 16 U.S.C. § 1540(g), whether defendant is in compliance with the terms of the CBW permit issued by FWS.  Defendant argues that although Congress authorized private parties to bring citizen suits to challenge violations of the ESA and its implementing regulations, Congress decided that only the government, through the Secretary of the Interior, could bring actions for violations

of a permit issued by FWS.  The Court agrees with defendant's reading of the statute.

Section 11 of the ESA provides for a broad enforcement scheme of which citizen suits are only one part.  Section 11(g) of the ESA authorizes a citizen to conduct a suit on his own behalf "to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof."  16 U.S.C. § 1540(g)(1)(A).  Section 11(a) provides that the Secretary of the Interior may assess civil penalties for violations of "any provision of [the ESA], or any provision of any permit or certificate issued [t]hereunder, or any regulation issued in order to implement" certain subsections of ESA Section 9, including subsections governing takings.  16 U.S.C. § 1540(a). Section 11(b) provides for criminal sanctions for violations of "any provision of [the ESA], or any provision of any permit or certificate issued [t]hereunder, or any regulation issued in order to implement" certain subsections of ESA Section 9, including subsections governing takings.  16 U.S.C. § 1540(b). Finally, Section 11(e) of the Act provides that the provisions of the "Act and any regulations or permits issued pursuant thereto shall be enforced by the Secretary, the Secretary of the

18

Treasury, or the Secretary of the Department in which the Coast Guard is operating, or all such Secretaries."  16 U.S.C. § 1540(e).

By specifically referencing permits in subsections (a), (b), and (e) of Section 11 (governing civil enforcement, criminal sanctions, administrative or judicial seizure and forfeiture), but not referencing permits in subsection (g) (pertaining to citizen suits), Congress evidenced its intent to preclude private parties from permit enforcement.  *See Bates v. United States*, 522 U.S. 23, 29-30 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  (citations and internal quotation marks omitted)); *see also Bennett*, 520 U.S. at 173 ("It is the 'cardinal principle of statutory construction' . . . [that] it is our duty 'to give effect, if possible, to every clause and word of a statute' . . . rather than to emasculate an entire section."  (citations and internal quotation marks omitted)).  Allowing plaintiffs to bring a citizen suit to enforce the terms of FEI's permit would be to ignore Congress's intentional inclusion of the term "permit" with reference to the Secretary of the Department of the Interior and exclusion of the term "permit" with reference to citizen suits. Moreover, the one district court that directly considered this

issue has rejected the notion that a plaintiff can seek enforcement of a permit in a citizen suit.  *See Atlantic Green Sea Turtle v. County Council*, No. 6:04-cv-1576-Orl-31KRS, 2005 U.S. Dist. LEXIS 38841, at * 43-44 (M.D. Fla. May 3, 2005) ("The ESA, itself, simply does not provide a private enforcement mechanism covering the terms and conditions of incidental take permits."); *see also Environmental Protection Ctr. v. FWS*, No. C 04-04647 CRB, 2005 U.S. Dist. LEXIS 30843, at *22 (N.D. Cal. Nov. 10, 2005) (finding in response to plaintiff's attempt to enforce a regulation against FWS that requires the Secretary to revoke permits when the permittee is not in compliance that "[p]laintiffs may not seek permit enforcement directly under the ESA, but may seek judicial review of the Secretary's alleged failure to revoke the Take Permit under the APA").

Although plaintiffs correctly point out that *Environmental Protection Center* is a suit against FWS to try to force the Secretary of the Department of the Interior to revoke a permit and therefore is factually distinguishable from this case, plaintiffs have offered no meaningful argument to counter the District Court for the Middle District of Florida's ruling in *Atlantic Green Sea Turtle*.  The only distinction between the cases factually is that *Atlantic Green Sea Turtle* involves an incidental take permit and this case involves a permit to enhance the propagation or survival of a species.  The analysis regarding

whether or not a citizen suit can be used to challenge actions thought to be contrary to the permit is the same.  Plaintiffs also incorrectly argue that *Atlantic Green Sea Turtle* was vacated by the Eleventh Circuit.  This is simply incorrect.  The Eleventh Circuit merely vacated the district court's judgment with respect to attorneys' fees and not with respect to any findings regarding permit enforcement.  *See Atlantic Green Sea Turtle v. County Council*, No. 05-135683-HH (11th Cir. Jan. 20, 2006) (Order); *see also Atlantic Green Sea Turtle v. City Council*, No. 6:04-cv-1576-Orl-31KRS (M.D. Fla. June 7, 2005) (Judgment in a Civil Case).

Plaintiffs also cannot end run Congress's intent to delegate permit enforcement exclusively to the Secretary of the Department of the Interior by arguing that they are merely seeking to enforce FWS regulations that require wildlife "possessed under a permit" to "be maintained under humane and healthful conditions," 50 C.F.R. § 13.41, and require any person holding a permit to "comply with all conditions of the permit and with all applicable laws and regulations governing the permitted activity," 50 C.F.R. § 13.48.  Any determination by the Court that FEI is not in compliance with these regulations would be a determination that the permit is not properly being enforced.  The Court does not have jurisdiction to make such a determination as Congress has specifically delegated such responsibility to the Secretary of the Department of the Interior.

21

Defendant holds a CBW permit issued pursuant to 50 C.F.R. § 17.21(g).  *See* Federal Fish and Wildlife Permit No. MA720230-0, Ex. 9 to Def.'s Mot. for Summ. J.  The permit was issued on February 14, 2006 and is valid through February 14, 2009. Defendant claims that 21 of its elephants qualify as "captive-bred wildlife" subject to this CBW permit.

Plaintiffs expend a number of pages in their brief and a number of paragraphs in their Rule 56(f) declaration challenging the evidence relied upon by defendants as to when, how, and from whom defendant acquired the elephants that defendant contends are subject to the "pre-Act" exemption.  Plaintiffs do not, however, provide any meaningful challenge or any reason for further discovery as to the elephants that defendant claims were born in captivity in the United States and subject to a CBW permit.  For example, on page 17 of their opposition to defendant's motion for summary judgment, plaintiffs indicate that there are disputes of material fact only with reference to the portions of defendant's statement of material facts and summary judgment motion that address "pre-Act" elephants.  Plaintiffs generally dispute all the facts related to defendant's captive-bred elephants in plaintiffs' response to defendant's statement of material facts claiming that defendant relies on an inadequate declaration and other inadmissible evidence.  Plaintiffs do not, however, point to any evidence whatsoever suggesting that the 21 elephants

defendant claims are subject to a take permit were not in fact born in captivity in the United States, nor do they provide any reason for the Court to doubt the evidence provided on this issue by defendant.  Moreover, in their Rule 56(f) declaration, plaintiffs state that there are genuine issues of material fact and that they need more discovery as to "when, how, and from whom" each elephant was acquired, not as to whether the elephant was in fact bred in captivity in the United States.  *See* Decl. of Cathy Liss Pursuant to Rule 56(f).

Plaintiffs certainly have not stated what facts they would discover that they have not discovered in the last three years that would illuminate the Court's decision on whether or not defendant has 21 elephants that were born in captivity in the United States.  For each of the 21 elephants allegedly subject to the CBW permit, defendant has provided several different pieces of evidence to support its contention that these elephants were in fact born in captivity in the United States.  Plaintiffs' conclusory allegations challenging the evidence with respect to all defendant's elephants are not sufficient to warrant further discovery on the only relevant issue regarding the elephants subject to the CBW permit – whether such elephants were born in captivity in the United States.  Accordingly, the Court **grants** defendant summary judgment as to the 21 elephants that are subject to a CBW permit.

**IV.   CONCLUSION**

For the foregoing reasons, the Court **grants in part and denies in part** defendant's Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

**Signed:**      **Emmet G. Sullivan**
             **United States District Judge**
             **August 23, 2007**