UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
AMERICAN SOCIETY FOR THE PREVENTION       )
    OF CRUELTY TO ANIMALS, et al.,                      )
                                                     )
                         Plaintiffs,                                )
                                                     )
   v.                                                      )
                                                     )   Civ. No. 03-2006 (EGS/JMF)
                                                     )
RINGLING BROTHERS AND BARNUM & BAILEY     )
    CIRCUS, et al.,                                      )
                                                     )
                    Defendant.                              )
_____)

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs move for a preliminary injunction in this case under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 et seq., to halt the "take" of endangered Asian elephants in the possession of defendant Feld Entertainment, Inc. ("FEI"), which operates the Ringling Brothers and Barnum & Bailey Circus, until this Court has an opportunity to reach a final resolution of this case.  As plaintiffs demonstrate in the accompanying memorandum of law, they are now able to prove with FEI's own documents and admissions that FEI keeps the elephants confined in heavy chains for at least half of each day – **and often more than 60 to 70 hours in a row when they are traveling on the train**, which the performing elephants do almost every week of the year.[1]

---

[1] Consistent with this Court's August 23, 2007 ruling, ASPCA v. Ringling Bros., 502 F. Supp. 2d 108, 110-14 (D.D.C. 2007), plaintiffs are seeking preliminary relief only with respect to the "Pre-Act" elephants in FEI's possession.

As explained by  leading experts in elephant care, including a veterinarian who worked for the San Diego Wildlife Park for almost thirty years, such chaining and confinement of the elephants "harms" and "wounds" the elephants by causing them serious foot, leg, and other injuries, and it also "harasses" these extremely intelligent and social animals by significantly impairing their basic need to walk and to interact with each other.   Accordingly, this chaining and confinement constitutes an illegal "take" under the ESA.  See 16 U.S.C. § 1532(19) (defining "take" to include "to harass, harm . . . [or] wound"); 50 C.F.R. § 17.3 (defining harass to mean an act that "creates an injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns").

As plaintiffs further demonstrate, because they are likely to prevail on their claim that the chaining and confinement of the endangered elephants "takes" these endangered animals in violation of the ESA, a preliminary injunction should be issued because, as the Supreme Court has declared,  endangered species are to be "afforded the highest of priorities." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 174 (1978); see also Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 784 (9th Cir. 1995) (showing of actual or imminent "take" of an endangered species requires injunction).

In support of this motion, plaintiffs submit the accompanying memorandum of law, Exhibits 1-51, the Declarations of Dr. Philip K. Ensley, Dr. Benjamin Hart, and Carol Buckley, and  a proposed order.  As permitted by Local Rule 65.1(d), plaintiffs request a hearing on this motion within 20 days.  They have today served by hand on FEI's counsel a complete set of the

motion, memorandum, proposed order, and all Exhibits.[2]

Respectfully submitted,

 /s/ Katherine A. Meyer
Katherine A. Meyer
(D.C. Bar No. 244301)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)
Kimberly D. Ockene
(D.C. Bar No. 461191)
Tanya M. Sanerib
(D.C. Bar No. 473506)

Meyer Glitzenstein & Crystal
1601 Connecticut Avenue
Suite 700
Washington, D.C. 20009
(202) 588-5206

Counsel for Plaintiffs

May 21, 2008

---

[2] Because some of the information upon which plaintiffs rely is subject to one of several protective orders that have been entered in this case, plaintiffs are filing the complete set of their preliminary injunction papers under seal and they are filing a redacted version on the public docket.  Plaintiffs called defendant's lawyers this morning to notify them that plaintiffs are filing this motion and to obtain their position but were unable to reach them.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
)
AMERICAN SOCIETY FOR THE PREVENTION            )
    OF CRUELTY TO ANIMALS, et al.,              )
                                                )
            Plaintiffs,                         )
                                                )
    v.                                          )
                                                )   Civ. No. 03-2006 (EGS/JMF)
                                                )
RINGLING BROTHERS AND BARNUM & BAILEY           )
    CIRCUS, et al.,                             )
                                                )
            Defendant.                          )
_____)


### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


Katherine A. Meyer
(D.C. Bar No. 244301)
Eric R. Glitzenstein
(D.C. Bar No. 358287)
Kimberly D. Ockene
(D.C. Bar No. 461191)
Tanya M. Sanerib
(D.C. Bar No. 473506)

MEYER GLITZENSTEIN & CRYSTAL
1601 Connecticut Ave., N.W.
Suite 700
Washington, D.C.  20009
(202)  588-5206

Dated:  May 21, 2008                    Counsel for plaintiffs

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Endangered Species Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    The Elephants At Issue and Plaintiffs' Chaining Claim . . . . . . . . . . . . . . . . . . 4

    C.    Relevant Proceedings to Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    FEI's Own Records And Testimony Demonstrate that the Elephants
        Are Confined In Chains for Much of Their Lives. . . . . . . . . . . . . . . . . . . . . . 10

        1.    The Elephants At The CEC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.    The Elephants Who Travel With The Circus . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON
    THE MERITS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Defendant's Own Documents And Testimony Demonstrate
        That FEI Is "Taking" The Endangered Elephants. . . . . . . . . . . . . . . . . . . . . 20

        1.    The Law Governing What Constitutes A "Take" Under The ESA . . . . 20

        2.    Keeping The Endangered Elephants In Chains For Much Of Their
            Lives "Takes" Them In Violation Of The ESA. . . . . . . . . . . . . . . . . 21

    B.    Plaintiffs Are Likely To Prevail On Their Standing Allegations. . . . . . . . . . . . 25

        1.    Plaintiff Tom Rider's Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        2.    The Standing Of The Organizational Plaintiffs . . . . . . . . . . . . . . 29

II.    A PRELIMINARY INJUNCTION IS APPROPRIATE AND NECESSARY . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                 **PAGE**

ALDF v. Glickman,
    154 F.3d 426 (D.C. Cir. 1998) ................................................................... 28

ASPCA v. Ringling Brothers,
    244 F.R.D. 49 (D.D.C. 2007) ................................................................. 9

ASPCA v. Ringling Brothers,
    246 F.R.D. at 39 (D.D.C. 2007) ............................................................. 29

ASPCA v. Ringling Brothers,
    317 F.3d 334 (D.C. Cir. 2003) ................................................ 8, 25, 28, 29

ASPCA v. Ringling Brothers,
    502 F. Supp. 2d 103 (D.D.C. 2007) ....................................................... 4

ASPCA v. Ringling Brothers,
    502 F. Supp. 2d 108 (D.D.C. 2007) ..................................................... 8, 9

Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach,
    469 F.3d 129 (D.C. Cir. 2006) ........................................................... 29, 31

Animal Prot. Institute v. Holsten,
    -- F. Supp. 2d --, 2008 WL 839739 (D. Minn. Mar. 28, 2008) .................................. 20

Babbitt v. Sweet Home Chapter of Communities for a Greater Or.,
    515 U.S. 687 (1995) ........................................................................ 20, 23

Bennett v. Spear,
    520 U.S. 154 (1997) ........................................................................ 28, 32

Bristol-Myers Squibb Co. v. Shalala,
    923 F. Supp. 212 (D.D.C. 1996) ............................................................. 18

Cary v. Hall,
    Civ No. 06-04363 (N.D. Ca. Oct. 3, 2006) (PI Ex. 56) ................................................ 31

Childers v. Slater,
    197 F.R.D. 185 (D.D.C. 2000) ................................................................. 29

City Federal Finance v. Office of Thrift Supervision,
    58 F.3d 738 (D.C. Cir. 1995) ........................................................................ 18

Ctr. for Biological Diversity v. Marina Point Development Associate,
    434 F. Supp. 2d 789 (C.D. Ca. 2006) .................................................... 20, 24

Defenders of Wildlife v. EPA,
    882 F.2d 1294 (8th Cir. 1989) .................................................................... 20

Defenders of Wildlife v. Martin,
    No. 05-248-RHW, 2007 WL. 641439 (E.D. Wash. Feb. 26, 2007) ............................ 20

Federal Election Commission v. Akins,
    524 U.S. 11 (1998) ...................................................................................... 30

Feld Ent., Inc. v. ASPCA,
    523 F. Supp. 2d 1 (D.D.C. 2007) .................................................................. 9

Forest Conservation Council v. Rosboro Lumber Co.,
    50 F.3d 781 (9th Cir. 1995) ........................................................................ 24

Friends of the Earth v. U. S. Navy,
    841 F.2d 927 (9th Cir. 1988) ...................................................................... 18

Havens Realty Corp. v. Coleman,
    455 U.S. 363 (1982) .............................................................................. 30, 31

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) .................................................................................... 25

Marbeled Murrelet v. Pac. Lumber Co.,
    83 F.3d 1060 (9th Cir. 1996) ...................................................................... 24

Meese v. Keene,
    481 U.S. 465 (1987) .............................................................................. 28, 32

National Wildlife Federation v. Burlington N. R. R., Inc.,
    23 F.3d 1508 (9th Cir. 1994) .................................................................. 24, 32

National Wildlife Federation v. National Marine Fisheries Serv.,
    422 F.3d 782 (9th Cir. 2005) .................................................................. 18, 32

National Wildlife Federal v. National Marine Fisheries Serv.,
    481 F.3d 1224 (9th Cir. 2007) .................................................................... 33

Public Citizen v. Department of Justice,
        491 U.S. 440 (1989) ..................................................................... 30

Sierra Club v. Marsh,
        816 F.2d 1376 (9th Cir. 1987) .................................................... 18

Sierra Club v. Yeutter,
        926 F.2d 429 (5th Cir. 1991) ...................................................... 20

Strahan v. Coxe,
        127 F.3d 155 (1st Cir. 1997) ................................................. 18, 23

Strahan v. Coxe,
        939 F. Supp. 963 (D. Mass. 1996) ................................... 23, 24, 33

Strahan v. Pritchard,
        473 F. Supp. 2d 230 (D. Mass. 2007) ......................................... 32

Tenn. Valley Authority v. Hill,
        437 U.S. 153 (1978) ................................................................. 2, 18

Wash. Metropolitan Area Transit Commission v. Holiday Tours,
        559 F.2d 841 (D.C. Cir. 1977) .................................................... 18

Watt v. Energy Action Education Foundation,
        454 U.S. 151 (1981) .................................................................... 31

Weinberger v. Romero-Barcelo,
        456 U.S. 305 (1982) ............................................................... 18, 32

**FEDERAL STATUTES**

16 U.S.C. § 1532(19) ............................................... 1, 3, 19, 22, 23

16 U.S.C. § 1538(a)(1)(B) ................................................. 3, 4

16 U.S.C. § 1539(a)(1)(A) .............................................. 4, 5, 30

**FEDERAL REGULATIONS**

50 C.F.R. § 17.3 ................................................ 3, 22, 23, 24

# INTRODUCTION

This memorandum is submitted in support of plaintiffs' motion for a preliminary

injunction to stop the illegal "take" of endangered Asian elephants in the possession of defendant

Feld Entertainment Inc. ("FEI"), which operates the Ringling Brothers and Barnum & Bailey

Circus ("Ringling Bros."), until this Court has an opportunity to issue a final decision in this

case.  As demonstrated below, now that fact discovery has occurred plaintiffs are able to show

with defendant's own records and deposition testimony that these endangered animals are in fact

confined in steel chains for almost half of their lives, day in and day out, and that when traveling

– which the performing elephants do almost every week of the year – **the elephants are chained**

**in box cars an average of more than twenty-six consecutive hours, and often more than**

**sixty to seventy hours at a time**.  <u>See, e.g.</u>, DVD of Blue Unit Elephants in Chains, Preliminary

Injunction Exhibit ("PI Ex.") 1; Photographs (PI Ex. 2) (elephants in chains on the train);

Photographs (PI Ex. 3) (elephants in chains).[1]

As supported by several leading experts in elephant care and behavior, including a

veterinarian who worked with elephants at the San Diego Wildlife Park for almost thirty years

and has now had an opportunity to review all of  the medical records for the elephants at issue in

this case and to physically inspect some of the animals, such chaining and confinement "harms,"

"harasses," and "wounds" the elephants, which constitutes an illegal "take" of this endangered

species under the Endangered Species Act.  <u>See</u> Declarations of Dr. Philip K. Ensley; Dr.

Benjamin Hart, Carol Buckley (PI Exs. 4-6); <u>see also</u> 16 U.S.C. § 1532(19) (defining "take").

Among other things, the systematic chaining causes leg, foot, muscular, and other physical

---

[1]  The plaintiffs are the American Society for the Prevention of Cruelty to Animals, the
Animal Welfare Institute, the Fund for Animals, Born Free USA united with Animal Protection
Institute, and a former Ringling Bros. employee named Tom Rider.

injuries, and also precludes the elephants from leading any semblance of a normal existence.

Although this unlawful and inhumane treatment has been going on for many years, plaintiffs are now able to prove the validity of their chaining claim **with defendant's own records and testimony**.  Accordingly, to ensure that the endangered elephants the Court has held may be the subject of this citizen suit are protected to the extent possible from continuing to suffer grave harm during the remaining time it takes the Court to resolve all of plaintiffs' claims on the merits, plaintiffs are moving for a preliminary injunction.  At an absolute minimum, the Court should grant such relief with respect to the seven elephants as to which the Court has already ruled plaintiffs have made adequate standing allegations.  Regardless of how the Court resolves this motion, plaintiffs urge the Court to schedule a trial on the merits of all of plaintiffs' claims as soon as practicable.[2]

## BACKGROUND

To demonstrate why plaintiffs are entitled to a preliminary injunction on their chaining and confinement claim, it is necessary to describe the applicable statutory and regulatory framework, and the evidence that demonstrates the ongoing "take" of the endangered elephants.

### A.      The Endangered Species Act

The Endangered Species Act ("ESA") is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Section 9 of the statute prohibits the "take" of any endangered species

---

[2] Although plaintiffs have a compelling claim – which they intend to demonstrate at trial – that FEI also "takes" the elephants by systematically striking them with bullhooks and other instruments, plaintiffs are limiting this motion to plaintiffs' chaining claim because it involves a straightforward application of ESA principles to FEI's own documents and admissions.

within the United States, 16 U.S.C. § 1538(a)(1)(B), including both wild and captive animals.

See, e.g., id. § 1538(a)(1) (section 9 prohibits the take of "any endangered species of fish or

wildlife") (emphasis added); see also 63 Fed. Reg. 48634, 48636 (Sept. 11, 1998) ("take" is

defined by Congress to apply to endangered or threatened wildlife "whether wild or captive").

The term "take" is broadly defined to mean "harass, harm, pursue, hunt, shoot, wound,

kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

The Fish and Wildlife Service ("FWS"), which administers the ESA, has additionally defined

"harm" to include any act that "kills or injures wildlife,"[3] and it has defined "harass" to mean "an

intentional or negligent act or omission which creates the likelihood of injury to wildlife by

annoying it to such an extent as to significantly disrupt normal behavioral patterns which include,

but are not limited to, breeding, feeding or sheltering."  50 C.F.R. § 17.3.[4]

The "grandfather clause" of section 9 provides an extremely limited exception for certain

section 9 prohibitions with respect to wildlife that "was held in captivity or in a controlled

environment" on either the date the ESA was enacted (December 28, 1973), or the date the

species was formally added to the list of endangered species – which for the Asian elephant was

June 14, 1976.  See 41 Fed. Reg. 24064, 24066.  However, pursuant to the plain language of the

statute, and as this Court has now ruled, this exception with respect to what are referred to as

---

[3] Such "injury" also includes actions that "significantly impair[] essential behavioral patterns." 50 C.F.R. § 17.3.

[4] For endangered animals held in captivity, "harass" is further defined to exclude only "(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act, (2) Breeding procedures, or (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife." Id.

"Pre-Act" animals does <u>not</u> apply to the "take" prohibition.  <u>See</u> 16 U.S.C. § 1538(b)(1)

(exemption applies only to sections 1538(a)(1)(A), (G)); <u>see also</u> <u>ASPCA v. Ringling Bros.</u>, 502

F. Supp. 2d 103, 107-10 (D.D.C. 2007) (the "grandfather clause" does not exempt the "Pre-Act"

elephants from the "take" prohibitions in the statute).[5]

Section 10 of the ESA gives the FWS limited authority to issue permits to allow activities

that are otherwise prohibited by Section 9, but only for "scientific purposes or to enhance the

propagation or survival of the affected species . . . ."  16 U.S.C. § 1539(a)(1)(A).  This limited

exception allows what would normally be a "take" where such action is undertaken to <u>benefit</u> the

species in the wild – e.g., it would allow the FWS to take members of an endangered species out

of the wild to breed more of the species that could then be used to replenish the wild population.

<u>See</u> <u>e.g.,</u> <u>id.</u> § 1531(b) (overall purpose of the ESA is to provide "for the conservation" of

endangered and threatened species); <u>id.</u> § 1532(3) ("conservation" means use of all methods to

recover the species in the wild so that it no longer needs the protections of the statute).  FEI does

not have a Section 10 permit to "take" any of the Pre-Act elephants at issue in this case.

**B.**     <u>**The Elephants At Issue And Plaintiffs' Chaining Claim**</u>

FEI currently has approximately fifty-three endangered Asian elephants in its possession.

<u>See</u> Ex. 1 to Def.'s Mot. for Summ. J., Sept. 5, 2006 (DE 82).  Approximately twenty of the

elephants were born in captivity; the others, including all seven of the elephants with whom

plaintiff Tom Rider worked – Karen, Nicole, Jewell, Lutzi, Mysore, Susan, and Zina – were born

---

[5] The "grandfather clause" additionally does not apply here because FEI uses the elephants in
a "commercial activity."  <u>See</u> 16 U.S.C. § 1538(b)(1) (the exception only applies where the
"holding and any subsequent holding or use" of the wildlife "<u>was not in the course of a
commercial activity</u>") (emphasis added); <u>see also</u> <u>id.</u> § 1532(2) ("commercial activity" includes
"all activities of industry or trade").

in the wild, and have been with Ringling Bros. for many years.  Id.; see also Asian Elephant

Studbook at 112-114 (PI Ex. 7) ("Studbook").[6]

    Elephants are remarkably intelligent animals.  They make and use rudimentary tools,

mourn the death of family members, are able to distinguish the voices of individuals of their

species, and have legendary memories.  See R. Sukumar, The Living Elephants: Evolutionary

Ecology, Behavior, and Conservation, 125 (2003); see also Dr. Hart Decl. ¶¶ 2, 7, 17 (PI Ex. 5).

They are also extremely social animals; they live in matriarchal societies in which the females stay

with their families for their entire lives and the males leave only when they are ready to start their

own families.  See, e.g., Sukumar, supra at 125-27, 175-79.  Elephants are also very mobile – in

the wild they walk long distances each day, sleeping only four to five hours each day.  See, e.g.,

id. at 159-60; see also Gruber, et al., "Variation in Stereotypic Behavior Related to Restraint in

Circus Elephants," 19 Zoo Biology 209-21 (2000) ("[f]ree-ranging elephants will sleep 4 to 5

hours a day").  Elephants also live relatively long lives, usually well into their 60s or 70s.  See,

e.g., M. Fowler and S. Mikota, Biology, Medicine, and Surgery of Elephants, 67 (2006)

("elephants may live 50-70 years").

_____

    [6] The Studbook is a compilation of data submitted by members and non-members of the
Association of Zoos and Aquariums ("AZA") concerning the origins, locations, births, and
deaths of all known Asian elephants in captivity in North America.  According to the Studbook,
at 112-114 (PI Ex. 7), Lutzi was born in the wild in 1950, "capture[d]" from the wild, and
acquired by Ringling Bros. ("Venice BB") in 1954; Mysore was born in the wild in 1950,
captured, and acquired by Ringling Bros. in 1985; Susan was born in the wild in 1951, captured,
and acquired by Ringling Bros. in 1954; Jewel was born in the wild in 1952, captured, and
acquired by Ringling Bros. in 1954; Karen was born in the wild in 1969, captured, and acquired
by Ringling Bros. in 1969; Zina was born in the wild in 1961, captured, and transferred to
Ringling Bros. in 1972; and Nicole was born in the wild in 1976, captured, and purchased by
Ringling Bros. in 1980.  See also Studbook at 26 (PI Ex. 7) (Ringling Bros. is referred to as
"Venice BB").

FEI currently uses approximately fifteen to eighteen Asian elephants in its traveling circus;

maintains approximately thirty elephants at its "Center for Elephant Conservation" ("CEC") in

Polk City, Florida, where it breeds elephants and houses elephants who are not currently touring

with the circus; and has about six elephants at its "retirement" facility in Williston Florida.  See

Def.'s Notice of Issues at 2, Sept. 19, 2006 (DE 188) (listing locations of the elephants);

REDACTED Ex.

1 to Def.'s Mot. for Summ. J., Sept. 5, 2006 (DE 82); Ringling Bros. and Barnum & Bailey

Center for Elephant Conservation http://www.elephantcenter.com (last visited on May 16, 2008).

Elephants are often transferred between the CEC and various units of the circus and then back to

the CEC.  See, e.g., PI Ex. 9 (FEI documents concerning the movement of elephants between the

road and the CEC); see also Deposition of Troy Metzler at 108 (Superintendent for Elephants for

the Blue Unit), Aug. 8, 2006 (PI Ex. 10); REDACTED

REDACTED

FEI operates three basic "units" of the circus – the Blue, Red, and Gold Units.  See

Metzler Dep. at 111-116 (PI Ex. 10).  The Blue and Red Units use approximately seven to ten

elephants at a time; the Gold Unit uses only one to two elephants.  See, e.g., id. at 111-116 (listing

elephants on the various units); see also REDACTED Both the Blue and Red

Units travel by train throughout the country, and go to approximately forty-two cities each year.

See, e.g., 2004 Blue Unit Itinerary (PI Ex. 12) (Blue Unit visited 42 cities); see also REDACTED

REDACTED At present, two of the seven

elephants with whom Mr. Rider worked when he was at the circus, Karen and Nicole, are

traveling with the Blue Unit, and five of the other elephants with whom he worked are located at

the CEC – Jewell, Lutzi, Mysore, Susan, and Zina.  See Def.'s Notice of Issues at 2, Sept. 19,

2006 (DE 188).

The elephants who travel with the circus are a small part of an overall circus show that

lasts about two hours and also includes clowns, acrobats, motorcycles, pyrotechnics, a high wire

act, dancers, horses, zebras, tigers, and dogs.  In fact, the total time any elephants perform is less

than twelve minutes per show.  See, e.g., Metzler Dep. at 128-48 (total time any of the elephants

perform is eleven minutes and nineteen seconds).  The elephants are dressed in colorful costumes

and paraded in and out of the arena, and some of them perform various "tricks" on command –

e.g., they stand on two legs, sit on tubs, ring a bell, or wave their trunks.  See, e.g., id. at 128-148

(describing Blue Unit routine).  The elephant handlers use "bull hooks" – fiberglass clubs with

steel hooks – to train and control the elephants for these performances.  See Metzler Dep. at 330-

335 (PI Ex. 10); Deposition of Frank Hagan at 13, 43, Nov. 9, 2004 (PI Ex. 13); PI Ex. 14

(Photograph of bullhook taken at Hagan Deposition); REDACTED

Plaintiffs have alleged that Ringling Bros. "takes" all of the endangered Asian elephants in

its possession in violation of section 9 of the ESA by routinely hitting them with bull hooks, and

by keeping them "in chains for long periods of time, up to 20 hours a day, and longer when the

elephants are traveling throughout the country."  Compl. ¶¶ 75-77.  Plaintiffs assert that this

chaining and confinement of the elephants for so many hours each day "takes" the animals by

"harming," "harassing," and "wounding" them in violation of section 9 and the FWS's regulations

– i.e., it "causes them physical injury, including foot injuries, and significantly disrupts their

normal behavioral patterns, including their social relationships with other elephants and their need

to walk long distances each day." Id. ¶ 77.

C.    **Relevant Proceedings To Date**

This case was originally filed on July 11, 2000, and it was refiled on September 26, 2003

after the Court of Appeals ruled that Mr. Rider had alleged sufficient Article III standing to

proceed and this Court authorized the plaintiffs to file a new complaint. See ASPCA v. Ringling

Bros., 317 F.3d 334, 338 (D.C. Cir. 2003); see also Order, Nov. 25, 2003 (DE 15).[7]

Although plaintiffs' original discovery requests sought all of the medical records for the

elephants, it took more than two and a half years for plaintiffs to obtain these highly relevant

records from defendant, requiring plaintiffs to file both a motion to compel the records and a

motion to enforce the Court's Order granting the motion to compel. See DE 27; DE 50; see also

Order, Sept. 26, 2006 (DE 94) (requiring defendant to produce "all records that in any way pertain

to the medical condition or health status of, and all veterinary records for, any and all Asian

elephants that were in defendants' custody or control from 1994 to the present").

On August 23, 2007, this Court granted partial summary judgment for defendant with

respect to FEI's "captive-bred" elephants. See ASPCA v. Ringling Bros., 502 F. Supp. 2d 108,

110-14 (D.D.C. 2007).  In particular, the Court held that because such elephants were currently

covered by a "captive-bred wildlife" permit issued by the FWS, only the FWS could bring an

enforcement action for violations of that permit. Id.  However, the Court denied summary

judgment for defendant on its additional contention that the "Pre-Act" elephants are exempt from

the "take" prohibitions of the statute. Id. at 107-10.

_____

[7] The Court of Appeals did not address the organizational plaintiffs' standing on the grounds
that "each of them is seeking relief identical to what Rider seeks." ASPCA v. Ringling Bros.,
317 F.3d at 338 (citations omitted).

Because the Court also granted plaintiffs' motion to compel their Rule 34 inspections of the elephants, Order at 10-11, Aug. 23, 2007 (DE 178), on November 13, 2007 and November 29, 2007 plaintiffs' experts conducted physical and behavioral inspections of the seven elephants with whom Mr. Rider worked – i.e., they inspected two of the elephants who are currently traveling with the Blue Unit (Karen and Nicole) and five of the elephants who are currently housed at the CEC (Lutzi, Jewell, Mysore, Susan, and Zina). Fact discovery in the case closed on January 30, 2008, the parties have now exchanged expert reports, and under the current schedule all expert discovery is to be concluded by July 18, 2008.[8]

---

[8] The case has also been complicated by an extensive counter-attack launched by FEI after it switched lawyers in this case in 2006. On February 28, 2007, FEI filed a motion to add a RICO counterclaim and unclean hands defense against plaintiffs, alleging that the organizational plaintiffs and others are "bribing" Mr. Rider to be a plaintiff in this case because they have funded his efforts to go around the country, first by Greyhound Bus, and now in a used van, to inform the public, media, and legislators about the way the endangered elephants are mistreated. See DE 121. Despite the fact that plaintiffs' counsel long ago informed the Court that Mr. Rider was engaged in this public education campaign – which pales in comparison with FEI's own extensive public relations effort to convince the public that the elephants are treated with the highest standard of care – FEI also alleges that plaintiffs are engaged in a massive "cover-up" of this alleged "scheme." See id.; see also ASPCA v. Ringling Bros., 244 F.R.D. 49, 52 (D.D.C. 2007) (noting that "Plaintiffs' counsel admitted in open court on September 16, 2005 that the plaintiff organizations provided grants to Tom Rider to 'speak out about what really happened' when he worked at the circus"). Although this Court eventually denied FEI's motion to add the proposed counterclaim and an unclean hands defense on the grounds that it was filed with an improper "dilatory" purpose, see ASPCA v. Ringling Bros., 244 F.R.D. at 51-52, FEI then filed a separate case making the same allegations, which this Court stayed pending resolution of this ESA case. See Feld Ent., Inc. v. ASPCA, 523 F. Supp.2d 1 (D.D.C. 2007). Meanwhile, although this Court stayed all discovery in the RICO case, id., and plaintiffs disclosed all of the funding they provided to Mr. Rider over the last eight years, as required by this Court's August 23, 2007 Order, defendant maintains that plaintiffs are in violation of that Order, and Magistrate Facciola has been holding an evidentiary hearing to resolve that contention, which plaintiffs dispute.

**D.**     **FEI's Own Records And Testimony Demonstrate That**
           **The Elephants Are Confined In Chains For Much Of Their Lives.**

Although several former Ringling Bros. employees, including plaintiff Tom Rider, have

consistently confirmed that the elephants are routinely kept confined in chains for many hours

each day and for days at a time when the circus is traveling,[9] FEI denies that this is true.  See

Def.'s Answer ¶¶ 75-77 (DE 4) (denying plaintiffs' chaining allegations).  However, plaintiffs

have now obtained definitive evidence from defendant itself that not only corroborates plaintiffs'

chaining claim, but demonstrates that the FEI elephants live encumbered by chains for a

substantial portion of their lives.  This is true          REDACTED          and the

elephants traveling on the various circus "units."

**1.**     **The Elephants At The CEC**

As stated, supra at 6, FEI  keeps about thirty of the endangered elephants in its possession

at any one time at the CEC in Florida, including five of the Pre-Act elephants with whom Mr.

---

[9]  See, e.g., Tom Rider's Resp. to Def.'s First Set of Interrogs. at 35-36, June 9, 2004 (PI Ex.
16) (stating that "every elephant" who traveled with the Blue Unit from June 3, 1997 to
November 25, 1999 "was chained for long periods of time, up to 20 hours a day, and longer
when the elephants were traveling," and that the elephants "are chained at night, when they are
eating, and . . . when they are on the train"); Deposition of Tom Rider at 30-31, Oct. 12, 2006 (PI
Ex. 17) (1st Rider Dep.) (testifying that when the circus was performing at Madison Square
Garden, they were kept chained on concrete for twenty-two and a half hours each day for
approximately three weeks; and that when the circus was performing at the MCI Center in
Washington, D.C., the elephants were chained on concrete for twenty-two and a half hours each
day); Deposition of Gerald Ramos at 13 (who worked for the Blue Unit in 2006) (PI Ex. 18) (the
elephants were chained "all the time"); Declaration of Robert Tom, Jr. ¶ 17 (who worked for the
circus for approximately two years between 2004-2006), Oct. 10, 2006, (PI Ex. 19) ("[o]n a 3 or
4 day train run, they stop only once to let the elephants and horses off the train for about 2 hours
to clean the boxcars.  During these infrequent stops, we fill up a dumpster-and-a-half with waste
that accumulates in the four animal cars"); Declaration of Archele Faye Hundley ¶ 19 (who
worked for the circus from April 20 to June 27, 2006), Sept. 29, 2006, (PI Ex. 20) ("[t]he
elephants are only unchained when the public is around.  Whenever the public is not around, the
elephants are chained up").

Rider worked – Lutzi, Zina, Jewell, Susan, and Mysore.  See Def.'s Notice of Issues at 2, Sept. 19, 2006 (DE 188) (listing locations of the elephants).

Although in its widely disseminated public relations documents FEI touts the CEC as a "200-acre" facility with "prime meadow where elephants can roam and socialize to their heart's content," PI Ex. 21, evidence obtained from FEI in fact shows that the elephants REDACTED

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████        Thus, according to FEI's own records  REDACTED

███████████████████████████████████████

REDACTED elephants are chained on two alternate legs – one front and one back leg – with the chains anchored to metal rings that are embedded in concrete flooring in front of and behind each elephant.  See, e.g., USDA Memorandum, 1999 (PI Ex. 26) (describing elephants

"chained on opposite front-rear legs"); ███████████ REDACTED ███████████

██████████; see also ███████████ REDACTED ███████████

██████████████ As a result, the elephants can only move a

few feet in each direction.  See e.g., USDA Memorandum, 1999 (PI Ex. 26)("[t]he animals

movements were restricted by this method of restraint.  There was only some side to side

swaying motions"); see also ███████████ REDACTED ███████████

██████████████ The baby elephants are

separated from their mothers when they are about 2 years old and then kept separate from their

mothers – i.e., in sharp contrast to what occurs in the wild, once separated, the mothers and their

offspring are not maintained together at the CEC, and they do not travel together on the road.

See e.g., USDA Memorandum, 1999 (PI Ex. 26) (describing "baby elephants" Doc and Angelica

at the CEC who were "chained on opposite front-rear legs" as a result of the "routine"

"separation process from their mothers"); ███████████ REDACTED ███████████

██████████████████████████

██████████████████████ see also

Metzler Dep. at 204, 208, 212 (PI Ex. 10) (young elephants do not travel with their mothers on

the road); Deposition of Alejandro Vargas at 55-56 (Superintendent of Animals), May 31, 2007

(PI Ex. 29) (baby elephants did not travel with their mothers on the Blue Unit).

    2.    **The Elephants Who Travel With The Circus**

The elephants who currently travel with the circus also spend an enormous amount of

time in chains.  Indeed, although plaintiffs have voluminous evidence demonstrating that the

elephants spend most of their lives in chains – i.e., whenever they are not on public display, see

supra note 9 – FEI itself concedes that the performing elephants are <u>always</u> chained at "night,"

████████████████ REDACTED ████████████████.  <u>See, e.g.</u>, Def.'s Answer to Interrog. No. 13, June

9, 2004 (PI Ex. 30) (admitting that the performing elephants are "tethered" throughout "the

night"); ████████████████ REDACTED ████████████████

████████████████  Thus, depending on when the last show ends, the elephants are chained at

least nine to thirteen hours each day.  <u>See</u>, <u>e.g.</u>, 1ˢᵗ Rider Dep. at 22 (explaining that after the

show is over the elephants are watered and then are "immediately taken into the tent [and]

chained up," and "that's where they remain until the next morning"); FEI website (last show

often ends at 5 p.m.); <u>see also</u> ████████████████ REDACTED ████████████████

████████████████████████████; Vargas Dep. at 186 (PI Ex.

29) (elephants are chained until 7:30-8:30 a.m. the next day).  These elephants are additionally

kept in chains at other times during the day, depending on the venue.  <u>See, e.g.</u>, Def.'s Answer to

Interrog. No. 13, June 9, 2004 (Pl. Ex. 30); Def.'s Second Supplemental Answer to Interrog. No.

13, Jan. 31, 2007 (PI Ex. 31); <u>id.</u> (stating that some of the performing elephants on the Blue and

Red Units are kept in chains during the day time).[10]

████████████ REDACTED ████████████ the performing elephants are also usually chained on two

alternate legs – one in front and one in back.  <u>See e.g.</u>, Deposition of Robert Ridley at 128

(elephant handler who has worked for Ringling Bros. for 40 years), Aug. 25, 2006 (PI Ex. 32).

The elephants can only move a few feet in each direction, and can not turn around.  <u>See, e.g.</u>, 1st

---

[10] Even more detailed information concerning when the elephants are chained each day should
be revealed by either the ███████ REDACTED ███████ or the ███████ REDACTED ███████ which
defendant has refused to provide to plaintiffs and are the subject of a motion to compel that is
pending before Magistrate Facciola.  <u>See</u> DE 250.

Rider Dep. at 23-25 (PI Ex. 17); Hagan Dep. at 85-90 (PI Ex. 13); see also ████████ REDACTED ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ [11]

    The performing elephants are also chained on two legs at all times when they are on the train that is used to transport them from city to city.  See Ridley Dep at 128 (PI Ex. 32); see also

████████████████████ REDACTED ████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████  The train cars are typical box cars used to carry freight – they are long, narrow, and dark inside, with hard unyielding surfaces.  See DVD, Exhibit 1; see also ████████████ REDACTED ████████████

████████████████████████  Several elephants are kept ████████ REDACTED ████████

████████████████████████  See, e.g., ████████ REDACTED ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

---

[11] ████████████████████ REDACTED ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████

In fact, documents obtained from FEI called "Transportation Orders" show that the Blue Unit elephants are chained in box cars for **an average of more than twenty-six consecutive hours** when they travel from one venue to another – which they do approximately forty-eight to fifty weeks each year – and that they are **often kept chained in the box cars for sixty to seventy hours or more at a stretch**.  <u>See</u> Attachments B and C to Declaration of Michelle Sinnott (PI Ex.37)  (compilation of data from Transportation Orders); Declaration of Michelle Sinnott (PI Ex. 37) (explaining compilation of data); <u>see also</u> Metzler Dep. at 246 (PI Ex. 10) (circus travels for forty-eight weeks a year); Blue Unit Itinerary (PI Ex. 12) (2004 schedule showing Blue Unit on the road for fifty weeks); DVD of Blue Unit Elephants in Chains (PI Ex. 1); Photographs (PI Ex. 2).

The Transportation Orders for the Red Unit likewise demonstrate that the elephants who travel with that unit of the circus are also kept chained on the train for an average of more than twenty-six hours, and often sixty to seventy hours, and that on several occasions they were kept chained for **ninety to one hundred consecutive hours**.  <u>See</u> Attachment D to Sinnott Decl. (PI Ex. 37) (Transportation Orders for Jan. 1, 2000-June 10, 2004) (trip from Lexington KY to Tucson AZ on June 21, 2001 (100 hours)); <u>id.</u> (trip from St. Louis MO to Tampa FL on Nov. 18, 2002 (ninety-four hours)); ████████████ REDACTED ████████████

███████████████████████████████████████

███████

The Transportation Orders reflect the time that the train is loaded and ready to depart a venue ("loaded") and the time the train arrives at the next venue and the animals are ready to be unloaded (trains are "spotted"), for each venue to which the Blue and Red Units have traveled

since January 2, 2000 to ████REDACTED████. See, e.g., Attachment A to Sinnott Decl. (Sample

Transportation Orders for the Blue Unit).  Moreover, because evidence shows that the elephants

spend additional time chained on the train <u>before</u> it departs, and that they also spend time chained

on the train <u>after</u> it arrives at a new location, these Transportation Orders reflect the absolute

<u>minimum</u> number of hours the elephants spend chained on the train each year.  <u>Compare, e.g.</u>,

Hagan Dep. at 102 (PI Ex. 13) (stating that the train going to Wichita Falls, Texas was loaded at

10:00 p.m. on Sunday night), <u>with</u> Transportation Order for Wichita Falls trip (PI Ex. 38)

(indicating that the train was not "loaded" until 12:00 a.m. the next day); <u>see also</u> Hagan Dep. at

103 (PI Ex. 13) (if the circus arrives the night before a performance the elephants are kept on the

train);████████████REDACTED████████████

████████████████████████████████████████

████.[12]

    Thus, defendant's own records reveal that the endangered elephants who perform for the

circus spend a huge amount of their lives each year chained in box cars.  Moreover, when that

amount of time is added to the number of hours the elephants spend in chains when they are

<u>off</u> the train, it is clear that, according to FEI's own documents and testimony, **these highly**

**intelligent and social animals spend almost half of their lives each year confined in heavy**

**metal chains.**

---

[12]<u>See also</u> ████████████REDACTED████████████

████████████████████████████████████████

████████████████████████

For example, at the end of this month (May 2008), the Blue Unit elephants will be placed in chains for a minimum of [REDACTED] consecutive hours while they travel [REDACTED] miles from Wilkes Barre, Pennsylvania to Council Bluffs, Idaho.  2008 Blue Unit Itinerary (PI Ex. 39);

[REDACTED]

[REDACTED] [13]

Then, once in Idaho, the elephants will be chained for at least nine to twelve hours each day, Def.'s Answer to Interrog. No. 13 (PI Ex. 30); [REDACTED] Vargas Dep. at 186 (PI Ex. 29), for the three days that the circus performs in Council Bluffs from June 6-8, 2008.  2008 Blue Unit Itinerary (PI Ex. 44); see also supra at 12-13.  The elephants will then be loaded back on the train and chained for another [REDACTED] hours for the [REDACTED] mile trip to Colorado Springs, Colorado, see [REDACTED], where they will be chained another nine to twelve hours each of the four days the circus performs at that venue, see Def.'s Answer to Interrog. No. 13 (PI Ex. 30); [REDACTED] Vargas Dep. at 186 (PI Ex. 29), and then they will be loaded back on the train and chained for another [REDACTED] hours for the [REDACTED] mile trip to Las Vegas, Nevada, see [REDACTED] [REDACTED], where they will perform nine shows over four days, 2008 Blue Unit Itinerary (PI Ex. 39), until they are loaded back on the train for the trip to Phoenix, Arizona.  Id.

And so it goes for the elephants, day after day, week after week, month after month, year after year, until the elephants are too old or too infirm to travel, at which point they will be

---

[13] [REDACTED]

[REDACTED]

shipped to the CEC where these endangered animals will ██████ REDACTED ██████
██████████████████████████ a day until they are put <u>back</u> on the road or they

die.  As we discuss next, this heartbreaking existence is not only cruel and inhumane, it is also a

flagrant violation of the ESA.

<u>**ARGUMENT**</u>

An applicant for a preliminary injunction must normally demonstrate (1) that it has raised

a serious, substantial issue, (2) that it and the interests its seeks to protect will suffer irreparable

injury if the injunction is not granted, (3) that other interested parties will not suffer substantial

harm if the injunction is granted, and (4) that injunctive relief is in the public interest.  <u>Wash.</u>

<u>Metro. Area Transit Comm'n v. Holiday Tours</u>, 559 F.2d 841, 842-44 (D.C. Cir. 1977).  The

Court may issue an injunction where there is a particularly strong showing of any one of these

factors, and a comparatively lesser showing of the other three factors.  <u>See</u> <u>City Fed Fin. v. Office</u>

<u>of Thrift Supervision</u>, 58 F.3d 738, 747 (D.C. Cir. 1995); <u>Bristol-Myers Squibb Co. v. Shalala</u>,

923 F. Supp 212, 215 (D.D.C. 1996).

However, in cases involving endangered species, such as this one, the traditional

balancing test does not apply because, as the Supreme Court explained in <u>T.V.A. v. Hill</u>, the

"language, history, and structure of the [ESA] indicates beyond doubt that Congress intended

endangered species to be <u>afforded the highest of priorities</u>."  437 U.S. at 174 (emphasis added).

Thus, in an ESA case, when plaintiffs demonstrate the likelihood of harm to an endangered

species, preliminary relief is <u>required</u> irrespective of the economic consequences that may flow

from such relief, since Congress itself has determined that the "balance of hardships and the

public interest <u>tip heavily in favor of endangered species</u>."  <u>Sierra Club v. Marsh</u>, 816 F.2d 1376,

1383 (9th Cir. 1987) (emphasis added); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982) (in enacting the ESA "Congress [] foreclosed the exercise of the usual discretion possessed by a court of equity") (citing T.V.A. v. Hill, 437 U.S. at 173); Nat'l Wildlife Fed'n v. NMFS, 422 F.3d 782, 793-94 (9th Cir. 2005) ("[T]he traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA"); Strahan v. Coxe, 127 F.3d 155, 160 (1st Cir. 1997), cert. denied, 525 U.S. 830 (1998)  ("[U]nder the ESA, . . . the balancing and public interest prongs have been answered by Congress"); Friends of the Earth v. U. S. Navy, 841 F.2d 927, 933 (9th Cir. 1988) (in cases involving endangered species, "Congress removed from the courts their traditional discretion in injunction proceedings").

Here, plaintiffs seek preliminary injunctive relief to prevent a systematic, ongoing – and, plaintiffs contend, patent – violation of the ESA from continuing.  Thus, the endangered Asian elephants at issue here have already endured years of confinement in chains which "harms," "harasses," and "wounds" them in violation of the ESA.  Now that plaintiffs are able to demonstrate the validity of this claim with defendant's own records and deposition testimony, plaintiffs seek a preliminary injunction to prevent further harm to the endangered elephants during the time it takes the Court to resolve the case on the merits of all of plaintiffs' claims.  As demonstrated below, such relief is entirely appropriate.

## I.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

As demonstrated, plaintiffs now have irrefutable evidence from FEI itself that the endangered Asian elephants in its possession live a substantial portion of their lives confined in heavy metal chains – when they are stationed at a venue to perform, throughout the night, REDACTED

-19-

REDACTED and when they are traveling from city to city, which they do forty-eight to fifty weeks of

every year.  Such treatment constitutes a "take" under the ESA.

      **A.    Defendant's Own Documents And Testimony Demonstrate**
           **That FEI Is "Taking" The Endangered Elephants.**

          **1.    The Law Governing What Constitutes A "Take" Under The ESA**

The term "take" in the ESA is broadly defined to mean "to harass, harm, pursue, hunt,

shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16

U.S.C. § 1532(19).  As the Supreme Court has observed, this extremely important term is

"'defined . . . in the broadest possible manner to include every conceivable way in which a

person can take or attempt to take any fish or wildlife.'"  Babbitt v. Sweet Home Chapter of

Cmtys. for a Greater Or., 515 U.S. 687, 705 (1995) (quoting S. Rep. No. 93-307, at 7 (1973))

(emphasis added).  Indeed, as the Supreme Court further observed, the legislative history of the

ESA demonstrates that Congress even considered birdwatching to fall within the definition of a

"take" "'where the effect of those activities might disturb the birds and make it difficult for them

to hatch or raise their young.'"  Id. at 705 (quoting H.R. Rep. No. 93-412, at 15 (1973)).

Thus, there is no requirement that the harm to the species be intentional; rather, both

direct and indirect harm can constitute unlawful "takes" of a listed species.  See Sweet Home,

515 U.S. at 704-07 (holding that actions that destroy the habitat of an endangered species can be

a "take" of the species); see also Defenders of Wildlife v. EPA, 882 F.2d 1294, 1301 (8th Cir.

1989) (agency's registration of pesticide that causes harm to endangered black-footed ferret

constitutes a "take" under section 9 of the ESA); Ctr. for Biological Diversity v. Marina Point

Dev. Assoc., 434 F. Supp. 2d 789, 795-96 (C.D. Ca. 2006) (developer's construction of

condominium in bald eagle habitat was a "take" of the species); Animal Prot. Inst. v. Holsten, ---

F. Supp. 2d ---, No. 06-3776, 2008 WL 839739, at *6  (D. Minn. Mar. 28, 2008) (state agency's

grant of trapping license for non-listed species within the range of the listed Canada lynx

constitutes unlawful "take" of the lynx because the traps kill and injure the lynx); Defenders of

Wildlife v. Martin, No. 05-248-RHW, 2007 WL 641439, at *5 (E.D. Wash. Feb. 26, 2007)

(agency's decision to allow snowmobiles in habitat of listed caribou species constitutes a "take"

within the meaning of section 9); Sierra Club v. Yeutter, 926 F.2d 429, 438-39 (5th Cir. 1991)

(Forest Service's policy of cutting trees to control pine beetle infestation constitutes "take" of

endangered woodpecker).

**2.     Keeping The Endangered Elephants In Chains For Much
Of Their Lives "Takes" Them In Violation Of The ESA.**

Here, of course the actions that comprise a take are not incidental.  Rather, it is part and

parcel of the routine practice of the circus that the endangered elephants are kept in chains for

many hours each day.  Because as explained by the experts, such a life of bondage invariably

"harms," "harasses," and "wounds" these legally protected animals in a plethora of ways, FEI is

"taking" the elephants in contravention of the ESA.

As explained by Dr. Philip Ensley, a board-certified veterinarian who worked with

elephants at the San Diego Wildlife Park for almost thirty years, and who has now had the

opportunity to review all of the medical records for the Ringling Bros. elephants and to

physically inspect the seven elephants with whom plaintiff Tom Rider worked, REDACTED

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

-21-

████████████████████ REDACTED ████████████████████

█████████████████████████████████████████████████

████████████████████████████  Ensley Decl. ¶ 24 (PI Ex. 4) (emphasis added).  For

example, even a small portion of the publicly available medical records for the elephants show

that the elephants suffer recurring leg and feet injuries, including lameness and infected nail

tissue.  See Ensley Decl. ¶¶ 14-21 (PI Ex. 4); see also Medical Records (PI Ex. 43) (sample of

medical records).  Indeed, based on his review of all of  the medical records, Dr. Ensley found

████████████████████ REDACTED ████████████████████

█████████████████████████████████████████████████

████████████████████████████ .  See id. Ensley Decl. ¶¶ 11-12 (PI Ex. 4) (emphasis in

original).

        Similarly, Carol Buckley, who runs a world-renowned sanctuary for captive elephants,

explains that "[c]haining and confinement causes health problems for elephants, including foot

ailments," including arthritis and degenerative joint disease, and that it also causes repetitive

"stereotypic behavior"– eg., swaying back and forth for hours at a time – "which is the direct

result of an animal being denied the opportunity to undertake a natural behavior."  See Buckley

Decl. ¶¶ 9-11 (PI Ex. 6).  Ms. Buckley, who also inspected all seven of the elephants with whom

Mr. Rider worked, concurs with Dr. Ensley that ████████████ REDACTED ██████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████  See Buckley Decl. ¶¶ 17, 22 (PI Ex. 6) (emphasis added).  Dr.

Benjamin Hart, of the University of California at Davis, who has reviewed much of the evidence

and also inspected Karen and Nicole, explains that because "[e]lephants are highly sensitive and

cerebral animals," the ███████████████████████████████████████████████

████████████████████████████████████████████████████████   See Hart Decl.

¶¶ 3, 18 (PI Ex. 5) (emphasis added).

Thus, FEI's chaining of the elephants "harms" them, 16 U.S.C. § 1532(19), because it

"injures" them in myriad ways.  See 50 C.F.R. § 17.3 ("harm" means "an act which actually kills

or injures wildlife," including by "significantly impairing essential behavior patterns"); see also,

e.g., Ensley Decl. ¶¶ 10-13, 15 (PI Ex. 4) ██████████████████████████████  Buckley

Decl. ¶¶ 9-11, 15-21 (PI Ex. 6) ██████████████████████████████████████████

████████); Hart Decl. ¶¶ 14-16 (PI Ex. 5) ██████████████████████████████████

████████.

Second, the chaining of the elephants also "wounds" them, see 16 U.S.C. § § 1532(19),

because it results in cuts, infections, and scars.  See, e.g., Webster's New World College

Dictionary, at 1541 (3d ed. 1996) ("wound" means "an injury to the body in which the skin or

other tissue is broken, cut, pierced, torn, etc."); Ensley Decl. ¶ 15 (PI Ex. 4) ████████████

████████████████████████); Photographs of Elephants (PI Ex. 44); Medical

Records of Elephants (PI Ex. 43); Buckley Decl. ¶¶ 18-19 (PI Ex. 6) █████████████████

████████████████████████████████████); see also Strahan v. Coxe, 939 F.

Supp. 963, 984 (D. Mass. 1996) aff'd in part and vacated in part, 127 F.3d 155 (1st Cir. 1997)

(noting that "scars" on whales' tails demonstrated "take" by fishing gear entanglement).

Third, the constant chaining of the elephants also "harasses" the animals within the meaning of the "take" prohibition, 16 U.S.C. § 1532(19), because it "significantly disrupt[s] [their] normal behavioral patterns," including their need to walk, turn around, explore their surroundings, and socialize with other elephants. See 50 C.F.R. § 17.3 (the definition of "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such extent as to significantly disrupt normal behavioral patterns"); see also Sweet Home, 515 U.S. at 705 ("harass" includes birdwatching where it impairs natural behaviors of listed species (citations omitted)); **REDACTED** Buckley Decl. ¶¶ **REDACTED** (PI Ex. 6); **REDACTED** As Dr. Hart succinctly explains, because the elephants are confined in chains for so much of their lives they **REDACTED** **REDACTED** **REDACTED** " Hart Decl. ¶ 15 (PI Ex. 5); see also id. ¶ 18 (chaining is especially "a critical issue with an animal species, such as the Asian elephant, which is highly intelligent and evolutionarily adapted to a life of moving about, interacting with other elephants, and engaging in numerous social interactions").[14]

Therefore, because plaintiffs can show not only that the chaining of the elephants has caused injury to these endangered animals in the past, but is continuing to cause them injury every day of their lives, they have a strong likelihood of success on the merits of this claim. See, e.g., Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 784 (9th Cir. 1995)

---

[14] Furthermore, FEI's chaining practice does not "meet or exceed" any "animal husbandry" standard that has been issued under the Animal Welfare Act, or relate to the provision of any "veterinary care," or constitute a "breeding procedure," and hence fails to qualify for any of the limited exceptions from the definition of "harass" as that this term is applied to captive wildlife. See 50 C.F.R. § 17.3; see also Ensley Decl. ¶ 15 (PI Ex. 4).

(showing of actual or imminent threat of "take" of endangered species requires injunction);

Marbeled Murrelet v. Pac. Lumber Co., 83 F.3d 1060, 1066 (9th Cir. 1996) (the citizen suit

provision of the ESA "allows private plaintiffs . . . to enjoin private activities that are reasonably

certain to harm a protected species") (citations and quotation marks omitted) (emphasis added);

Nat'l Wildlife Fed'n v. Burlington N. R. R., Inc., 23 F.3d 1508, 1510 (9th Cir. 1994)

(preliminary injunction appropriate where plaintiffs "make a showing that a violation of the ESA

is at least likely in the future" (citations omitted)); Ctr. for Biological Diversity, 434 F. Supp. 2d

at 795-96 (where construction of development has already caused a take by harassing the bald

eagle population, evidence is sufficient to demonstrate that continued construction will likewise

cause a "take"); Strahan v. Coxe, 939 F. Supp. at 984 (granting preliminary injunction where

affidavits from scientists showed likelihood of future "take" of endangered whales).

> **B.      Plaintiffs Are Likely To Prevail On Their Standing Allegations.**

Plaintiffs are also likely to prevail on their assertions that they have Article III standing to

seek the requested relief – i.e. that they suffer cognizable injuries that are caused by FEI's illegal

actions and that will be redressed to some extent should plaintiffs prevail on their claims.  See

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

> **1.      Plaintiff Tom Rider's Standing**

The Court of Appeals has already ruled that plaintiff Tom Rider, who worked for the

Ringling Bros. circus for two and a half years and worked with at least seven of the elephants

who are still in FEI's possession, alleged sufficient standing in this case based on his personal

relationship with the elephants and the aesthetic injury he suffers from either continuing to see

the elephants he loves suffering from their mistreatment or having to refrain from visiting them

to avoid such injury.  See ASPCA v. Ringling Bros., 317 F.3d at 338 (relying on Friends of the

Earth, Inc. v. Laidlaw Envt. Servs., 528 U.S. 167, 181-82 (2000)).  All of the allegations that

form the basis of Mr. Rider's standing can easily be demonstrated with testimony that he has

already provided in this case.

Thus, during the two and a half years that he worked for the circus, Mr. Rider formed a

strong personal attachment to many of the Ringling Bros. elephants, including Karen, Nicole,

Lutzi, Zina, Mysore, Susan, and Jewell.  See 1st Rider Dep. at 11, 17, 112 (PI Ex. 17); see also

USDA Memorandum, July 21, 2000 (PI Ex. 45) (USDA investigator observes that "[t]here is no

question that he [Mr. Rider] loves the elephants that he worked with . . . and wants to help them

find a better life than what is provided by the circus").[15]

Mr. Rider saw the elephants mistreated on a daily basis by being kept in chains for long

periods of time and hit with bullhooks,[16] and he observed the negative impacts this treatment had

---

[15] Mr. Rider has testified that 

---

[16] See 1st Rider Dep. at 23-31 (PI Ex. 17) (describing seeing the elephants chained for "the
majority of the time"); id. at 31 (the elephants were chained on concrete for 22 ½ hours every day
for three weeks when the circus performed at Madison Square Garden, for 21 days); id. at 41-42
(the elephants were chained for 48-72 consecutive hours when traveling on the train); id. at 43-64
(describing daily abuse with the bull hook in the name of "discipline"); id. at 290 (he saw
beatings of elephants "3-4 times a week"); see also

on the elephants' behavior and demeanor,[17] which in turn marred his aesthetic enjoyment of the elephants.  See e.g.,1st Rider Dep. at 64-68 (PI Ex. 17) (he saw wounds on elephants caused by bullhooks); id. at 79 (he heard the elephants "scream" when they were hit).  Mr. Rider left the circus because he could not tolerate watching the elephants be abused, see, e.g., 1st Rider Dep. at 105-107 (PI Ex. 17), and because he wanted to do everything in his power to "put a stop" to that abuse, id. at 105-107.[18]

---

REDACTED

REDACTED

[17] See 1st Rider Dep. at 32 (PI Ex. 17) (he saw the elephants "rocking back and forth in chains all the time – constant swaying back and forth - because they weren't able to do anything"); id. at 79 (when the elephants were hit with bullhooks they would "cower," and "scream" and "turn sideways and flinch").

[18] Indeed, in addition to being a plaintiff in this lawsuit, Mr. Rider has devoted the last eight years of his life to traveling around the country while he lives out of a used van to speak to grassroots groups, reporters, and legislators about what really goes on behind the scenes at the Ringling Bros. circus, in an effort to ameliorate the plight of these animals.  See, e.g., 1st Rider Dep. at  107-112, 204-210, 283-287 (PI Ex. 17); REDACTED ); see also Plfs.' Opp'n to FEI's Mot. to Add RICO Counterclaim at 26-28 (DE 132) (providing partial list of Mr. Rider's media and legislative efforts).  While FEI attempts to paint Mr. Rider's public education campaign as something nefarious that casts doubt on Mr. Rider's credibility, his advocacy work actually highlights his devotion to the elephants with whom he formed a strong personal bond.  FEI also attempts to make it look like Mr. Rider is living in the lap of luxury by aggregating the amount of funding he has received for his media and public education efforts over the last eight years.  In fact, on an annual basis Mr. Rider has received extremely modest funding for his grass roots public education campaign that, while paling in comparison to the massive public relations efforts conducted by FEI, is nonetheless effective in explaining to the public what actually occurs at the circus.  See id.; see also Tr. Testimony at 2069, March 9, 2006 (PI Ex. 47) (FEI spends $1 million a year on advertising in New York City alone).  Indeed, it is precisely because Mr. Rider is a former employee for the circus, with first-hand knowledge of the elephant abuse, that he is such a valuable spokesperson for these animals.

Since leaving the circus, and in the years this litigation has dragged on, Mr. Rider has also

made many efforts to visit and observe the elephants he loves, although every time he does so, he

suffers more aesthetic injury because of the way the elephants are mistreated.  See, e.g., ██████

████████████████████████████████████████████████████████████████████

██████████.[19]  Accordingly, Mr. Rider suffers precisely the kind of aesthetic harm that

the Court of Appeals has already recognized is sufficient for purposes of Article III.  See ASPCA

v. Ringling Bros., 317 F.3d at 336 ("Rider's allegations of injury fit within decisions of this court

and the Supreme Court recognizing that harm to one's aesthetic interests in viewing animals may

be a sufficient injury in fact") (citations omitted).[20]

_____

[19]  See also 1st Rider Dep. at 108-115 (PI Ex. 17) (he has been around the circus around 40-50
times since he left, and has observed the elephants in chains and being struck with bullhooks); ██
████████████████████████████████████.  In fact because of his media and public education
work, Mr. Rider has had occasion over the years to also see the Red Unit elephants as well as the
Blue Unit elephants, see 1st Rider Dep. at 108, 115 (PI Ex. 17); ████████████████████
█████and is now dedicated to preventing the abuse of these animals as well.  See ██████████
████████

[20]  Mr. Rider's accounts of the systematic mistreatment of the elephants have been
corroborated not only by several other former Ringling Bros. employees, but also by FEI's own
internal documents.  See, e.g., Hagan Dep. at 14 (PI Ex. 13) (when the elephants "moved out of
line," the head elephant handler "would usually whack them across the trunk or the foot" –
i.e. "strike him with a bullhook"); Tom Decl. ¶ 27 (PI Ex. 19) ("I have seen members of the
elephant crew hooking elephants behind the ear, on the legs and on the trunk and leaving bloody
wounds"); id. ¶ 18 ("[w]hile on the boxcars, the animals do not have enough room to turn around
or lay down"); Hundley Decl. ¶¶ 6-7 (PI Ex. 20) (recounting brutal beating she witnessed of an
elephant in Tulsa Oklahoma); id. ¶ 19 ("[t]he elephants are only unchained when the public is
around"); Ramos Dep. at 11 (PI Ex. 18) (the head elephant trainer hit the elephants with bull
hooks "all the time"); see also report from Deborah Fahrenbruck, FEI's "Animal Behaviorist" (PI
Ex. 48) (describing "an elephant dripping blood all over the arena floor during the show from
being hooked" (emphasis added)); Internal E-Mail from Heather Riggs, FEI Veterinary
Technician (PI. Ex. 49) ("[a]fter this morning's baths, at least 4 of the elephants came in with

-28-

There also is no question that Mr. Rider is likely to prevail on both the causation and redressability prongs of Article III standing.  Indeed, the aesthetic injury he suffers is much more than "fairly" traceable to defendant's chaining and confinement of the elephants, Bennett v. Spear, 520 U.S. 154, 167-68 (1997) – it is the direct result of that mistreatment.  Moreover, if plaintiffs prevail in this case, and the elephants are no longer chained on concrete for many hours of their lives, Mr. Rider's injuries will certainly be at least partially redressed.  See Meese v. Keene, 481 U.S. 465, 476 (1987) (to establish redressability plaintiffs need only show that they will obtain some relief for their injuries); see also ALDF v. Glickman, 154 F.3d 426, 443-44 (D.C. Cir. 1998) (redressability sufficient because if plaintiff prevails the animals will either be more humanely treated by their current owner or relocated to a better situation).

## 2.      The Standing Of The Organizational Plaintiffs

Although the Court of Appeals did not address the issue of whether the organizational plaintiffs also have standing on the grounds that "each of them is seeking relief identical to what Rider seeks," ASPCA v. Ringling Bros., 317 F.3d at 338, this Court subsequently limited the scope of relief that the plaintiffs may obtain here to the seven elephants with whom Mr. Rider worked, since Mr. Rider's standing was the sole basis for the Court of Appeals' decision. See ASPCA v. Ringling Bros., 246 F.R.D. 39, 42 (D.D.C. 2007).  However, the Court did so without addressing the independent basis for standing asserted by the organizational plaintiffs, including API which recently joined this case, and without the benefit of  two recent decisions that bear on this issue, Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129 (D.C. Cir. 2006), Cary v. Hall, Civ No. 06-04363 (N.D. Ca. Oct. 3,

multiple abrasions and lacerations from the hooks" (emphasis added)).

2006) (PI Ex. 50).

For these reasons, and because, as demonstrated <u>supra</u>, <u>all</u> of the Pre-Act elephants are being "taken" by FEI's routine chaining practices, plaintiffs urge the Court to revisit the question of whether plaintiffs may seek relief – including preliminary relief – with respect to <u>all</u> of the Pre-Act elephants. <u>See</u> Fed. R. Civ. P. 54(b) (a district court may revise its own interlocutory rulings "at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities"); <u>see also</u> <u>Childers v. Slater</u>, 197 F.R.D. 185, 190 (D.D.C. 2000) (the court may reconsider any interlocutory judgment "'as justice requires'" (quoting Fed. R. Civ. P. 60(b)). As demonstrated below, particularly in view of recent decisions, plaintiffs believe that there is a likelihood that they will ultimately prevail on the issue of the organizational plaintiffs' standing as well.

The organizational plaintiffs, including API, which was added to this case in February 2006, suffer both informational and organizational injuries because defendant FEI engages in the "take" of an endangered species without applying for and obtaining a Section 10 permit, as required by the ESA. <u>See</u> Compl. ¶¶ 3-16; Supplemental Compl. ¶¶ 3-6 (DE 180). Thus, as a result of FEI's violation of Section 10, the organizational plaintiffs are denied all of the information to which they would be entitled under that provision of the statute, including a demonstration by FEI that its treatment of the elephants is necessary to "enhance the propagation or survival" of the Asian elephant, and all other information that was obtained or generated by the FWS in response to the permit application. <u>See</u> 16 U.S.C. § 1539(c); <u>see also</u> Declaration of Nicole Paquette, General Counsel of API ¶¶ 9-12 (PI Ex. 51) (explaining that API is injured by its inability to obtain the information that is required by Section 10).

Such informational injury is well recognized as sufficient for Article III purposes.  See, e.g., Federal Election Comm'n v. Akins, 524 U.S. 11, 20-21, 24-25  (1998) (voters had standing to challenge failure of lobbying organization to register as a "political committee" because this deprived them of information to which they would be entitled  under the federal campaign statute); Public Citizen v. Dep't of Justice, 491 U.S. 440, 449-51 (1989) (failure to be provided information required to be disclosed under the Federal Advisory Committee Act causes injury for standing purposes ); Havens Realty Corp. v. Coleman, 455 U.S. 363, 373-74 (1982) (deprivation of information about housing availability constitutes "specific injury" for standing). Indeed, a district court in California recently ruled that animal welfare and environmental organizations had standing based on a similar argument – i.e., that because ranches allowing the "canned hunting" of endangered antelopes were not obtaining separate Section 10 permits that authorized this "take" of a listed species, the organizations were deprived of information to which they are entitled under Section 10 of the ESA.  See Cary v. Hall, Civ No. 06-04363 (N.D. Ca. Oct. 3, 2006) (PI Ex. 50).

The organizational plaintiffs are additionally injured by FEI's failure to abide by Section 10 of the ESA because, as a consequence, they must spend their own resources to investigate FEI's activities to be able to keep their members informed about these matters, and to pursue alternative ways of countering FEI's claims that it treats the elephants with the highest standard of care, in an effort to curtail FEI's illegal activities.  See, e.g., Paquette Decl. ¶12 (PI Ex. 51) (explaining that FEI's failure to abide by the ESA has "impaired the organization's ability to carry out its organizational mission").  Such organizational injury is also well recognized as cognizable for standing purposes, see Havens Realty, 455 U.S. at 378-79, as the Court of

Appeals for this Circuit recently reiterated.  See Abigail Alliance, 469 F.3d at 132-33 (finding

standing where group's organizational mission is impeded by defendant's failure to abide by its

legal obligations).  Therefore, because FEI's conduct "perceptibly impair[s]" the organizations'

mission to conserve endangered species, and to monitor and comment upon requests to engage in

activities that are otherwise strictly prohibited by the ESA, see, e.g., Paquette Decl. ¶12 (PI Ex.

51), see Havens Realty, 455 U.S. at 379, "there can be no question that the organization has

suffered injury in fact."  Id.[21]

Furthermore, because the organizations' informational and economic injuries are both

"fairly traceable" to defendant's conduct, Bennett v. Spear, 520 U.S. at 167, and would at least be

partially remedied if FEI would comply with its statutory obligations – either by ceasing to

engage in the unlawful conduct or by applying for a permit to do so – the organizational plaintiffs

are also likely to succeed on both the causation and redressability prongs of Article III standing.

See Meese v. Keene, 481 U.S. at 476-77.

## II.     A PRELIMINARY INJUNCTION IS APPROPRIATE AND NECESSARY

In view of the likelihood that plaintiffs will prevail on their chaining and confinement

claim, preliminary injunctive relief is plainly required here, since, as discussed earlier, "[t]he

presumption in cases arising under the ESA is that the balancing of harms and effect on the

public interest tips in favor of protecting the endangered animals."  Strahan v. Pritchard, 473 F.

Supp. 2d 230, 240 (D. Mass. 2007) (citing National Wildlife, 23 F.3d at 1511); see also

---

[21] Because the Court need only find standing with respect to one plaintiff, Watt v. Energy
Action Educ. Found., 454 U.S. 151, 160 (1981), plaintiffs are not discussing the standing of the
other organizational plaintiffs, which have all asserted informational and organizational injuries
because of FEI's failure to comply with Section 10 of the ESA.

Weinberger v. Romero-Barcelo, 456 U.S. at 313 ("Congress foreclosed the exercise of the usual

discretion possessed by a court of equity").

Thus, because "[t]he traditional preliminary injunction analysis does not apply to

injunctions issued pursuant to the ESA," the Court is not required to "weigh economic harm . . .

in reaching its conclusion." Nat'l Wildlife Fed. v. Nat'l Marine Fish. Serv., 422 F.3d 782, 793-

94 (9th Cir. 2005).  Moreover, plaintiffs are not seeking to shut down the entire circus, but

instead simply seek to prevent defendant from continuing to harm, harass, and wound the

endangered elephants by keeping them in chains for many hours each day during the time it takes

the Court to resolve all of plaintiffs' claims on the merits.  Indeed, even if this meant that for

some reason the circus could not use the elephants at all in its performances for some period of

time, this would have a minimal impact on FEI, since the elephants constitute only a fraction of

the entire show.  See supra at 7.  It would have even less economic impact with respect to

elephants maintained at the CEC of the Williston facility, since those elephants are not currently

performing.

In any event, because plaintiffs have demonstrated that the chaining of the elephants

"takes" them in violation of Section 9 of the ESA, and FEI has already succeeded in delaying a

final resolution of this case for many years – and continues to engage in tactics that will only

further delay securing final relief for these endangered elephants – the Court should issue a

preliminary injunction that requires FEI to take immediate steps to halt this illegal activity, at

least until the Court can hold a trial and issue a final decision on all of plaintiffs' claims.  See

Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv., 481 F.3d 1224, 1242 (9th Cir. 2007) (upon

finding a violation of the ESA, courts have broad discretion to fashion injunctive relief),

amended and superceded by --- F.3d ----, 2008 WL 1821470 (9th Cir. April 24, 2008); see also

Strahan v. Coxe, 939 F. Supp. at 989 (court crafts interim injunction to reduce the number of

"takes" of endangered whales).  While plaintiffs believe that they are entitled to such relief with

respect to all of the elephants currently being used by FEI, at an absolute minimum the Court

should grant such relief with respect to the seven elephants for whom the Court has already ruled

Mr. Rider has sufficiently asserted standing in this case.[22]

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be

granted.

Respectfully submitted,

  /s/ Katherine A. Meyer
Katherine A. Meyer
(D.C. Bar No. 244301)
Eric R. Glitzenstein
(D.C. Bar. No. 358287)
Kimberly D. Ockene
(D.C. Bar No. 461191)
Tanya M. Sanerib
(D.C. Bar No. 473506)

Meyer Glitzenstein & Crystal
1601 Connecticut Avenue
Suite 700
Washington, D.C. 20009

---

[22]  Granting the preliminary relief requested would mean that, at least until this case is resolved on the merits, FEI would be required to send all of the Pre-Act elephants who are currently traveling (approximately 11) to a location where they would not be in chains except when necessary to provide them veterinary care, including for example, one of FEI's stationary venues such the location in Tampa Florida where it has its annual "winter quarters"or the 200-acre CEC in Polk City, or at some other location approved by the Court; and that FEI would be required to maintain the other Pre-Act elephants who are currently at either the CEC or the Williston facility unchained, except when necessary to administer veterinary care.

(202) 588-5206

Counsel for Plaintiffs

May 21, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
AMERICAN SOCIETY FOR THE PREVENTION           )
    OF CRUELTY TO ANIMALS, et al.,            )
                                              )
                        Plaintiffs,           )
                                              )
    v.                                        )
                                              )   Civ. No. 03-2006 (EGS/JMF)
                                              )
RINGLING BROTHERS AND BARNUM & BAILEY         )
    CIRCUS, et al.,                           )
                                              )
                        Defendant.            )
_____ )

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of May, 2008, copies of the unredacted version of

plaintiffs' motion for a preliminary injunction, supporting memorandum, exhibits, and proposed

order were hand-delivered to defendant's counsel:

John M. Simpson
Lisa Zeiler Joiner
Fulbright & Jaworski
801 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2623


  /s/ Katherine A. Meyer
Katherine A. Meyer
Meyer Glitzenstein & Crystal
1601 Connecticut Avenue
Suite 700
Washington, D.C. 20009
(202) 588-5206

Counsel for Plaintiffs