# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ———————————————— | ) | |
| AMERICAN SOCIETY FOR THE | ) | |
| PREVENTION OF CRUELTY | ) | |
| TO ANIMALS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 03-2006 (EGS) |
| | ) | |
| FELD ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Tom Rider was formerly employed by Defendant Feld Entertainment, Inc.

("FEI"), where he worked with several of defendant's Asian elephants in defendant's Ringling

Bros. and Barnum & Bailey ("Ringling Bros.") traveling circus.  Plaintiff Animal Protection

Institute ("API") is a non-profit organization which conducts advocacy and public policy

campaigns focused on animals in entertainment.  Plaintiffs brought this action against FEI,

alleging that FEI's use of bullhooks and prolonged periods of chaining with respect to its circus

elephants violates the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq*.  The Court

presided over a non-jury trial from February 4, 2009 to March 18, 2009, during which time the

Court heard testimony from approximately thirty fact and expert witnesses and reviewed and

admitted hundreds of documents into the evidentiary record.  After the trial concluded, and at the

Court's direction, each party submitted Proposed Findings of Fact and Conclusions of Law.

Closing arguments were held on July 14, 2009.  Based on all of the evidence presented, the

relevant law, and the entire record developed over nine years of litigation in this matter, and for

the reasons stated herein, the Court makes the following findings of fact and conclusions of law. Consistent with these findings and conclusions, and because the plaintiffs have failed to establish the standing required by Article III of the United States Constitution, the Court will enter judgment in favor of defendant.

## I.    BACKGROUND

### A.    The Parties

Defendant FEI is a corporation organized under the laws of the State of Delaware. *See* Defendant's Proposed Findings of Fact and Conclusions of Law ("Def.'s Prop. FOF") at ¶ 11.[1] FEI or its predecessor entities have produced and presented a live circus show under the "Ringling Bros." or similar name for 139 years, and elephants have been included in those shows since 1872. *Id.* at ¶ 12.  FEI currently owns fifty-four (54) Asian elephants, the largest group of captive Asian elephants in the United States. *Id.* at ¶¶ 24, 27.  A number of FEI's Asian elephants perform in circus shows and travel with three circus units. *Id.* at ¶ 28.  In addition to the traveling shows, FEI also maintains Asian elephants at its Center for Elephant Conservation ("CEC") in central Florida, and at the Two Tails Ranch in Williston, Florida ("Williston Ranch").  *Id.*  Those facilities are not open to the public. *Id.*  FEI's elephants are sent to the CEC or the Williston Ranch for breeding, research, and retirement. *Id.* at ¶ 28.  Since 1992, through

---

[1] Citations to specific statements in plaintiffs' and defendant's respective Proposed Findings of Facts and Conclusions of Law are explicitly adopted by the Court.  Accordingly, the Court incorporates the record citations cited therein.  Citations to transcripts of the trial proceedings in this matter will be cited by the date, followed by a reference to the a.m. or p.m. session if there are two or more transcripts for that date, followed by the relevant page and line number(s), followed by the witness's name in parentheses, if applicable.

FEI's breeding program, twenty-two (22) Asian elephants have been bred and born in captivity. *Id.* at ¶ 29.

Plaintiff Tom Rider worked for the Ringling Bros. circus on one of the circus's traveling units, the Blue Unit, from June 1997 to November 1999.  *See* Plaintiffs' Proposed Findings of Fact ("Pls.' Prop. FOF") at ¶ 3.  Initially employed as a "barn helper," and later as a "barn man," Rider was responsible for cleaning up after the elephants, providing them with food and water, and watching over them while he was on duty.  *Id.*  As discussed below, *see infra* Part I.C., plaintiffs' complaint in this case alleges that during the nearly two and a half years that Rider worked on the Blue Unit, he developed a strong personal attachment to many of the Ringling Bros. elephants.  *See* Complaint (Docket Entry ("DE") 1) (Sept. 26, 2003) ("Compl.") at ¶ 18. Seven of the elephants with whom Rider worked on the Blue Unit are still in FEI's possession: Karen, Nicole, Lutzi, Zina, Mysore, Susan, and Jewell.[2]  Pls.' Prop. FOF at ¶ 9.  Karen and Nicole still perform on the circus's Blue Unit, while Lutzi, Jewell, Susan, Mysore, and Zina are at the CEC.  Pls.' Prop. FOF at ¶ 12; Def.'s Prop. FOF at ¶¶ 48, 49.  According to FEI, Lutzi, Jewell, Susan, Mysore, and Zina are retired from circus performing, and will never again be exhibited by FEI in the circus.  Def.'s Prop. FOF at ¶ 49.  All seven of the elephants at issue in this case are adults; the oldest, Mysore, is approximately sixty-three (63) years old, and the youngest, Nicole, is approximately thirty-four (34) years old.  *Id.* at ¶ 25.

---

[2]  As discussed *infra*, Part I.C., while plaintiffs originally sought relief with respect to all of the Asian elephants owned by FEI (approximately fifty-four), several legal rulings issued during the course of this litigation have narrowed the number of elephants at issue to the seven elephants named here with whom Rider worked.

Plaintiff API is a non-profit organization formed in 1968 and based in Sacramento, California.  Pls.' Prop. FOF at ¶ 67.  API has four campaign areas, one of which focuses on animals in entertainment.  *Id.*  API also works on international wildlife trade, exotic pets, and trapping and fur issues.  *Id.*  API's work related to circus animals includes (a) public education and advocacy; (b) legislative efforts; and (c) regulatory work.  *Id.* at ¶ 68.  API has approximately 40,000 members and supporters.  *Id.* at ¶ 74.

## B.      Plaintiffs' Claims

Rider and API contend that FEI "takes" the Asian elephants in its possession in violation of Section 9 of the ESA by "harming," "harassing," and "wounding" the elephants.  *See* Plaintiffs' Second Amended Pre-Trial Statement ("Pls.' Pretrial St.") at 1 (citing 16 U.S.C. § 1532(19) (providing definition of "take")).  Specifically, plaintiffs allege that defendant's employees "take" the elephants by routinely hitting them with bullhooks[3] to train, handle, "correct," and "discipline" the animals, and by chaining them on hard surfaces for many hours each day, and for even longer durations while the elephants are transported on train cars from one location to the next.[4]  *Id.* at 1-2.

---

[3] The bullhook is an approximately two and a half to three-foot long rod made of wood or fiberglass, with a metal hook and a metal point on its end.  *See* Pls.' Prop. FOF at ¶ 125.

[4] Earlier in this litigation, plaintiffs also claimed that FEI's practice of "weaning" or "forcibly separating" baby elephant calves from their mothers at an earlier age then would happen in the wild is an unlawful "take" in violation of the ESA.  On August 23, 2007, however, the Court granted partial summary judgment for defendant, holding that plaintiffs could not seek relief with respect to defendant's captive-born elephants because FEI's captive-born elephants are held pursuant to a valid permit issued by the Fish and Wildlife Service, and only that agency can bring an enforcement action concerning such a permit.  *See ASPCA v. Ringling Bros.*, 502 F. Supp. 2d 103 (D.D.C. 2007).  As a result of that ruling, plaintiffs have withdrawn their "weaning" claim.  *See* Pls.' Pretrial St. at 3, n.1; *see also infra*, Part I.C.

4

Plaintiffs maintain that the use of the bullhook "wounds," "harms," and "harasses" the elephants in violation of the ESA's "take" prohibition because it causes physical, psychological, and behavioral injuries to the elephants, and also significantly impairs and disrupts the elephants' essential and normal behavioral patterns, including their ability to move freely without being hit, their ability to explore their surroundings, and their ability to socialize with other elephants. *See* Pls.' Pretrial St. at 11. Plaintiffs also contend that defendant's practice of chaining the elephants "harms," "harasses," and "wounds" the elephants in many ways, such as by contributing to serious foot, leg, joint, and other injuries and diseases, as well as significantly impairing and disrupting their essential and normal behavior patterns, including their need to walk, their need to turn around and to explore their surroundings, and their need to socialize with other elephants. *Id.* at 7.

## C.     Procedural History

This litigation is in its ninth year.[5] The original complaint in this action was docketed as Civil Action Number 00-1641, and was filed on July 11, 2000, on behalf of, among others, the American Society for the Prevention of Cruelty to Animals ("ASPCA"), Animal Welfare Institute ("AWI"), and Fund for Animals ("FFA"), as well as certain plaintiffs who were later dismissed, namely the Performing Animal Welfare Society ("PAWS"), Pat Derby, Edward

---

[5] To say that this case has involved highly litigious, complex, and protracted discovery and motions practice is to profoundly understate the history of this case. The Court acknowledges with sincere appreciation the tireless efforts of U.S. Magistrate Judge John M. Facciola, and the several law clerks in Judge Facciola's and this Court's chambers who have worked on this case throughout the years. Significant judicial resources were expended, particularly during the more than five years of discovery in this matter, in order to advance this litigation to trial.

Stewart, and Glenn Ewell.  *See* Def.'s Prop. FOF at ¶ 18.  Plaintiffs filed a Second Amended

Complaint on April 10, 2001.

On June 29, 2001, the Court dismissed the Second Amended Complaint on the grounds

that plaintiffs lacked standing to sue.  *See* Mem. Op. & Order, Civ. No. 00-1641 (DE 20) (June

29, 2001) ("June 29, 2001 Decision").  With regard to Rider, the Court found that Rider had

"failed to demonstrate sufficient injury-in-fact," because "he ha[d] not alleged a presently

suffered aesthetic injury[.]" *Id.* at 6, 9 (finding that like the plaintiff in *Animal Legal Defense*

*Fund v. Espy*, 23 F.3d 496 (D.C. Cir. 1994), whose alleged injury based on exposure to animals

being inhumanely treated in her research field was found to be insufficient to support standing

where she had been away from the research field for six years and therefore had not suffered the

aesthetic injury during that time, Rider had been away from the circus for two years and during

that time had not been exposed to the alleged mistreatment).  The Court also found that Rider's

contention that he wished to return to elephant training was a "speculative and uncertain claim

. . .  not sufficient to support the requirement that the plaintiff's aesthetic injury, if not presently

suffered, be imminently threatened."  June 29, 2001 Decision at 6.

The Court also dismissed the case as to the organizational plaintiffs, who alleged that

they suffered informational and economic injury as a result of defendant's failure to apply for a

permit prior to "taking" the elephants.  *See id.* at 10-11 (discussing organizational plaintiffs'

argument that if defendant applied for a permit, plaintiffs would receive all of the information

they require through the public notice and comment period provided by the Section 10 process).

The Court recognized that under this Circuit's precedent, an informational or economic injury

"may be sufficient to support standing to a person adversely affected or aggrieved by an agency

6

action (or inaction)."  *Id.* at 11 (citing *Animal Legal Def. Fund v. Espy* ("*ALDF II*"), 29 F.3d 720,

724 (D.C. Cir. 1994)).  The Court found, however, that the cases in which informational injury

was sufficient to support standing were limited to suits brought against the agency whose failure

to enforce the regulation at issue caused the plaintiff's injury.  *See* June 29, 2001 Decision at 12

(citing *ALDF II,* 29 F.3d at 724; *Humane Soc'y v. Babbitt*, 46 F.3d 93, 101 (D.C. Cir. 1995); *Fla.*

*Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996); *Fed. Election Comm'n v.*

*Akins*, 524 U.S. 11 (1998); *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440 (1989)).  Accordingly,

because plaintiffs' injury "was not caused by defendant, but rather by a third party's

interpretation of the applicable statute[,]" the Court held that the organizational plaintiffs lacked

standing and dismissed them from the case.  *See* June 29, 2001 Decision at 12.

On February 4, 2003, the U.S. Court of Appeals for the District of Columbia Circuit

reversed that decision.  *See ASPCA v. Ringling Bros.*, 317 F.3d 334 (D.C. Cir. 2003).  As

discussed in detail below, *see infra* Part II.C., the Court of Appeals held that, assuming the truth

of the allegations in the Second Amended Complaint, Mr. Rider had standing to sue.  *Id.* at 336,

338.  The Court of Appeals did not reach the question of whether the organizational plaintiffs

had standing independent of Rider's claims.  *Id.* at 338 ("Rider's allegations are sufficient to

withstand a motion to dismiss for lack of standing.  We therefore do not decide whether the other

plaintiffs have standing because each of them is seeking relief identical to what Rider seeks.").

On September 26, 2003, ASPCA, AWI, FFA and Rider filed another complaint against

FEI, which was docketed as Civil Action Number 03-2006.  On November 25, 2003, the original

action, Civil Action Number 00-1641, was dismissed without prejudice.  Since that time, this

action has proceeded as a single civil action under Civil Action Number 03-2006.  On February

23, 2006, API was added as a plaintiff to this action pursuant to plaintiffs' Supplemental

Complaint ("Supp. Compl."). *See* Order (DE 60) (February 23, 2006).

In their complaint, plaintiffs sought an order: (1) declaring that FEI's treatment of its

elephants violates the ESA and that statute's implementing regulations; (2) enjoining FEI from

continuing to violate the ESA and that statute's implementing regulations with respect to the

elephants in its possession; (3) enjoining FEI from purchasing, receiving, transporting in

interstate commerce, harming, harassing, and "taking" endangered elephants; (4) enjoining FEI

from beating, wounding and injuring endangered elephants, forcibly separating baby elephants

from their mothers, and keeping elephants on chains for most of the day, unless and until FEI

obtains a permit to do so from the Fish and Wildlife Service ("FWS") pursuant to the procedural

and substantive requirements of Section 10 of the ESA; (5) directing FEI to forfeit possession of

the endangered elephants in its possession; (6) awarding plaintiffs their reasonable attorney's

fees and costs for this action; and (7) granting plaintiffs such other and further relief as may be

just and proper.[6]  *See* Compl. at 21-22.

---

[6]  As noted *supra*, n.4, plaintiffs have withdrawn their claim that defendant's practice of forcibly separating baby elephants from their mothers constitutes an unlawful "take" under the ESA.  Plaintiffs have also withdrawn their original claim for forfeiture of FEI's elephants.  *See* Minute Entry (June 11, 2008) ("Forfeiture is withdrawn and stricken from the record.").  On July 14, 2009, during closing arguments, plaintiffs again modified their request for relief.  Rather than requesting an immediate injunction prohibiting use of the bullhook (which plaintiffs' counsel stated was not "realistic," 3-18-09 a.m. at 14:24-15:3), plaintiffs sought "sort of a cross between declaratory judgment and an injunction." *Id.* at 15:17-18.  Specifically, plaintiffs sought a declaration that only certain uses of the bullhook would be illegal, principally using it to "get[] elephants to perform in the circus." *Id.* at 11:8-12:8.  Plaintiffs requested a similar form of relief with respect to their chaining claim.  *Id.* at 16:12-21.  With the issuance of such declaratory relief, plaintiffs argued that FEI should then have a period of time to seek a permit from FWS. *Id.* at 15:10-20; 16:15-21.

On August 23, 2007, following several years of extensive discovery, this Court granted in part and denied in part a motion for summary judgment for FEI.  *See ASPCA v. Ringling Bros.*, 502 F. Supp. 2d 103 (D.D.C. 2007) ("August 23, 2007 Decision").  In its motion, FEI argued that an exemption from certain provisions of the ESA for animals held in captivity prior to the date the animal was listed as an endangered species under the ESA also applied to the ESA's "take" prohibition.  As a result, FEI argued that the thirty-four (34) elephants that FEI had owned prior to the date that the Asian elephant was listed as an endangered species (so-called "pre-Act" elephants) were exempt from the "take" prohibition.  The Court rejected that argument, finding that the "pre-Act" exemption did not apply to the "take" prohibition.  *Id.* at 108, 110.

The Court did, however, grant summary judgment for FEI as to twenty-one (21) elephants for which FEI held a valid "captive-bred wildlife" ("CBW") permit from the FWS.  *Id.* at 113.  As the Court explained in its opinion, FWS adopted the CBW registration regulation in 1979, and exempted animals born in captivity and held pursuant to a valid CBW permit from the "taking" prohibition of the ESA.  *Id.* at 110-11 (citing 50 C.F.R. § 17.21(g); 44 Fed. Reg. 54002, 54007 (Sept. 17, 1979)).  Accordingly, because the ESA's "take" prohibition did not apply to animals held pursuant to a CBW permit, the Court determined that it lacked jurisdiction to decide plaintiffs' claims as to those elephants for which FEI had a CBW permit.  *See* August 23, 2007 Decision at 111-12 (explaining that only the Secretary of the Interior can bring actions for violations of a permit issued by FWS).

On October 25, 2007, the Court granted in part defendant's motion for reconsideration of the August 23, 2007 Decision, agreeing with FEI that because the Court of Appeals had determined that Rider's standing to sue was premised on (i) his alleged "'strong personal

attachment to the elephants'" with whom he had worked, and (ii) his alleged "'suffer[ing] from the mistreatment of the elephants to which he became emotionally attached during his tenure at Ringling Bros.,'" plaintiffs' standing was limited to the "pre-Act" elephants with whom Rider had worked.[7]  *ASPCA v. Ringling Bros.*, 246 F.R.D. 39, 42 (D.D.C. 2007) ("October 25, 2007 Decision") (quoting *Ringling Bros.*, 317 F.3d at 335, 338).

Following the summary judgment ruling, the motion for reconsideration, and additional discovery, a non-jury trial on plaintiffs' claims commenced on February 4, 2009, and concluded on March 18, 2009.  At various points during the trial, in response to certain evidence and arguments, the Court ordered the parties to file expedited briefs on several issues, including (1) the scope of the statutory or regulatory authority, if any, of any federal agency with respect to Asian elephants in captivity in American circuses, and how any such authority has been exercised with respect to the "take" allegations plaintiffs have made in this case, *see* 2-6-09 p.m. at 69:1-75:11; and (2) the organizational plaintiffs' Article III standing, *see* Minute Order (Feb. 19, 2009).  Following the trial, and after the parties' post-trial pleadings were filed with the Court, final closing arguments were held on July 14, 2009.  The case was thereafter taken under advisement.

---

[7] Although the Court's October 25, 2007 opinion names six "pre-Act" elephants with whom Rider worked that were still at issue in the case, the Court accepts, over defendant's objection, that a seventh elephant, Zina, also falls into that category.  *See* Def. Prop. FOF ¶ 37, n.2.  It is undisputed that Rider worked with Zina on the Blue Unit and that she is still in FEI's possession.  *Id.* at ¶ 40; Pls.' Prop. FOF ¶ 9.

II.   **LEGAL FRAMEWORK**

A.   **The Endangered Species Act**

The effective date of the ESA, 16 U.S.C. § 1531 *et seq.*, as originally enacted by the

United States Congress, was December 28, 1973.  Pub. L. No. 93-205, 87 Stat. 884, 903 (Dec.

28, 1973).  The ESA has three stated purposes: (1) to provide a means for conserving the

ecosystems of endangered and threatened species; (2) to provide a program for the conservation

of endangered and threatened species; and (3) to implement the United States' agreement to

certain international treaties and conventions.  16 U.S.C. § 1531(b).

The Convention on the International Trade in Endangered Species of Wild Fauna and

Flora ("CITES"), July 1, 1975, 27 U.S.T. 1087, is an international agreement among

governments which aims generally to ensure that international trade in specimens of wild plants

and animals does not threaten their survival.  The United States Senate gave its advice and

consent to CITES on August 3, 1973, and the President of the United States ratified CITES on

September 13, 1973.  *Id.*  CITES entered into force on July 1, 1975. *Id.*

Appendix I to CITES lists certain species of animals and plants that are "threatened with

extinction."  CITES, Art. II.1.  The Asian elephant was listed on Appendix I to CITES at the

time that the Convention took effect on July 1, 1975.  *See* CITES, Appendix I (listing *elephas*

*maximus*).[8]  The Asian elephant was listed as an "endangered species" pursuant to Section 4 of

the ESA by the United States Fish and Wildlife Service, Department of Interior, on June 14,

1976.  41 Fed. Reg. 24062, 24066 (June 14, 1976).

---

[8] *Elephas maximus* is the scientific name for a species of land mammal whose common
name is the Asian elephant.  41 Fed. Reg. 24062, 24066 (June 14, 1976).

### 1.    Section 9 of the ESA - The "Take" Prohibition

Section 9 of the ESA prohibits the "take" of any endangered species.  16 U.S.C.

§ 1538(a)(1)(B).  The term "take" is broadly defined to mean "harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C.

§ 1532(19).  The FWS has additionally defined "harm" to include any act that "actually kills or

injures wildlife," including actions that "significantly impair[] essential behavioral patterns."  50

C.F.R. § 17.3.

"Harass" under the ESA means:

an intentional or negligent act or omission which creates the likelihood of injury
to wildlife by annoying it to such an extent as to significantly disrupt normal
behavioral patterns which include, but are not limited to, breeding, feeding, or
sheltering.  This definition, when applied to captive wildlife, does not include
generally accepted:
> (1) Animal husbandry practices that meet or exceed the minimum
> standards for facilities and care under the Animal Welfare Act,
> (2) Breeding procedures, or
> (3) Provisions of veterinary care for confining, tranquilizing, or
> anesthetizing, when such practices, procedures, or provisions are not
> likely to result in injury to the wildlife.

50 C.F.R. § 17.3.  The term "wound" is not defined in the ESA or its implementing regulations.

As the Supreme Court has observed, the term "take" is defined in the statute "in the

broadest possible manner to include every conceivable way in which a person can 'take' or

attempt to 'take' any fish or wildlife.'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater

Or.*, 515 U.S. 687, 704 (1995) (quoting S. Rep. No. 93-307, at 7 (1973)). There is no requirement

that the harm to the species be intentional, and both direct and indirect harm can constitute

unlawful "takes" of a listed species.  *See, e.g.*, *id.* at 704-07 (holding that actions that destroy the

habitat of an endangered species can "take" the species).

12

Once the court finds that there is an unlawful "take" of an endangered species, it must craft an appropriate remedy to halt the conduct that constitutes the "take."  *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978) (rejecting any role for the courts "to strike a balance of equities" because "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities").

### 2.        Section 10 of the ESA - The Permit Process

Section 10(a)(1) of the ESA requires that whenever a "person" – defined to include a corporation, 16 U.S.C. § 1532(13) – seeks to engage in an activity that is otherwise prohibited by Section 9, it must first obtain a permit from the FWS authorizing that activity.  *Id*. § 1539(a)(1).  To apply for a permit the applicant must provide and verify specific information, including, *inter alia*, a description of the facilities where the animals are being used, displayed and maintained; the experience of the animal handlers; the "taking" that will occur; and the reasons such a "take" is justified – i.e., a demonstration that the taking will "enhance the propagation or survival" of the species.  50 C.F.R. §§ 17.22(v)-(vii); 16 U.S.C. § 1539(a)(1)(A).

Under Section 10(c), all of this application information "shall be available to the public as a matter of public record at every stage of the proceeding."  16 U.S.C. § 1539(c).  In addition, notice of the application must be published in the Federal Register – at which time the agency must invite the submission "from interested parties, within thirty days after the date of the notice, of written data, views, or arguments with respect to the application."  *Id.*  The U.S. Court of Appeals for the District of Columbia Circuit has held that these affirmative disclosure requirements are mandatory, as is reflected by the plain words of the statute.  *See Gerber v.*

*Norton*, 294 F.3d 173, 179-82 (D.C. Cir. 2002).  Further, in the event that the FWS decides to

grant a permit, the agency's findings – i.e., that the permit (1) was "applied for in good faith, (2)

if granted and exercised will not operate to the disadvantage of such endangered species, and (3)

will be consistent with the purposes and policy" of the Act – must be published in the Federal

Register.  16 U.S.C. § 1539(d).  Finally, the FWS must find that the animals are being

"maintained" under humane and healthful conditions.  *See* 50 C.F.R. § 13.41 ("Any live wildlife

possessed under a [FWS] permit must be maintained under humane and healthful conditions.").

### 3.        Section 11 of the ESA - The Citizen-Suit Provision

The ESA includes a citizen-suit provision, which provides that:

> (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf -

>> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof; or

>> . . .

>> (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under [Section 1533] which is not discretionary with the Secretary.

16 U.S.C. § 1540(g)(1).  As the Supreme Court noted in *Bennett v. Spear*, 520 U.S. 154, 164-65

(1997), the ESA's citizen suit provision is "an authorization of remarkable breadth when

compared with the language Congress ordinarily uses."

### B.      Article III Standing

Article III of the United States Constitution limits the federal judiciary's jurisdiction to

"cases" or "controversies."  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167,

180-81 (2000).  As the Supreme Court has said, "the core component of standing is an essential

and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 560-61 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).

Article III's case or controversy (i.e., standing) requirement has three elements: (1) injury

in fact; (2) causation; and (3) redressability.  *See Laidlaw*, 528 U.S. at 180-81 (citing *Lujan*, 504

U.S. at 560-61) ("[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has

suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision.").  Plaintiffs, as the parties seeking to invoke federal jurisdiction, bear

the burden of establishing standing, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-

04 (1998), and must establish such standing "separately for each form of relief sought[,]" *see*

*Laidlaw*, 528 U.S. at 185 (internal citations omitted).

### C.      *ASPCA v. Ringling Bros.,* **317 F.3d 334 (D.C. Cir. 2003)**

As discussed *supra*, Part I.C., in 2001, this Court granted defendant's motion to dismiss,

holding that Rider and the organizational plaintiffs had failed to establish Article III standing.

*See* June 29, 2001 Decision.  The Court of Appeals reversed this Court's decision with respect to

Rider's standing.[9]  *See generally Ringling Bros.*, 317 F.3d 334.  Emphasizing repeatedly that its

decision was based solely on the pleadings and that it was required to assume the truth of Rider's

claims, the Court of Appeals held that:

> Based upon [Rider's] desire to visit the elephants (which we must assume might
> include attending a performance of the circus), his experience with the elephants,
> his alleged ability to recognize the effects of mistreatment, and what an injunction
> would accomplish, Rider's allegations are sufficient to withstand a motion to
> dismiss for lack of standing.

*Id.* at 338.  In fact, in addition to the language just quoted, the Court of Appeals noted the

pleading standard at least four more times in its five-page opinion.  *See id.* at 336 ("At the

pleading stage, general factual allegations of injury resulting from the defendant's conduct may

suffice because courts assume plaintiffs can back up their general claims with specifics at trial."

(internal quotation marks omitted)); *id.* at 337 ("Given the posture of the case, we must assume

the truth of the claims."); *id.* at 338 ("These factors, coupled with the lesser standard required to

show standing on a motion to dismiss, distinguish this case from [*Humane Society v.*] *Babbitt*.);

*id.* ("If Rider wins the case, we must assume - because the case is at the pleading stage - that his

injury will be resolved.").

The Court of Appeals found that, assuming the allegations in the complaint were true,

Rider had established a sufficient "injury-in-fact" to satisfy the first element of the standing

requirement because "Rider alleged a strong personal attachment to the elephants[,]" and "stated

a desire to visit the elephants, making his injury present or imminent[.]" *Id.* at 337-38.  The court

---

[9] The Court of Appeals did not reach the organizational plaintiffs' standing, because the
organizations were seeking the identical relief that Rider sought.  *See Ringling Bros.*, 317 F.3d at
338.  The appellate court did state, however, that the "strongest case for standing is presented by
Thomas Rider[.]" *Id.* at 335.

found that the second element of Article III standing, causation, was easily demonstrated

because "[i]t is unquestioned that Ringling Bros.'s alleged actions - inhumane treatment of the

elephants - are the source of the aesthetic injuries that Rider alleges."  *Id.* at 338.

As for the third element, redressability, the Court of Appeals referenced the two forms of

relief that Rider was seeking at that time: (i) an injunction halting Ringling Bros.' mistreatment

of the elephants in violation of the ESA; and (ii) an order directing the defendant to forfeit

possession of the elephants.  The Court of Appeals then concluded that "[i]f Rider wins the case,

we must assume - because the case is at the pleading stage - that his injury will be resolved."  *Id.*

The court explained:

> Although the complaint does not come right out and say that an end to
> mistreatment will bring about a change in the elephants' behavior, this is a fair
> inference.  It may also be inferred that if Rider wins, the elephants will no longer
> exhibit the physical effects of mistreatment.  Rider then will be able to attend the
> circus without any aesthetic injury.  It follows that Rider has alleged enough to
> show that his injuries will likely be redressed if he is successful on the merits.

*Id.*

## III.    ANALYSIS

As discussed *supra*, Part I.B., Plaintiffs Rider and API bring this suit pursuant to the

citizen-suit provision of the ESA, alleging that FEI's use of the bullhook and chains on the Asian

elephants in its circus performances "harms," "harasses," and "wounds" the elephants, and that

those "takes" of the elephants, absent a Section 10 permit - which FEI does not have - are in

violation of Section 9 of the ESA.[10]  In its defense, FEI argues, among other things, that plaintiffs

---

[10] While the ASPCA, AWI, and FFA apparently wish to remain named plaintiffs in the
caption of this case, plaintiffs' counsel confirmed during closing arguments that those
organizations are no longer advancing a standing argument or seeking relief in this case.  *See* 7-
14-09 at 10:12-10:23 ("The Court: All right.  So it's clear, if I allowed them to remain in the

lack the standing required to pursue these claims.  Based on the following findings of fact and

conclusions of law,[11] the Court concludes that plaintiffs have failed to prove the standing

required by Article III of the United States Constitution.  This Court therefore lacks jurisdiction

over plaintiffs' claims.  Because the Court concludes that plaintiffs lack standing, the Court does

not - and indeed cannot - reach the merits of plaintiffs' allegations that FEI "takes" its elephants

in violation of Section 9 of the ESA.  Accordingly, for the reasons set forth below, judgment will

be entered for the defendant.

### A.      Rider Does Not Have Article III Standing

The allegations taken as true and relied upon by the Court of Appeals to establish Rider's

standing were that: (1) Rider formed a "strong, personal attachment" to the elephants, *Ringling*

*Bros.,* 317 F.3d at 335, 337; (2) Rider left his job at Ringling Bros. because of the mistreatment

---

caption of the case, it's because they're named plaintiffs; you're not furthering a claim on behalf of those other organizational plaintiffs, other than API?  And the only standing argument from an organizational point of view that you're making is with respect to API only?  Ms. Meyer: That is true, Your Honor.  The Court: All that's true?  Ms. Meyer: Yes, Your Honor.").

[11] The Court has carefully and independently reviewed and considered the parties' proposed Findings of Fact and Conclusions of Law, the parties' respective objections thereto, the supplemental briefing, the evidence, and the entire record in this case.  To ensure that the Court's Findings of Fact and Conclusions of Law accurately reflect the Court's independent assessment of the evidence and the legal conclusions the Court has reached based on that evidence, the Court has rejected, modified, and/or supplemented the parties' proposed findings and conclusions, as appropriate.  *See, e.g.*, *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1407 (D.C. Cir. 1988) ("[W]e strongly disapprove of the District Court's wholesale adoption of the plaintiffs' proposed findings . . . ."); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 984 (D.C. Cir. 1984) ("We are not so naive as to suggest that trial judges should *never* use proposed findings of counsel; indeed, such a suggestion would be absurd and would belie the reality of trial practice in the United States. . . . [However, a] District Judge . . . must scrupulously avoid giving the parties or the public *any* basis for perceiving that he is deciding the case otherwise than pursuant to an application of controlling law to the facts and in the exercise of his impartial, independent, considered, judgment.")

of the elephants, *id.* at 335; (3) Rider "would like to work with the elephants again and would

attempt to do so if the elephants were relocated[,]" *id.*; (4) Rider would like to visit the elephants,

but cannot do so without being injured from seeing the animals and detecting their mistreatment,

which he can discern without actually observing the mistreatment, *id.* at 337; and (5) if Rider's

relief is granted, the elephants will no longer exhibit the physical effects of mistreatment, and

thus Rider will be able to attend the circus and see the elephants without injury, *id.* at 338.  It is

these "general factual allegations," therefore, that Rider was required to "back up . . . with

specifics at trial," in order to satisfy the requirements of Article III.  *Id.* at 336 (citing *Lujan*, 504

U.S. at 561).  Unfortunately for Rider, and fatal to his Article III standing, Rider was unable to

do so.  The Court concludes that Rider's evidence at trial was not credible with respect to the

allegations the Court of Appeals had to accept as true at the pleading stage to support Rider's

Article III standing to sue.

### 1.    Findings of Fact

1.      Mr. Rider claims that he has a strong personal and emotional attachment to the elephants
that he worked with while employed by FEI from June 3, 1997 through November 25, 1999.
Compl. ¶ 20 (DE 1).  Mr. Rider also claims that what he contends is FEI's mistreatment of these
animals causes him aesthetic and emotional injuries.  *Id.* ¶¶ 22-23.  Based upon the following
Findings of Fact ("FOF"), the Court does not find Mr. Rider's testimony to be credible. The
Court finds that Mr. Rider failed to prove either a strong and personal attachment to the seven
elephants at issue or that FEI's treatment of those elephants caused and continues to cause Mr.
Rider to suffer aesthetic or emotional injury. Mr. Rider was repeatedly impeached, and indeed
was "pulverized" on cross-examination.[12]  The Court finds that Mr. Rider is essentially a paid

---

[12] The impeachment of Mr. Rider was indeed overwhelming, prompting the Court to
question counsel several times over the course of the remainder of the trial regarding Mr. Rider's
standing, his credibility, and what weight to give his testimony. *See, e.g.*, 2-26-09 a.m. at 51:8-
51:9 (The Court: "[Counsel] did a good job of pulverizing on cross-examination.  Doesn't that
go to the weight, though?"); 2-26-09 p.m. at 90:23-91:05 (The Court: "Maybe I shouldn't use
that word, [pulverized,] but it was – there was a powerful cross-examination."); 7-14-09 at
48:22-49:1 ("And during the course of the trial, I recall very vividly saying during one of the

plaintiff and fact witness who is not credible, and therefore affords no weight to his testimony regarding the matters discussed herein, i.e., the allegations related to his standing to sue.

### a.    Mr. Rider's Employment in the "Circus Community"

2.     Mr. Rider was employed by Clyde Beatty – Cole Bros. Circus ("CB-CB"), working for that entity as an elephant attendant immediately prior to his job with FEI. DX 38; 2-12-09 p.m. at 13:21-14:16 (Rider). Mr. Rider testified that he quit that job due to the mistreatment of an elephant named "Pete." 2-12-09 p.m. at 16:21-24 (Rider). This testimony is not credible. Mr. Rider admitted on cross-examination that his decision to leave CB-CB was sparked by an alleged conversation with Kenneth Feld, thus admitting that he had decided to seek employment with FEI *before* the alleged incident involving Pete. *Id.* at 17:2-19:14.  The Court finds that Mr. Rider left the employment of CB-CB and accepted a job with FEI because FEI offered higher pay and better working conditions, not because of the alleged mistreatment of "Pete." *Id.* at 19:15-20:20.

3.     Mr. Rider maintains that he witnessed elephant mistreatment on the Blue Unit of FEI's circus which he contends continued on a daily basis throughout his employment. 2-12-09 p.m. at 26:16-18 (Rider).  Nonetheless, Mr. Rider continued to work for FEI for two and one-half years. 2-12-09 a.m. at 17:14-19 (Rider).  The Court finds it unlikely that a person who claims he quit one job (CB-CB) due to elephant abuse would continue to work – for two and a half years – for a subsequent employer (FEI) that allegedly engaged in the same or similar mistreatment of elephants.

4.     While there is some evidence that Mr. Rider complained to the elephant handlers and his direct supervisor about the alleged elephant mistreatment, during the entire time Mr. Rider worked for FEI, he did not complain to anyone in management about the mistreatment. 2-12-09 p.m. at 28:15-29:17 (Rider). While Mr. Rider was employed by FEI, FEI corporate executives, including the Chief Executive Officer of FEI, Kenneth Feld, visited the Blue Unit on multiple occasions. *Id.* at 33:10-22, 34:1-6. Mr. Rider had the opportunity to complain about alleged elephant mistreatment to any of these executives but did not do so. *Id.* at 33:23-25, 34:7-36:11.

5.     During the entire time in which Mr. Rider worked for FEI, he did not complain to any veterinarians about the alleged elephant mistreatment.  While Mr. Rider was employed at FEI, veterinarians routinely visited the Blue Unit. 2-12-09 p.m. at 30:10-12 (Rider). Mr. Rider actually had a direct interaction with one of the veterinarians, Dr. Gary West. *Id.* at 31:21-33:4. However, Mr. Rider did not complain to Dr. West or to any of the other veterinarians about how the elephants were being treated or that the elephants were being hooked or chained too much. *Id.* at 30:19-31:2.

---

exchanges with the attorneys, that arguably his direct examination, arguably he was pulverized with cross-examination about all sorts of matters . . . .").

6.      During the entire time in which Mr. Rider worked for FEI, he did not complain to USDA officials or state and local animal control authorities about the alleged elephant mistreatment. While Mr. Rider was employed at FEI, employees of the USDA as well as employees of state and local animal control authorities visited the Blue Unit to inspect the animals, including the elephants. 2-12-09 a.m. at 67:5-22 (Rider); 2-12-09 p.m. at 36:12-15, 37:12-18 (Rider).  There were numerous inspections by USDA and state and local inspectors of the Blue Unit during the period when Mr. Rider worked for FEI. DX 73, 80, 81. Mr. Rider had the opportunity to complain about alleged elephant mistreatment, including allegedly excessive use of the bullhook and chaining of the elephants, to any of these federal or state employees but did not do so. 2-12-09 p.m. at 36:21-37:21 (Rider).

7.      During the entire time in which Mr. Rider worked for FEI, there is no evidence that he complained to the media about the alleged elephant mistreatment.  While Mr. Rider was employed at FEI, there was at least one visit to the Blue Unit by a network television program. 2-12-09 p.m. at 37:22-24 (Rider).  Mr. Rider did not approach or tell any of the individuals associated with that program about any alleged elephant mistreatment. *Id.* at 37:25-38:7.

8.      Mr. Rider claims that he had a personal and emotional attachment to the elephants he worked with on the Blue Unit, and he referred to them as his "girls." 2-12-09 a.m. at 31:3; Compl. ¶ 22.  Mr. Rider compares his attachment to the FEI elephants to the attachment that he has for his own two daughters and his grandson. 2-12-09 p.m. at 25:2-26:15 (Rider).  The Court finds it unlikely that a person with that degree of attachment to individual animals would stand silent in the face of their alleged mistreatment.  Based upon his failure to complain, the Court finds that Mr. Rider either (1) did not witness elephant mistreatment when he was employed by FEI or (2) any mistreatment he did witness did not affect him to the extent that he suffered an aesthetic or emotional injury.

9.      Mr. Rider's attempts at trial to explain his failure to complain to management or law enforcement authorities are not persuasive. Mr. Rider claims that his job was threatened when he complained about elephant mistreatment to his supervisor, Randy Peterson.  2-12-09 p.m. at 39:11-18 (Rider); 2-17-09 p.m. at 69:24-72:16.  However, Mr. Rider was a member of a labor union (the Teamsters) which had a collective bargaining agreement with FEI.  2-12-09 p.m. at 39:19-21; 3-11-09 p.m. at 79:14-80:25 (Sowalsky); DX 200 & 201.  The collective bargaining agreement precluded terminating the employment of union members without just cause. 3-11-09 p.m. at 81:1-13 (Sowalsky); DX 200 & 201 (Art. XI).  A complaint about animal abuse would not have been just cause for dismissal. 3-11-09 p.m. at 82:1-6 (Sowalsky). Mr. Rider complained to the union about alleged threats to his employment and was advised by the union that he could not be fired for complaining about the treatment of elephants. 2-17-09 p.m. at 69:24-72:16 (Rider). The collective bargaining agreement would have permitted Mr. Rider to pursue a grievance with respect to any termination of employment that was based upon Mr. Rider having complained about the treatment of FEI's animals by other FEI employees. DX 200 & 201 (Art. XI). The Court recognizes, of course, that an employee may fear making complaints against an employer, regardless of the protections provided - or at least promised - by a collective bargaining agreement.  However, Mr. Rider also did not complain about any mistreatment of the

elephants even after he quit his job.  Mr. Rider had a conversation with the Blue Unit manager, Jeff Steele, on his last day of work, but still did not complain, 2-12-09 p.m. at 29:7-15 (Rider), even though, at that point there was no threat whatsoever to his FEI employment.  Based on the totality of the evidence, the Court finds Mr. Rider's explanations as to why he did not complain not to be credible.

10.     Mr. Rider testified that he appeared before a committee of the Nebraska legislature in 2006 and told the committee that he had received written reprimands ("written up") by FEI three times for complaints about animal abuse. 2-12-09 p.m. at 44:17-45:4 (Rider). Mr. Rider continues to insist that this is true, *id.* at 45:3-6, despite having also testified that his write ups at FEI were for work rule violations. *Id.* at 40:22- 44:16; *see also infra* FOF 11.  The Court finds that the evidence does not support Mr. Rider's allegation that he was written up because he was complaining about mistreatment of the elephants.

11.     The evidence presented at trial established that FEI's written reprimands to Mr. Rider were for violations of FEI's work rules, including missing a day of work (December 2, 1998), insubordination to a supervisor (July 19, 1999), and drunk and disorderly conduct (October 30, 1999). 2-12-09 p.m. at 3:23-4:8 (Rider); DX 40-42.  Mr. Rider admits that he received written reprimands, and that he had an opportunity to present his version of events. 2-12-09 p.m. at 4:11-5:10 (Rider).  He admits that he engaged in the conduct for which he was reprimanded. *Id.* at 40:22-44:16.  Mr. Rider's employment was not terminated as a result of any of these reprimands. *Id.* at 43:14-16.  The Court finds that the written reprimands given to Mr. Rider were not in response to his complaints regarding elephant abuse.

12.     In addition to the lack of any complaint about elephant mistreatment to management while Mr. Rider was employed by FEI, there is no evidence that Mr. Rider spent any additional time with or paid additional attention to the elephants beyond the minimum requirements of his job. 2-12-09 p.m. at 106:19-107:6 (Rider); 3-4-09 a.m. at 13:6-8 (Raffo).

13.     Mr. Rider left his employment with FEI in November 1999. He now claims this was because he could not bear to witness further mistreatment of the Blue Unit elephants. 2-12-09 a.m. at 68:17-69:14 (Rider). The Court does not find Mr. Rider to be credible on this point.  Mr. Rider spoke with the Blue Unit Manager, Jeff Steele, on the day he left FEI, but Mr. Rider did not raise any issue with respect to elephant treatment with Mr. Steele. 2-12-09 p.m. at 29:7-15 (Rider).  Mr. Rider departed his employment with FEI voluntarily at the end of the Blue Unit tour in November 1999.  *Id.* at 46:7-12.

14.     After Mr. Rider left his employment with FEI in November 1999, he did not complain to the USDA or to any other animal control authority about the treatment of FEI's elephants. 2-12-09 p.m. at 46:13-19 (Rider).

15.     After Mr. Rider left his employment with FEI, he traveled to Europe with a group of three elephants as their attendant. The three elephants were named "Lechame," "Meena" and "Kamala" and were owned by Richard Chipperfield (the "Chipperfield elephants"). 2-12-09 p.m.

at 45:7-25 (Rider); 2-12-09 a.m. at 22:10-19 (Rider).  The Chipperfield elephants had been touring with the Blue Unit of FEI's circus when Mr. Rider worked on the Blue Unit. 2-12-09 a.m. at 18:22-19:2 (Rider). Mr. Rider claims that he had a personal and emotional attachment to the Chipperfield elephants that was just as strong as his personal and emotional attachment to FEI's own Blue Unit elephants.  2-12-09 p.m. at 51:4-8 (Rider).  Mr. Rider claims that he witnessed Mr. Raffo mistreating the Chipperfield elephants (as well as FEI's elephants) during the time that they were with the Blue Unit. *Id.* at 48:4-11. Despite what he claims he witnessed about Mr. Raffo, Mr. Rider accepted employment to travel with Mr. Raffo to Europe with these three elephants. *Id.* at 48:12-14. Mr. Rider also claims that, while traveling in Europe, these three elephants were subjected to the same sort of mistreatment that he says occurred while Mr. Rider was on the Blue Unit. 2-12-09 a.m. at 71:3-16 (Rider). The Court finds that a person claiming to suffer aesthetic and emotional injury due to his witnessing elephant mistreatment, and who claims that he quit his job as a result of what he witnessed, would not accept, and remain in, employment with one of the very persons engaged in the mistreatment.

16.      Mr. Rider testified on direct examination that he "never used a bullhook at Ringling," and that he "never needed one[.]" 2-12-09 a.m. at 63:13-64:10 (Rider).  However, in December 1999, Mr. Rider was photographed holding a bullhook and using that instrument to interact with one of the three Chipperfield elephants (Meena) which he also has characterized as one of his "girls." 2-12-09 p.m. at 101:18-105:5 (Rider); DX 32. A person such as Mr. Rider who now professes to have such strong personal views against the use of the bullhook on elephants – to the point of suffering a claimed "aesthetic injury" as a result of witnessing the use of that instrument – would not have handled a bullhook, much less used it on an elephant.  Furthermore, Mr. Raffo testified that Mr. Rider used a bullhook during the period in which Mr. Rider worked in Europe for Mr. Raffo. 3-4-09 a.m. at 8:11-24, 25:6-9 (Raffo). Mr. Raffo further testified that Mr. Rider never complained about the bullhook or its use, *id*. at 8:25-9:23, 25:21-24, and that neither Mr. Raffo nor his wife "forced" Mr. Rider to use the bullhook, either in the photographs that were taken or during Mr. Rider's employment in Europe, *id*. at 21:18-23:2, 25:6-14.  While the Court finds portions of Mr. Raffo's testimony to be of questionable value, the Court credits Mr. Raffo's testimony with respect to these limited findings, including the findings in FOF 12, 20, 22.

17.      The Court does not find plaintiffs' counsel's or Mr. Rider's attempts to rationalize or explain away the photographic evidence to be persuasive. The theory that Mr. Rider went to Europe with Mr. Raffo hoping that "it would all change," 2-12-09 p.m. at 105:6-7 (Rider), with respect to the use of the bullhook and chains on the Chipperfield elephants is contradicted by Mr. Rider's own testimony that (1) when he went to Europe, he had no reason to believe that the bullhook and chains would not be used, *id*. at 48:15-49:5 (Rider); (2) that Mr. Raffo – the person who was to be in charge of the Chipperfield elephants in Europe – was one of the very persons that Mr. Rider claims he saw mistreating the elephants while Mr. Rider worked for FEI, *id*. at 48:4-14; and (3) that he was "forced" to use the bullhook on the elephants he alleges he was personally attached to before he had even left the United States to go to Europe with Mr. Raffo. 2-12-09 p.m. at 102:1-105:18.  This undermines Mr. Rider's testimony that he opposed use of the bullhook "from the get go" in his job with FEI, 2-12-09 a.m. at 63:13-64:10 (Rider).  If he really was staunchly opposed to the bullhook, it is unlikely that Mr. Rider would have agreed to

23

accompany Mr. Raffo to Europe, especially knowing that he would be "forced" to use the bullhook on the elephants.

18.     Mr. Rider's testimony at trial about his own use of the bullhook is further contradicted by his prior inconsistent statements regarding this issue.  Specifically, during a legislative hearing in Connecticut in 2005, Mr. Rider testified that the Connecticut hearing was only the second time in his life that he had ever held a bullhook, when in fact, he had held one on multiple occasions prior to 2005, some of which had been photographed. 2-12-09 p.m. at 101:18-105:24 (Rider); DX 32.

19.     Mr. Rider left his employment with Mr. Raffo in March 2000.  2-12-09 p.m. at 54:9-22 (Rider).  Mr. Rider offered more than one account for why he left this job. Mr. Rider stated that he left this job due to the alleged mistreatment of the three Chipperfield elephants.  2-12-09 a.m. at 71:3-16 (Rider); 2-12-09 p.m. at 54:9-22 (Rider).  Mr. Rider also stated that he left this job as a result of what Mr. Rider claims was Richard Chipperfield's improper euthanization of two tigers. 2-12-09 a.m. at 71:25-73:1 (Rider); 2-12-09 p.m. at 53:19-21 (Rider).

20.     Mr. Rider alleges in the various complaints and amended complaints in this case that he stopped working in the "circus community" because he could no longer tolerate the way that elephants were treated by FEI. Compl. ¶ 33, Civ. No. 00-1641 (DE 1) (July 11, 2000); Am. Compl. ¶ 33, Civ. No. 00-1641 (DE 7) (August 11, 2000); Sec. Am. Compl. ¶ 21, Civ. No. 00-1641 (DE 21) (April 10, 2001); Compl. ¶ 21, Civ. No. 03-2006 (DE 1) (September 9, 2003). The Court does not find these assertions to be credible. From April 1997 through March 2000, Mr. Rider held three jobs in the circus industry working with elephants (CB-CB, FEI and with Mr. Raffo in Europe).  2-12-09 a.m. at 17:14-18:15, 70:23-25 (Rider); 2-12-09 p.m. at 13:21-14:16 (Rider); DX 38. All of the elephants that Mr. Rider worked with were managed with the bullhook and chains, and Mr. Rider himself has used a bullhook with the elephants.  2-12-09 a.m. at 31:11-18, 49:25-50:20 (Rider); 2-12-09 p.m. at 15:9-25 (Rider); 2-12-09 p.m. at 101:18-105:24 (Rider); DX 32.  However, Mr. Rider made no efforts to complain to the management of those circuses about the treatment of the respective elephants, or to bring any of his concerns about the use of the bullhook or chains to the attention of any governmental authorities. 2-12-09 p.m. at 16:16-20, 20:21-24, 26:12-29:17, 33:23-25, 34:7-36:11, 36:21-37:21, 46:13-16 (Rider); 3-4-09 a.m. at 8:25-9:23; 25:21-23 (Raffo).  The Court finds that Mr. Rider left these circus jobs not because of any mistreatment of the elephants, but for reasons personal to Mr. Rider, such as higher salary and better working conditions (leaving CB-CB for FEI, 2-12-09 p.m. at 19:15-20:20 (Rider)) or the opportunity to travel in Europe (leaving FEI for Raffo, *id*. at 50:4-13; 3-4-09 a.m. at 21:3-8 (Raffo)).  Furthermore, as indicated by FOF 21-59 below, the Court finds that the evidence does not support a conclusion that Mr. Rider left the circus community in March 2000 because he could no longer tolerate the alleged mistreatment of the elephants, or that *at the time he worked for FEI* he had a strong, personal and emotional attachment to the elephants and was suffering aesthetic injury as a result of witnessing their mistreatment.

      **b.**      **Prior to Becoming a Plaintiff in this Lawsuit and Throughout the Entire Nine Years of this Litigation, Mr. Rider's Sole Source of Income Has Been Provided By Animal Advocacy Organizations Involved With This Lawsuit**

21.    Mr. Rider began to speak out about what he claims was elephant mistreatment in March 2000. 2-12-09 p.m. at 54:23-56:11 (Rider). As set forth below, at all times from and after March 2000, Mr. Rider has received money and other financial benefits from animal activists or others sympathetic to such interest groups, including all organizational plaintiffs in this case (past and present), plaintiffs' counsel and an organization run by plaintiffs' counsel. DX 48A. At no point in the period after March 2000 has Mr. Rider held a job or had any source of income or financial support other than the money and other financial benefits that Mr. Rider has received from animal advocacy organizations or others sympathetic to such groups. 2-12-09 p.m. at 83:7-20 (Rider).

22.    In March 2000, with no advance notice, Mr. Rider left his job with Mr. Raffo while they were in Frankfurt, Germany. 3-4-09 a.m. at 26:12-25 (Raffo); 2-12-09 p.m. at 54:9-22 (Rider). Prior to leaving, Mr. Rider obtained a salary advance from Mr. Raffo. *Id.*

23.    While still in Frankfurt, during the two days before he quit his job with Mr. Raffo, Mr. Rider was observed frequently speaking with two individuals with English accents. *Id.* at 26:20-27:14.  Mr. Rider then traveled from Frankfurt to London, where he participated in interviews with a journalist working for a newspaper called *The Daily Mirror.* 2-12-09 a.m. at 74:4-75:10 (Rider); 2-12-09 p.m. at 54:23-55:22 (Rider). Based on Mr. Rider's interviews, *The Daily Mirror* published two articles concerning the treatment of the three elephants that Mr. Rider cared for when employed by Mr. Raffo. 2-12-09 p.m. at 55:20-56:8 (Rider). While in London, *The Daily Mirror* paid for Mr. Rider's hotel and living expenses. *Id.* at 55:8-13. *The Daily Mirror* also paid for Mr. Rider's air ticket for his return to the United States and persons associated with that publication gave him $1,100.00 in cash. *Id.* at 55:14-19, 57:8-59:25.

      **(1)**      **Payments to Mr. Rider From Former Lead Plaintiff PAWS**

24.    Prior to leaving London, Mr. Rider was referred to PAWS by an organization in London, the Animal Defenders. 2-12-09 p.m. at 60:4-10 (Rider). Mr. Rider returned to the United States on March 20, 2000. *Id.* at 56:12-57:7.  Mr. Rider contacted PAWS, who placed him in touch with plaintiffs' fact witness Betsy Swart.  Ms. Swart in turn arranged for Mr. Rider to travel to California to meet with representatives of PAWS. *Id.* at 60:7-16. While Mr. Rider testified that he rode a bus to California, *id.* at 60:24-61:2, he signed an interrogatory answer under oath stating that PAWS paid for an airline ticket so that he could fly to California, *id.* at 61:3-62:17; DX 16 at 75. By March 25, 2000, Mr. Rider was in Galt, California, giving a sworn statement to a lawyer for PAWS as to what Mr. Rider claimed he witnessed when employed by FEI. 2-12-09 p.m. at 60:17-23, 64:2-4 (Rider); PWC 184 at 1. That same day – March 25, 2000 – PAWS began providing Mr. Rider with lodging and paying him $50.00 per week. 2-12-09 p.m. at 64:2-

13 (Rider). Mr. Rider's relationship with PAWS lasted until May 7, 2001. *Id.* at 67:20-23; DX 39.

25.     From March 25, 2000 through February 2001, PAWS paid for Mr. Rider's lodging in a motel in or around Galt, California, and paid him $50.00 per week. 2-12-09 a.m. at 76:21-77:24 (Rider); 2-12-09 p.m. at 64:5-13 (Rider). From February 2001 through May 2001, PAWS provided Mr. Rider with a place to live and sent him periodic checks ranging in amount from $185.00 to $200.00. 2-12-09 p.m. at 66:23-67:8 (Rider). Mr. Rider admits that he did not perform a "real job" for PAWS. *Id.* at 67:18-19. Nevertheless, he was on PAWS's payroll during this time period and wrote a letter to that effect to PAWS using the terms "payroll" and "security job." *Id.* at 67:24-68:25; DX 39. From March 25, 2000 through May 14, 2001, Mr. Rider's only source of financial support was the funds and other benefits provided to him by PAWS. 2-12-09 p.m. at 69:1-6 (Rider).

26.     Even though Mr. Rider has characterized the funding he received from PAWS as "grant" money, PAWS did not characterize it in that manner.  In 2000, PAWS paid Mr. Rider $2,691.67 in funds that PAWS reported to the Internal Revenue Service ("IRS") as "nonemployee compensation." 2-12-09 p.m. at 69:7-21 (Rider); DX 56. In 2001, PAWS paid Mr. Rider $2,492.00 in funds that are recorded on IRS records as "wages."  2-12-09 p.m. at 69:22-70:11 (Rider); DX 57. There is no evidence that PAWS called the money it paid to Mr. Rider "grants." In April 2007, when Mr. Rider ultimately filed federal income tax returns for 2000 and 2001, he declared the money that PAWS had paid him in 2000 as income and the money that PAWS had paid him in 2001 as wages. 2-17-09 p.m. (12:50) at 5:5-20 (Rider); DX 60 at 1, 4, 21. The statements on these tax returns were made by Mr. Rider under penalty of perjury. 2-17-09 p.m. (12:50) at 5:21-24 (Rider); DX 60 at 2, 22.

27.     Aside from the interview with *The Daily Mirror*, for which he was compensated, and the initial statement to Ms. Swart of PAWS, from whom he received travel expenses, it appears that Mr. Rider's advocacy efforts began in earnest only after the commencement of his financial relationship with PAWS.  2-12-09 p.m. at 64:14-66:2 (Rider); FOF 23-24.

28.     After meeting with Pat Derby of PAWS, and after accepting money and other things of value from PAWS, Mr. Rider agreed to be a plaintiff in this case.  2-12-09 p.m. at 63:8-18, 65:3-5 (Rider). The original complaint was filed on July 11, 2000. Compl., Civ. No. 00-1641 (DE 1) (July 11, 2000). The plaintiffs named in that complaint were PAWS, ASPCA, AWI, FFA, Ms. Derby, and Messrs. Stewart, Rider and Ewell. *Id.* at 1. Ms. Derby and Mr. Stewart were employees or associates of PAWS. *Id.* at 1, ¶ 23. Ms. Derby and Mr. Stewart claimed to be advocates for elephant welfare and claimed that they suffered emotional and aesthetic injury as a result of FEI's treatment of its Asian elephants. *Id.* ¶¶ 23-24, 26-27. Messrs. Rider and Ewell were the only plaintiffs who had been employed by FEI and were the only plaintiffs who claimed to have a personal and emotional attachment to any of FEI's elephants. *Id.* ¶¶ 30, 32, 36, 38. They also claimed that they suffered emotional and aesthetic injury as a result of FEI's treatment of its Asian elephants. *Id.* ¶¶ 32, 38.

29.     PAWS, ASPCA, AWI and FFA claimed in their original complaint that FEI's treatment of its Asian elephants deprived the organizations of their ability to obtain and disseminate information about FEI's treatment of its Asian elephants and caused these organizations to spend substantial financial and other resources pursuing alternative sources of information about FEI's actions and treatment of its Asian elephants. *Id.* ¶¶ 6, 11, 16, 21. None of the organizational plaintiffs alleged a personal and emotional attachment to any of FEI's elephants, and none of them claimed that they suffered any emotional or aesthetic injury as a result of FEI's treatment of its Asian elephants. *Id.* ¶¶ 1-102.

30.     At the time that Mr. Rider became a plaintiff in the instant lawsuit, he was being provided continuous lodging by PAWS and being paid compensation. 2-12-09 p.m. at 64:2-65:5 (Rider). During the period from March 25, 2000, through at least May 7, 2001, in which PAWS provided Mr. Rider with lodging and paid him amounts that were designated compensation or wages, Mr. Rider had no other employment or source of income or financial support other than the benefits and funds that he received from PAWS. *Id.* at 69:1-6.

31.     On August 11, 2000, plaintiffs filed an amended complaint that dropped Mr. Ewell as a plaintiff. Am. Compl., Civ. No. 00-1641 (DE 7) (August 11, 2000).  As a result, Mr. Rider was the only plaintiff in the case who had been employed by FEI and who claimed to have a personal and emotional attachment to any of FEI's elephants. *Id.* ¶¶ 30-35.

32.     In late 2000, plaintiffs PAWS, Ms. Derby, and Mr. Stewart entered into a settlement agreement with FEI, and on January 23, 2001, these parties were dropped as plaintiffs in the present case. Notice of Dismissal, Civ. No. 00-1641 (DE 14) (January 23, 2001); 3-3-09 p.m. at 108:2-18 (Feld). In May 2001, Mr. Rider, who had remained a plaintiff in the present case, terminated his relationship with PAWS. 2-12-09 p.m. at 67:20-69:9 (Rider); DX 39.

### (2)     Payments to Mr. Rider from the Remaining Organizational Plaintiffs

33.     At the time when PAWS, *et al.*, left the case and when Mr. Rider terminated his relationship with PAWS, Mr. Rider was the only plaintiff who had been employed by FEI, who claimed to have a personal and emotional attachment to any of FEI's elephants, and who claimed to suffer an emotional or aesthetic injury on account of FEI's treatment of its elephants.  Sec. Am. Compl. ¶¶ 18-22, Civ. No. 00-1641 (DE 21) (April 10, 2001). While the money from PAWS stopped, Mr. Rider continued to be paid.  2-12-09 p.m. at 71:5-18 (Rider). Within three or four days of the termination of his relationship with PAWS, Mr. Rider received money from the law firm of Meyer & Glitzenstein (now Meyer, Glitzenstein & Crystal ("MGC")), the attorneys representing all of the plaintiffs in this litigation. *Id.* at 71:16-21, 72:11-15. The funds MGC paid to Mr. Rider were charged back to the existing organizational plaintiffs on MGC's legal bills for the instant case as "shared expenses" or "special expenses." 3-10-09 a.m. at 67:2-69:16 (Weisberg); 3-10-09 p.m. at 44:3-45:22 (Markarian); 3-11-09 a.m. at 11:10-13:4 (Liss); DX 61 at 1-8, 16-19 & 34-39 (invoices to ASPCA, AWI and FFA for payment to Rider in May 2001). At this point in time, Mr. Rider had no source of income other than the money paid to him

by plaintiffs' counsel. 2-12-09 p.m. at 72:4-7 (Rider).

34.     As set forth below in FOF 35-47, during the period from May 2001 through at least the end of 2008, the payments by the organizational plaintiffs to or for the benefit of Mr. Rider remained constant, but were paid using the following methods: (1) through MGC; (2) directly from the organizational plaintiffs; and (3) through or from the Wild Advocacy Project ("WAP"), an organization run by plaintiffs' counsel.

### (a)     Payments Through MGC

35.     At various times from May 2001 until November 2003, money was made available to Mr. Rider through MGC. DX 61; DX 18R at 22-23; DX 19 at 20-21; DX 20R at 34-35. The monies that MGC provided to Mr. Rider were then charged back to the organizational plaintiffs on MGC legal bills as expenses and were reimbursed to MGC in that fashion. 3-10-09 a.m. at 67:11-68:9 (Weisberg); 3-10-09 p.m. at 44:3-16 (Markarian); 3-11-09 a.m. at 11:12-12:18 (Liss); DX 61; DX 18R at 22-23; DX 19 at 20-21; DX 20R at 34-35. The totals of such payments by the organizational plaintiffs to Mr. Rider through MGC from May 2001 to the present are approximately:

| ORGANIZATIONAL PLAINTIFF | AMOUNT PAID TO RIDER THROUGH MGC |
|---|---|
| ASPCA | $5,700.00<br>DX 61 at 1-15; DX 18R at 22-23; DX 48A |
| AWI | $2,000.00<br>DX 61 at 16-33; DX 19 at 20-21 |
| FFA | $4,400.00<br>DX 61 at 34-57; DX 20R at 34-35 |

**(b)      Direct Payments**

36.      At various times, the organizational plaintiffs paid money to Mr. Rider directly or defrayed certain of his expenses.  The totals of such payments by the organizational plaintiffs during the period from May 2001 are approximately:

| ORGANIZATIONAL PLAINTIFF | AMOUNT PAID TO RIDER DIRECTLY |
|---|---|
| ASPCA | $14,000.00[13]<br>3-10-09 a.m. at 61:15-23 (Weisberg);<br>DX 18R at 21-24; DX 46; DX 48A;<br>DX 209 |
| AWI | $5,900.00[14]<br>DX 19 at 19-20, 25; DX 46; DX 48A; DX<br>63; DX 209 |
| FFA | $1,000.00<br>DX 20R at 33; DX 46; DX 48A; DX 64 |
| API | $660.00<br>DX 21 at 12, 17; DX 48A |

---

[13] FEI contends that the amount ASPCA paid directly to Mr. Rider is more than $25,500.00.  Def.'s Prop. FOF ¶ 88.  Plaintiffs maintain that the amount is approximately $14,000.00.  *See* Plaintiffs' Objections ("Pls.' Obj.") to Def.'s Prop. FOF at ¶ 88.  Because of the various methods used by plaintiffs to pay Mr. Rider, it is difficult to ascertain from the record the precise amount that should appear in this table, versus the tables found at FOF 35 and FOF 40. Therefore, the Court will include in this table the lower amount, which is not disputed by plaintiffs.  However, the precise amount by category is not material to the Court's findings regarding the plaintiff organizations' payments to Mr. Rider (there is no dispute that those payments are in the tens of thousands of dollars and total well over $150,000.00), and Ms. Weisberg testified that the amount paid by the ASPCA to Mr. Rider was $25,500.00, the amount cited by FEI.  3-10-09 a.m. at 61:15-23 (Weisberg).

[14] Again, FEI maintains that the amount AWI paid directly to Mr. Rider is more than $7,000.00, *see* Def.'s Prop. FOF ¶ 88, while plaintiffs argue that the documentation relied upon by defendant indicates the amount is approximately $5,900.00.  *Id.*  For the reasons stated *supra*, n.14, the Court will use the lower amount, which is not disputed by plaintiffs.  *See* Pls.' Obj. to Def.'s Prop. FOF at ¶ 88.

### (c)      Payments Through WAP

37.     Most of the money provided to Mr. Rider has been paid by the organizational plaintiffs to
WAP, which then, in turn, provided the money to Mr. Rider or paid expenses on his behalf.  2-
12-09 p.m. at 79:24-80:10 (Rider); DX 49; DX 50; DX 51.  WAP is a 501(c)(3) organization that
is operated by Eric Glitzenstein and Katherine Meyer, the lawyers and named partners in MGC
who represent the plaintiffs in this case. 2-12-09 p.m. at 72:16-73:7 (Rider); PWC 91 at 1.

38.     Beginning in December 2001 and continuing until at least the beginning of 2008, the
organizational plaintiffs made payments to WAP for the purpose of funding Mr. Rider.  DX 18R
at 22; DX 19 at 19, 25-26; DX 50.  While FFA/HSUS[15] (Mr. Markarian) testified that it was not
certain whether WAP used its "donations" for other purposes as well, 3-10-09 p.m. at 48:16-
49:18 (Markarian), this testimony is undermined by the documents underlying FFA/HSUS's
"donations," which indicate that the money was specifically for use in connection with this
litigation. 3-10-09 p.m. at 49:19-52:2 (Markarian); DX 67. FFA/HSUS's testimony also is
questionable given that in 2003, plaintiffs' counsel, Ms. Meyer, specifically sent an email to the
representatives of the organizational plaintiffs, including Mr. Markarian, requesting funds to
support Mr. Rider's advocacy efforts regarding the elephants and the lawsuit, and expressly
suggesting that the funds for Mr. Rider could be contributed to WAP so that they would be tax
deductible.  DX 65.

39.     In July 2005, ASPCA, AWI and HSUS hosted a fundraiser in Pacific Palisades,
California. DX 62 & 62A. The event purported to be a "benefit to rescue Asian elephants from
abuse by Ringling Bros. Barnum & Bailey," the purpose of which was to "raise money so [the
plaintiffs] c[ould] successfully wage this battle on behalf of the elephants." 3-11-09 a.m. at
19:23-20:1, 20:25-21:9 (Liss); DX 62 & 62A.  Proceeds from the fundraiser (more than
$13,000.00) were provided by AWI to WAP, which in turn disbursed those funds to Mr. Rider.
3-11-09 a.m. at 21:10-20 (Liss); DX 62 & 62A; DX 50 at 2 (October 7, 2005 entry: "AWI-From
fundraiser in LA"; November 20, 2005 entry: "Grant $ from AWI (from Fundraiser in CA)").

---

[15] FFA is an affiliate of the Humane Society of the United States ("HSUS").  3-10-09
p.m. at 48:13-48-15 (Markarian).  For convenience, the Court will refer to FFA as "FFA/HSUS."

40.     The totals of payments by the organizational plaintiffs to WAP for Mr. Rider, from
December 2001 to January 2008, are:

| ORGANIZATIONAL PLAINTIFF | AMOUNT PAID TO RIDER THROUGH WAP |
| --- | --- |
| ASPCA | $6,000.00<br>3-10-09 a.m. at 70:6-71:14 (Weisberg);<br>DX 18R at 22; DX 48A; DX 50 |
| AWI | $55,000.00<br>3-11-09 a.m. at 15:8-18:5 (Liss);<br>DX 19 at 14, 19-20, 26; DX 48A; DX 50 |
| FFA/HSUS | $11,500.00<br>3-10-09 p.m. at 47:24-48:1 (Markarian);<br>DX 20R at 33-34; DX 48A; DX 50; DX 67 |
| API | $15,951.00<br>2-19-09 p.m. at 87:22-92:24 (Paquette);<br>DX 21 at 5-6, 11-12; DX 48A; DX 50;<br>DX 66 |

In addition to the amounts listed above, WAP continued to pay Mr. Rider in 2008, and he
received approximately $25,000.00 that year. 2-12-09 p.m. at 82:21-83:6 (Rider).  In total, WAP
has made payments to Mr. Rider totaling $165,000.00.[16] *Id.*; DX 48A; DX 49; DX 51.

41.     Mr. Rider has received regular payments from WAP, initially $500.00 per week and later
$1,000.00 every two weeks, beginning in July 2003 and continuing through at least the end of
2008. DX 49; DX 51; 2-12-09 p.m. at 82:21-83:6 (Rider).  The mechanics of WAP's payments
to Mr. Rider are described below in FOF 42-47.

42.     WAP's payments to Mr. Rider are sent by MGC via Federal Express.  3-11-09 a.m. at
37:21-22 (Glitzenstein Dep. at 109:20-110:9); DX 346; DX 58A. The support staff from MGC
prepares the Federal Express envelopes to Mr. Rider. 3-11-09 a.m. at 37:2-4 (Glitzenstein Dep.
at 42:16-43:13); DX 346. The expense for the mailing is paid for by MGC. 3-11-09 a.m. at
37:21-22, 38:5-6 (Glitzenstein Dep. at 110:10-111:15 & 163:9-18); DX 346. MGC and WAP are
located in the same suite of offices. *Compare* Civ. No. 03-2006 (Docket Sheet) (MGC address)
*with* DX 53 (WAP letters to Rider).

---

[16] Plaintiffs do not dispute that the amounts represented in the table are the amounts paid
by plaintiffs to Mr. Rider through WAP, and that the total amount paid to Mr. Rider by WAP is
$165,000.00.  *See* Pls.' Obj. to Def.'s Prop. FOF ¶ 92.

43.     WAP's regular and systematic payments to Mr. Rider fund his day-to-day living expenses, including entertainment expenditures such as DVDs. 3-11-09 a.m. at 36:18-19 (Glitzenstein Dep. at 24:8-22, 27:2-21); DX 346; DX 52.  WAP also provided the funds to purchase Mr. Rider's used 1983 Volkswagen Van, which he lives in and uses to travel around the country.  2-12-09 a.m. at 85:09-24 (Rider); *id.* at 91:19-92:1; DX 37; DX 49 at 3 (4-12-05 entry).

44.     WAP's regular and systematic payments to Mr. Rider are not reimbursements for expenses actually incurred by him. WAP provides money to Mr. Rider on a bi-weekly basis, *see* DX 49 & DX 51, and after receiving and spending such payments, Mr. Rider periodically submits receipts to WAP. 3-11-09 a.m. at 36:18-19 (Glitzenstein Dep. at 25:19-26:17); DX 346; DX 50; DX 52. WAP does not conduct a "penny-by-penny" analysis of how Mr. Rider spends the money provided to him. 3-11-09 a.m. at 36:18-19 (Glitzenstein Dep. at 25:19-26:17); DX 346. Mr. Rider is not expected to produce receipts for expenses totaling the amount of funding that WAP has provided to him. 3-11-09 a.m. at 36:25 (Glitzenstein at Dep. at 34:7-35:11); DX 346.  Mr. Rider identified no restrictions on how he could spend the money, and stated that he regarded all of his living expenses as "media expenses." 2-17-09 p.m. (12:50) at 6:13-7:11 (Rider).

45.     Beginning on or about August 15, 2005, more than three years after WAP's payments to Mr. Rider first began in 2002, WAP started sending cover letters with its checks to Mr. Rider. DX 53 at 4 (TR 00376) (cover letter dated 8-15-05). The cover letters indicate that Mr. Rider's media "efforts" will target certain cities.  DX 53. The cities cited in the cover letters track the route of FEI's circus performances. *Compare* DX 53 *with* DX 59. The cover letters were signed by Eric Glitzenstein. DX 53. At or about the same time, in August 2005, WAP's ledger of payments to or for Mr. Rider began reflecting the same cities that are indicated in its cover letters to him. DX 49 at 4 (August 29, 2005 entry for "Media in San Francisco").

46.     WAP acknowledges that its decision in 2005 to begin sending the cover letters along with its checks to Mr. Rider was influenced by a subpoena served on it by counsel for FEI, pursuant to Federal Rule of Civil Procedure 45.  3-11-09 a.m. at 37:12-14 (Glitzenstein Dep. at 94:12-96:3); DX 346. The ledger also then began reflecting the cities referenced in the cover letters to Mr. Rider. 3-11-09 a.m. at 37:12-14 (Glitzenstein Dep. at 91:14-93:9); DX 346; DX49; DX 53.

47.     Mr. Rider does not actually travel to all of the cities which are indicated on WAP's cover letters and ledger. 3-11-09 a.m. at 36:25 (Glitzenstein Dep. at 32:9-33:17); 2-17-09 p.m. (12:50) at 8:6-9:15 (Rider); DX 346; DX 49; DX 53.  A significant number of WAP's cover letters and checks to Mr. Rider are mailed to Florida, even though the cover letters and the WAP ledger indicate that Mr. Rider's "media" efforts are focused on cities throughout the United States. 3-11-09 a.m. at 37:2-4 (Glitzenstein Dep. at 40:18-41:6); *id.* at 37:7-8 (Glitzenstein Dep. at 45:15-46:9); DX 346; DX 58A.

### (3)   The Payments to Mr. Rider are Not Reimbursements for a "Media Campaign"

48.   From the time he returned to the United States on March 20, 2000 through December 31, 2008, Mr. Rider has been paid at least $190,000.00 by PAWS, ASPCA, AWI, FFA/HSUS and API (directly or through MGC or WAP) and by WAP itself. 2-12-09 p.m. at 82:21-83:6 (Rider); DX 48A. Since May 2001, the payments from the existing organizational plaintiffs, directly or through MGC or WAP, and from WAP itself, have totaled approximately $185,000.00. 2-12-09 p.m. at 82:21-83:6 (Rider); DX 48A. The organizational plaintiffs and Mr. Rider claim that this money is to reimburse Mr. Rider for the expenses he has incurred in conducting a media and educational outreach program about the treatment of FEI's elephants. 3-10-09 a.m. at 62:8-63:3 (Weisberg); 3-10-09 p.m. at 16:12-25 (Weisberg); *id.* at 64:10-14 (Markarian); 3-11-09 a.m. at 30:7-17 (Liss); 2-19-09 p.m. at 17:21-24 (Paquette). The Court does not find this testimony to be persuasive. Plaintiffs certainly established during the trial that Mr. Rider engages in media and educational outreach activity regarding FEI's Asian elephants, including speaking out about what he allegedly witnessed regarding elephant mistreatment, and publicizing his involvement in this litigation. The Court does not doubt that the plaintiff organizations willingly support those efforts. Nevertheless, based on the totality of the evidence, including FOF 24-59, the Court concludes that while the organizational plaintiffs may see Mr. Rider's media and outreach activities as a benefit, that is not the primary purpose for the payments to Mr. Rider. Rather, the primary purpose is to keep Mr. Rider involved with the litigation, because he is the only plaintiff who alleges a personal and emotional attachment to the elephants and an aesthetic injury based on the alleged mistreatment he claims to have witnessed while working for FEI.

49.   While Mr. Rider has claimed that his media work has tracked the actual route of FEI's Blue Unit, much of his claimed media work has actually been performed in the home of one of his daughters or at a campground in Florida, even though WAP's cover letters to him and the ledger kept by WAP imply that Mr. Rider is traveling, as described *supra* FOF 45-47. 2-17-09 p.m. (12:50) at 8:3-9:16 (Rider); DX 49; DX 53. Most of Mr. Rider's "media work" is conducted on his cell phone or laptop computer. 2-17-09 p.m. (12:50) at 9:17-10:1 (Rider). Mr. Rider's travels, as indicated by the locations where he has both received checks from WAP (DX 58A) and has actually spent the money (DX 52), do not correlate with the movement of FEI's Red or Blue Units (DX 59) or with WAP's letters (DX 53) and ledger (DX 49) (which reflect FEI's performances). For example, from May 3-11, 2007, Mr. Rider spent money in Texas, New Mexico, Louisiana and Florida and received a check by Federal Express from WAP in Texas. DX 52 (TR 00365, 00243-46); DX 58A (M 104). During that same period, the Blue Unit was in Massachusetts and New York; the Red Unit was in Rhode Island and Connecticut. DX 59. Similarly, from October 11 through November 11, 2007, all of Mr. Rider's documented expenditures and receipts of checks from WAP were in Florida. DX 52 (TR 00641-42, 00648, 00664, 00668-70, 00681); DX 58A (M 003-04, 103). During that same period, the Blue Unit was in Massachusetts, New Hampshire, Connecticut, Pennsylvania, and Missouri; the Red Unit was in Colorado, Ohio, and Illinois. DX 59.

50.     The specific evidence offered by plaintiffs of Mr. Rider's actual press and media-related activities was contained in PWC 94A & 94B. 2-12-09 a.m. at 89:10-90:3 (Rider). Much of this material does not appear to be the result of efforts by Mr. Rider himself but, rather, the fact of the lawsuit being referenced by others in media pieces and Mr. Rider being identified as one of the plaintiffs. PWC 94A & 94B.  Even if the Court were to assume that all of the media activity contained in this exhibit was the result of Mr. Rider's efforts alone, the activities are nonetheless episodic and noncontinuous.  There appear to be a number of gaps in this activity lasting several weeks or months, including one such gap of more than nine months.  *Id.* (no evidence of media or outreach work from May 9, 2007 to March 2, 2008). Despite the irregular and sporadic nature of the media work, the payments and other financial support have come to Mr. Rider from WAP and the organizational plaintiffs or their counsel without interruption.  DX 18R at 21-24, 27; DX 19 at 18-21, 25-26; DX 20R at 32-35; DX 46, DX 48A, DX 49-51, DX 53, DX 61, DX 63-67. Mr. Rider admitted that WAP had never withheld a payment on the ground that Mr. Rider had not done enough media work and he could not identify any interruption in the payments. 2-17-09 p.m. (12:50) at 10:2-15 (Rider).  Plaintiffs produced evidence that media and public outreach efforts do not always produce immediate results, and that at times Mr. Rider might travel to cities ahead of the circus as part of his media work, and the Court recognizes this to be the case. Nevertheless, the Court finds, based on the evidence, that while plaintiffs' payments to Mr. Rider may support his media and outreach efforts, those payments were only loosely, if at all, correlated to those efforts.  In fact, even during long periods when Mr. Rider was not producing any media coverage, the payments continued, suggesting that plaintiffs would not have stopped paying Mr. Rider even if he did no media or public outreach work.  Further, there is no evidence to indicate that Mr. Rider would have undertaken these efforts on his own accord, absent the payments, based on his alleged personal and emotional attachment to the FEI elephants and his alleged aesthetic injury resulting from the alleged mistreatment of those elephants.

51.     The Court finds that the payments that Mr. Rider has received are directly linked to the litigation: Mr. Rider testified that he has no expectation of further payments from either the organizational plaintiffs or WAP once the litigation has been concluded, assuming the plaintiffs prevail. 2-12-09 p.m. at 86:13-88:10 (Rider). WAP acknowledges that Mr. Rider's "public education campaign" is "intertwined with the purpose of [this] case" and that the "distinction" between the "public education campaign" and litigation like this "is meaningless." 3-11-09 a.m. at 38:19 (Glitzenstein Dep. at 386:4-388:12); DX 346.

52.     MGC sent and Mr. Rider received an IRS Form 1099 for tax year 2001 stating that MGC had paid Mr. Rider $8,781.00 in "nonemployee compensation" during 2001. 2-12-09 p.m. at 80:24-81:5 (Rider); DX 55. WAP sent and Mr. Rider received IRS Forms 1099 for tax years 2002, 2003, 2004, 2005, 2006, 2007, and 2008, stating that WAP had paid Mr. Rider the following amounts of "nonemployee compensation": $7,773.34 in 2002; $7,336.00 in 2003; $23,940.00 in 2004; $33,600.00 in 2005, $32,900.00 in 2006, $25,700.00 in 2007, and approximately $25,000.00 in 2008. 2-12-09 p.m. at 81:6-83:6 (Rider); DX 54. ASPCA did not produce in discovery an IRS Form 1099 for any of the payments that it made to or for Mr. Rider directly or indirectly. 3-10-09 a.m. at 75:17-76:5 (Weisberg).  There is no evidence of any such Form 1099's from any of the other organizational plaintiffs.  Regardless of the characterization

of these funds as "grants," "compensation," or otherwise, the Court finds that these payments were primarily intended to - and indeed did - keep Mr. Rider involved with the litigation and advance the organizational plaintiffs' purposes for this litigation.

53.     The Court finds that the primary purpose of the funding provided by the organizational plaintiffs by and/or through MGC and WAP was to secure Mr. Rider's initial and continuing participation as a plaintiff in this litigation. This is not a case in which the financial support began years - or even months - after Mr. Rider's advocacy efforts, which might suggest that the organizations were simply providing financial support so that Mr. Rider could continue advocating for an issue or cause to which he had long since demonstrated a commitment. To the contrary, the financial support in this case began before the advocacy efforts and suggests that absent the financial incentive, Mr. Rider may not have begun or continued his advocacy efforts or his participation as a plaintiff in this case. In May 2001, at the time that the organizational plaintiffs commenced providing financial support to Mr. Rider, which previously had been supplied by PAWS, Mr. Rider was the only plaintiff in the case alleging that he had a personal and emotional attachment to FEI's elephants and the only plaintiff alleging that FEI's treatment of its elephants caused him aesthetic and emotional injury. Sec. Am. Compl. ¶¶ 18-22, Civ. No. 00-1641 (DE 21) (April 10, 2001). By May 2001, when the current organizational plaintiffs began paying Mr. Rider, FEI already had moved to dismiss the case on the ground, among others, that neither Mr. Rider nor the organizational plaintiffs had standing to sue. Civ. No. 00-1641 (DE 8, 12 & 13). On June 29, 2001, the Court dismissed this case on the basis that neither Mr. Rider nor the organizational plaintiffs had standing to sue. *See* June 29, 2001 Decision. The case was reinstated by the Court of Appeals in 2003, but solely on the basis of what had been alleged by Mr. Rider with respect to his personal and emotional attachment to the elephants with whom he had worked and the aesthetic injury he claimed that he suffered as a result of FEI's treatment of those elephants. *Ringling Bros.*, 317 F.3d at 335, 338. Indeed, the Court of Appeals recognized that Mr. Rider presented the plaintiffs' "strongest case for standing." *Id.* at 335. In order for this case to continue it was therefore crucial to the organizational plaintiffs that Mr. Rider remain a plaintiff. The Court finds that ensuring Mr. Rider's continued participation as a plaintiff was a motivating factor behind the payments to him, and that these payments were a motivating factor for his continued involvement in the case.

54.     Although Mr. Rider professes a love for elephants generally, in 2003 he declined an opportunity for a job at FFA's Black Beauty Ranch where he could have worked with elephants and could have earned a bona fide salary doing so. 2-12-09 p.m. at 83:17-86:12 (Rider); 3-10-09 p.m. at 39:9-42:6 (Markarian); DX 20R at 25-26. According to a FFA employee, Mr. Rider declined both full-time and part-time employment at the Black Beauty Ranch "on the ground that he need[ed] to continue to stay on the road to tell people about what goes on at the circus" and because he was "more interested" in his "public education efforts." DX 20R at 25. However, because Mr. Rider does a substantial part of his "media work" on a cell phone from one location, *see* FOF 49, the job at Black Beauty Ranch (particularly the part-time offer) would not necessarily have interfered with that "media work."

55.     Mr. Rider was not forthright about the payments that he had received from the organizational plaintiffs and their (and his) counsel. In his June 9, 2004 response to FEI's Interrogatory No. 24, which asked whether Mr. Rider had received any compensation from any animal advocate or animal advocacy organization for services rendered, Mr. Rider stated – under oath – that "I have not received any such compensation." DX 16 at 12. This statement was false. By June 9, 2004, the date that Mr. Rider provided this sworn answer, he had received more than $50,000.00 from PAWS, MGC, ASPCA, AWI, FFA and WAP. 2-12-09 p.m. at 92:11-21 (Rider); DX 48A. All of these entities are, and were at the time, animal advocates or animal advocacy organizations. The money that these groups had paid to Mr. Rider was "compensation" because it was designated by these groups as either "wages" or "nonemployee compensation" on IRS Form 1099's and other tax forms sent to Mr. Rider, and received by him. DX 54-57. The money paid was for services rendered. When Mr. Rider ultimately filed federal income tax returns in 2007 for the years 2000 through 2004, he stated, under penalty of perjury, that his occupation was "advocate"; that he ran a "business" in the form of a sole proprietorship that provided a "service," namely, that of an "advocate"; and he reported all of the payments he had received from these groups as income or wages. 2-12-09 p.m. at 96:2-9 (Rider); 2-17-09 p.m. (12:50) at 5:5-24 (Rider); DX 60 at 1-2, 4, 21-23, 27-28, 30, 36-38, 47-49.

56.     The Court is not persuaded by Mr. Rider's *post hoc* effort to explain this false interrogatory answer. That Mr. Rider did not regard the payments as "compensation" because he believed he was performing a "public service," 2-12-09 p.m. at 91:24-92:8 (Rider), is irrelevant and contradicted by Mr. Rider's own federal income tax returns, as noted above. Furthermore, the Court finds no excuse for this false response. The lawyer who signed the objections to this answer, Katherine Meyer, DX 16 at 13, was a principal in two of the entities – WAP and MGC – that had paid Mr. Rider and had sent him 1099's reporting such payments. Moreover, the third payor, PAWS, who also sent Mr. Rider a 1099, was one of Ms. Meyer's clients. DX 54-56. Indeed, after the payments to Mr. Rider from PAWS ceased in May 2001, it was apparently Ms. Meyer's suggestion that the other organizational plaintiffs pay Mr. Rider, initially through MGC, and later through WAP. 2-12-09 p.m. at 70:12-71:4, 72:16-73:7 (Rider). Mr. Rider did not provide a complete and truthful answer to Interrogatory No. 24 until September 24, 2007, after the Court had overruled his objections and compelled his answer. DX 16 at 25-28.

57.     The organizational plaintiffs have also been less than forthcoming about the extent of the payments to Mr. Rider.  In response to FEI's discovery requests, neither ASPCA, FFA nor AWI disclosed in their initial responses in 2004 that they had paid money directly to Mr. Rider or through MGC when, by that point in time, they had in fact done so. 3-10-09 a.m. at 83:12-15 (Weisberg); 3-10-09 p.m. at 55:22-56:17 (Markarian); 3-11-09 a.m. at 21:21-22:13 (Liss). In 2004, ASPCA made reference to the fact that payments had been made to MGC and WAP, although ASPCA did not disclose that such payments were ultimately remitted to Mr. Rider. DX 18R at 6-11. FFA and AWI did not disclose their payments to Mr. Rider through MGC and WAP even when specifically asked about Mr. Rider's funding at their depositions taken pursuant to Federal Rule of Civil Procedure 30(b)(6). 3-10-09 p.m. at 55:1-18 (Markarian); 3-11-09 a.m. at 13:8-15:3 (Liss). The true nature and extent of the payments the organizational plaintiffs had made to Mr. Rider directly or through MGC or WAP was not fully disclosed until after the

Court's order of August 23, 2007, granting FEI's motion to compel the disclosure of such information. 3-10-09 a.m. at 83:16-86:9 (Weisberg); 3-10-09 a.m. at 56:4-17 (Markarian); 3-11-09 a.m. at 21:21-22:13 (Liss); DX 18R at 21-23 (ASPCA); DX 19 at 18-21 (AWI); DX 20R at 32-35 (FFA).

58.     During the period from 2001 through 2006, Mr. Rider did not declare any of the money that had been paid to him by the organizational plaintiffs, WAP or MGC as income on any tax return filed with the federal or any state government. 2-12-09 p.m. at 94:19-95:1 (Rider). Mr. Rider did not file such tax returns until April 2007, after the subject had been raised in his October 2006 deposition and other filings in this case. *Id.* at 95:2-23. While it appears that Mr. Rider did then file his tax returns, there is no evidence that Mr. Rider himself paid the taxes that were owed on the money paid to him by the organizational plaintiffs, MGC and WAP. After he filed tax returns in April 2007, Mr. Rider was subjected to tax liens by the IRS in the amount of $14.941.75. *Id.* at 97:7-9. Mr. Rider did not have the money to discharge these back taxes; these amounts have been paid on his behalf by "friends." *Id.* at 96:10-97:6.

59.     Based on the foregoing, the Court concludes that the primary purpose of the funding provided by the organizational plaintiffs was to secure and maintain Mr. Rider's participation in this lawsuit, not legitimate reimbursement for bona fide media expenses.  This determination is based on (i) the manner in which the payments to Mr. Rider were structured, accounted for and characterized by the organizational plaintiffs, MGC and WAP; (ii) the fact that they were not disclosed initially in discovery, by both omissions and affirmatively false statements; and (iii) the fact that Mr. Rider never even filed tax returns until he was confronted about it in this very case.

### c.      Mr. Rider Has No Aesthetic or Emotional Injury

60.     As indicated in FOF 61-73 below, Mr. Rider's allegations of aesthetic and emotional injury stemming from a personal and emotional attachment to certain of FEI's Asian elephants are not credible.  Mr. Rider's allegations, which both this Court and the Court of Appeals were required to accept as true pursuant to Federal Rule of Civil Procedure 12(b)(6) for purposes of ruling on the issue of standing in 2001 and 2003, were not truthful. Those allegations were contradicted by Mr. Rider's own actions, which were not disclosed to either court or to defendant until after the standing decisions were issued, during the discovery process.

61.     In pleadings and other filings in this Court and in the Court of Appeals during the period from July 2000 through 2002, Mr. Rider represented that he would like again to visit or observe the Blue Unit elephants with whom he had worked and formed a personal attachment, but was refraining from doing so in order to avoid subjecting himself to further aesthetic injury. Compl. ¶ 34, Civ. No. 00-1641 (DE 1) (July 11, 2000); 2-17-09 p.m. (12:50) at 18:8-20:20 (Rider).  The evidence demonstrates, however, that contrary to his claims, from March 2000 through June 2004, Mr. Rider had seen or observed these elephants on numerous occasions - approximately ten (10) or fifteen (15) times per year since 1999. *Id.* at 20:24-22:19.  The details of these visits and observations were not disclosed by Mr. Rider until June 9, 2004 when he served his first

responses to defendant's interrogatories. DX 16 at 10-11; *compare* Sec. Am. Compl. ¶ 22, Civ. No. 00-1641 (DE 21) (April 10, 2001) *with* Compl. ¶¶ 22-23, Civ. No. 03-2006 (DE 1) (September 26, 2003).

62.     In pleadings and other filings in this Court and in the Court of Appeals from July 2000 through October 2006, Mr. Rider represented that, if the Blue Unit elephants with whom he had worked and had formed a personal attachment were moved to a sanctuary or other place where they were no longer allegedly mistreated, he would visit those animals as often as possible and would seek a position to work with them again. Sec. Am. Compl. ¶ 22, Civ. No. 00-1641 (DE 21) (April 10, 2001); Compl. ¶ 22, Civ. No. 03-2006 (DE 1) (September 26, 2003). However, as found in FOF 66-69 below, Mr. Rider has had several such opportunities to visit his "girls" outside of the circus, but he has not taken advantage of those opportunities. On the one occasion that he visited one of his "girls" outside of the circus, it appears to have had more to do with litigation posturing than with a genuine personal attachment.

63.     Mr. Rider's claim of a personal and emotional attachment to the FEI elephants he worked with on the Blue Unit from 1997 through 1999, Compl. ¶ 20, Civ. No. 03-2006 (DE 1) (9-23-06) – which currently consists of Jewel, Karen, Lutzi, Mysore, Nicole, Susan and Zina as the only FEI elephants left from that group – is not born out by the evidence. Mr. Rider's testimony indicates that, if he had any sort of attachment to elephants, it was to the three Chipperfield elephants (Lecheme, Kamala and Meena) that were on the Blue Unit during the same period of time. On cross-examination, Mr. Rider admitted that the reason he went to Europe in late 1999 with Daniel Raffo was so that Mr. Rider could be with the "three elephants that I was really attached to," *i.e.*, the three Chipperfield elephants. 2-12-09 p.m. at 51:9-52:9 (Rider).

64.     Mr. Rider's testimony as to the physical characteristics and personality traits of Jewel, Karen, Lutzi, Mysore, Nicole, Susan and Zina was not credible because it was vague and non-specific and did not supply information that would be known only to those with intimate personal knowledge of or familiarity with these animals. 2-12-09 a.m. at 22:20-29:6 (Rider).

65.     Mr. Rider could not identify the FEI elephants in question from video tapes that were played in the courtroom during his cross-examination. One instance involved a video clip from 1997 in which Graham Chipperfield was filmed practicing with five elephants that Mr. Rider had worked with on the Blue Unit and to whom he claims an attachment: Meena, Lecheme, Kamala, Sophie and Karen.  DX 324A.  Mr. Rider identified the three Chipperfield elephants but could not identify the FEI elephants, Sophie or Karen, despite having allegedly visited Sophie as recently as 2006. 2-12-09 p.m. at 126:14-127:2 (Rider); 2-17-09 p.m. (12:50) at 66:25-67:2 (Rider); FOF 66. Mr. Raffo readily identified all of these elephants from the same clip, even though he had not worked with the elephants since 2001. 3-4-09 a.m. at 13:19-14:15, 17:2-4, 46:4-14 (Raffo). Another instance involved a clip from 1999 in which certain Blue Unit elephants received an olive oil rub-down in the D.C. Armory. DX 173A. Although Mr. Rider remembered the event, 2-12-09 p.m. at 129:21-130:12 (Rider), he could not identify the elephants in the video, *id*. at 133:21-135:1, 135:14-19. This is particularly significant because one of the elephants, Susan, has the distinctive and unusual (for an Asian elephant) characteristic

of a swayed back. 2-24-09 p.m. (2:40) at 44:4-12, 45:12-13 (Ensley); 3-16-09 p.m. (2:45) at 10:16-20 (Schmitt).

66.     The Asian elephant Sophie was one of the elephants on the Blue Unit when Mr. Rider was employed by FEI in 1997-99 and as to which he claims to have formed a personal and emotional attachment. 2-17-09 p.m. (12:50) at 66:12-18 (Rider). FEI donated Sophie to the Niabi Zoo, in Moline, Illinois, in 2003, where she has resided ever since. DX 4 at 39; PWC 36 at 43, 91. Sophie's location at the Niabi Zoo is listed publicly in the NORTH AMERICAN REGIONAL ASIAN ELEPHANT STUDBOOK. DX 4 at 39; PWC 36 at 43, 91. At the time of his first deposition on October 12, 2006, Mr. Rider had not visited Sophie. 2-17-09 p.m. (12:50) at 66:21-24 (Rider). After his October 2006 deposition (in which he was questioned about whether he had visited Sophie), Mr. Rider visited Sophie once as part of the "media work" he was purportedly engaged in. *Id.* at 69:2-4; 66:25-67:2.   That visit is the only time Mr. Rider has visited Sophie, *id.* at 69:5-12, despite the fact that the Niabi Zoo is approximately one-hundred (100) miles from the residence of Mr. Rider's daughter. *Id.* at 69:13-22.   Mr. Rider has not sought any position with the Niabi Zoo or otherwise that would permit him to work with Sophie again. *Id.* at 68:21-69:1. Mr. Rider has not sent a 60-day notice letter to the Niabi Zoo or sued that zoo for "taking" Sophie, even though Mr. Rider knows that Sophie is managed by the zoo with a bullhook and chains and even though Mr. Rider claims his visit with Sophie caused him "aesthetic injury." *Id.* at 67:24-68:11.   The Court finds that Mr. Rider's visit of Sophie was not the result of a personal attachment to Sophie.

67.     The Asian elephants named "Minnie" and "Rebecca" were two of the elephants on the Blue Unit when Mr. Rider was employed by FEI in 1997-99 and as to which he claims to have formed a personal and emotional attachment. 2-17-09 p.m. (12:50) at 70:10-18 (Rider).  As part of a litigation settlement, FEI donated Minnie and Rebecca to PAWS in 2002, and Mr. Rider was aware of that fact in 2002. 2-17-09 p.m. (12:50) at 70:19-71:16 (Rider); DX 4 at 45; PWC 36 at 55. Minnie has since passed away, while Rebecca remains at PAWS' facility. 2-17-09 p.m. (12:50) at 72:24-25 (Rider). At the time of his first deposition on October 12, 2006, Mr. Rider had not visited Minnie or Rebecca. *Id.* at 71:17-20. At the time of his second deposition on December 18-19, 2007, Mr. Rider had not visited Minnie or Rebecca. *Id.* at 71:21-24. There is no evidence that Mr. Rider has ever visited Minnie or Rebecca at PAWS. Mr. Rider is not precluded from visiting Rebecca at PAWS. *Id.* at 72:3-17. Mr. Rider has not sought any position with PAWS or otherwise that would permit him to work with Rebecca again. *Id.* at 72:18-23.  The Court finds that Mr. Rider's failure to visit these elephants even once in nearly seven years, especially when considered in connection with FOF 66 (that he only visited Sophie once in over five years), FOF 33-52 (he has been provided with a van and is paid by the organizational plaintiffs to travel around to see the elephants), undermines and contradicts the allegations in his Complaint that he has a strong emotional and personal attachment to these animals and that he would like to visit and work with them again if they were out of the circus.  Compl. at ¶¶ 20, 22.

68.     The Asian elephants Karen and Nicole were two of the elephants on the Blue Unit when Mr. Rider was employed by FEI in 1997-99 and as to which he claims to have formed a personal

and emotional attachment. Compl. ¶ 20; 2-12-09 a.m. at 18:22-19:2 (Rider).  Karen and Nicole are still performing on the Blue Unit. 3-12-09 a.m. at 20:9-11 (French); DX 1.  Karen and Nicole were inspected on November 14, 2007, at the Blue Unit venue in Auburn Hills, Michigan. 2-17-09 p.m. (12:50) at 74:1-3 (Rider); PWC 143A-F; DX 26A-J. The inspection of Karen and Nicole was conducted by plaintiffs' expert witnesses who were accompanied by plaintiffs' counsel. *Id.* at 73:21-25; DX 185 at 5-10. The inspection provided four (4) hours of time for observation of these elephants. DX 184 at 2. Mr. Rider was aware before this inspection occurred that it was going to take place. 2-17-09 p.m. (12:50) at 73:21-74:9 (Rider). As a plaintiff in the case, Mr. Rider had a right to be present at the inspection in Auburn Hills and to see Karen and Nicole under the supervision of and with the support of his counsel, but Mr. Rider did not attend. *Id.* at 74:10-11.  That Mr. Rider would forego the opportunity to spend this time with Karen and Nicole dramatically undermines his credibility with respect to his professed attachment to these elephants.

69.     The Asian elephants Jewel, Lutzi, Mysore, Susan and Zina were five of the elephants on the Blue Unit when Mr. Rider was employed by FEI in 1997-99 and as to which he claims to have formed a personal and emotional attachment. Compl. ¶ 20; 2-12-09 a.m. at 18:22-19:2 (Rider). Jewel, Lutzi, Mysore, Susan and Zina were inspected on November 29, 2007, at the CEC. 2-17-09 p.m. (12:50) at 74:4-6 (Rider); PWC 142A-E; DX 27A. The inspection of Jewel, Lutzi, Mysore, Susan and Zina was conducted by plaintiffs' expert witnesses who were accompanied by plaintiffs' counsel. *Id.*; DX 185 at 5-10. The inspection provided four (4) hours of time for observation of these elephants. DX 184 at 2. Mr. Rider was aware before this inspection occurred that it was going to take place. 2-17-09 p.m. (12:50) at 74:7-9 (Rider). As a plaintiff in the case, Mr. Rider had a right to be present at the inspection at the CEC and to see Jewel, Lutzi, Mysore, Susan and Zina under the supervision of and with the support of his counsel, but Mr. Rider did not attend. *Id.* at 74:10-11.  That Mr. Rider would forego the opportunity to spend this time with Jewel, Lutzi, Mysore, Susan and Zina dramatically undermines his credibility with respect to his professed attachment to these elephants.  This is especially true in view of the fact that (1) WAP provided Mr. Rider with the funds to purchase a van in 2005, and Mr. Rider is paid by the plaintiff organizations and by WAP allegedly to travel the country advocating for these animals, FOF 37-52; and (2) it appears from the Federal Express airbills used by WAP to send plaintiffs' payments to Mr. Rider, DX 58A, that Mr. Rider was actually in Florida, where the CEC is located and where the inspection took place, at the time of this inspection.  DX 58A.

70.     Mr. Rider claims that he had a personal and emotional attachment to the elephants that were owned by Mr. Chipperfield – Kamala, Lechame and Meena – but Mr. Rider has made no effort to ascertain the whereabouts of these elephants or to visit them. 2-17-09 p.m. (12:50) at 74:12-23 (Rider). In addition, when asked in an interrogatory to list the elephants he had worked with at FEI, Mr. Rider omitted Meena even though Mr. Rider was allegedly just as attached to Meena as he was to the other elephants. *Id.* at 63:13-64:25; DX 16 at 9. The Court finds it unlikely that such an omission would occur were there actually a strong attachment, particularly since there is no evidence that Mr. Rider lacked ample time and opportunity to answer this interrogatory.

71.     Mr. Rider testified that his personal and emotional attachment to the Asian elephants on FEI's Red Unit is just as strong as his personal and emotional attachment to the Blue Unit elephants. 2-17-09 p.m. (12:50) at 65:24-66:2 (Rider).  Mr. Rider never worked with any of the Red Unit elephants. *Id.* at 66:3-11.  Mr. Rider's testimony that he is just as attached to the elephants that he never worked with as he is to the elephants he worked with for two and a half years significantly undermines his credibility with respect to his claimed close personal and emotional attachment to the Blue Unit elephants.

72.     In addition to the other facts found above, Mr. Rider's assertion of a personal and emotional attachment to the elephant Zina is not credible because Mr. Rider omitted that elephant when asked by his lawyer in his 2006 deposition to name the elephants with which he had a personal and emotional attachment. 2-17-09 p.m. (12:50) at 65:1-15 (Rider) (referencing 2006 Dep. at 10:22-11:6). Mr. Rider similarly struggled to recall the names of the Blue Unit elephants in his 2007 deposition. *Id.* at 65:16-23 (referencing 2007 Dep. at 270:14-271:9). Mr. Rider likens his attachment to the Blue Unit elephants to the attachment he has to his children and grandchild.  2-12-09 p.m. at 26:1-11 (Rider).  The Court, however, finds it unlikely that a person would forget the names of his children or grandchildren or struggle to recall their names when asked to name them.  The Court also finds it unlikely that a person would (i) be unable to describe the physical characteristics and personality traits of his children or grandchildren in detail, FOF 64; (ii) be unable to identify his children or grandchildren when shown pictures of them, FOF 65; or (iii) would make little or no effort to visit his children or grandchildren when given the opportunity and resources to do so, FOF 43, 66-69.

73.     In addition to the other facts found above, Mr. Rider's assertion of a personal and emotional attachment to the elephant Karen is not credible. Mr. Rider made a videotape in which he referred to Karen derogatorily as a "bitch." 2-17-09 p.m. (12:50) at 55:17-56:9 (Rider); DX 30B. Mr. Rider claims that his use of the term "bitch" was not intended as a derogatory term, and that he also calls his daughter a "bitch" as a term of endearment. 2-17-09 p.m. (12:50) at 56:13-18, 77:3-22 (Rider); 2-17-09 p.m. (2:48) at 58:1-59:8 (Rider).  It is clear to the Court from Mr. Rider's tone on the video that he was not using the term "bitch" as an endearment.  DX 30B. Mr. Rider has also characterized Karen as a "killer elephant" who would have killed or seriously injured him had she had the opportunity to do so, and that she "hated" him. 2-17-09 p.m. (12:50) at 55:11-16, 76:20-23.  These are not the terms in which one typically describes a relationship of close personal or emotional attachment.

### d.     Mr. Rider's Alleged Aesthetic or Emotional Injury is Not Redressable

74.     There is no evidence that Mr. Rider has any intention of re-applying for employment with FEI in any position that would permit him to observe, work with, interact with or otherwise be in the vicinity of any of FEI's Asian elephants.  The CEC and the Williston Ranch are not open to the public.  3-3-09 p.m. at 9:22-24; 9:25-10:2 (Feld).  Mr. Feld's testimony is unrefuted that FEI will never rehire Mr. Rider or give him access to the CEC or the Williston Ranch. 3-3-09 p.m.

20:17-21:5 (Feld).  Accordingly, Mr. Rider has no way of lawfully gaining access to the CEC or to FEI's facility in Williston. 2-17-09 p.m. (12:50) at 48:7-20.

75.     Jewel, Lutzi, Mysore, Susan and Zina are located at the CEC. 3-5-09 p.m. at 35:9-36:3 (Jacobson); DX 1. These elephants are retired from circus performances, and no longer participate in any training or rehearsing with respect to circus performances. 3-3-09 p.m. at 10:25-11:17 (Feld); 3-5-09 p.m. at 95:7-9 (Jacobson). According to FEI, these elephants will never again be exhibited by FEI in circus or other public performances or activities. 3-3-09 p.m. at 11:18-23 (Feld); 3-5-09 p.m. at 105:11-18 (Jacobson); DX 308A (Jacobson Dep. at 230:7-17). Karen and Nicole are still performing with the Blue Unit. 3-5-09 p.m. at 36:8-9 (Jacobson); DX 1.  According to the evidence, which the Court credits, if the use of the bullhook and chains were prohibited these elephants could not safely continue performing in the circus, and would therefore be removed to the CEC.  3-5-09 p.m. at 36:10-17; 104:10-105:10 (Jacobson); 3-4-09 p.m. at 82:14-83:6 (K. Johnson); 3-12-09 a.m. at 57:6-59:6 (French); 3-3-09 p.m. at 23:1-24:12 (Feld).

76.     There is no evidence that Mr. Rider has the ability, by observing an elephant, to determine whether that elephant has been mistreated by use of a bullhook or chains. There is no evidence that Mr. Rider has the ability, by observing an elephant that has previously been managed with the bullhook and chains, to detect the effects on that elephant's behavior of a court order that prohibits further use of the bullhook or chains with respect to that elephant.

### e.     Mr. Rider's Observations Since December 1, 1999

77.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant Jewel, including any mistreatment as a result of the bullhook or chaining with respect to Jewel. 2-17-09 p.m. (2:48) at 73:13-16 (Rider).

78.     Since December 1, 1999, the only mistreatment Mr. Rider claims he has observed as to the elephant Karen was a film (PWC 132P) he made of Mr. Ridley in Tulsa in 2001. 2-17-09 p.m. (2:48) at 74:9-12 (Rider).  Mr. Rider did not observe any bleeding as a result of that incident. *Id.* at 74:13-15. There is no evidence that since December 1, 1999, Mr. Rider has observed any other mistreatment of the elephant Karen including any mistreatment as a result of the bullhook or chaining with respect to Karen.

79.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant Lutzi, including any mistreatment as a result of the bullhook or chaining with respect to Lutzi. 2-17-09 p.m. (2:48) at 73:17-19 (Rider).

80.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant Mysore, including any mistreatment as a result of the bullhook or chaining with respect to Mysore. 2-17-09 p.m. (2:48) at 73:20-24 (Rider).

81.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant

Nicole, including any mistreatment as a result of the bullhook or chaining with respect to Nicole. 2-17-09 p.m. (2:48) at 73:25-74:2 (Rider).

82.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant Susan, including any mistreatment as a result of the bullhook or chaining with respect to Susan. 2-17-09 p.m. (2:48) at 74:3-5 (Rider).

83.     Since December 1, 1999, Mr. Rider has not observed any mistreatment of the elephant Zina, including any mistreatment as a result of the bullhook or chaining with respect to Zina. 2-17-09 p.m. (2:48) at 74:6-8. (Rider).

84.     Mr. Rider has never personally observed an Asian elephant in the wild.  2-12-09 p.m. at 10:21-25 (Rider).

85.     Mr. Rider has never observed any training of FEI's elephants. 2-12-09 p.m. at 10:11-16 (Rider). All of the elephants Mr. Rider worked with had been trained before he started working at FEI. *Id.* at 10:8-10.

## 2.   **Conclusions of Law**

1.     If plaintiffs had standing to sue, this Court would have subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331.  However, as the Court concludes below, neither Mr. Rider nor the organizational plaintiffs have standing to sue and, therefore, this Court lacks subject matter jurisdiction in this case.

2.     Under Article III of the U.S. Constitution, the "irreducible constitutional minimum" of standing to sue is: (1) an injury in fact; (2) that is fairly traceable to the defendant's action; and (3) that is capable of judicial redress. *Lujan*, 504 U.S. at 560; *Ringling Bros.*, 317 F.3d at 336. Plaintiffs have the burden of proving their standing to sue. For the reasons stated in COL 2-32, *infra*, plaintiffs have failed to prove the facts necessary to establish their standing to sue. Therefore, this case will be dismissed for lack of Article III jurisdiction.

3.     Mr. Rider's claimed injury in fact is predicated upon an aesthetic interest, namely, his allegedly strong personal and emotional attachment to the Asian elephants that he tended to when he was employed by FEI as a barn man on the Blue Unit from June 1997 through November 1999. While an emotional attachment to a particular animal can form the predicate for an aesthetic injury, Mr. Rider has failed to prove that he had such an attachment to the Asian elephants Jewel, Karen, Lutzi, Mysore, Nicole, Susan and Zina, which are the only Asian elephants currently in FEI's possession that were on the Blue Unit from June 3, 1997 through November 25, 1999.

4.     Mr. Rider's testimony at trial about his personal and emotional attachment to these elephants is not credible in light of his own undisputed actions at the time he worked for FEI and thereafter, which were undertaken long before this lawsuit was filed and before there was a

43

motive to falsify. Mr. Rider never complained to management about the treatment of the elephants while at FEI and made no effort to complain about that treatment after he left, to either the USDA or anyone else, even though he had ample opportunity to do so. FOF 4-9, 20. Moreover, while he claims that he quit his job at FEI due to elephant abuse, he immediately took another job tending elephants for Mr. Raffo, one of the very persons whom Mr. Rider claimed had abused the FEI elephants as well as the three elephants from England as to which Mr. Rider also claims a personal and emotional attachment. FOF 15, 17. His credibility with regard to his personal and emotional attachment to the elephants is further undercut by Mr. Rider's own use of the bullhook while employed by Mr. Raffo. FOF 16, 17.

5.      Mr. Rider's self-serving testimony at trial about his personal and emotional attachment to these elephants also is not credible because he did not begin to make complaints about how FEI treated its elephants until after he began accepting money from animal activists, possibly first from such individuals in the United Kingdom and then certainly from PAWS, MGC, the current organizational plaintiffs and WAP. Other than these payments, which have totaled at least $190,000.00 and have flowed to Mr. Rider in an uninterrupted stream from March 2000 through at least December 31, 2008, Mr. Rider has had no other source of income or financial support. FOF 21-47. While the Court recognizes that Mr. Rider has performed some media and outreach services for the organization plaintiffs, the claim that this money was solely for Mr. Rider's "media work" is not credible. Based on the evidence in this case, the purported "media work" does not explain the money that the organizational plaintiffs, their lawyers and related entities paid to Mr. Rider. FOF 48-59. This lawsuit could not have been maintained without Mr. Rider's participation as a plaintiff, and the payments to him are linked directly to the litigation itself. FOF 48, 53. The Court concludes that the primary purpose of the funds paid to Mr. Rider was to secure and maintain his participation in this lawsuit and were not legitimate reimbursements for bona fide media expenses. FOF 59.

6.      While Mr. Rider claimed in pleadings and filings in this Court and the D.C. Circuit that he was refraining from visiting his "girls" in order to spare himself further aesthetic injury and that he would frequently visit his "girls" if they were no longer with FEI, those claims were false. Shortly after he began taking money from the organizational plaintiffs and/or their counsel (and his), Mr. Rider began following FEI's circus units and observing the elephants, including elephants on the Blue Unit. FOF 61. Therefore, contrary to his representations to the Court, Mr. Rider was not refraining from seeing his "girls." Moreover, after Mr. Rider began working for animal activists, three (3) of his "girls" were donated to a sanctuary or zoo by FEI. Mr. Rider made no attempt to visit any of them until after he was deposed in October 2006 and this issue was pointed out to him; even then he still failed to visit two (2) of these elephants (Minnie and Rebecca) who were placed in a sanctuary (PAWS). FOF 66-67. Mr. Rider used to work for PAWS, and there is no evidence that he was precluded from visiting Minnie while she was still alive or that he is precluded from visiting Rebecca now. FOF 67.

7.      Although Mr. Rider did visit Sophie in the Niabi Zoo after his first deposition, the Court concludes that the single visit to Sophie was motivated by the litigation and not by a personal attachment to Sophie. FOF 66. Contrary to his pleadings, Mr. Rider has made no effort to obtain

a position with this zoo in which he could work with Sophie again. *Id*. Moreover, although this zoo is approximately a hundred miles from the residence of one of Mr. Rider's own daughters and although he is paid by the other plaintiffs and WAP allegedly to travel the country (in a van paid for by the plaintiff organizations and WAP) and advocate on behalf of his "girls," Mr. Rider has only managed to visit Sophie once since she was donated by FEI to that zoo in 2003. FOF 43, 66. Finally, Mr. Rider has taken no steps to perfect a "taking" claim against the Niabi Zoo, even though he admits that Sophie is one of his "girls," and even though he is aware that Sophie is managed by this zoo with the bullhook and chains – the same tools that FEI used and still uses to manage Mr. Rider's other "girls." FOF 66.

8.      Seven (7) of Mr. Rider's "girls" were available for Mr. Rider to visit in a Court-ordered inspection in this very case, but he chose not to attend. FOF 68-69. Mr. Rider has likened his attachment to these elephants to the attachment he has for his children and grandchild; the Court finds it unlikely that a person with a strong personal and emotional attachment to his children or grandchildren would pass up a chance to be with them in a court-ordered visit. *Id*. Mr. Rider's assertions of an attachment to the seven elephants at issue are undermined further by his admissions that the elephants he was really attached to were the three Chipperfield elephants. FOF 63.

9.      The fact that Mr. Rider has referred derogatorily to the Asian elephant Karen as a "bitch" and a "killer" who "hated" him refutes Mr. Rider's claim of a close personal and emotional attachment to Karen. FOF 73. In addition, the fact that Mr. Rider forgot entirely the Asian elephants Meena and Zina when asked in interrogatories and a deposition to name, under oath, his "girls" undermines Mr. Rider's claim of a close and personal and emotional attachment to Meena and Zina. FOF 70, 72. Mr. Rider's testimony about the physical characteristics and personality traits of the seven elephants at issue was vague and nonspecific. He could not recognize several of the elephants on videotape and he struggled to name them when asked in deposition. Each of these facts further undermine his claim of a close, personal attachment to these animals. FOF 64-65, 70, 72.

10.     The Court concludes that Mr. Rider has no aesthetic interest with respect to the Asian elephants Jewel, Karen, Lutzi, Mysore, Nicole, Susan, and Zina upon which an injury in fact could be predicated for purposes of standing.

11.     Even if Mr. Rider had an aesthetic interest in the elephants at issue, any injury in fact that he claims he suffers as a result of FEI's use of the bullhook and chaining of these elephants is not imminent. Although he told a different story when he was trying to establish standing before this Court and the U.S. Court of Appeals for the District of Columbia Circuit in 2001-03, Mr. Rider now admits that he has observed the Blue Unit elephants in the period since he left his employment with FEI. FOF 61. However, Mr. Rider also admits that, from December 1, 1999 through the present time, he has not observed any mistreatment of the Asian elephants Jewel, Lutzi, Mysore, Nicole, Susan or Zina. FOF 77, 79-83. The evidence offered by Mr. Rider to support the alleged mistreatment of the Asian elephant Karen during this time period was inconclusive and insufficient to support his claims. FOF 78.

12.     Even if Mr. Rider had an aesthetic interest in the elephants at issue, and even if the
aesthetic injury that Mr. Rider allegedly suffers as a result of FEI's use of the bullhook and
chaining in the management of Jewel, Karen, Lutzi, Mysore, Nicole, Susan and Zina were
imminent, it cannot be redressed by the Court. Mr. Rider has abandoned with prejudice his claim
for forfeiture of the elephants. Minute Entry (June 11, 2008). The only remedy that the Court
could award Mr. Rider, assuming he proved a "taking," is an injunction against FEI's use of the
bullhook and chaining or a declaration that the use of the bullhook and chains constitutes a
"take" with respect to the seven elephants at issue. However, such relief, even if it were ordered,
would not redress Mr. Rider's claimed aesthetic injury.

13.     The D.C. Circuit ruled that Mr. Rider's alleged injury is aesthetic, *i.e.*, "defendant [is]
adversely affect[ing] plaintiff's enjoyment of . . . fauna, which the plaintiff wishes to enjoy again
upon the cessation of defendant's actions." *Ringling Bros.*, 317 F.3d at 337. Thus, central to the
Court's analysis was plaintiffs' request for an injunction. The Court proceeded on the premise
that the remedy sought would, if granted, bring a "cessation of the defendant's actions." *Id*. In
the final argument in this case, however, plaintiffs' counsel abandoned the request for an
immediate injunction, opting instead for a declaratory judgment, to be followed by a period of
time in which FEI could seek a permit from FWS. 3-18-09 a.m. at 14:24-15:3. A mere
declaration, however, will not redress Mr. Rider's alleged aesthetic injury.

14.     Even if plaintiffs were to renew their request for an injunction, and even if the Court
were to entertain it, there is no evidence from which the Court could conclude that an injunction
would redress Mr. Rider's alleged aesthetic injury. An injunction will remedy an aesthetic
injury only if the plaintiff is in fact able to enjoy the fauna again upon the cessation of the
challenged actions. *See Ringling Bros.*, 317 F.3d at 337. The Court of Appeals found
redressability based on the pleadings because it had been alleged that Mr. Rider could tell from
their behavior whether the elephants were being mistreated even if he was not a witness to the
actual alleged mistreatment. *Id.* Therefore, if the complained-of practices were enjoined, "Rider
then will be able to attend the circus without aesthetic injury" because, the court reasoned, Mr.
Rider will be able to "detect the effects" of the injunction on the animals' behavior. *Id*. at 337-
38. Thus, it is clear that injunctive relief will redress Mr. Rider's claimed aesthetic injury only if
Mr. Rider is able to view Jewel, Karen, Lutzi, Mysore, Nicole, Susan or Zina again without
FEI's use of the bullhook or chaining so that he can "detect the effects" of the injunctive relief.
This theory fails for two principal reasons.

15.     First, the D.C. Circuit assumed, pursuant to Federal Rule of Civil Procedure 12(b)(6), the
truth of the allegation that Mr. Rider, who no longer works with the seven elephants at issue and
therefore no longer is in a position to witness their alleged mistreatment, nonetheless can detect
the effects of the mistreatment by observing the elephants' behavior and likewise could detect
the effects on that behavior of an injunction against the bullhook and chains. However, at trial,
Mr. Rider was required to prove this allegation. He did not do so. There was no evidence as to
Mr. Rider's powers of perception in this regard. FOF 76. Although Mr. Rider testified that he
witnessed intermittent swaying of certain Blue Unit elephants when they were chained, 2-12-09

a.m. at 35:5-17 (Rider), he offered no proof that an injunction against the bullhook and/or chains would result in a cessation of the swaying activity of those of the seven elephants at issue who intermittently sway.  To the contrary, competent evidence was admitted to demonstrate that elephants at Carol Buckley's sanctuary sway even though they are not chained, 2-23-09 p.m. (2:00) at 79:17-83-23 (Buckley).  Thus, the Court is not persuaded that an injunction against chaining would necessarily cause these elephants to stop swaying.

16.     Second, the evidence shows that even if an injunction against the bullhook and chains were issued and even if that injunction brought about some kind of change in the elephants' behavior that Mr. Rider actually has the power to discern, Mr. Rider will not be able to detect the effects of this relief because he is unlikely to ever see these elephants again.  Jewel, Lutzi, Mysore, Susan and Zina reside at the CEC.  FOF 75.  These elephants no longer travel with the circus units or perform for the public. *Id*. The evidence indicates that they will never be involved in circus performances again where they could be observed by Mr. Rider either in performances, on animal walks, animal open houses, or in the traveling elephant barn that is erected at outside venues. *Id*.  The CEC is private property and is not open to the public.  FOF 74.  Mr. Rider has no access to that facility, and no prospect of any future relationship with FEI by employment or otherwise. FOF 74. There is no basis in the ESA upon which the Court could compel FEI to grant Mr. Rider access to that facility, and plaintiffs have cited no cases to the contrary. Therefore, even if he obtained the injunction that he seeks, Mr. Rider will never be in a position to observe Jewel, Lutzi, Mysore, Susan and Zina again.

17.     While Karen and Nicole currently are on the Blue Unit and can be observed by Mr. Rider, if the Court were to enjoin FEI's use of the bullhook and chaining with respect to Karen and Nicole, the evidence shows that FEI would remove these elephants from the Blue Unit and send them to the CEC.  FOF 75.  That facility is private property and not open to the public. FOF 74.  There is no basis in the ESA upon which the Court could grant Mr. Rider access to these facilities, and plaintiffs have not cited any cases to the contrary. Therefore, even if he obtained the injunction that he seeks, Mr. Rider would not be in a position to observe Karen and Nicole and "detect the effects" of that injunction, and as a result, his alleged injury is not redressable.

18.     In sum, Mr. Rider failed to carry his burden to prove the allegations in his complaint that the Court of Appeals stated he must prove in order to establish Article III standing.  For example, the evidence established that:

18.1         Plaintiffs failed to prove that Mr. Rider formed a "strong, personal attachment" to the elephants, *Ringling Bros.,* 317 F.3d at 335, 337.  To the contrary, Mr. Rider testified that his attachment to the Red Unit elephants was just as strong as his attachment to the Blue Unit elephants, and he has never worked with the Red Unit elephants, FOF 71; Mr. Rider does not recognize the seven elephants at issue in pictures or videotapes and does not relate specific physical or personal characteristics about those elephants, FOF 64-65; he struggles to remember the elephants' names when asked to name them, FOF 72; he referred to one of the

seven elephants, Karen, derogatorily as a "bitch," FOF 73; and, with the exception of one visit, he has made no effort to visit the elephants who are no longer with the circus, despite having the opportunity and means to visit them, FOF 66-67.

18.2     Plaintiffs failed to prove that Mr. Rider left his job at FEI because of the mistreatment of the elephants. *Ringling* Bros., 317 F.3d at 335. To the contrary, Mr. Rider did not complain about elephant mistreatment to management during the nearly two and a half years he was employed by FEI, nor did he complain to the veterinarians who cared for the elephants, nor to any federal or state authorities, nor did he approach the media regarding the alleged mistreatment, FOF 4-8; Mr. Rider had a meeting with the Unit Manager on the day he left FEI, and he did not complain about the alleged mistreatment FOF 9; even in the months after Mr. Rider left FEI, he did not complain to federal or state authorities or approach the media about the alleged mistreatment; Mr. Rider left FEI to work with Mr. Raffo in another circus, despite that Mr. Rider claims Mr. Raffo was one of the handlers who regularly mistreated the elephants on the Blue Unit, FOF 15; Mr. Rider himself has used a bullhook and he left to work with Mr. Raffo knowing that Mr. Raffo would "force" him to use a bullhook on the elephants while in Europe, FOF 16-18.

18.3     Plaintiffs did not prove that Mr. Rider "would like to work with the elephants again and would attempt to do so if the elephants were relocated." *Ringling Bros.*, 317 F.3d at 335. To the contrary, Mr. Rider has made little or no effort to even *visit* the three elephants with whom he claims a strong, personal attachment who have been relocated to non-circus environments, and he has not sought employment with either the zoo where Sophie has been located since 2003 or with the PAWS sanctuary where Rebecca has been located since 2002. FOF 66-67.

18.4     Plaintiffs failed to prove that Mr. Rider would like to visit the elephants, but cannot do so without being injured from seeing the animals and detecting their mistreatment, which he can discern without actually observing the mistreatment. *Ringling Bros.*, 317 F.3d at 337. To the contrary, Mr. Rider has in fact seen some of the elephants at issue on numerous occasions since 2000, and has even filmed them. FOF 61. In all of that time, Mr. Rider acknowledged that has not witnessed any mistreatment of any of those elephants, with the exception of one inconclusive videoclip of an incident that Mr. Rider claims depicts Karen being mistreated by a bullhook. FOF 77-83. Further, there was no credible evidence to establish that Mr. Rider can "detect" the effects of any mistreatment on the elephants, without actually observing the mistreatment. FOF 76.

18.5     Plaintiffs failed to prove that if Mr. Rider's relief is granted, the elephants will no longer exhibit the physical effects of mistreatment, and thus Mr. Rider will be able to attend the circus and see the elephants without injury. *Ringling Bros.*, 317

F.3d at 338.  To the contrary, plaintiffs did not establish that Mr. Rider can detect the physical effects of mistreatment.  FOF 76.  Moreover, the evidence at trial demonstrates that if Mr. Rider's relief were to be granted, the only two elephants at issue that are currently in the circus would be removed to the CEC, where the other five elephants at issue already reside, and Mr. Rider would have no access to any of those elephants.  FOF 74-75.

19.     Based on the totality of the evidence, including the evidence discussed in COL 18.1-18.5, as well as the timing, amount, and circumstances surrounding the payments that Mr. Rider has received from the plaintiff organizations and WAP throughout the course of this litigation, FOF 21-59, and based on the Court's observations of Mr. Rider on the witness stand over the course of two days, February 12 and 17, 2009, the Court is compelled to conclude that Mr. Rider is not a credible witness.  Mr. Rider often gave conflicting answers and was repeatedly impeached on the witness stand.  Accordingly, the Court does not credit his testimony regarding his allegations with respect to standing.

20.     Because he failed to establish injury in fact and redressability with respect to any of his claims, Mr. Rider has no standing to sue under Article III of the United States Constitution, and Mr. Rider's claims shall be dismissed with prejudice.

### B.     API Does Not Have Article III Standing

As discussed *supra*, Part I.C., this Court initially dismissed the organizational plaintiffs' claims, holding that the organizational plaintiffs lacked standing to sue because their informational injury was caused not by the defendant, but instead by a third party's interpretation of the applicable statute.  *See* June 29, 2001 Decision at 12.  In reviewing this Court's June 29, 2001 Decision, the Court of Appeals did not reach the organizational plaintiffs' standing because it determined that, at the pleading stage, Rider had alleged enough to establish such standing. *See Ringling Bros.*, 317 F.3d at 338.  It is significant, however, that the Court of Appeals began its analysis by stating that "[t]he strongest case for standing is presented by Thomas Rider."  *Id.* at 335.  This is not surprising.  Pursuant to the appellate court's decision, Rider could have established standing to sue had he been able to credibly prove his allegations at trial.  *See supra*, Part II.C.  Because Plaintiff Rider failed to prove standing, however, the Court must now

49

determine whether API's alleged informational and economic injury is sufficient to satisfy the necessary elements for Article III standing - (1) injury in fact; (2) causation; and (3) redressability.  Consistent with its June 29, 2001 Decision, the Court concludes that it is not.  As discussed below, API lacks standing to sue FEI because FEI is not the cause of API's alleged injury and that injury is not redressable by the Court.  The Court therefore lacks subject matter jurisdiction over API's claims.

## 1.    Findings of Fact

86.    As plaintiff witness Nicole Paquette testified, the organizational mission of Plaintiff API is to advocate against cruelty and exploitation of animals. 2-19-09 p.m. at 2:19-3:6 and 4:4-4:6 (Paquette).  Ms. Paquette has worked at API for nine years, and has served as general counsel since 2002. *Id*. at 3:14-3:19.  The Court finds Ms. Paquette's testimony regarding API, as set forth in FOF 87-96, to be credible.

87.    Based in Sacramento, California, and formed in 1968, *id*. at 3:10-3:13, in December 2007, API combined with another organization, Born Free U.S.A., and changed its name to Born Free U.S.A. united with Animal Protection Institute. *Id*. at 43:24-44:1. API, a non-profit 501(c)(3) organization, has four campaign areas, one of which focuses on animals in entertainment.  It also works on international wildlife trade, exotic pets, and trapping and fur issues. *Id*. at 4:7-11.

88.    With regard to animals in the circus, API's work includes: (a) public education and advocacy; (b) legislative efforts; and (c) regulatory work. *Id*. at 4:16-4:21; 23:24-24:5.

89.    Ms. Paquette testified that the purpose of API's public education and advocacy efforts is to educate the public and API members regarding the treatment of animals such as the animals at the Ringling Bros. circus, including use of the bullhook and chains. *Id*. at 4:22-5:5.

90.    According to Ms. Paquette, API spends significant resources on these advocacy efforts. *Id*. at 8:24-9:3; 9:18-9:20; 10:10-10:13; 11:19-11:23. These resources are used for API's website, fliers and posters that API distributes to the public, as well as its mailings to members, the organization of peaceful protests, a billboard campaign, and public service announcements. *Id*. at 6:1-6:12; 9:7-11:23; *see also* PWC 92 at 1-29 (API 5550-5578). API also sends action alerts to members notifying them when the circus is coming, and advising them about how to get involved with API issues. 2-19-09 p.m. at 11:24-12:15 (Paquette); *id*. at 14:4-14:16; *see also* PWC 92 at 30-31 (API 5594-5595); PWC 92 at 45-49 (API 4828-4832).  In addition, API publishes a quarterly magazine that educates API members, and includes stories about the Ringling Brothers circus. 2-19-09 p.m. at 12:16-13:22 (Paquette); *see also* PWC 92 at 32-44

(API 5622-5626; 5670-5673; 5679-5682). Again, API spends a significant amount of money producing and distributing these materials. 2-19-09 p.m. at 13:23-14:3 (Paquette). Although each of these efforts also includes some other circus work, Ms. Paquette testified that the majority of API's advocacy efforts on the circus campaign are focused on the Ringling Bros. circus. *Id*. at 14:17-14:21.

91.     API also engages in legislative advocacy as part of its circus campaign. *Id*. at 17:25-18:6. According to Ms. Paquette, API spends significant resources on these legislative efforts. *Id*. at 22:21-23:1.

92.     API also regularly monitors the Federal Register for activities of FWS under the ESA, and regularly comments on permits issued by the FWS concerning captive animals after reviewing the application materials as permitted by ESA Section 10. *Id*. at 28:7-28:16.

93.     API has approximately 40,000 members and supporters nationwide. According to Ms. Paquette, API and its members are concerned about FEI's use of the bullhook on elephants, the chaining of the elephants, and their transport across the country. *Id*. at 5:6-5:25. In addition to API's ongoing advocacy efforts to address these concerns, in July 2005, API sent FEI a 60-day notice letter of intent to sue for violations of the ESA. *Id*. at 16:10-17:6; *see also* PWC 91. On February 23, 2006, API became a plaintiff in this suit. *See* Order, Civ. Action No. 03-2006 (DE 60) (February 23, 2006).

94.     Ms. Paquette testified that because FEI has not applied for a Section 10 permit concerning its elephants, API must use other means to endeavor to collect information to advocate for these animals, including monitoring news services. 2-19-09 p.m. at 30:18-31:1 (Paquette). Ms. Paquette also testified that API spends significant staff time trying to collect this information. *Id*. at 31:2-31:4.

95.     According to Ms. Paquette, in 2007, API spent approximately $97,000.00 on its work advocating for the better treatment of animals in captivity. *Id*. at 36:16-37:10. API spent a similar amount in 2008. *Id*. at 37:20-37:25. These funds include staff time, legislative efforts, and public advocacy and media efforts. Ms. Paquette testified that the bulk of these funds are spent on API's advocacy concerning the FEI elephants. *Id*. at 37:13-19; 38:4-11.

96.     API also expends approximately $40,000.00 each year pursuing alternative sources of information from individuals, other organizations and government agencies concerning FEI's treatment of its Asian elephants.  *Id*. at 38:12-39:18.

97.     Ms. Paquette also testified that if API were to obtain information regarding FEI's elephants through a Section 10 permit process, the organization would use the data for fact sheets, magazine articles, website postings and other forms of information to inform API's members and the general public about these matters and to further its advocacy efforts. She further testified that API would be able to use this information in its legislative efforts. *Id*. at 34:9-17; *see also id*. at 85:3-12.

98.     There is no evidence that any member of ASPCA, AWI, FFA or API has any kind of personal or emotional attachment to any of FEI's Asian elephants.

99.     There is no evidence that any member of ASPCA, AWI, FFA or API has suffered any aesthetic or emotional injury as a result of FEI's treatment of its Asian elephants.

100.     Plaintiffs ASPCA, AWI, and FFA have abandoned any claim to independent standing in this case. 2-26-09 p.m. at 85:6-12. No witness representing any of these plaintiffs testified on behalf of plaintiffs during their case-in-chief; instead, representatives from the ASPCA, AWI, and FFA were called as adverse witnesses by defendant during its case-in-chief. 3-10-09 a.m. at 8:25-92:4 (Weisberg); 3-10-09 p.m. at 20:20-22:9 (Weisberg); *id.* at 22:25-61:20, 72:8-73:24 (Markarian); 3-11-09 a.m. at 4:11-23:19 (Liss).

101.     The remaining organizational plaintiff, API, does attempt to establish standing based upon an asserted "informational injury," but its claims in that regard are no different than the "informational injury" claims that the other organizational plaintiffs made, but have now abandoned, and that this Court rejected in 2001. *Compare* Suppl. Compl. ¶ 6 (DE 180) (February 23, 2006) *with* Compl. ¶¶ 6, 11, 16 (DE 1) (September 26, 2003); *see* Civ. No. 00-1641 (DE 20) (June 29, 2001). The Court found such identity of claims when it permitted API to join this case. Order at 1 (DE 60) (February 23, 2006).

102.     There is no evidence that FEI has an obligation to provide API with any form of information under the ESA, either pursuant to Section 9 of the ESA - the provision upon which API's claims against FEI are based, 16 U.S.C. § 1538 - or any other provision of the statute. While API claims that it must spend resources to replicate the information that API claims would be generated by a permit application proceeding under Section 10 of the ESA, 16 U.S.C. § 1539, Suppl. Compl. ¶ 6, API has presented no evidence of any obligation that FEI currently has to seek a permit under Section 10 of the ESA. Even if, as a result of this case, FEI were to seek the permit that API argues for in a proceeding under Section 10 of the ESA, API has not established that it would actually spend less of its resources on circus elephant related issues than it does now. Although API testified that it would "probably" no longer spend the "bulk" of its captive animal advocacy funds if FEI no longer had elephants, 2-19-09 p.m. at 38:1-11 (Paquette), that evidence is irrelevant because API has abandoned its claim for forfeiture of FEI's elephants. Minute Entry (June 11, 2008).

103.     Assuming, *arguendo*, that FEI was to seek the permit that API argues for in a proceeding under Section 10 of the ESA, API has not demonstrated that such a proceeding would actually occur.  Any such proceeding would be under the control of FWS.  API also has not demonstrated that a Section 10 proceeding would yield any information from FEI that API has not already received in this litigation. According to API, the information it would receive from such a proceeding is identified in FWS's permit regulation, 50 C.F.R. § 17.22(a)(1)(v), (vi) & (vii). 2-19-09 p.m. at 31:6-34:8 (Paquette). However, the record indicates that API already has such information. *Compare* 50 C.F.R. § 17.22(a)(1)(v) *with* 2-19-09 p.m. at 83:13-18 (Paquette)

(admitting API has FEI's address, show schedules); PWC 49A-C (numerous transportation orders setting out the schedules for the trains on which the elephants on the units are transported); *compare* 50 C.F.R. § 17.22(a)(1)(vi) *with* 2-19-09 p.m. 83:19-84:4 (Paquette) (admitting that plaintiffs have photographs of and have visited and observed the CEC, the Blue Unit traveling facility, elephant rail cars, and electric pens); PWC 118 & PMC 54 & PMC 54A (inspection photos of elephants, husbandry tools and facilities); PWC 142A-E & 143A-F (inspection video tapes of same items); 3-5-09 p.m. at 26:7-40:25 (Jacobson) (experience of G. Jacobson and CEC handlers); 3-12-09 a.m. at 4:23-20:13 (French) (experience of B. French); PWC 46 at pp. 14-16, 36-38, 45-54, 58-61, 67-88 (listings of FEI employees involved with elephants); *compare* 50 C.F.R. § 17.22(a)(1)(vii) *with* 3-4-09 a.m. at 5:17-6:17, 11:20-12:22, 13:19-20:15, 56:17-73:4 (Raffo) (explanation of use of bullhook and chaining generally and on Blue Unit); 3-5-09 p.m. at 27:6-33:4, 55:1-63:25, 64:19-71:19, 76:16-90:1, 102:21-105:7 (Jacobson) (explanation of use of bullhook and chains generally and at CEC); 3-12-09 a.m. at 20:14-59:22 (French) (explanation of use of bullhook and chains on Blue Unit and in train cars); 3-5-09 a.m. at 102:21-119:22 (Coleman) (explanation of use of bullhook and chains on Red Unit and in train cars); Civ. No. 03-2006, DE 82, 100, 391 & 391A (briefs and other filings in case describing FEI's use of bullhook and chains).

104.    API also testified that a Section 10 permit proceeding would yield a regulatory analysis under Section 10(d) by FWS, 16 U.S.C. § 1539(d). 2-19-09 p.m. at 104:24-105:23 (Paquette). Such an analysis would be prepared by the government, not by FEI.  The analysis would presumably be totally within the control of FWS.

## 2.    Conclusions of Law

21.    There is no injury in fact that API has suffered as a result of anything that FEI has done or failed to do. "Informational standing arises only in very specific statutory contexts where a statutory provision has explicitly created a right to information." *Ass'n of Am. Physicians & Surgeons v. FDA*, 539 F. Supp. 2d 4, 15 (D.D.C. 2008) (quotation marks and citations omitted) (Bates, J.). Nothing in the ESA obligates FEI to give API any information. API's claims against FEI are pursuant to Section 9 of the ESA for an alleged "taking" of FEI's elephants. 16 U.S.C. § 1538. There is nothing in Section 9 that imposes a duty on FEI to provide any kind of information to API. *Id.* Even if API were to succeed in demonstrating that FEI's use of the bullhook and chains is a "taking," a ruling by this Court to that effect will not generate any "information" for API.

22.    API's effort to anchor its "informational injury" to Section 10 of the ESA is unavailing. According to API, FEI is "taking" its Asian elephants "without permission from [FWS] pursuant to the process created by Section 10" of the ESA.  Plaintiffs argue that "if API prevails," FEI "will have to seek permission from FWS to engage in practices that constitute a 'take' of the animals," which will supposedly give API the information it has allegedly been denied. Suppl. Compl. ¶ 6. This premise is incorrect.  In the first place, FEI has not been required by FWS to obtain a Section 10 permit for the handling of its elephants.  The gravamen of API's "informational injury" claim is that FWS *should be* requiring FEI to apply for a Section 10

permit, but FWS has not done so.  This, however, is a matter that API must seek to redress with FWS; FWS's failure to require FEI to obtain a permit provides no basis for API's standing to sue FEI.

23.     Second, even if the practices at issue were declared to be a "take," FEI might decide not to seek a permit, opting instead to present the circus solely with CBW elephants.  Even if FEI were voluntarily to seek a Section 10 permit or were ordered to seek one, there is no guarantee that API would obtain the information that it seeks. Even if FEI sought a permit under Section 10, the conduct of such a proceeding and the information flowing from that proceeding would be in the control of FWS, not FEI. FOF 103-104.  FWS, however, is not a party to this case. *Id*. The information flow that API claims it would obtain would be completely up to the actions of a nonparty, FWS. *Id*. Under Article III, it must be that the injury "fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Lujan*, 504 U.S. at 571; *Humane Soc'y*, 46 F.3d at 100-01; *Freedom Republicans v. Fed. Election Comm'n*, 13 F.3d 412, 419 (D.C. Cir.), *cert. denied*, 513 U.S. 821 (1994). With respect to both the injury that API claims and the Court's ability to redress it, API's "informational injury" stems from FWS's action or inaction, not from any action or inaction of FEI. Because FWS is not a party here, API's "informational injury" standing fails.

24.     The "informational injury" standing cases on which API relies do not persuade the Court that API has standing in this case.  In each of the cases relied upon by API, the defendant, whether the government or a private party, had a legal duty to provide the plaintiff with some kind of information. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) (plaintiff had statutory right "to truthful information [from the defendant] concerning the availability of housing"); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24 (D.C. Cir. 1990) (defendant prohibited by Fair Housing Act from disseminating racially preferential advertising information); *see also Shays v. FEC*, 528 F.3d 914, 923 (D.C. Cir. 2008) (plaintiff's claim that agency regulation illegally denied him information he was entitled to under statute regarding presidential campaign contributions); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937-38 (D.C. Cir. 1986) ("[T]he challenged regulations deny [plaintiffs] access to information and avenues of redress they wish to use in their routine information-dispensing, counseling, and referral activities."). Nothing in Section 9 of the ESA or any other part of the statute imposes any such duty on FEI for the benefit of API.

25.     Similarly, unlike the instant case, *Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 469 F.3d 129 (D.C. Cir. 2006), was an action by private parties against a federal agency whose regulations had allegedly "caused a drain on Abigail Alliance's resources and time." *Id*. at 132. Here, the relevant federal agency that is allegedly depriving API of information – FWS – is *not* a party to this case. As this Court recognized in 2001, there is a "continuous line of case law holding that standing based on an informational injury is only applicable in suits brought against th[e] agency that failed to enforce the regulation in question." June 29, 2001 Decision at 12. The other cases upon which API relies also involved actions against the agency or party that was allegedly denying the information. *See, e.g.*, *Akins*, 524 U.S.

11 (action against Federal Election Commission ("FEC") challenging FEC's determination that advocacy organization was not a "political committee" and therefore not required to disclose certain information pursuant to the Federal Election Campaign Act); *Pub. Citizen*, 491 U.S. 440 (action against Department of Justice ("DOJ") pursuant to the Federal Advisory Committee Act to enjoin DOJ from seeking input on potential judicial nominees from a committee of the American Bar Association ("ABA") unless the ABA agreed to disclose the names of, and information related to, the potential nominees). The Court distinguished these cases when it found no "informational injury" standing in 2001. *See* June 29, 2001 Decision at 12.

26.    Plaintiffs' reliance on the recent case of *Judicial Watch, Inc. v. Department of Commerce*, 583 F.3d 871 (D.C. Cir. Oct. 9, 2009), is similarly misplaced. In *Judicial Watch*, the plaintiff organization sued the Department of Commerce ("Commerce"), claiming that pursuant to the Federal Advisory Committee Act ("FACA"), plaintiff was entitled to information related to meetings between Commerce and an outside council established by Commerce. *Id.* at 872-73. Commerce argued that the plaintiff organization lacked standing and the district court agreed. The Court of Appeals reversed, finding that the injury requirement was met because "[i]n the context of a FACA claim, an agency's refusal to disclose information that the act requires be revealed constitutes a sufficient injury." *Id.* at 873. As for causation, the Court of Appeals found that, assuming the council was an "advisory committee" for purposes of FACA, "Commerce is subject to an array of FACA obligations concerning the Council and its sub-groups that are entirely within its power to discharge." *Id.* (citing *Public Citizen*, 491 U.S. at 450-51). Finally, the Court of Appeals found that the injury was redressable because "the court could order that Commerce conduct any prospective encounters between itself and the Council . . . in compliance with FACA's requirements." *Id.* at 873-74. Like the cases discussed above - and unlike API's claim against defendant FEI - *Judicial Watch* involves a suit against a federal agency pursuant to a statute that explicitly requires that certain information in the defendant agency's control be disclosed. *Id.* at 873-74.

27.    *Cary v. Hall*, No. C 05-4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006), likewise is inapposite. The plaintiffs in *Cary* challenged the validity of a FWS regulation that authorized a "take" of endangered antelope prohibited by Section 9 of the ESA without requiring that the "take" be authorized by a Section 10 permit. While this sounds similar to API's claim here, the fundamental distinction is that the action in *Cary was against FWS*, not the private parties who would be "taking" the species at issue. Furthermore, the action was brought *under Section 10* of the ESA *not under Section 9*. The plaintiffs in *Cary* had a valid "informational injury" because FWS' failure to go through the notice and comment procedures of Section 10(c) was an injury that could be remedied by the court because FWS was properly before it. In the present case, FWS is not a party; API is suing under Section 9 of the ESA, and there is nothing in Section 9 that requires FEI to give API any information. *See also Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. June 22, 2009) (Kennedy, J.) (finding that organizational plaintiffs had standing based on informational injury in a suit *against FWS* brought under *Section 10* of the ESA); *but cf. Born Free U.S.A. v. Norton*, 278 F. Supp. 2d 5, 11 (D.D.C. 2003) (Bates, J.) (similar claims by API and AWI of "informational injury" in Swaziland elephant case "raised substantial questions about plaintiffs' standing to pursue some of their claims"), *vacated as*

*moot*, No. 03-5216, 2004 WL 180263 (D.C. Cir. Jan. 21, 2004).  Accordingly, the Court concludes that plaintiffs' reliance on "informational injury" cases in which the government is a party is misplaced in this private civil suit.

28.     In addition, even if the outcome of this case were to lead to a Section 10 permit proceeding, the "information" that API would expect to receive in such a proceeding would be the information specified by three paragraphs of the FWS regulation governing "enhancement of propagation or survival" permits: 50 C.F.R. § 17.22(a)(1)(v), (vi) & (vii). 2-19-09 p.m. at 31:6-34:19 (Paquette). The record shows that API already has or has ready access to all of this information.  FOF 103.  This is significant, and further undermines plaintiffs' reliance on *Judicial Watch*.  In *Judicial Watch*, the defendant argued that plaintiff's claim of informational injury under FACA was moot because the defendant had already produced to plaintiff certain information pursuant to the Freedom of Information Act ("FOIA").  *See* 583 F.3d at 874.  The Court of Appeals rejected that argument because "[t]he scope of FOIA's document disclosure requirements is in a number of respects narrower than FACA's analogous requirements."  *Id.*  In contrast, API has not demonstrated that the information it might receive under a Section 10 permit proceeding would be broader in scope than the information it has already received in discovery in this case.  FOF 103.

29.     API also claims that it would find "useful" the analysis that Section 10(d) of the ESA requires of FWS with respect to an "enhancement of propagation or survival" permit. 2-19-09 p.m. at 104:24-105:23 (Paquette). This argument is unavailing.  The content of the Section 10(d) analysis is within the control of FWS.  FOF 104.  Indeed, even in *Cary*, *where FWS was a party*, the court found that "it is doubtful whether the findings required to be published under § 10(d) are essential to make public participation in the § 10 permit process meaningful" and that it was "unclear whether the informational interests ostensibly protected by § 10(d) are sufficient to support constitutional, prudential and statutory standing." 2004 WL 6198320 at *11 (citing *Akins*, 524 U.S. at 19-20) .

30.     API is attempting to use Section 9 of the ESA to force FEI to apply for a permit under Section 10 of the ESA, which FWS has never required from FEI.  API's objective is that such a permit application might trigger a notice-and-comment proceeding in which API might participate and obtain "more information" about FEI's elephants.  There is no legal basis to sustain such an approach under current precedent.  API has sued a private party under the citizen suit provision in Section 9 seeking information from that private party pursuant to a Section 10 notice and comment process that would be promulgated by FWS.  However, FWS has neither promulgated such a process nor is it a party to this suit.  To grant API relief under these circumstances would be to profoundly alter and expand the law on Article III standing based on informational injury.

31.     API also argues that because it spends resources advocating better treatment for captive animals, it would spend less of those resources monitoring FEI's treatment of its elephants if the alleged "taking" were enjoined, even in the absence of a subsequent permit proceeding. This argument also is unavailing to establish Article III standing.  The claim is not supported by any

competent evidence. There was no testimony that API would actually spend less resources on captive animal issues or even on elephants in circuses were FEI's practices declared to be a "taking." FOF 102. Ms. Paquette testified that API might not spend the "bulk" of its captive animal advocacy money if FEI no longer had elephants, 2-19-09 p.m. at 38:1-7 (Paquette), but that is beside the point because API has abandoned its forfeiture claim. Minute Entry (June 11, 2008); FOF 102.

32.     Because the organizational plaintiffs have not established an injury in fact, traceable to FEI's actions that can be redressed by the Court, the organizational plaintiffs have no standing to sue under Article III of the United States Constitution, and their claims shall be dismissed.

## IV.     CONCLUSION

Based on the foregoing findings of fact and conclusions of law, plaintiffs have not

established the requisite standing necessary to satisfy Article III's case-or-controversy

requirement.  Accordingly, judgment will be entered in favor of defendant.  A separate order

accompanies this Memorandum Opinion.

**Signed:**          **Emmet G. Sullivan**
                    **United States District Judge**
                    **December 30, 2009**