**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

```
                            )
ANIMAL WELFARE INSTITUTE,   )
et al.,¹                    )
                            )
            Plaintiffs,     )
                            )   Case No. 03-2006 (EGS/JMF)
        v.                  )
                            )
                            )
FELD ENTERTAINMENT, INC.    )
                            )
            Defendant.      )
                            )
```

---

<u>**MEMORANDUM OPINION**</u>

On December 30, 2009, following a six week non-jury trial, this Court granted judgment in favor of Feld Entertainment Inc., ("FEI") in this Endangered Species Act litigation commenced by one individual, Tom Rider ("Rider"), and several non-profit organizations advocating for animal rights. *ASPCA v. Feld Entm't Inc.*, 677 F. Supp. 2d 55 (D.D.C. 2009) (hereinafter "*ASPCA II*" or "2009 Opinion"). Familiarity with the 2009 Opinion is assumed. Pursuant to Local Rule 54.2, the attorneys' fees issues were held in abeyance until the appellate process had concluded. On October 28, 2011, the Court of Appeals

---

¹ On December 31, 2012, the Court approved a stipulation dismissing with prejudice the American Society for the Prevention of Cruelty to Animals ("ASPCA"), following a settlement between FEI and ASPCA. The Court has therefore granted ASPCA's motion to amend the case caption by removing its name to reflect its dismissal from the case.

affirmed judgment for FEI and against both the individual
plaintiff, Rider, and the sole organizational plaintiff still
asserting claims in the case, Animal Protection Institute
("API").  *ASPCA v. FEI*, 659 F.3d 13 (D.C. Cir. 2011)
(hereinafter "*ASPCA III*").  On January 11, 2012, the Court of
Appeals denied the plaintiffs' petition for rehearing.

FEI now moves for an award of attorneys' fees against the
plaintiffs and their counsel, jointly and severally, under (1)
the fee shifting provision of the Endangered Species Act
("ESA"), 16 U.S.C. § 1540(g)(4); (2) the court's inherent
authority; and (3) 28 U.S.C. § 1927.  FEI also seeks fees
against a non-party, the Humane Society of the United States
("HSUS").  The parties agreed to bifurcate the fee litigation to
determine first, whether FEI is entitled to fees, and if so,
second, the appropriate amount.  The first phase is before the
Court.

This is the next chapter in this extraordinary litigation,
which commenced over a decade ago.[2]  After eleven years,
including two appeals, protracted, contentious, and expensive
discovery, and a six week trial, the plaintiffs were unable to

---

[2] It is not, however, the final chapter in litigation between
these parties.  FEI has filed a lawsuit against the plaintiffs
and their attorneys in this case alleging that their conduct in
this lawsuit violated the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*  That case
is ongoing.

produce any credible evidence that any of them had standing to pursue their claims.  To the contrary, it was conclusively determined that Rider was a paid plaintiff, hired by the other plaintiffs and their counsel, who had a "motive to falsify" his testimony so that he would continue to be paid.  *ASPCA II*, 677 F. Supp. 2d at 89.  Things went just as badly for the organizational plaintiffs, most of whom dropped out of the case during the trial, after forcing FEI to prepare a defense against each of them.  The standing arguments of API, the sole remaining plaintiff, were found devoid of merit as a matter of fact and of law by this Court and the Court of Appeals.  *Id.* at 94-100; *ASPCA III*, 659 F.3d at 22-28.  It is against this extraordinary backdrop that this Court concludes this case was groundless and unreasonable from its inception, and, therefore, that FEI should recover the attorneys' fees it incurred when it was forced to defend itself in this litigation.

Pending before the Court is Defendant FEI's Motion for Entitlement to Attorneys' Fees and Non-Party HSUS's Motion to Strike HSUS from FEI's Motion for Entitlement to Attorneys' Fees.  Upon consideration of the motions, the oppositions, and replies thereto, the entire record, and for the reasons explained below, the Court concludes that attorneys' fees are warranted, jointly and severally against all plaintiffs, under

the fee shifting provision of the ESA, 16 U.S.C. § 1540(g)(4).

The Court further concludes that pursuant to 28 U.S.C. § 1927,

plaintiffs' counsel Katherine Meyer and her law firm, Meyer,

Glitzenstein & Crystal ("MGC") are jointly and severally liable

for FEI's attorneys' fees incurred in litigating the portion of

its Motion to Compel which sought information about Tom Rider's

financial relationship with animal rights advocates. *See* FEI's

Mot. to Compel Testimony of Plaintiff Thomas Eugene Rider, ECF

No. 101; *see also* Order of August 23, 2007 Granting in Part

FEI's Motion to Compel, ECF No. 178.  In light of these

determinations, the Court does not reach the question whether an

award of attorneys' fees could also be awarded pursuant to the

Court's inherent authority.

FEI's request that the Court award attorneys' fees against

plaintiffs' counsel, other than as set forth above, is not

justified by the record in this case.  Accordingly, these

individuals are not liable for fees.  Finally, FEI's request

that the Court award attorneys' fees against non-party HSUS is

not justified by FEI's Motion, and accordingly, the Court does

not hold HSUS liable for fees at this time.

## I. BACKGROUND

Plaintiffs originally commenced this lawsuit against FEI in

July 2000, alleging that its use of bullhooks and chains in

4

connection with the Asian elephants in its Ringling Brothers circus violates the Endangered Species Act.  Specifically, plaintiffs alleged that defendant's use of these instruments constitutes a "take" of the elephants in violation of the ESA by "harming," "harassing," or "wounding" the elephants.  *ASPCA II*, 677 F. Supp. 2d at 58-59.

It is well settled that standing is the threshold question in every civil case in federal court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).  "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent . . . (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 560-61.  Rider, as an individual, and the remaining plaintiffs, as organizations, asserted standing under different legal theories and alleged different facts in support of their standing claims.  This Court dismissed the case for lack of standing in 2001.  See Mem. Op & Order, Civ. No. 00-1641 (June 29, 2001).  Plaintiffs appealed, and the Circuit reversed the judgment and remanded the case in 2003.  *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003) ("*ASPCA I*").  Six years later,

following bitter and protracted discovery battles and extensive motions practice, the case was tried before the Court without a jury.

The 2009 Opinion, based on the evidence presented during the trial, contains over one hundred Findings of Fact and thirty two Conclusions of Law.  The Court carefully considered the testimony of approximately thirty witnesses and hundreds of exhibits in an effort to find any evidence that any of the plaintiffs had standing to pursue their claims.  There was none. The voluminous decision will not be repeated here, but a summary recitation of some of the findings of fact and conclusions of law will demonstrate the groundless nature of the claims. Unless otherwise noted, the information below is from the 2009 Opinion.[3]

### A. Tom Rider

Rider, the only individual plaintiff in the case, had worked for FEI as a "barn man," feeding, cleaning up after, and watching over some of Ringling Brothers' traveling elephants from 1997 – 1999.  *ASPCA II*, 677 F. Supp. 2d at 58.  He claimed that (1) he had developed a strong personal and emotional

---

[3] Where a citation is to a finding of fact ("FOF") or conclusion of law ("COL"), the citation will be limited to the number of the relevant finding or conclusion.  Otherwise, the citation will refer to the page number of the 2009 Opinion.

attachment to these elephants, who he referred to as his "girls;" (2) he left his job at Ringling Bros. because of the mistreatment of the elephants; (3) he would like to work with the elephants again and would attempt to do so if the elephants were relocated; and (4) he would like to visit the elephants again, but cannot do so without being injured from seeing the animals and detecting their mistreatment, which he can discern without actually observing the mistreatment. *Id.* at 67.  In the original Complaint, filed in July 2000, as well as the First Amended Complaint filed in 2001, the plaintiffs represented that Rider would like to visit or observe his "girls," but could not do so without injury, because he could detect the effects of their mistreatment just by looking at them. *Id.*  Later, in another iteration of the complaint filed in 2003, this allegation changed to provide that he "continued to visit" the elephants he knows, even though "each time he does so, he suffers more aesthetic injury."  Complaint, ECF No. 1 at ¶ 23.

These allegations formed the core of Rider's argument as to the injury element of standing.  As for the third element, redressability, Rider sought (i) an injunction halting Ringling Bros.' mistreatment of the elephants, and (ii) an order

directing FEI to forfeit possession of the elephants.[4] *ASPCA II*, 677 F. Supp. 2d at 65-66. If this relief were granted, plaintiffs alleged, the elephants would no longer exhibit the physical effects of mistreatment and thus Rider would be able to attend the circus and see the elephants without injury. *Id.* at 67.

Unfortunately, <u>none</u> of these allegations was supported by competent evidence. *Id.* Rider was "pulverized" on the witness stand, and failed to show he had any attachment to the elephants or suffered any injury by FEI's use of the bullhooks and chains. FOF 1  What the evidence did demonstrate was that Tom Rider was a paid plaintiff with a "motive to falsify" his alleged attachment to the elephants: he was supplied with his only source of income-nearly $200,000 between 2000 and 2008-by the plaintiff organizations, funneled to him through plaintiffs' counsel Katherine Meyer and Eric Glitzenstein.  Rider, the organizational plaintiffs, and plaintiffs' counsel sought to conceal the nature, extent and purpose of the payments from FEI during the litigation, including through an affirmatively false interrogatory response signed by Rider and prepared by Ms. Meyer, the same attorney who was paying him.  The complete details of the payments to Rider were "not fully disclosed until

---

[4] The plaintiffs also sought a declaratory judgment and attorneys' fees.

after the Court's order of August 27, 2007, granting FEI's motion to compel the disclosure of such information." FOF 57. The following findings of fact and conclusions of law from the 2009 Opinion demonstrate the groundless nature of Rider's claims and his co-plaintiffs' and counsel's, involvement in the payments.

- There was no evidence that Rider left his job at Ringling Bros. because he could no longer tolerate FEI's use of bullhooks and chains.  FEI was the second of three circuses for which he worked; all three circuses used bullhooks and chains.  He left FEI to work for another circus, in Europe. FOF 20.  The elephant handler in the European circus was Daniel Raffo, one of the very persons whom Rider claimed abused the elephants at FEI; Rider knowingly followed a person he claimed mistreated the elephants. FOF 15, COL 4. Plaintiffs and their counsel knew this information before filing the lawsuit. *See* Mot. for Fees at Ex. 11 (Rider's sworn statement to former plaintiff Performing Animal Welfare Society ("PAWS"), Mar. 25, 2000).

- Rider's claim that he received written reprimands from FEI for complaining about animal abuse was false; he received written reprimands for, *e.g.*, missing work, insubordination, and drunk and disorderly conduct.  FOF 10-11.  There was no evidence that he ever complained to FEI management about the animals' treatment, not even on his last day of work, when there was no reason to fear reprisals.  FOF 9.  Finally, <u>Rider himself used the bullhook on the elephants, a fact which plaintiffs and their counsel knew by no later than 2005</u>, when FEI produced photographs of Rider using a bullhook.  FOF 16-18, 20; *see also* FEI Mot. for Fees, Ex. 10 (Compilation of Pretrial Rider Evidence Relied on in the 2009 Opinion).

- Between March 2000, four months before the original complaint in the 2000 case against FEI was filed, and trial

in 2009, Rider "was paid at least $190,000.00 by" the
organizational plaintiffs in this case, by plaintiffs'
counsel's law firm, MGC, or through the Wild Advocacy
Project ("WAP"), a non-profit organization controlled by
two of plaintiffs' counsel, Ms. Meyer and Mr. Glitzenstein.
FOF 37, 48.  From March 2000 through the trial in 2009,
this money was his only source of income and support.  FOF
21.  "Rider's advocacy efforts began in earnest only after
the commencement of his financial relationship," with the
plaintiff organizations.  FOF 27.  Rider was paid
continuously and without interruption throughout the
litigation.  FOF 24, 33, 50.

- The funds paid to Rider appeared to be paid in such a way
  as to avoid ready detection.  They were characterized,
  variously, as "wages," "non-employee compensation,"
  "grants," "shared expenses," "special expenses," and
  "donations." FOF 25-26, 33, 38, 52.  Beginning on or about
  August 2005, more than three years after WAP's payments to
  Rider began, "WAP started sending letters with its checks
  to Rider, indicating that Mr. Rider's media "efforts" will
  target certain cities. The cities cited in the cover
  letters track the routes of FEI's circus performances.  The
  letters were signed by Eric Glitzenstein."  FOF 45.
  However, Rider did not actually follow the circus, nor did
  he perform significant media activity.  "[M]uch of his
  claimed media work was actually performed in the home of
  one of his daughters or at a campground in Florida." FOF
  49.  Rider's media activities were "episodic and non-
  continuous . . . . irregular and sporadic."  FOF 50.  "Much
  of the evidence offered by plaintiffs [at trial] of Mr.
  Rider's actual press and media-related activities . . .
  does not appear to be the result of efforts by Mr. Rider
  himself but rather the fact of the lawsuit being referenced
  by others in media pieces and Mr. Rider being identified as
  one of the plaintiffs." *Id.*

- Rider lied about the payments.  In 2004, FEI served an
  interrogatory on Rider asking whether he had received any
  compensation from any animal advocate or animal advocacy
  organization for services rendered.  Rider stated – under

oath – "I have not received any such compensation" when in
fact <u>he had already received more than $50,000.00 from his
co-plaintiffs, counsel's law firm, and WAP, the non-profit
organization controlled by attorneys Meyer and
Glitzenstein.</u>  FOF 55.  Ms. Meyer, who signed the
objections to the false response, had been paying Rider
through her law firm and WAP since 2001, and had sent him
1099s reporting the payments. FOF 56.   The organizational
plaintiffs also concealed the payments from FEI, in whole
or in part, by providing misleading or incomplete
information to FEI until after the Court granted FEI's
motion to compel complete information about payments to
Rider in the summer of 2007.  FOF 57.

- At the time the Complaint was filed in 2000 and the Amended
  Complaint in 2001, the plaintiffs and their counsel knew
  that Rider was not, as he alleged, "refraining from" seeing
  the animals in order to avoid suffering injury.  On the
  contrary, they were paying him to follow the circus and
  observe the elephants; between 2000 and 2004, he had seen
  the elephants 10 – 15 times per year. FOF 61, COL 6.  The
  D.C. Circuit relied on these false claims of a "refraining
  from" injury in 2003 in reversing this Court's 2001
  dismissal on standing grounds.  The basis for the Circuit's
  determination that Rider had alleged injury sufficient to
  confer standing was that "he would like to visit the
  elephants, but is unwilling to do so because he would
  suffer "aesthetic and emotional injury" from seeing the
  elephants unless they are placed in a different setting or
  are no longer mistreated." *ASPCA I*, 317 F.3d at 335 (D.C.
  Cir. 2003).

- Rider's claims that he would like to visit and/or work with
  the elephants again and would attempt to do so if the
  elephants were relocated "were false."  COL 6.  Three of
  the elephants to whom he claimed a personal attachment were
  relocated from FEI to non-circus environments early in this
  litigation.  Two were relocated to a PAWS sanctuary in
  2002; a third was relocated to a zoo in 2003.  FOF 67, COL
  18.3.  Rider and his counsel were aware of this; Rider gave
  a videotaped speech in 2002, which plaintiffs later

produced in discovery, stating that former Ringling Bros.
elephants had been moved to PAWS.  FEI's Mot. for Fees, Ex.
19.  With the exception of a single visit to the elephant
who moved to the zoo, there is "no evidence" that Rider
ever visited the elephants who are no longer with the
circus, "despite having the opportunity and means to visit
them," nor has he sought employment to work with these
elephants.  COL 18.1, FOF 66-67.  Plaintiffs and their
counsel knew that Rider had made zero effort in this regard
by no later than Rider's deposition in 2006.  FOF 66.  When
Rider was deposed again in 2007, plaintiffs and counsel
knew that Rider visited the zoo once as part of the "media
work" which plaintiffs and counsel were paying him to
perform, but still had made no effort to see the other two
elephants.  *Id.*  At trial, there was "no evidence" that
Rider "has ever visited [these two elephants] at PAWS."
FOF 67.

- There was no evidence to support Rider's claim that he
  would like to visit the elephants performing at Ringling
  Bros. again, but cannot do so without being injured from
  seeing the animals and detecting their mistreatment, which
  he can discern without actually observing the mistreatment.
  "There is no evidence that Mr. Rider has the ability, by
  observing an elephant, to determine whether that elephant has
  been mistreated by use of a bullhook or chains. There is no
  evidence that Mr. Rider has the ability, by observing an elephant
  that has previously been managed with the bullhook and chains, to
  detect the effects on that elephant's behavior of a court order
  that prohibits further use of the bullhook or chains with respect
  to that elephant."  FOF 76.

- There was no credible evidence that Rider was "emotionally
  attached" to his "girls."  In addition to all of the
  foregoing, he made a 2006 videotape, produced by plaintiffs
  in discovery, in which he described one of the elephants to
  whom he claimed an attachment as a "bitch" and a "killer
  elephant" who "hated" him and would hurt or kill him if she
  could.  FOF 73.  During his 2006 and 2007 depositions, he
  could not name the elephants with whom he allegedly had a
  personal and emotional attachment.  FOF 72.  He testified

that he was equally attached to Ringling Bros. elephants he
never worked with as he was to the elephants he worked with
for two and a half years.  FOF 71.  When shown video clips
of the elephants to whom he claimed an attachment, he could
not identify them.  FOF 65.

- The only relief that could have redressed Rider's alleged
  injuries was an injunction or forfeiture.  Plaintiffs
  abandoned both.  They abandoned with prejudice the claim
  for forfeiture in 2008, and they abandoned their request
  for injunctive relief in the <u>final argument at trial</u>,
  immediately before this case was taken under advisement.
  COL 12-13.[5]

### B. The Organizational Plaintiffs

The organizational plaintiffs alleged that they suffered

informational and economic injury as a result of FEI's

mistreatment of the elephants.  Complaint, ECF No. 1 at ¶¶ 6,

11, 16; *ASPCA II*, 677 F. Supp. 2d at 60.  First, they alleged

"informational" standing, claiming they have not been able to

obtain information which must be disclosed pursuant to a

statute. *ASPCA II*, 677 F. Supp. 2d at 60, FOF 101, COL 21.

Specifically, they claimed that because FEI's use of the

bullhook and chains is a "take" prohibited by Section 9 of the

ESA, the circus "cannot lawfully engage in these practices

without first applying for and obtaining a permit pursuant to

---

[5] The plaintiffs left open the possibility that they would renew
their request for an injunction at a later date, but the Court
determined that even if one were granted, Rider's injuries still
would not be redressed because there was no evidence he could
detect FEI's mistreatment of the elephants without actually
witnessing the mistreatment.  COL 14-15.

Section 10 of the ESA, in which case it will have to submit the information required by the section, information which will then be available," by statute, to the organizations. *ASPCA III*, 659 F.3d at 22.  The organizations claimed FEI caused their injury by its refusal to seek a government permit for its "takings," thereby depriving them of information to which they would be entitled in the course of a permit proceeding. *Id.* at 19.  To redress this alleged injury, the organizations sought an injunction enjoining FEI from using bullhooks and chains unless and until FEI obtains a permit to do so from the Fish and Wildlife Service pursuant to the procedural and substantive requirements of Section 10 of the ESA. *ASPCA II*, 677 F. Supp. 2d at 61.

Second, the organizations alleged that they suffered an economic injury because they had to expend resources to combat FEI's treatment of elephants.  Complaint, ¶¶ 6, 11, 16; *ASPCA III*, 659 F.3d at 19.  Specifically, they claimed that FEI's unlawful practices injure their advocacy and public education efforts in promoting humane treatment of animals, because the use of bullhooks and chains by Ringling Bros. creates a public impression, particularly among children, that bullhooks and chains are not harmful to the elephants.  This impression, in turn, makes it more difficult—and thus more costly—for the

14

organizations to educate the public about the harm inflicted by chains and bullhooks. *Id.* at 26, 28. Again, to redress their injuries, plaintiffs sought injunctive relief preventing FEI from using these practices, and forfeiture of the elephants.

The plaintiff organizations' standing claims fared no better than Rider's. As an initial matter, <u>all but one of the organizational plaintiffs abandoned all claims to relief during the trial.</u> *ASPCA II*, 677 F. Supp. 2d at 66, n.10. And, as noted above, Rider and the remaining organizational plaintiff, API, abandoned their claim to forfeiture in 2008 and to immediate injunctive relief during trial. Nevertheless, despite this dramatically scaled-back case, API's claims were found baseless by this Court and by the Court of Appeals.

First, API's alleged informational injury was not cognizable as a matter of law under Section 9 of the ESA, *the only section of the ESA plaintiffs sued under or sought to enforce.* "Nothing in section 9 gives [organizational plaintiffs] a right to any information." *ASPCA III*, 659 F.3d at 23. The only way API would be able to establish "informational standing" under the ESA would be if (1) FEI applied for a permit from the Fish and Wildlife Service to engage in a "taking" of the elephants under Section 10 (not Section 9) of the ESA; (2) FEI or FWS refused to provide to API the information required by

statute to be provided during the permitting process; and (3) API was injured by the refusal because it had no other access to this information.  *Id.; see also ASPCA II*, COL 28.  <u>None of these events occurred in this case</u>.  API claimed "informational injury" under a section of the ESA which provides no right to information, it claimed a right to information arising out of an administrative proceeding which never happened, and *it failed to show that, even if such a proceeding were to occur, it would receive access to any information about FEI that it had not already received in discovery in this case.*  COL 28.  Even if API's claim had a basis in law, which it did not, it failed to provide any evidence of its alleged injury, let alone one which could be redressed by a favorable outcome in the case.

    The organizational plaintiffs' claim of economic injury – taken up to the brink of trial by all the organizational plaintiffs, abandoned by all but API during trial, and pursued through trial and appeal by API – was, likewise, "not supported by any competent evidence.  There was no testimony that API would actually spend less resources on . . . . elephants in circuses were FEI's practice declared to be a "taking."" COL 31.  API's fact witness "testified that API might not spend the "bulk" of its captive animal advocacy money if Feld no longer had elephants, but this is beside the point because API has

abandoned its forfeiture claim." *Id.*  As the Court of Appeals

explained, "[c]entral to API's standing is its allegations that

. . . [the] use of bullhooks and chains by" Ringling Bros.

"creates a public impression . . . that bullhooks and chains are

not harmful to elephants.  This impression, in turn, makes it

more difficult – and therefore more expensive – for API to

educate the public about the harm inflicted by chains and

bullhooks." *ASPCA III*, 659 F.3d at 27.  However, "nothing in

the record supports the key link in API's standing argument,

namely, that Feld's use of bullhooks and chains fosters a public

impression that those practices are harmless . . . . Indeed, the

only evidence arguably on point comes from Tom Rider, who

testified that Feld takes steps to conceal the chains and

bullhooks from public view . . . . Contrary to API's claim that

Feld's treatment of elephants gives the impression that the use

of bullhooks and chains is humane, Rider's testimony suggests

that the public may in fact have little awareness of these two

techniques." *Id.* 27-28.

## II.  Discussion

### A. Endangered Species Act

#### 1. General Standards

Plaintiffs brought this action under the ESA.  The ESA

contains a fee shifting provision, which provides "in issuing

any final order in any suit brought pursuant to" § 1540(g)(1),
the Court, in its discretion, "may award costs of litigation,
(including reasonable attorney and expert witness fees) to any
party, whenever the court determines such award is appropriate."
16 U.S.C. § 1540(g)(4).  Although the Supreme Court and this
Circuit have not defined when it is "appropriate" to award
attorneys' fees to an ESA defendant, the Supreme Court has
indicated that environmental fee-shifting statutes should be
interpreted similarly to their civil rights counterparts.  *See*
*Pennsylvania v. Delaware Valley Citizens' Council*, 478 U.S. 546,
559-60 (1986).  This is because the statutes share common
purposes: (1) "to promote citizen participation in the
enforcement of important federal policies," *id*. at 560, and, at
the same time, (2) to prevent plaintiffs from filing "frivolous"
or "unjustified" suits.  *Christiansburg Garment Co. v. EEOC*, 434
U.S. 412, 419, 421 (1978); *Marbled Murrelet v. Babbitt*, 182 F.3d
1091, 1095 (9th Cir. 1999).  The Ninth Circuit has held that
courts should "apply to the ESA the civil rights standard for
awarding fees to prevailing defendants." *Marbled Murrelet*, 182
F.3d at 1095.  Under this standard, a defendant may recover
attorneys' fees when "the plaintiff's action was frivolous,
unreasonable, or without foundation," or that "the plaintiff
continued to litigate it after it clearly became so."
*Christiansburg*, 434 U.S. at 421-22.  *Christianburg* does not

require a showing of bad faith.   434 U.S. at 419 (Congress did

not intend to "giv[e] the private plaintiff substantial

incentives to sue, while foreclosing to the defendant the

possibility of recovering his expenses in resisting even a

groundless action unless he can show that it was brought in bad

faith.")

In applying these criteria, courts must "resist the

understandable temptation to engage in post hoc reasoning by

concluding that, because a plaintiff did not ultimately prevail,

his action must have been unreasonable or without foundation."

*Id.*  The Supreme Court has cautioned that such "hindsight logic"

could "discourage all but the most airtight claims" and has

urged district courts to be mindful that "[d]ecisive facts may

not emerge until discovery or trial" and that, "[e]ven when the

law or the facts appear questionable or unfavorable at the

outset, a party may have an entirely reasonable ground for

bringing suit."  *Mbulu v. Bureau of Nat'l Affairs*, 448 F. Supp.

2d 122, 125 (D.D.C. 2006) (quoting *Christianburg*, 434 U.S. at

422).[6]

---

[6] Plaintiffs and their counsel have provided extensive
declarations in which they describe motivations and thought
process for acting as they did before and during the trial.  The
Court has reviewed these declarations and accords them
appropriate weight, but is mindful that the declarations may
contain a different kind of post hoc reasoning, namely,

## 2. The Court has Jurisdiction to Award Fees under the ESA to FEI, the Prevailing Party

Neither party seriously disputes that, if the Court were to analyze FEI's entitlement to fees under the ESA on the merits, the *Christianburg* standard would apply.  Motion for Fees at 20-22; Opposition at 20-22.  However, plaintiffs argue that the ESA fee provision is unavailable in this case for two reasons. First, plaintiffs claim that because the Court found it lacked jurisdiction over the underlying ESA cause of action, it also lacks jurisdiction to award fees under the ESA.  Opp'n at 20-21. Second, they claim that because the Court never reached the merits of plaintiffs' claims, FEI is not a "prevailing party" under *Christianburg*, and is therefore not entitled to fees. Upon careful consideration, the Court concludes neither argument has merit, and accordingly FEI may seek fees under the ESA.  *Id.* at 23-24.

The circuits are divided on whether a court has authority to award attorneys' fees under a statutory fee shifting provision when the underlying case falls outside its subject matter jurisdiction, and this Circuit has not been directly faced with the question.  *See District of Columbia v. Jeppsen*,

---

hindsight logic employed to justify plaintiffs' prosecution of the lawsuit.

514 F.3d 1287, 1289 (D.C. Cir. 2008) (noting conflict, but finding no need to address issue).  The Eighth and Ninth Circuits have held that statutory fee shifting provisions embedded in statutes that confer substantive rights, such as Title VII of the Civil Rights Act, cannot themselves confer subject matter jurisdiction.  *Branson v. Nott*, 62 F.3d 287, 293 (9th Cir. 1995) ("Where there is no subject matter jurisdiction to proceed with the substantive claim, as a matter of law that lack of jurisdiction bars an award of attorney's fees under" the fee shifting provision of the statute.) (citations and quotation marks omitted); see also *Keene Corp. v. Cass*, 908 F.2d 293 (8th Cir. 1990).

In more recent cases, the Seventh and Tenth Circuits have taken a different view.  These Circuits found courts have jurisdiction to award fees to prevailing defendants under the fee shifting provisions of the Emergency Planning and Community Right to Know Act and the False Claims Act, even though the courts dismissed the underlying claims for lack of jurisdiction. *Citizens for a Better Env't v. Steel Co.*, 230 F.3d 923 (7th Cir. 2000); *Grynberg v. Praxair*, 389 F.3d 1038 (10th Cir. 2004).  The courts explained that "courts that lack jurisdiction with respect to one kind of decision may have it with respect to another."  *Steel Co.*, 230 F.3d at 926.  For example, Federal

Rule of Civil Procedure 11 and certain provisions of Title 28 of
the United States Code explicitly "permit awards of litigation
expenses in suits that federal courts are not authorized to
decide on the merits," *Id.*, 230 F.3d at 927 (citing 28 U.S.C. §§
1919; 1447(c)), and the Supreme Court has "held that attorneys'
fees may be awarded under Rule 11 even if the case *never* came
within the district court's subject matter jurisdiction." *Id.*
(citing *Willy v. Coastal Corp.*, 503 U.S. 131 (1992).
Accordingly, the circuit courts conclude, "a motion seeking an
award under [fee shifting] rules or statutes is a case or
controversy that may be adjudicated to the extent the movant has
suffered at its adversary's hands an injury that may be
redressed by a decision in its favor.  Article III therefore
presents no obstacle to fee-shifting, whether or not the fees
were incurred in proceedings that were cases or controversies
under Article III." *Id.* at 927-928 (citation omitted); see also
*Grynberg*, 389 F.3d at 1057.

Upon consideration, this Court finds *Steel Co.* and *Grynberg*
are more persuasive than *Branson* and *Keene Corp.*, and will apply
the Seventh and Tenth Circuit's analysis to FEI's request for
attorneys' fees.  The fee shifting provision in the ESA permits
the Court to award attorneys' fees "in issuing any final order
in any suit brought pursuant to" the citizen-suit provisions of

the ESA.  16 U.S.C. § 1540(g)(4).  Plaintiffs' action was
brought pursuant to the citizen suit provision; "it could not
have been brought under any *other* law, and the suit's failure
did not make it the less [a lawsuit] brought pursuant to" the
citizen suit provision. *Steel Co.*, 230 F.3d at 929 (citation
omitted).  Moreover, the case or controversy requirements are
met in this case.  FEI has allegedly expended an enormous sum of
money defending this protracted litigation. It claims this
injury is the result of a frivolous lawsuit, an alleged
injustice which may be redressed by an award of attorney fees as
contemplated by the statute.  Accordingly, the Court concludes
that it has subject matter jurisdiction to award attorneys' fees
under the ESA.

The Court also concludes that FEI is a "prevailing party"
and accordingly may seek fees under the ESA.[7]  Plaintiffs argue
that, since this case was dismissed on jurisdictional grounds
and not on the merits, FEI did not "prevail."  Opp'n at 23.
Citing *Jeppsen*, plaintiffs claim it is an open question in this
Circuit whether a defendant who received judgment, but not on

---

[7]  Although the ESA attorney fees provision does not contain
"prevailing party" language, the Supreme Court has found that if
a party seeks fees based on a judicially-determined resolution
in litigation under the ESA, the prevailing party requirement
applies. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 682 & n.1
(1983).  Moreover, under the *Christiansburg* standard, a
defendant must be the prevailing party to be entitled to fees.
*Christianburg*, 434 U.S. 412, 422 (1978).

the merits, may be considered a prevailing party.  514 F.3d at
1290-91. Since *Jeppsen*, however, the D.C. Circuit has held that
"a party need receive only some form of judicial relief, not
necessarily a court-ordered consent decree or a judgment on the
merits," to hold prevailing party status.  *Turner v. Nat'l
Transp. Safety Bd.*, 608 F.3d 12, 15 (D.C. Cir. 2010) (citations
omitted).  More recently, the Court of Appeals held that a
defendant could seek fees as a prevailing party when the
plaintiff withdrew its administrative complaint shortly before
trial was scheduled and the ALJ dismissed the proceedings with
prejudice.  *Green Aviation Mgmt. Co. v. Fed'l Aviation Admin.*,
676 F.3d 200 (D.C. Cir. 2012).  Therefore, the dismissal of the
case for lack of subject matter jurisdiction does not prevent
the defendant from seeking fees as a prevailing party.

This Circuit has articulated a two part test for
determining whether a defendant is a "prevailing party":

> (1) the judgment must be in favor of the party seeking the
> fees; and (2) the judicial pronouncement must be
> accompanied by judicial relief.

*Green Aviation*, 676 F.3d at 203-4 (discussing *Buckhannon Bd. &
Care Home, Inc. v. West Virginia Dep't of Health and Human Res.*,
532 U.S. 598 (2001)).  In the present case, the first factor is
clearly satisfied.  The Court's judgment in the case was entered
"in favor" of FEI.  *ASPCA II*, 677 F. Supp. 2d at 101.  The

24

remaining question is whether the order granted judicial relief. The Court of Appeals has held that "*res judicata* effect would certainly qualify" as judicial relief "where, for example, it protected the prevailing [party] from having to pay damages or alter its conduct." *Dist. of Columbia v. Straus*, 590 F.3d 898, 902 (D.C. Cir. 2010).  Judicial relief also exists where, as a result of the dismissal, the adversaries are no longer "where they were before the complaint was filed."  *Turner*, 608 F.3d at 16 (explaining, by contrast, that where the complaint is dismissed without prejudice at the request of the plaintiff, the order dismissing the case is "just an administrative housekeeping measure, not a form of relief" because the plaintiff did not need the judge's permission to withdraw the complaint).[8]

In this case, FEI obtained judicial relief.  The dismissal against Rider was with prejudice, and the dismissal as to all of his and API's claims placed the parties in a different position than they were before the complaint was filed.  Legally, if not financially, FEI is in a better position now than it was when the complaint was filed.  FEI is protected from having to alter

---

[8] This case is unlike *Turner* because, although organizational plaintiffs ASPCA, AWI and FFA withdrew all claims to relief during the trial, they did not ask to be dismissed as plaintiffs in the case; indeed, they asked to remain as named plaintiffs. *ASPCA II*, 677 F. Supp. 2d at 66, n.10.

its conduct or to pay damages from the events underlying the complaint, and the plaintiffs cannot not re-file their complaint based on the same set of facts because the court has concluded, based on those facts, that they lack standing to satisfy Article III's case or controversy requirement.  Accordingly, FEI is the prevailing party, and may seek fees under the ESA's fee shifting provision.

> ### 3. The Complaint was Frivolous, Unreasonable and Groundless, and FEI Is Entitled to Attorneys' Fees under the ESA

As set forth above, the standard for awarding attorneys' fees to prevailing defendants is stringent, and for good reason; statutes such as section 1988 of the Civil Rights Act and ESA's citizen suit provision were enacted to insure that private citizens have a meaningful opportunity to vindicate their rights and to encourage citizen enforcement of important federal policies.  *Marbled Murrelet*, 182 F.3d at 1095.  However, "frivolous suits . . . do not aid the cause of" protecting the earth's species.  "On the contrary, they undermine the legitimate efforts of those bringing legitimate suits, and draw scarce judicial resources away from these cases."  *Harris v. Group Health Ass'n*, 662 F.2d 869, 874 (D.C. Cir. 1981).  In such cases, the Court should exercise its discretion to award fees to a prevailing defendant.  *Id.*

FEI argues that, from its inception, plaintiffs' lawsuit was destined to fail.  For the reasons set forth at length in the Court's 2009 Opinion, and summarized, in part, above, the Court finds that the lawsuit was, from the beginning, frivolous and vexatious.  There was no legal or factual basis on which to find Rider or API had standing to bring this action.  Plaintiffs prolonged the litigation by raising new theories of standing during the case, and, worse, by attempting to conceal the nature and extent of Rider's funding.  Finally, after the litigation had dragged on for nine years, the plaintiffs abandoned parties and claims to relief during the trial.

Frivolous is defined as "utterly lacking in legal merit and evidentiary support." *U.S. ex. rel. J. Cooper & Assoc., Inc. v. Bernard Hodes Group, Inc.*, 422 F. Supp. 2d 225, 238 (D.D.C. 2006) (citations omitted).  Evidence of vexatiousness includes "actions that deliberately delay the proceedings . . . the raising of new allegations in an effort to circumvent the arguments in a defendant's motion to dismiss, and the inclusion of counts for which the available evidence defeats any inference" of a claim.  *Id.* (citations omitted).

The plaintiffs assert four arguments why this lawsuit is not frivolous or vexatious.[9]  First, they claim the Court's findings as to Rider are nothing more than adverse credibility determinations, which have been found insufficient to support an award of fees under *Christianburg*.  Opp'n at 28-30.  Plaintiffs are correct that adverse credibility findings, without more, do not always justify a finding that a case was frivolous at the outset.  *See, e.g.*, *Am. Fed'n of State, Cnty. and Mun. Emps. v. Cnty. of Nassau*, 96 F.3d 644, 652 (2d Cir. 1996).  ("[A] claim is not necessarily frivolous because a witness is disbelieved or an item of evidence is discounted, disproved, or disregarded at trial.")  This outcome of this case, however, did not rest solely on a credibility determination. See Section I, *supra* (recounting, *e.g.*, knowingly false allegations included in original complaint and amended complaint in 2000 and 2001, all plaintiffs' abandonment of forfeiture in 2008 and injunctive relief during the trial, all but one organizational plaintiff's abandonment of <u>any</u> claim to relief during the trial, and the

---

[9] Plaintiffs spend much of their opposition, as well as voluminous declarations by plaintiffs' lawyers attached to it, arguing that the case was brought and maintained in good faith. *See e.g.*, Opp'n at 4-20, 32-38.  This argument is irrelevant to a fee award to prevailing defendants under the ESA, which does not require a showing of bad faith.  *Christianburg*, 434 U.S. at 419.

lack of any legal or factual basis for the remaining
organizational plaintiff's claims of standing).

Moreover, the credibility determination the Court did make
was far more damning that a routine judgment call resolving
different versions of the facts.  The Court found Rider was
"pulverized" on cross-examination and afforded his testimony "no
weight" as to any of the material allegations in the complaint,
namely, "his standing to sue." *ASPCA II*, 677 F. Supp. 2d at 67.
More important, the Court determined that he was "essentially a
paid plaintiff and fact witness," *id.*, who had "a motive to
falsify" the entire basis for his standing – his alleged
personal and emotional attachment to the elephants.  *Id.* COL 4.
In other words, the Court did not just discredit some of Rider's
testimony.  Rather, it determined that his claims to standing
were entirely unbelievable, and in some instances actually
false, that he had no personal or emotional attachment to the
elephants, and that absent nearly $200,000 in payments by his
co-plaintiffs, he "may not have begun or continued his advocacy
efforts or his participation as a plaintiff in this case."  FOF
53.  These determinations by the Court are far more than an
adverse credibility determination: they are akin to a finding
that a civil rights plaintiff's testimony was "an unmitigated
tissue of lies [and] that no one had discriminated against her,"

justifying a fee award to the prevailing defendant. *Carrion v. Yeshiva Univ.*, 535 F.2d 722, 728 (2d Cir. 1976).

Second, plaintiffs argue that, despite the defects in Rider's credibility, they had a reasonable basis for filing and maintaining the lawsuit. Opp'n 33-36. Specifically, plaintiffs argue that they conducted a reasonable pre-filing investigation and that they amassed "an abundance of evidence," from Rider and other sources, that FEI used the bullhook and chain and that these practices harmed the elephants. *Id.* This recitation of evidence by plaintiffs misses the point entirely; no matter how strong the merits of a case may be, plaintiffs are not insulated from scrutiny under *Christianburg* if they have no right to be in court. *See, e.g.*, *Access Now, Inc. v. Town of Jasper*, Case 02-59, 2004 U.S. Dist. LEXIS 905 (E.D. Tenn. Jan. 7, 2004) (awarding fees under *Christianburg* against non-profit disability rights advocacy group which pursued claim "right up to eve of trial" despite no evidence that plaintiff had standing).

FEI did not win this case based on any findings regarding its treatment of the elephants. Rather, the court never reached that issue because it found that plaintiffs lacked standing to sue. Therefore, it is immaterial whether plaintiffs had evidence about FEI's treatment of its animals; the question is whether they had evidence of either Rider's or API's standing to

30

bring the case.   As discussed in the 2009 Opinion and summarized above, they should have known that the standing claims were unreasonable.   Indeed, they knew that Rider did no advocacy work on behalf of elephants -- not even complaining to circus management -- until he was paid by plaintiffs to do so.[10]   They knew Rider had worked for three circuses, all of which used bullhooks and chains.   They further knew that Rider followed Daniel Raffo -- a bullhook-wielding elephant handler whom Rider described as particularly vicious -- from one circus to another, working with him at Ringling Brothers as well as another circus immediately thereafter.   As the lawsuit continued, the problems with Rider's claims of personal and emotional attachment to the elephants became even more obvious.   He made no effort to see his "girls" who were no longer in the circus; his media efforts were sporadic at best, as he spent much of his time staying with family or in a campground in Florida; and photographs surfaced showing Rider using a bullhook.

"Courts have awarded attorneys' fees to prevailing defendants where no evidence supports the plaintiff's position

---

[10]   The Court rejects any claim by plaintiffs or their counsel that the fact that Rider took no action on behalf of the animals until he began getting paid for his efforts was <u>not</u> a red flag, likely a fatal one, as to his credibility.   See Opp'n at 2-3, 14-18.   Any such claim is conclusively undermined by the fact that Rider, plaintiffs and counsel attempted to minimize, if not conceal, these payments for years.   FOF 25-26, 33, 38, 52, 55-57.

or the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning or at some significant point in the proceedings after which the plaintiff continues to litigate." *Smith v. Smythe-Cramer Co.*, 754 F.2d 180, 183 (6th Cir. 1985). In this case, counsel and the organizational plaintiffs are experienced in litigation under the ESA and other environmental statutes. See, e.g., Mot. for Fees at Ex. 3 (representative list of cases from MGC's website, including many dozens filed under citizen suit provisions pursuant to a variety of environmental statutes). These organizations and their counsel are well aware of how closely standing is scrutinized in cases filed under citizen-suit provisions; in fact, they have publicly spoken about the issue. See, e.g., *Id.* at Ex. 4, *Symposium: Confronting Barriers to the Courtroom for Animal Advocates*, 13 Animal L. 1; 61; 87 (2006) (legal symposium where plaintiffs' counsel explored barriers to standing). Indeed, plaintiffs and their counsel deliberately drafted Rider's initial standing allegations to conform to a standing theory that he was "refraining from" seeing the elephants, and that failing to do so caused him injury. *ASPCA I*, 317 F.3d at 335-37. Then, when the case was remanded in 2003, counsel amended the complaint so that his allegations would conform to a different standing theory, specifically, that he was *continuing* to see the elephants and

32

suffering additional injury each time he saw them.  Complaint at ¶ 23.  In short, Plaintiffs' and counsel's prior experience with this precise issue – standing requirements for animal advocates – makes it even more clear that they "either knew or reasonably should have known that [they] did not have sufficient facts to establish standing," and therefore that the claim was "groundless from its inception."  *Access Now*, 2004 U.S. Dist. LEXIS 905, at *15-16.

Third, plaintiffs claim that they brought their claims for a proper purpose – to protect the elephants – and therefore that the case was not vexatious.[11]  Opp'n 36-37.  This is not the standard for vexatiousness, which is evidenced by, *inter alia*, "actions that deliberately delay the proceedings . . . the raising of new allegations in an effort to circumvent the arguments in a defendant's motion to dismiss . . . and the inclusion of counts for which the available evidence defeats any inference" of a claim.  *U.S. ex. rel. J. Cooper*, 422 F. Supp. 2d at 238 (citations omitted).  As set forth in the 2009 Opinion and above, there is overwhelming evidence that the plaintiffs satisfy the vexatiousness standard.  They deliberately delayed

---

[11] Of the four arguments plaintiffs advance in opposition to a fee award under *Christianburg*, plaintiffs only assert one – that they had a proper purpose for the lawsuit – as to API.  The other three arguments are advanced on behalf of Rider only. Opp'n at 26-40.

the proceedings by (1) providing false or incomplete information about the financial arrangements between Rider and the other plaintiffs for years, and (2) forcing FEI and the court to spend time and resources litigating against organizational plaintiffs and requests for relief which plaintiffs abandoned during the trial.  They raised new allegations in the 2003 complaint, claiming Rider was injured because he continued to see his "girls" because the original allegations that he was injured by "refraining from" seeing them were demonstrably false.  Finally, there was no merit to API's claims: its claim of informational standing was baseless in law and fact, and it presented "no testimony" or "any competent evidence" to support its economic standing claim.  COL 31; *see also ASPCA III*, 659 F.3d at 27 ("nothing in the record supports the key link in API's standing argument.")

Finally, plaintiffs argue that this action cannot be frivolous because plaintiffs survived a motion to dismiss and, partially, a summary judgment motion.  Opp'n at 39-40.  In other words, plaintiffs suggest that the case could not have been frivolous because frivolous cases are weeded out before trial. This is not necessarily true.  "Some frivolous cases impose large costs on defendants when they require counsel to wade through voluminous records or review many cases."  *In re TCI*,

34

769 F.2d 441, 448 (7th Cir. 1985).  This is the case here, where
Rider's standing hinged on his credibility, which only a trial
could resolve.  That the case lasted as long as it did "was
attributable not to the closeness of the questions," but to
plaintiffs' willingness to make standing claims which are "easy
to allege and hard to disprove, and therefore . . . require
substantial discovery and litigation, even when they are
groundless from the outset." *Murphy v. Bd. of Ed. of the
Rochester City School Dist.*, 420 F. Supp. 2d 131, 136 (W.D.N.Y.
2006); see also *Leviski v. ITT Educ. Svcs.*, Case 07-867, 2012
U.S. Dist. LEXIS 40646, *34 (S.D. Ind. Mar. 26, 2012) (defendant
"was required to do some digging before ferreting out the
frivolousness of th[e] case.").

### B. Inherent Authority

     In addition to powers deriving from rule or statute, courts
also have inherent authority to sanction litigation misconduct
when a party has "acted in bad faith, vexatiously, wantonly, or
for oppressive reasons." *Alyeska Pipeline Service Co. v.
Wilderness Society*, 421 U.S. 240, 258-59 (1975) (citations
omitted).  Such power is governed "by the control necessarily
vested in courts to manage their own affairs so as to achieve
the orderly and expeditious disposition of cases." *Chambers v.
NASCO, Inc.*, 501 U.S. 32, 43 (1991).  A court must "exercise

caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Id.* at 50 (citation omitted). Accordingly, the Supreme Court has advised that courts "ordinarily should rely on the Rules rather than the inherent power" if there is bad faith misconduct that can adequately be sanctioned under applicable rules or statutes. *Id.* If, however, "neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

The Supreme Court's analysis in *Chambers* "leads to the conclusion that if statutory or rules-based sanctions powers are entirely adequate, they should be invoked, rather than the inherent power." Joseph, *Sanctions: The Federal Law of Litigation Abuse*, § 26(A)(1), 4th ed. (2008) (collecting cases). This Circuit has agreed. "When rules alone do not provide courts with sufficient authority to . . . prevent abuses of the judicial process, the inherent power fills the gap." *Shepherd v. ABC*, 62 F.3d 1469, 1474 (D.C. Cir. 1995).

In this case, there is no gap to be filled. The Court has already found sanctions warranted under *Christianburg* against all plaintiffs.[12] And FEI has moved for sanctions against all

---

[12] FEI points to no authority that counsel can be sanctioned under ESA's fee shifting provision. To the contrary, fee awards

attorneys under 28 U.S.C. § 1927.  As FEI admits, the standard

for a fee award under § 1927 is at least as broad as the court's

authority to issue sanctions for attorney misconduct under its

inherent powers.  Mot. for Fees at 41-42; see also Section II.C,

infra.  Because the relief FEI seeks is available through rules

and statutes, the Court has no "need or justification" to invoke

its inherent power.  *Fidelity Nat'l Title Ins. Co. v.

Intercounty Nat'l Title Ins Co.*, 412 F.3d 745, 752 (7th Cir.

2005).

### C. Sanctions Against Counsel Pursuant to 28 U.S.C. § 1927

Section 1927 empowers a court to assess attorneys' fees

against counsel "who so multiplies the proceedings in any case

unreasonably and vexatiously. . .." 28 U.S.C. § 1927.  The

Circuit "has not established whether the standard [for

unreasonable and vexatious conduct under section 1927] should be

recklessness or the more stringent bad faith." *La Prade v.

Kidder Peabody & Co., Inc.*, 146 F.3d 899, 905 (D.C. Cir. 1998)

(citations omitted).

---

are not available against counsel in the civil rights statutes
which the courts have found analogous to the ESA.  See, e.g.,
*Amlong & Amlong, PA v. Denny's, Inc.*, 457 F.3d 1180, 1189 (11th
Cir. 2006); *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498,
1508-09 (10th Cir. 1996).

The Court of Appeals has cautioned that the power to sanction attorneys individually "is a power which the courts should exercise *only* in instances of serious and studied disregard for the orderly process of justice." *United States v. Wallace*, 964 F.2d 1214, 1220 (D.C. Cir. 1992)(quoting *Overnite Transp. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 795 (7th Cir. 1983)). Recklessness is a "high threshold . . . and in general requires deliberate action in the face of a known risk, the likelihood or impact of which the actor inexcusably underestimates or ignores." *Id.* at 1219-20. A finding of subjective bad faith requires "willfulness" or "deliberate intent to harm." *American Hosp. Ass'n v. Sullivan*, 938 F.2d 216, 221 (D.C. Cir. 1991). The bad faith must also be material to warrant sanctions; in other words, it must have occurred in an area "critical to the success of [plaintiffs'] case." *Perichak v. Int'l Union of Electrical Radio & Machine Workers*, 715 F.2d 78, 84 & n.9 (3d Cir. 1983); see also *Ass'n of Amer. Physicians & Surgeons, Inc. v. Clinton*, 187 F.3d 655, 661 (D.C. Cir. 1999). Regardless of whether the applicable standard is bad faith or recklessness, a finding of vexatiousness under § 1927 must be supported by clear and convincing evidence. *Alexander v. FBI*, 541 F. Supp. 2d 274, 303 (D.D.C. 2008).

"[A] sanctioned attorney must receive specific notice of
the conduct alleged to be sanctionable and the standard by which
that conduct will be assessed, and an opportunity to be heard on
that matter." *Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir.
1997); *see also Felheimer, Eichen & Braverman v. Charter Tech.*,
57 F.3d 1215, 1225 (3rd Cir. 1995) (due process prior to
sanctioning an attorney is satisfied when attorneys were
"provided with sufficient, advance notice of exactly which
conduct was alleged to be sanctionable[.]").[13]

Neither FEI nor the plaintiffs have acknowledged that the
standard for sanctions under § 1927 in this Circuit is
unsettled, nor have they suggested which standard the Court
should use to analyze the attorneys' conduct.  To determine

---

[13] For this reason alone, FEI's claim against all counsel other
than Ms. Meyer and Mr. Glitzenstein is denied.  Aside from a
single footnote in its opening brief and single paragraph in its
reply, FEI cites no specific actions by other attorneys which
could be construed as providing the "specific notice" required
before a § 1927 sanctions are imposed.  Moreover, the chart
created by FEI, purporting to be "a summary of the . . . FOFs
and COLs that support . . . FEI's claims" under § 1927, only
contains references to Ms. Meyer and Mr. Glitzenstein.  See Mot.
for Fees at 4, n.7 and at 41, n.36; *see id.*, Ex. 6 at 9-10
(Chart Created by FEI to Show FEI's Entitlement to Fees Under 28
U.S.C. § 1927).  In any event, FEI's argument lacks merit.  FEI
accuses the other attorneys of nothing more specific than being
listed as counsel of record at various points during the
litigation and signing their names to various pleadings, the
significance of which is unexplained.  FEI has provided no
evidence, much less clear and convincing evidence, by which the
Court could find they are personally liable for FEI's attorneys'
fees.

whether the attorneys' conduct is sanctionable in this Circuit in light of this uncertainty, the Court examines the cases in which the Circuit has awarded sanctions under § 1927.  Critical to each case was a showing that the sanctioned attorney had actual knowledge that his action was willfully disobedient or otherwise mendacious at the time he engaged in the conduct.

For example, in *LaPrade v. Kidder Peabody*, plaintiff's counsel filed an *ex parte* motion in state court to stop an ongoing arbitration, notwithstanding the fact that a federal court had ordered the arbitration to proceed and had retained jurisdiction over the underlying case pending arbitration. Plaintiff had the same counsel for all proceedings; accordingly, counsel knew of the federal court's ongoing jurisdiction. Moreover, counsel did not inform either court – state or federal – about the other court's involvement in the case.  146 F.3d 899 (D.C. Cir. 1998).  Likewise, in *Fritz v. Honda*, counsel was sanctioned for (1) refusing to dismiss his case after being informed that service was insufficient, forcing defendant to file a motion to dismiss which he did not oppose; (2) taking discovery in federal court despite the fact that he had no intention of proceeding with federal litigation and had already filed an identical case in state court; and (3) telling his client not to appear for her deposition.  818 F.2d 924 (D.C.

Cir. 1987).  The remaining cases similarly demonstrate the
attorney's actual knowledge that his conduct was vexatious or in
bad faith at the time he engaged in the conduct.  *See, e.g.,*
*McLaughlin v. Bradlee*, 803 F.2d 1197 (D.C. Cir. 1986) (plaintiff
attorney filed a fourth lawsuit, substantially identical to
three previous lawsuits he had filed and lost; he continued to
file meritless motions after the court warned him he would be
subject to sanctions);  *Reliance Ins. Co. v. Sweeney*, 792 F.2d
1137 (D.C. Cir. 1986) (attorney failed to identify any disputed
facts in motion for summary judgment; after losing, he appealed
and again refused to identify any facts in support of his
case).[14]

Applying these principles to this case, the Court finds, by
clear and convincing evidence, that § 1927 sanctions against
Katherine Meyer and her law firm, MGC, are warranted for her

---

[14] On the other hand, courts in this Circuit have refused to
impose § 1927 sanctions for conduct which did not include actual
knowledge and intentional conduct.  *See, e.g.*, *United States v.*
*Wallace*, 964 F.2d at 1220 (reversing sanctions on attorney who
erred by failing to subpoena witnesses for trial, resulting in a
delay of proceedings, where there was no evidence that the
attorney "intended to delay the trial or to not subpoena
witnesses for the trial."); *Alexander v. FBI*, 541 F. Supp. 2d at
305 ("no evidence" that counsel "knowingly submitted false
testimony" or that they acted "with an intent to mislead [the]
Court.")

participation in Rider's response to his 2004 interrogatories.[15]
As set forth in detail in the 2009 Opinion and *supra*, Rider lied
when answering FEI's 2004 interrogatory asking whether he had
received any compensation from any animal advocate or animal
advocacy organization for services rendered.   Rider stated –
under oath – "I have not received any such compensation" when in
fact he had already received more than $50,000.00 from his co-
plaintiffs.   FOF 55.   Further, the record clearly and
convincingly established that Ms. Meyer, who signed the
objections to the false response, had been paying Rider through
her law firm and WAP since 2001, and had sent him IRS Form 1099s
reporting the payments as compensation. FOF 55-56.   Accordingly,
Ms. Meyer may be held liable for FEI's attorneys' fees incurred
in litigating the portion of its Motion to Compel which sought
information about Rider's financial relationship with animal
rights advocates.   *See* FEI's Mot. to Compel Testimony of
Plaintiff Thomas Eugene Rider, ECF No. 101; *see also* Order of
Aug. 23, 2007 Granting in Part FEI's Motion to Compel, ECF No.
178.

---

[15] In this Circuit, a law firm may be held liable for actions of
its attorneys, and the Court exercises its discretion to hold
MGC liable for the acts of Ms. Meyer.   *See La Prade*, 146 F.3d at
900; *see also Enmon v. Prospect Capital Corp.*, 675 F.3d 138,
147-48 (2d Cir. 2012) (explaining that actions of a founding,
named partner of a firm may be attributed to firm when his
actions were indistinguishable from those of the firm).

FEI's claims, however, are not limited to such specific conduct.  It claims that all of plaintiffs' attorneys violated § 1927 throughout the entire prosecution of the case, and seeks "an award of fees encompassing the entire litigation".  Mot. for Fees at 45.  The record presently before the Court, however, does not demonstrate clearly and convincingly that counsel violated § 1927 other than as described above.[16]

The primary basis upon which FEI asserts the court should hold counsel liable is – phrased bluntly – FEI's claim that counsel bribed Rider to testify falsely.  Mot. for Fees 42-43. The Court does not have an adequate record to make such a finding.  The 2009 Opinion establishes that Rider's testimony was wholly incredible, and in certain instances, he testified falsely.  *See, e.g.*, FOF 1, 55; COL 6.  The 2009 Opinion further establishes that Rider was paid to participate in the litigation; and that "absent the financial incentive, Mr. Rider may not have begun or continued his advocacy efforts or his participation as a plaintiff in this case."  FOF 53.  Finally, the 2009 Opinion establishes that the plaintiffs and their counsel sought to conceal, at least in part, the payments from FEI.  FOF 55-57.  However, entirely absent from the 2009 Opinion

---

[16]   The Court's decision today necessarily only relies on evidence presented to it during this litigation.  The Court expresses no view whether evidence supporting such a finding may otherwise exist.

is any conclusion that counsel knew Rider had no attachment to the animals but paid him to lie, under oath, and say that he did.  Certainly, the record before the Court does not provide clear and convincing evidence required for sanctions under § 1927.  Sanctions are therefore not available on this basis. *See, e.g., Mona v. Hirsch*, Case No. 87-1102, 1989 U.S. Dist. LEXIS 9651 at *4 (D.D.C. Aug. 15, 1989) ("while the primary witness for plaintiffs was found to be lacking in credibility, [the Court] has no basis for believing that counsel for plaintiffs participated in a scheme to commit perjury.")

The record also does not support a finding of individual liability for pursuing the case through trial as, according to FEI, it became "patently obvious" that Rider had no credibility, and that API's claim to standing would not survive.  Mot. for Fees at 43.  As discussed *supra*, the court finds that pursuit of this case was objectively frivolous, and awards fees on that basis.  But again, there is no evidence that counsel had actual knowledge that Rider lacked an emotional or personal attachment to the elephants, nor that counsel otherwise intentionally directed the continuation of a lawsuit they personally knew was factually and legally baseless.  *Compare Fritz*, 818 F.2d 924 (counsel continued lawsuit despite his actual knowledge that it would not ultimately go forward); *McLaughlin*, 803 F.2d 1197

44

(counsel filed and pursued fourth lawsuit despite having lost
substantially identical previous three); *Reliance*, 792 F.2d 1137
(counsel appealed adverse decision on summary judgment despite
his refusal to identify a single material fact in dispute); *with*
*Mona v. Hirsch*, 1989 U.S. Dist. LEXIS 9651, *4 (§ 1927 sanctions
not appropriate where no clear and convincing evidence that
counsel "continued to prosecute the case knowing it to be
totally lacking in merit.")

Finally, FEI suggests counsel should be sanctioned for
filing a complaint with "false and unsupported allegations,"
namely, that Rider was injured by "refraining from" seeing the
elephants, when in fact counsel knew he was seeing the elephants
throughout this period.  Mot. for Fees at 43.  FEI argues that
the D.C. Circuit relied on these false allegations in reversing
this Court's 2001 dismissal of Rider's claims, and without these
knowing misrepresentations, the case would never have gone
forward.  *Id.* at 33–35.

This is a close call.  The Court agrees with FEI that, to
the extent counsel relied on a "refraining from" standing injury
for Rider from 2000 to 2003, this theory was knowingly false.
The 2009 Opinion establishes that Rider was being paid – by
plaintiffs, Ms. Meyer and Mr. Glitzenstein - to follow the
circus and see the elephants throughout this time.  FOF 61.

45

However, in order to establish sanctionable conduct under §
1927, FEI must show clearly and convincingly that counsel's
false statements "vexatiously" multiplied the proceedings.  Upon
careful consideration, the Court concludes that the record in
this case does not meet that standard.

Rider's standing claim throughout the litigation was
premised on the theory that because of his personal and
aesthetic attachment to the animals, he would be injured either
by (a) seeing the animals he loved, and seeing the effect of
their mistreatment, which would cause him injury; or (b)
refraining from seeing the animals he loved, which would also
cause him injury.  *See ASPCA II*, 677 F. Supp. 2d at 67. Indeed,
plaintiffs relied on both sides of this coin in their argument
to the Court of Appeals in 2002.  As plaintiffs explained, "Mr.
Rider has alleged that he is presently injured by having to
choose between visiting his "girls" in their physically and
psychologically damaged state, and thereby suffering additional
aesthetic injury, and refraining from visiting them at all."
*See* Mot. for Fees., Ex. 7, Reply Brief of Plaintiffs-Appellants
at 12-13.

Alleging either injury was sufficient for Rider to survive
a motion to dismiss.  *Compare Friends of the Earth v. Laidlaw
Envtl. Servs., Inc*. 528 U.S. 167 (2000) (finding standing

requirement satisfied where plaintiffs alleged a "refraining

from" injury), *with Animal Legal Def. Fund v. Glickman*, 154 F.3d

426 (D.C. Cir. 1998) (en banc) (finding standing requirement

satisfied where plaintiff had alleged an injury by continuing to

visit animals treated inhumanely).  Indeed, the Circuit relied

on both in its 2003 opinion.  *ASPCA I*, 317 F.3d at 336-37

(discussing both cases and concluding, "to generalize from

*Glickman* and *Laidlaw*, an injury in fact may be found when a

defendant adversely affects a plaintiff's enjoyment of flora or

fauna, which the plaintiff wishes to enjoy again upon the

cessation of the defendant's actions.")

In fact, FEI admits as much, noting that once Rider's

standing theory "morphed," in 2003, to an injury based on his

continued observations of the animals, his allegations "involved

disputed factual claims that were entirely dependent on Rider's

credibility and were intertwined with the merits of his ESA

"taking" claim."  Mot. for Fees at 10.  And, as FEI further

admits, Rider <u>was</u> seeing the elephants between 2000 and 2004;

accordingly, his claim to *Glickman* standing would clearly have

survived a motion to dismiss even if no "refraining from" injury

had ever been alleged.  Mot. for Fees at 2, 9.

To be clear: the fact that the "refraining from"

allegations in plaintiffs' complaint between 2000 and 2003 were

false at the time they were made is deeply troubling, and, as the Court has already indicated, warrants fees under the *Christianburg* standard.  However, Rider's claims of standing would have gone forward under *Glickman* even if his continued observations of the elephants had been clear from the outset. Accordingly, FEI has not shown, by clear and convincing evidence, that counsel "multiplied the proceedings . . . unreasonably and vexatiously" to justify an award under § 1927.

### D. Sanctions Against HSUS

In a footnote, FEI asks the Court to find HSUS jointly and severally liable for all attorneys' fees, despite the fact that HSUS is not and has never been a party to the case.  Mot. for Fees at 4, n.6.  HSUS then filed a motion to strike itself from FEI's fee motion because it is a non-party.  FEI opposed the motion to strike, arguing that (1) there are instances in which a non-party may be bound to a judgment as a matter of substantive law; (2) there are numerous disputed factual and legal issues regarding HSUS's status in this case; and (3) the motion to strike is procedurally improper, and in any event the Court should be "reluctant to determine disputed or substantial questions of law on a motion to strike."  FEI's Opp'n to HSUS Mot. to Strike at 26 (quoting *Chaconas v. JP Morgan Chase Bank*, 713 F. Supp. 2d 1180, 1191 (S.D Cal. 2010)).

48

To say the briefing on this issue has been disjointed is an understatement.  FEI initially raised the issue in a single footnote that does not even appear in the argument section of its Motion for Fees. This Court "need not consider cursory arguments made only in a footnote," *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 529 n.3 (D.C. Cir. 1999) (en banc), and it declines to do so here.  The Court further declines to consider this question in the context of a motion to strike, particularly one which both FEI and HSUS claim raises factual and legal disputes.  Opp'n to HSUS Mot. to Strike at 2, 10, 24- 26; *see also, generally*, HSUS Reply.  Accordingly, FEI's request to hold HSUS jointly and severally liable is **DENIED WITHOUT PREJUDICE** to refile at an appropriate time and in an appropriate procedural posture.  In light of the foregoing, HSUS's Motion to Strike is **DENIED** as moot.

## III. CONCLUSION

For the foregoing reasons, FEI's motion for attorneys' fees against all plaintiffs in this action jointly and severally is **GRANTED**.  Further, plaintiffs' counsel Katherine Meyer and MGC are jointly and severally liable for FEI's attorneys' fees incurred in litigating the portion of its Motion to Compel which sought information about Tom Rider's financial relationship with animal rights advocates. *See* FEI's Mot. to Compel Testimony of

Plaintiff Thomas Eugene Rider, ECF No. 101; *see also* Order of
August 23, 2007 Granting in Part FEI's Motion to Compel, ECF No.
178.  In all other respects, FEI's motion for attorneys' fees is
**DENIED.**  In light of the Court's determination that FEI's motion
for fees as relates to HSUS is denied, HSUS's Motion to Strike
is **DENIED AS MOOT.**

In light of the Court's determination that FEI is entitled to
recovery, the Court must determine the appropriate amount.  See
Min. Order of Feb. 10, 2012.  No schedule for such proceedings
has been set.  Accordingly, the parties are directed to file a
joint status report, including a recommendation for further
proceedings, by no later than April 15, 2013.  An appropriate
Order will accompany this Memorandum Opinion.

   **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
           **United States District Judge**
           **March 29, 2013**