## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIMAL WELFARE INSTITUTE, et al.,    ) | |
|         ) | |
|     Plaintiffs,     ) | |
|         ) | |
|     v.     ) | **Case No: 03-2006 (EGS/JMF)** |
|         ) | |
| FELD ENTERTAINMENT, INC.,    ) | |
|         ) | |
|     Defendant.     ) | |
|         ) | |
|         ) | |
|         ) | |

## DECLARATION OF JOHN M. SIMPSON IN SUPPORT OF DEFENDANT FELD ENTERTAINMENT, INC.'S PETITION FOR ATTORNEYS' FEES

1.      My name is John M. Simpson. I am more than twenty-one (21) years of age and am competent to make this declaration. Unless indicated otherwise, I have personal knowledge of the facts stated in this declaration.

2.      I am a partner in the law firm of Fulbright & Jaworski LLP ("Fulbright" or the "Firm"). Since the inception of Fulbright's engagement as counsel for defendant Feld Entertainment, Inc. ("FEI" or the "Company") in the above-captioned matter (the "ESA Case") – December 2005 through the present date – I have been the Firm's partner in charge of the litigation for this client and lead counsel of record for the defendant in the ESA Case.

3.      On March 29, 2013, the Court in this action ruled that "this case was groundless and unreasonable from its inception, and, therefore, that FEI should recover the attorneys' fees it incurred when it was forced to defend itself in this litigation." Memorandum Opinion at 3 (03/29/13) (ECF No. 620).[1] The Court ruled that "[i]n light of the Court's determination that

---

[1] Unless indicated otherwise, all references herein to "ECF No." are to the electronic docket entries in Civil Action No. 03-2006-EGS/JMF (D.D.C.).

FEI is entitled to recovery, the Court must determine the appropriate amount." *Id.* at 50.  The Court also ruled that "plaintiffs' counsel Katherine Meyer and MGC are jointly and severally liable for FEI's attorneys' fees incurred in litigating the portion of its Motion to Compel which sought information about Tom Rider's financial relationship with animal rights advocates." *Id.* at 49.  This declaration and the exhibits attached hereto are submitted in support of FEI's petition to establish the amount of attorneys' fees to be awarded to FEI in this case, filed contemporaneously herewith.  The declaration provides the foundation for (i) the Fulbright attorneys' fees incurred by FEI in connection with the ESA Case and sought by FEI's petition; (ii) the amount of the sanction to be assessed against Katherine Meyer and Meyer, Glitzenstein & Crystal ("MGC"); and (iii) the expert witness and other fees that FEI incurred in connection with the ESA Case and which likewise are recoverable under section 11(g)(4) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g)(4).

> 4.   This declaration is organized into the following sections:

I.   Onset of the Engagement *(page 5)*

II.   Staffing of the ESA Case *(page 7)*

III.   Qualifications and General Responsibilities of the Fulbright Attorneys Whose Hours and Fees Are Being Claimed by FEI in This Case *(page 13)*

> John M. Simpson *(page 13)*
> Joseph T. Small, Jr. *(page 16)*
> Lance L. Shea *(page 17)*
> Jonathan S. Franklin *(page 18)*
> Lisa Zeiler Joiner *(page 19)*
> Michelle C. Pardo *(page 21)*
> Julie A. Hardin *(page 23)*
> Andre T. Hanson *(page 24)*
> Joseph E. Hartman *(page 25)*
> Kristin L. McGovern *(page 26)*
> Tillman J. Breckinridge *(page 27)*

George A. Gasper *(page 28)*

Rena S. Scheinkman *(page 29)*

Ashley E. Seuell *(page 30)*

Sarah E. Warlick  *(page 31)*

Shameka L. Gainey *(page 32)*

Joel C. Simon *(page 33)*

Mark T. Emery *(page 34)*

Kara L. Petteway *(page 35)*

Mark L. Jensen *(page 37)*

Jesse M. Coleman *(page 38)*

Casey Batchelor *(page 39)*

Rebecca E. Bazan *(page 40)*

Tracy DeMarco *(page 40)*

Mary Fritz *(page 41)*

Pamela L. Jackson *(page 42)*

Chad A. Thompson *(page 42)*

Patrick D. Fuller *(page 43)*

Heather A. Nearhoof *(page 43)*

IV.   Course of Proceedings in the ESA Case *(page 44)*

    A.   Fact Discovery and Pre-Trial Motions:  March 10, 2006 through January 30, 2008 *(page 45)*

    B.   Evidentiary Hearing and Expert Discovery:  February through May 2008 *(page 51)*

    C.   Preparing the Case for Trial:  June 2008 through January 2009 *(page 54)*

    D.   Trial:  February 4, 2009 through March 18, 2009 *(page 59)*

    E.   Post-Trial Proceedings:  March 19, 2009 through December 30, 2009 *(page 61)*

    F.   Proceedings in 2010 *(page 63)*

    G.   Proceedings on Appeal to the D.C. Circuit:  November 2010 through January 11, 2012 *(page 64)*

    H.   Proceedings on Remand from the D.C. Circuit:  January 12, 2012 through March 31, 2013 *(page 65)*

V.   Factors Bearing on the Amount of Work Required to Defend the ESA Case *(page 68)*

    A.   High Stakes Nature of the Case *(page 69)*

    B.   Ideological Zeal in the Plaintiffs' Case *(page 70)*

C.    Novelty of the Issues *(page 72)*

D.    Certain of Plaintiffs' Actions Contributed to the Protracted Nature and Cost of the ESA Case *(page 73)*

VI.    Fulbright's Timekeeping and Billing Practices as They Pertain to the ESA Case *(page 81)*

A.    Timekeeping *(page 81)*

B.    Billing *(page 83)*

VII.    The Rates Charged by Fulbright for Work on the ESA Case *(page 89)*

A.    Fulbright's Method of Determining Rates *(page 89)*

B.    The Reasonableness of Fulbright's Rates *(page 93)*

VIII.    Calculation of the Lodestar Amount for the Fulbright Work on the ESA Case *(page 102)*

A.    Items Excluded from FEI's Claims *(page 102)*

    1.    Timekeepers with Fewer than 100 Hours *(page 104)*

    2.    Temporary Attorneys *(page 105)*

    3.    Law Firm Transition Costs *(page 106)*

    4.    Elephant Veterinary Records *(page 108)*

    5.    Privileged Matters *(page 111)*

    6.    Travel Time *(page 114)*

    7.    Summary *(page 116)*

B.    Calculation of the Lodestar Amount for the Fulbright Time *(page 117)*

X.    The Section 1927 Sanction Against Katherine Meyer and MGC *(page 121)*

IX.    Expert Witness and Other Fees *(page 125)*

Verification *(page 127)*

Index of Exhibits

# I.

## ONSET OF THE ENGAGEMENT

5.      Fulbright was engaged to represent FEI in the ESA Case in December 2005.  The case was transitioned from Covington & Burling LLP ("Covington") to Fulbright, and Fulbright attorneys entered appearances for FEI, and Covington withdrew, in March 2006.  ECF Nos. 61 & 62.  Fulbright has represented FEI continuously in connection with the ESA Case from the inception of the engagement in December 2005 through the present date, a period of seven (7) years and approximately ten (10) months.  This declaration provides factual support for FEI's claim for the attorneys' fees incurred during the period from December 1, 2005 through March 31, 2013 that were billed by Fulbright to, and paid by, FEI.  For attorneys' fees incurred by FEI during the period from and after April 1, 2013, a supplemental petition and supplemental declaration will be filed with the Court.

6.      Fulbright was retained to represent FEI in the ESA Case because of the Firm's long prior history of representing FEI in litigation, including the Firm's prior representation of FEI in ESA litigation.

7.      FEI became a client of Fulbright in 1989 when Fulbright merged with Reavis & McGrath, a law firm that had represented FEI or its predecessors, as well as the Feld family, for more than thirty (30) years.  I have continuously represented FEI (or its predecessor corporation, Irvin Feld & Kenneth Feld Productions, Inc.) in various civil litigation matters in federal and state court and certain administrative agencies since July 1990.  In my more than twenty-three (23) years of representing FEI, I developed substantial knowledge of the company's business and operations and in particular, the Ringling Bros. and Barnum & Bailey Circus ("Circus") which FEI owns and operates.  Putting aside the ESA Case, several of the other cases I have handled or participated in for FEI or its related persons or entities have been complex and protracted, and

5

two of them have been resolved by jury trials in this Court with appeals in the D.C. Circuit.  Two

other Fulbright partners, Joseph T. Small, Jr., and Lisa Zeiler Joiner, who became part of the core

group of lawyers representing FEI in the ESA Case, and whose credentials are described in

greater detail below, also had substantial prior experience representing FEI in protracted and

complex litigation in this Court, in the District of Columbia and in other federal and state courts.

      8.     Prior to the ESA Case, one of the few cases (if not the only case) arising under the

ESA and also involving captive Asian elephants in a circus or exhibition context was *Humane*

*Soc'y of the U.S. v. Babbitt*, No. 92-5268 (D.D.C.), *on appeal*, No. 93-5339 (D.C. Cir.)

("*Babbitt*").  *Babbitt* was an action by the Humane Society of the United States ("HSUS")

challenging certain actions and inactions of the U.S. Fish and Wildlife Service in connection

with the movement of an Asian elephant from a zoo in Wisconsin to a circus exhibition facility

in Illinois.  Fulbright was retained to represent FEI as an intervenor-defendant in *Babbitt*, and I

led the team representing the client in both the trial court and on appeal.  While *Babbitt* did not

involve the "taking" provision of section 9 of the ESA, 16 U.S.C. § 1538, which was the primary

focus of the ESA Case, it did involve section 9's "commercial activity" prohibition as well as

section 10 of the statute, 16 U.S.C. § 1539, both of which were raised by plaintiffs in the ESA

Case.  Although FEI and the government prevailed on the merits in the district court in *Babbitt*,

the case ultimately was dismissed at the appellate level because HSUS failed to satisfy the

causation and redressability requirements of Article III standing to sue.  *Humane Soc'y of the*

*U.S. v. Babbitt*, 46 F.3d 93, 100 (D.C. Cir. 1995).  In *Babbitt*, the D.C. Circuit reserved for

decision the legal issue that the appellate court ultimately decided in the ESA Case in 2003 (and

which formed the basis for plaintiff Tom Rider's theory of standing to sue herein), namely

"whether 'emotional attachment to a particular animal could form the predicate of a claim of

injury.'" *ASPCA v. Ringling Bros.*, 317 F.3d 334, 337 (D.C. Cir. 2003) (quoting *Babbitt*, 46 F.3d at 98). My representation of FEI in *Babbitt*, including my experience therein with the ESA and Article III standing issues, as well as my and the Firm's experience representing FEI in prior complex and protracted litigation, were principal reasons for FEI's retention of Fulbright to represent the Company in the ESA Case.

9.     In addition to *Babbitt*, Fulbright had institutional expertise with the ESA, including the fact that, through Reavis & McGrath, the Firm advised the Company on compliance with the statute at the time the law was enacted in 1973, participating in the process leading to the opinion letter that the Company received in 1975 from the U.S. Fish and Wildlife Service holding that FEI did not need a permit to transport its Asian elephants in interstate commerce for circus exhibition. That opinion letter, which remains a valid legal interpretation by the agency, was admitted into evidence at the trial of the ESA Case. *See* ECF No. 484-3 (Def. Ex. 5) (03/19/09).

## II.
### STAFFING OF THE ESA CASE

10.     Fulbright handled the ESA Case throughout the more than 7 ½ years of its representation with a core group of five (5) or fewer attorneys over the life of the engagement. Although the individuals changed at certain points, that team essentially was comprised of a senior partner, a junior partner, two to three associates and a senior partner advisor/consultant. As described below, that core group was augmented at three points due to the demands of the case, but the core group remained largely the same.

11.     In the initial stages of Fulbright's involvement (March 2006 through September 2006), the working team consisted of senior partner John M. Simpson, partner Lisa Zeiler Joiner, (then) senior associate Michelle C. Pardo and associate George A. Gasper, with (then) senior

partner Joseph T. Small, Jr. providing strategic legal and client relations consultation.  Mr. Small conferred and advised throughout the course of the ESA Case but did not attend hearings or depositions.  In October 2006, (then) second-year associate Kara L. Petteway joined the case.  The core Simpson/Joiner/Pardo/Gasper/Petteway working team handled the case throughout the pre-trial fact discovery and motions period, from October 2006 through March 2008.

12.     In 2006 and 2007, the core working group was augmented with associates who participated in the review and production of documents and privilege determinations in discovery sought from FEI by the plaintiffs.  Although other attorneys, paralegals and other professionals also participated in the document reviews, the three principal associates engaged in this regard were Joseph E. Hartman, Ashley E. Seuell and Sarah E. Warlick.  These additional attorneys were needed due to the demands of the document review and production process.

13.     In March, 2008, when the case entered the stage of exchanging expert reports and taking expert witness depositions, partner Lance L. Shea, who had substantial experience with expert witnesses in litigation, was asked to assist.  Mr. Shea's involvement was necessary due to the large number of expert witnesses (eight (8) for the plaintiffs and six (6) for FEI) and the complexity and novelty of the issues addressed in the various expert reports.  Mr. Shea led an expert witness team of himself and senior counsel Andre T. Hanson and attorney and special consultant Mary Fritz, both of whom also had prior experience with expert witness issues.  This team was principally responsible for the expert witness issues in expert discovery, the pre-trial preparation period, during the trial and in connection with the post-trial preparation of expert-related proposed findings of fact and conclusions of law and the post-trial arguments.  The expert witness team had no further involvement in the case after the last post-trial argument.

14.     During the trial of this case from February 4 through March 18, 2009, the Fulbright trial team in the courtroom was Mr. Simpson, Mr. Shea, Ms. Joiner, Ms. Pardo and Ms. Petteway.  Mr. Gasper left Fulbright in August 2008, well before the trial, and was not replaced. Derek Palisoul, a non-attorney litigation support specialist and independent contractor, provided computer and electronic document support during the trial and also sat at counsel's table.

15.     In 2010, after the December 30, 2009 judgment was entered by the Court in favor of FEI (ECF Nos. 558 & 559), the core group of attorneys changed when Ms. Joiner and Ms. Petteway left Fulbright and (then) first-year associate Rebecca E. Bazan joined the case.  Most of 2010 was devoted to an effort to mediate the case, and FEI was represented in that mediation by Mr. Simpson, Mr. Small and Ms. Pardo.  While another Fulbright partner, Richard C. Smith participated in the mediation, he did so only in connection with the related racketeering case, No. 07-1532-EGS/JMF (D.D.C.) ("RICO Case"), and none of his work is the subject of the instant petition.

16.     In 2011 through January 2012, when the case was briefed and argued on appeal to the D.C. Circuit, the core Simpson/Pardo/Bazan working team was augmented by two appellate lawyers, partner Jonathan S. Franklin and senior associate Mark T. Emery.  Messrs. Franklin and Emery worked on the appeal and then had no further involvement in the case after the appellate process was concluded.

17.     In December 2011, Ms. Petteway returned to Fulbright.  From that point until the present, the core working team for FEI for the ESA Case has been Mr. Simpson, Ms. Pardo, Ms. Petteway and Ms. Bazan.

18.     The Fulbright staffing described in paragraphs 11 through 17 above was comparable to, and not materially different from, the outside counsel staffing by MGC of the

ESA Case for the plaintiffs.  During the period prior to trial, much of the work on behalf of plaintiffs appeared to be performed by partners Katherine A. Meyer, Kimberly Ockene and Tanya Sanerib.  Partners Eric Glitzenstein, Howard Crystal and associate Delcianna Winders also were involved, although on a lesser scale.  Former MGC partner Jonathan Lovvorn and Professor Stephen A. Salzburg also were counsel of record for plaintiffs but generally did not enter appearances at hearings or depositions.

19.     The number of outside counsel attending depositions for plaintiffs and defendant generally was the same.  On occasion, plaintiffs' outside counsel outnumbered defendant's outside counsel and vice versa.  In some depositions, each side had one outside counsel present.  Attached hereto as Exhibit ("Ex.") 26 is a chart that I prepared that lists the appearances of outside counsel at depositions that were entered on the record of the deposition.[2]

20.     During the period prior to trial, the number of outside counsel attending status and other types of hearings in the case for plaintiffs and defendants also generally was the same.  Included in Ex. 27 hereto is a chart, prepared at my direction, that lists the appearances of outside counsel at hearings in the ESA Case that were entered on the record of the hearing.

21.     In the courtroom sitting at counsel's table during the trial, FEI had five (5) lawyers (Simpson, Joiner, Shea, Pardo and Petteway) (three partners; one senior associate; and one associate) and one (1) non-attorney technology professional (Derek Palisoul).  Plaintiffs had the same number:  five lawyers (Meyer, Glitzenstein, Crystal, Sanerib and Winders) (four partners and one associate) and one (1) non-attorney technology professional (MGC paralegal Michelle Sinnott).

22.     On appeal to the D.C. Circuit in 2011-12, six (6) lawyers entered appearances or appeared on the briefs for plaintiffs:  Ms. Meyer and Mr. Glitzenstein, as well as Carter G.

_____

[2]  The exhibits referred to herein are listed on the index at the end of the declaration.

Phillips and three (3) other attorneys from Sidley Austin LLP – Paul J. Zidlicky, Eric D. McArthur and Bryson L. Bachman. This exceeded the number of lawyers entering appearances or appearing on the briefs for FEI: Messrs. Simpson, Franklin and Emery and Ms. Pardo.

23. Simultaneously with the filing of plaintiffs' opposition to FEI's motion for entitlement to attorneys' fees in June 2012, attorneys Meyer, Glitzenstein, Crystal, Lovvorn and Ockene withdrew their appearances for plaintiffs. ECF No. 601. Since then, plaintiffs (and the former plaintiff American Society for the Prevention of Cruelty to Animals ("ASPCA")) have each retained their own, separate counsel and collectively have been represented by fifteen (15) attorneys who have entered appearances in this case: Daniel S. Ruzumna (ASPCA), Jonathan Hatch (ASPCA), Paul Bauer (ASPCA), Harry S. Clarke (ASPCA), Peter W. Tomlinson (ASPCA), Bernard J. DiMuro (Animal Welfare Institute ("AWI")), Hillary J. Collyer (AWI), Stephen L. Neal, Jr. (AWI), Andrea Moseley (AWI), Logan D. Smith (The Fund For Animals ("FFA")), Roger E. Zuckerman (FFA), Andrew Caridas (FFA), Matthew G. Kaiser (Rider) and David H. Dickieson (Animal Protection Institute, now known as Born Free USA ("API")). An additional lawyer, Stephen L. Braga (who represented three of the original plaintiffs in the ESA Case (Performing Animal Welfare Society ("PAWS") Pat Derby and Ed Stewart, No. 00-1641, ECF No. 16), now represents Ms. Meyer and MGC with respect to the sanction entered against them. This is three (3) times the number of lawyers representing FEI in this case (4-5 lawyers) during the period since the appellate remand.

24. Attached hereto as Ex. 3 is a true and accurate copy of a Microsoft Excel spreadsheet, prepared at my direction by Fulbright accounting personnel that reflects data extracted from the Firm's accounting database pertaining to the ESA Case.[3] Ranked in descending order by the number of hours billed to the ESA Case, this exhibit lists each of the

---

[3] *See* paragraphs 183-197, *infra*, which explain the Fulbright accounting/timekeeping system.

107 Fulbright timekeepers who recorded time worked on the ESA Case during the period from December 1, 2005 through March 31, 2013. For each such timekeeper, this exhibits states the person's position with Fulbright, current employment status, the number of hours that the person recorded as worked, the value of the worked time, the number of the hours that Fulbright billed to FEI and the value of the hours that Fulbright billed to FEI and that FEI paid for. As this exhibit shows, during the period from December 1, 2005 through March 31, 2013, Fulbright timekeepers recorded 49,250.45 hours worked on the ESA Case at a recorded value of $21,084,747.75. *See* Ex. 3 hereto at 4. Of the hours recorded as worked during that period, 46,573.09 hours were billed to FEI at a value of $19,612,183.21. *Id.*

25.    Attached hereto as Ex. 2 is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared based upon the data that is reflected on Ex. 3, discussed in paragraph 24 above. The first page of Ex. 2 lists the Ex. 3 data for the core working team on the ESA Case (Simpson, Pardo, Joiner, Petteway, Gasper, Small and Bazan). As this exhibit shows, during the period from December 1, 2005 through March 31, 2013, this core working team (seven (7) lawyers total) worked **64.40 percent** of the total hours recorded as worked on the ESA Case, which represents **71.29 percent** of the recorded value of the total hours worked. *See* Ex. 2 hereto at 1. That same core seven (7) lawyer working team worked **66.84 percent** of the total hours that were billed by Fulbright to FEI on the ESA Case, which represents **72.75 percent** of the total amount that was billed by Fulbright to FEI. *Id.*

26.    Page 2 of Ex. 3 extracts the same data that is reflected on Ex. 2, discussed in paragraph 24 above, for the core working team on the ESA Case (Simpson, Pardo, Joiner, Petteway, Gasper, Small and Bazan) as augmented by (i) the pre-trial discovery document review team described in paragraph 12 (Hartman, Seuell and Warlick); (ii) the expert witness

team described in paragraph 13 (Shea, Hanson and Fritz); and (iii) the appellate team described in paragraph 16 (Franklin and Emery).  As this exhibit shows, during the period from December 1, 2005 through March 31, 2013, the core working team, as augmented (fifteen (15) lawyers total) worked **81.09 percent** of the total hours recorded as worked on the ESA Case, which represents **96.76 percent** of the recorded value of the total hours worked.  *See* Ex. 2 hereto at 2. That same fifteen (15) lawyer group worked **84.18 percent** of the total hours that were billed by Fulbright to FEI on the ESA Case, which represents **98.24 percent** of the total amount that was billed by Fulbright to FEI.  *Id.*

## III.

### QUALIFICATIONS AND GENERAL RESPONSIBILITIES OF THE FULBRIGHT ATTORNEYS WHOSE HOURS AND FEES ARE BEING CLAIMED BY FEI IN THIS CASE

27.     Paragraphs 28 through 111 below describe the qualifications and respective duties and tasks of the twenty-five (25) lawyers and four (4) non-attorney professionals who worked on the ESA Case between December 1, 2005 and March 31, 2013 and whose work is the basis for the instant petition.  The descriptions proceed generally by class year and job title and are based upon my personal knowledge, the timekeeping, employment and other records of the Firm and other reliable, publicly available materials which are indicated.[4]   The complete, day-to-day details of the work of these timekeepers in the ESA Case from December 1, 2005 through March 31, 2013, are set forth in the Firm time records and client invoices which are attached hereto as Exs. 31 & 32, and which are identified and explained in paragraphs 192-197 below.

### *John M. Simpson*

28.     I attended the Columbia University School of Law and graduated with a J.D. degree in 1978.  While at Columbia, I was a Harlan Fiske Stone Scholar and Articles Editor for

---

[4]   The experience, specific areas of expertise, and other credentials of these individuals are described in greater detail in their biographies, true and accurate copies of which are attached hereto as Exhibit 28, which is a compilation of the biographies of the attorneys referenced in this declaration, where available.

the *Columbia Journal of Transnational Law*. As an undergraduate, I attended Harvard College and graduated *cum laude* with an A.B. degree in American History in 1972.

29.     I am a member of the Bars of the District of Columbia (admitted in 1979) and the State of North Carolina (admitted in 1988). I was admitted to the Bar of this Court and the Bar of the U.S. Court of Appeals for the District of Columbia Circuit in 1979. I also am a member of the Bars of the Supreme Court of the United States and various other federal circuit, appellate and district courts.

30.     I became employed as an associate with Fulbright in 1978 and became a partner in 1986. I have spent the entirety of my legal career as a civil litigator with Fulbright in the Firm's Washington, D.C. office and have served as the partner in charge of the Washington Office litigation group. My practice, which has spanned more than thirty-five (35) years, has concentrated on complex litigation in federal court, principally on the defense side. Many of the cases that I have handled or participated in have been significant, high stakes and sometimes "bet the company" matters for the clients involved. Many of these cases also have had a significant federal regulatory component. I have been the lead or first-chair attorney in complex jury and bench trials in federal and state court, including jury and bench trials in this Court. I also have argued seventeen (17) appeals in federal and state appellate courts, including six (6) such arguments before the D.C. Circuit and have participated in the briefing of thirty-two (32) other appeals.

31.     As the partner in charge of the litigation and lead counsel of record for FEI in the ESA Case, I was responsible for developing the overall litigation strategy for the client; staffing the litigation; supervising the work of the Fulbright lawyers on the case and communicating with the client on all strategic and tactical decisions. I also have had responsibility for billing the file

for this case. I either wrote or reviewed (and revised and/or commented upon) every filing that Fulbright made in the ESA Case.

32.     Specifically, some of the major tasks that I performed in the ESA Case were (a) preparing FEI's motion for summary judgment, brief, reply and all attachments as well as FEI's motion for reconsideration on certain summary judgment points (ECF Nos. 82, 100, 183); (b) taking the depositions of Tom Rider; (b) preparing for and defending as lead counsel FEI witnesses in deposition (Kenneth Feld, James Andacht, Jerome Sowalsky and Daniel Raffo); (c) lead counsel in the November 2007 Rule 34 inspections by plaintiffs of the Asian elephants at issue; (d) lead counsel in the 2008 evidentiary hearing and cross-examination of Lisa Weisberg of ASPCA in that hearing; (e) preparation of FEI's pre-trial proposed findings of fact and conclusions of law (ECF Nos. 342, 391); (f) lead counsel for FEI at trial, including the opening statement, FEI's Rule 52(c) motion and argument at the close of plaintiffs' evidence, and the two final arguments; cross-examining Michelle Sinnott and Tom Rider; handling the adverse direct examination of Lisa Weisberg of ASPCA; handling the direct and redirect examinations of FEI witnesses Kenneth Feld, Daniel Raffo and Jerome Sowalsky; and writing the two briefs ordered by the Court during trial on the regulatory framework and organizational standing (ECF Nos. 417, 432); (g) preparation of designations and cross-designations of deposition transcripts for trial; (h) preparation of FEI's, and FEI's responses to, plaintiffs' post-trial proposed findings of fact and conclusions of law related to Tom Rider and standing (ECF Nos. 535, 540); (i) lead counsel for FEI during the 2010 mediation and preparation of the papers submitted to the mediator; (j) lead counsel in the 2011-12 D.C. Circuit appeal, including writing the factual and Tom Rider-related parts of the briefs and arguing the appeal for FEI; and (k) lead counsel in negotiating and concluding the $9.3 million settlement with ASPCA in 2012 (ECF No. 608).

### *Joseph T. Small, Jr.*

33.     Joseph T. Small, Jr. received his J.D. from the University of Virginia in 1975. He received a B.A., *summa cum laude*, in Philosophy and Latin from Washington & Lee University in 1969 where he was a member of Phi Beta Kappa. Following law school, Mr. Small clerked for the Hon. Samuel Conti of the United States District Court for the Northern District of California. Mr. Small is admitted to the Bars of the District of Columbia and Virginia and the Bar of this Court.

34.     Mr. Small was employed as an associate by Fulbright in 1977 and became a partner in the Firm in 1983. Mr. Small practiced in the litigation group of Fulbright's Washington, D.C., office where his practice focused on white collar criminal defense and investigations and complex federal court litigation. Mr. Small was involved in several high-profile white-collar criminal investigations and trials, including representation of individuals in the Iran-Contra and Bill Clinton/Monica Lewinsky matters. Mr. Small also has appeared as lead counsel for FEI in cases that have been tried or litigated in the District of Columbia Federal District Court and Superior Court. Mr. Small was the Partner-in-Charge of Fulbright's Washington office and a member of the Firm's Policy Committee. Mr. Small became a retired partner in 2013 and served as the Firm's interim Executive Director and currently is of counsel to the Firm.

35.     Mr. Small had significant prior experience with complex litigation involving FEI, including two (2) protracted matters that were ultimately resolved short of trial. Because of his prior experience with FEI litigation and the significance to the Company of the ESA Case, Mr. Small was asked by the client to serve as an additional resource to the handling attorneys and, in effect, as a "second set of eyes" with respect to significant strategic decisions and briefing. Mr. Small participated in the transition of the case from Covington to Fulbright. For a substantial

period of the time covered by the litigation, Mr. Small served as an interface with Richard A.

Palmer, a partner in Fulbright's New York, New York office who was the Company's

longstanding primary corporate advisor and the Firm's relationship partner with FEI. Mr.

Palmer was not a litigator, and Mr. Small provided him with updates and insight on the course of

the litigation. Mr. Small also participated directly in the mediation of the ESA Case in 2010.

### *Lance L. Shea*

36.     Lance L. Shea received his J.D., *magna cum laude*, from the University of San

Diego School of Law in 1989, where he was Editor-in-Chief of the *San Diego Law Review*. He

received a B.S., with distinction, in Health Sciences from Arizona State University in 1982 and

an M.S. in Health Science from Arizona State University in 1986. Mr. Shea is admitted to the

Bars of the District of Columbia, Texas and Arizona and to the Bar of this Court.

37.     Mr. Shea was employed as an associate by Fulbright in 1995 and became a

partner in the Firm in 2000. Mr. Shea practiced in the litigation groups of Fulbright's Houston,

Texas, and Washington, D.C., offices where his practice focused on pharmaceutical, health care

and environmental litigation, with emphasis on the issues associated with expert witnesses in

litigation. Mr. Shea has had experience in expert witness issues in connection with multi-district

litigation involving pharmaceutical claims. Mr. Shea left Fulbright in 2013 and currently is a

partner at Baker Hostetler in Washington, D.C. Mr. Shea also currently is an adjunct professor

of scientific evidence at the University of Maryland Francis King Carey School of Law.

38.     Mr. Shea led and supervised the work of the lawyers on the team that handled the

expert witness issues in the case. Specifically, some of the major tasks that Mr. Shea performed

in the ESA Case were (a) organizing the review of, and devising the strategy for responding to,

the reports of plaintiffs' expert witnesses; (b) taking the depositions of plaintiffs' expert

witnesses (Carol Buckley, Philip Ensley, Ben Hart, Colleen Kinzley, Gail Laule, Joyce Poole and

Ros Clubb); (c) overseeing the preparation of FEI expert Dennis Schmitt's report; (d) preparing

and defending as lead counsel Dr. Schmitt's deposition; (e) devising FEI's objections (ECF No.

371) to plaintiffs' evidence under *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579 (1993),

and its progeny ("*Daubert*") and consulting on FEI's strategy for responding to plaintiffs'

*Daubert* objections; (f) at trial as a member of the trial team, handling the cross-examinations of

plaintiffs' experts Joyce Poole, Ben Hart, Ros Clubb, Gaile Laule, Colleen Kinzley and Philip

Ensley and the direct and redirect examinations of FEI expert Dennis Schmitt; (g) preparing for

the *Daubert* admissibility arguments that the Court indicated in the Final Pretrial Order would be

considered during or after trial (ECF No. 373, ¶ 6); and (h) overseeing the preparation of FEI's,

and FEI's responses to plaintiffs', expert-specific post-trial proposed findings of fact and

conclusions of law (ECF Nos. 535, 540).

### Jonathan S. Franklin

39.     Jonathan S. Franklin received his J.D. from Yale Law School in 1990.  He

received an A.B. from Harvard College in 1986.  Mr. Franklin is admitted to the Bars of the

District of Columbia, the Supreme Court of the United States, the D.C. Circuit and all of the ten

(10) other federal circuit courts of appeals.

40.     Mr. Franklin became a partner in Fulbright in 2006, after having been a partner at

Hogan & Hartson (now Hogan Lovells, U.S. LLP) in Washington, D.C.  Mr. Franklin is the

partner in charge of the Firm's Supreme Court and appellate practices.  Mr. Franklin is a well-

recognized Supreme Court advocate.  He has argued seven (7) cases before the Supreme Court of

the United States, has served as counsel on the merits of fifteen (15) other Supreme Court cases

and has represented numerous clients in connection with petitions for *certiorari*.  Mr. Franklin

has also argued and handled numerous cases before the federal circuit courts of appeals,

including the D.C. Circuit.

41.     As a lawyer who focuses on appeals, Mr. Franklin's sole involvement in the ESA Case was when it was on appeal to the D.C. Circuit in 2010 through January 2012. Mr. Franklin participated in the drafting and submission of all of the briefs that FEI submitted to the Court of Appeals and had the primary responsibility for the formulation and preparation of the briefing on the organizational standing issues raised by plaintiffs. Mr. Franklin also participated in the formulation of appellate strategy and consulted on matters of appellate procedure and in connection with preparation of the oral argument given by Mr. Simpson who had extensive knowledge of the protracted underlying facts and record of the case.

### *Lisa Zeiler Joiner*

42.     Lisa Zeiler Joiner received her J.D. from the University of Denver College of Law in 1996, where she was a member of the Order of St. Ives and General Editor of the *Denver University Law Review*. She received her B.A., with High Distinction, in German and Economics from the University of Nebraska in 1992 where she was a member of Phi Beta Kappa. Prior to law school, Ms. Joiner studied at the University of Bonn, Germany, as a Fulbright Scholar. Ms. Joiner is admitted to the Bars of the District of Columbia and Colorado and the Bars of this Court and the D.C. Circuit and as corporate counsel in Virginia.

43.     Ms. Joiner was employed by Fulbright as an associate in 1999 and became a partner in the Firm in 2006. Ms. Joiner was a member of the litigation group of Fulbright's Washington, D.C., office where her practice focused on complex civil litigation in federal and state court. Ms. Joiner left Fulbright in 2010 and currently is the Senior Vice President and General Counsel of FEI.

44.     From the inception of the engagement until her departure from Fulbright in 2010, Ms. Joiner served as the second partner in charge of the ESA Case. Ms. Joiner participated heavily in all phases of the litigation. Specifically, some of the major tasks that Ms. Joiner

performed in the ESA Case were (a) leading the effort in pre-trial discovery to respond to the incoming discovery requests from plaintiffs, including gathering, organizing, reviewing and producing documents responsive to the plaintiffs' requests and plaintiffs' discovery "deficiency" letters as well as the orders issued by the Court (*e.g.*, ECF No. 98); (b) leading and participating in the briefing and research necessary to respond to the 2006 discovery motions filed by plaintiffs, including the motion to enforce the 09/26/05 order and the motion to inspect the Asian elephants at issue (ECF Nos. 70, 150); (c) coordinating the Rule 34 elephant inspections; (d) writing or reviewing the pre-trial motions and briefs; (e) handling hearings and status conferences with the Court; (f) taking the fact discovery depositions of Archele Hundley, Nicole Paquette (Rule 30(b)(6) deponent of API), Gerald Ramos, Margaret Tom and Robert Tom; (g) taking the trial deposition of Sasha Houcke; (h) preparing for and defending as lead counsel FEI witnesses in deposition (Brian French, Gary Jacobson (Rule 30(b)(6) deponent for FEI as well as un-retained expert witness for FEI), Troy Metzler, and Geoffrey Pettigrew) and former FEI employee Carrie Coleman; (i) handling FEI's objections to plaintiffs' third-party subpoenas to six (6) separate railroad companies; (j) overseeing the preparation of expert reports by Kari Johnson, Gary Johnson, Mike Keele and Ted Friend; (k) preparing for and defending as lead counsel for FEI the expert witness depositions of Gary Johnson, Kari Johnson, Mike Keele and Ted Friend; (l) in the 2008 evidentiary hearing, cross-examining Nicole Paquette of API, Cathy Liss of AWI and Tracy Silverman of AWI; (m) leading the effort to respond to plaintiffs' various 2008 discovery-related motions (*e.g.*, ECF Nos. 263, 271, 274 & 296); (n) managing the work of local counsel (Troutman Sanders, LLP and Hughes Hubbard) retained to assist with the PETA third party subpoena and resulting document production and the foreign (in France) deposition of Sasha Houcke, respectively; (o) leading the effort required to prepare and submit FEI's pre-trial

submissions, including the Rule 26(a)(3) pre-trial disclosures (ECF No. 318), the original and amended pre-trial statements (ECF Nos. 342 & 391), FEI's motion in limine (ECF No. 345) and FEI's responses to plaintiffs' motions in limine (ECF Nos. 354 & 356) and the pre-trial brief (ECF No. 362); (p) at trial, cross-examining Archele Hundley, Carol Buckley and Nicole Paquette and handling the direct and re-direct examinations of Gary Jacobson, Carrie Coleman, Ted Friend, Mike Keele and Troy Metzler; (q) preparation of designations and cross-designations of deposition transcripts for trial; (r) leading the effort post-trial to prepare FEI's post-trial brief and response to plaintiffs' post-trial brief (ECF Nos. 536, 541); and (s) participating in the preparation of FEI's proposed findings of fact and conclusions of law and responding to the like documents submitted by plaintiffs (ECF Nos. 535, 540).

### *Michelle C. Pardo*

45.     Michelle C. Pardo received her J.D., *magna cum laude*, from Catholic University, Columbus School of Law, in 1997, where she was Note and Comment Editor of the *Catholic University Law Review*. She received her B.A., *cum laude*, from Loyola College in 1992. Ms. Pardo is admitted to the Bars of the District of Columbia and Maryland and the Bars of this Court and the D.C. Circuit.

46.     Ms. Pardo was employed by Fulbright as an associate in 1997 and became a partner in the Firm in 2010. Ms. Pardo currently practices in the litigation group of Fulbright's Washington, D.C., office where her practice focuses on general civil litigation at the trial and appellate levels. Ms. Pardo has participated in high-profile matters in federal district court, including a jury trial and multi-district court pharmaceutical litigation. Ms. Pardo's experience also includes serving, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, during which she handled an appellate matter and argument in the D.C. Court of Appeals.

47.     Ms. Pardo has participated heavily in all phases of the ESA Case from the inception of the engagement until the present, first in the capacity as the principal senior associate and then as the second partner in charge of the litigation since 2010.  Specifically, some of the major tasks that Ms. Pardo performed in the ESA Case are (a) primary responsibility in responding to the incoming discovery requests from plaintiffs, including gathering, organizing, reviewing and producing documents responsive to the plaintiffs' requests and plaintiffs' discovery "deficiency" letters as well as the orders issued by the Court (*e.g.*, ECF No. 98); (b) reviewing and responding to plaintiffs' requests concerning their multi-month, on site videotape review conducted at Fulbright's offices; (c) review and determination of material appropriately covered by protective order; managing document review teams; (d) participating in the briefing and research necessary to respond to the 2006 discovery motions filed by plaintiffs, including the motion to enforce the 09/26/05 order and the motion to inspect the Asian elephants at issue (ECF Nos. 70, 150); (e) supplementing FEI's discovery responses; (f) handling privilege log and privilege determination, including in camera submission of privileged materials (ECF No. 238); (g) assisting in the preparation of multiple fact witnesses for deposition and related witness documents; (h) preparing for and defending as lead counsel FEI witnesses in deposition (Joe Frisco, Robert Ridley and Alex Vargas); (i) participation in the preparation of FEI's pre-trial submissions, including the Rule 26(a)(3) pre-trial disclosures (ECF No. 318), the original and amended pre-trial statements (ECF Nos. 342 & 391), FEI's motion in limine (ECF No. 345) and FEI's responses to plaintiffs' motions in limine (ECF Nos. 354 & 356), the pre-trial brief (ECF No. 362); (j) reviewing and analyzing video tape footage for trial exhibits, for use in FEI's case in chief and for impeachment and rebuttal purposes; (k) reviewing and analyzing evidentiary challenges to USDA documents obtained by plaintiffs pursuant to a related lawsuit, No. 05-

00840-EGS (D.D.C.), and negotiating the production of unredacted copies of those documents; (l) preparation for cross-examination of plaintiffs' designated fact witnesses and direct examination of FEI's witnesses; (m) at trial, cross-examining Lanette Williams Durham and Joseph Patrick Cuviello, presenting the testimony of Frank Hagan by deposition, handling the direct and re-direct examinations of FEI expert witnesses Kari Johnson and Gary Johnson and fact witness Brian French, and handling the main evidentiary argument on plaintiffs' exhibits at the close of plaintiffs' case; (n) preparation of designations and cross-designations of deposition transcripts for trial; (o) serving as FEI's spokesperson with the media about the trial; (p) participating in the preparation of FEI's proposed findings of fact and conclusions of law and responding to the like documents submitted by plaintiffs (ECF Nos. 535, 540); (q) representing FEI in the 2010 mediation; (r) participating in the briefing and appellate strategy in the 2011-12 D.C. Circuit appeal; (s) participating in the $9.3 million settlement with ASPCA, including preparation, finalization, execution and implementation of the settlement documents; (t) supervising the research and drafting required for the briefing on FEI's motion for entitlement to attorneys' fees (ECF No. 593); and (u) supervising the research and drafting of documents required in connection with collecting the costs awarded in 2013 pursuant to FEI's Bill of Costs. *See* ECF No. 613.

### *Julie A. Hardin*

48.     Julie A. Hardin received her J.D., with honors, from the University of Texas School of Law in 1999.   She received her B.S., *magna cum laude*, in Political Science and Philosophy from Texas Christian University in 1995.  Ms. Hardin is admitted to the Texas State Bar and to the Bars of various federal circuit and district courts.

49.     Ms. Hardin was employed by Fulbright as an associate in 2000 and became a partner in the Firm in 2009. At Fulbright, Ms. Hardin's practice focused on complex litigation in

federal and state court. Ms. Hardin left Fulbright in 2013 and currently is a partner at Reed Smith LLP in Houston, Texas.

50. In order to assist the FEI trial team meet the various deadlines in the pre-trial schedule, Ms. Hardin assumed primary responsibility for the preparation of FEI's pre-trial brief. ECF No. 362. In 2008, she participated in the drafting of the FEI pre-trial brief and supervised the research, drafting and the work of other attorneys who worked on that brief. Ms. Hardin also participated in the research and preparation of the arguments that FEI made in its *Daubert* and related objections to plaintiffs' expert witnesses (ECF No. 371) and assisted in the preparation and development of the *Daubert* arguments on behalf of FEI that the Court indicated in the Final Pretrial Order would be considered during or after trial. ECF No. 373, ¶ 6. In 2009, during the trial, Ms. Hardin assisted with the development of the *Daubert* issues and preparation for the presentation of same; performed research and analysis with respect to plaintiffs' attempt to limit the testimony of FEI expert Dennis Schmitt (ECF No. 470); and assumed principal responsibility for the research, drafting and other preparation necessary for FEI's post-trial brief and FEI's response to plaintiffs' post-trial brief (ECF Nos. 536, 541).

### *Andre T. Hanson*

51. Andre T. Hanson received his J.D., *magna cum laude*, from the University of Minnesota Law School in 1995 where he was a member of the Order of the Coif and Articles Editor of the *Minnesota Law Review*. He received a B.S. in Psychology/Philosophy from the University of Wisconsin, River Falls, in 1984. Following law school, Mr. Hanson clerked for the Hon. Frank Magill of the United States Court of Appeals for the Eighth Circuit. Mr. Hanson is admitted to the Minnesota State Bar and to the Bars of various federal circuit and district courts.

52.     Mr. Hanson was employed by Fulbright in 2004 as a senior associate.   Mr. Hanson currently is senior counsel in Fulbright's Minneapolis, Minnesota office.   Mr. Hanson's practice focuses on false advertising, products liability and litigation.

53.     Because of his prior experience with expert witness issues, Mr. Hanson was assigned to the team tasked with handling the expert witness issues during the ESA Case.   In 2008, he conducted research on plaintiffs' experts' prior cases; conducted legal research as to the admissibility of the evidence in plaintiffs' expert reports as well as the admissibility of the reports themselves as direct testimony; reviewed plaintiffs' experts' reports and prior writings and prepared deposition outlines; analyzed the expert deposition testimony to develop cross-examination questions for trial; and drafted expert-specific *Daubert* motions to present the admissibility arguments that the Court indicated in the Final Pretrial Order would be considered during or after trial.   ECF No. 373, ¶ 6.   In 2009 during the trial, Mr. Hanson continued his *Daubert*-related motions and hearing preparation and research; assisted with the preparation of FEI expert witness Schmitt for cross-examination; reviewed the trial transcripts to incorporate evidentiary citations into working drafts of FEI's proposed findings of fact (ECF No. 535); continued that task post-trial as to expert-related proposed findings; and analyzed and participated in preparing responses to plaintiffs' expert-related proposed findings of fact (ECF No. 540).

### *Joseph E. Hartman*

54.     Joseph E. Hartman received his J.D. from the University of Chicago Law School in 1999.   He received a B.A. from the University of Virginia in 1996.   Mr. Hartman is admitted to the Bars of the District of Columbia and Virginia, the Bar of this Court and the D.C. Circuit and the Bars of various other federal appellate and district courts.

55.     Mr. Hartman was employed by Fulbright in 1999 as an associate in the litigation group of Fulbright's Washington, D.C., office where his practice focused on civil litigation, antitrust and competition and white collar crime.   While at Fulbright, Mr. Hartman served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court.   Mr. Hartman left Fulbright in 2008 and currently is in private practice in Arlington, Virginia.

56.     Mr. Hartman performed specifically assigned, discrete legal tasks in the ESA Case.   Mr. Hartman was one of three (3) associates (along with Ms. Seuell and Ms. Warlick) who were regularly engaged in the review of documents for production to plaintiffs in pre-trial discovery.   In 2006, Mr. Hartman reviewed documents and videotapes for production to plaintiffs in discovery, including redactions and privilege review; he had responsibility for the preparation of FEI's log of privileged documents; and he researched and principally drafted FEI's motion to compel deposition testimony from plaintiff Tom Rider (ECF No. 101).   In 2007, Mr. Hartman continued working on the privilege log and conducted legal research pertinent to issues raised by FEI's third-party subpoena for documents to People for the Ethical Treatment of Animals ("PETA").

### Kristin L. McGovern

57.     Kristin L. McGovern received her J.D., with honors, from the George Washington University Law School in 2000.   She received her B.A., with high honors, from Bates College in 1993.  Ms. McGovern is admitted to the Bars of the District of Columbia and Maryland.

58.     Ms. McGovern was employed by Fulbright in 2000 as an associate in the litigation group of Fulbright's Washington, D.C., office where her practice focused on complex federal court litigation and antitrust.   While at Fulbright, Ms. McGovern served, on a voluntary

basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Ms. McGovern left Fulbright in 2010 and currently is employed by the Federal National Mortgage Association ("Fannie Mae") as Director of Government Relations.

59. Ms. McGovern performed specifically assigned, discrete legal tasks in the ESA Case. In 2006, she assisted with the review, coding and redaction of documents responsive to plaintiffs' document requests that were produced by FEI to the plaintiffs, and she reviewed and analyzed discovery documents in connection with the preparation of FEI fact witnesses for depositions. In 2009, Ms. McGovern conducted legal research and wrote memoranda as to evidentiary issues that arose during the trial with respect to the admissibility of certain trial exhibits.

### *Tillman J. Breckenridge*

60. Tillman J. Breckenridge received his J.D. from the University of Virginia School of Law in 2001. He received a B.A. in Psychology from the University of Virginia in 1998. Mr. Breckenridge is admitted to the Bars of the District of Columbia, California, Illinois and Virginia, the Supreme Court of the United States, the D.C. Circuit and various other federal circuit courts of appeals.

61. Mr. Breckenridge was employed by Fulbright in 2007 as an associate in the litigation group of Fulbright's Washington, D.C., office where his practice focused on appeals. Mr. Breckenridge left Fulbright in 2011 and currently is counsel at Reed Smith LLP in Washington, D.C.

62. In 2008, Mr. Breckenridge was assigned the specific task of reviewing the entire legislative history of the ESA and the amendments to the statute with respect to the arguments

that plaintiffs and FEI likely would make at trial with respect to the "taking" provision of the ESA. He wrote a memorandum memorializing the results of his review and analysis.

### *George A. Gasper*

63.     George A. Gasper received his J.D. from Georgetown University Law Center in 2003. He received a B.S. in Management and Marketing from Villanova University in 1999. Mr. Gasper is admitted to the Bars of the District of Columbia and Indiana and to the Bar of this Court.

64.     Mr. Gasper was employed by Fulbright in 2003 as an associate in the litigation group of Fulbright's Washington, D.C., office where his practice focused on complex federal court litigation and antitrust.   While at Fulbright, Mr. Gasper served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Mr. Gasper left Fulbright in 2008 and currently is a partner at Ice Miller LLP in Indianapolis, Indiana.

65.     Mr. Gasper participated heavily in most aspects of the ESA Case from the inception of the engagement until his departure from Fulbright in August 2008. Specifically, some of the major tasks that Mr. Gasper performed in the ESA Case were (a) principal responsibility for FEI's discovery against the plaintiffs, including legal and factual analysis underlying the motions to compel discovery against plaintiff Rider and the organizational plaintiffs and accompanying exhibits and briefing (ECF Nos. 126, 144, 149, 159); (b) principal responsibility for the third-party subpoenas against the Wildlife Advocacy Project ("WAP") and HSUS and the separate motions to compel against those entities (ECF Nos. 85, 192); (c) principal responsibility for the third-party subpoena against MGC; (d) principal responsibility for the factual investigation, legal analysis and research and drafting of the pleading and briefing in

28

connection with FEI's proposed counterclaim and FEI's response to the Rule 11 motion filed by plaintiffs in response (ECF Nos. 121, 137, 142, 165); (e) taking the depositions of D'Arcy Kemnitz and Eric Glitzenstein (Rule 30(b)(6) witness for WAP); (f) principal responsibility for handling the separate lawsuit necessary to enforce a third-party subpoena against PETA, appearing as counsel for FEI in the hearings before the U.S. District Court for the Eastern District of Virginia, *Feld Ent., Inc., v. PETA*, No. 2:08:mc04 (E.D.Va.); (g) in connection with the 2008 evidentiary hearing, preparation of the motions leading to the hearing (ECF Nos. 223, 247), cross-examining D'Arcy Kemnitz, Michael Markarian of FFA, Michelle Sinnott and Leslie Mink at the hearing, and preparation of the post-hearing proposed findings of fact (ECF No. 307); and (h) participating in the research and briefing as to plaintiffs' various 2008 discovery-related motions *(e.g.*, ECF Nos. 263, 271, 274 & 296).

### *Rena S. Scheinkman*

66.     Rena S. Scheinkman received her J.D., *summa cum laude*, from American University, Washington, College of Law, in 2003, where she was a member of the *American University Law Review*. She received a B.A., with honors, in Environmental Studies, from Washington University in 1997. Ms. Scheinkman is admitted to the Bar of the District of Columbia and Maryland and the Bar of this Court.

67.     Ms. Scheinkman was employed by Fulbright in 2003 as an associate in the litigation group of Fulbright's Washington, D.C., office where her practice focused on complex federal court litigation and antitrust. While at Fulbright, Ms. Scheinkman served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Ms. Scheinkman left

Fulbright in 2010 and currently is employed in the Executive Office for Immigration Review in the U.S. Department of Justice.

68.     Ms. Scheinkman performed specifically assigned, discrete legal tasks in the ESA Case. In 2006, she reviewed, analyzed and coded FEI documents and video tapes for production in discovery to plaintiffs. In 2008, Ms. Scheinkman conducted legal research and wrote a memorandum concerning the best evidence rule and other issues as to the admissibility of the video tape evidence that plaintiffs had listed on their pre-trial exhibit list.

### *Ashley E. Seuell*

69.     Ashley E. Seuell received her J.D., *summa cum laude*, from the University of Alabama School of Law in 2003. She received a B.A., *summa cum laude*, in English from Auburn University in 2000. Following law school, Ms. Seuell clerked for the Hon. Edward Carnes of the United States Court of Appeals for the Eleventh Circuit. Ms. Seuell is admitted to the Bars of the District of Columbia and Alabama and the Bar of this Court.

70.     Ms. Seuell was employed by Fulbright in 2004 as an associate in the litigation group of the Firm's Washington, D.C., office. Ms. Seuell's practice focused on civil litigation. While at Fulbright, Ms. Seuell served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Ms. Seuell left Fulbright in 2010.

71.     Ms. Seuell performed specifically assigned, discrete legal tasks in the ESA Case. Ms. Seuell was one of three (3) associates (along with Ms. Warlick and Mr. Hartman) who were regularly engaged in the review of documents for production to plaintiffs in pre-trial discovery. In 2006-07, Ms. Seuell reviewed, analyzed, redacted and coded FEI documents for production and privilege designation; performed second-level review of documents reviewed by other

attorneys; reviewed and analyzed the elephant-related video tapes requested by plaintiffs; and performed legal research on discovery issues and on issues in FEI's summary judgment reply (ECF No. 100). In 2009, during the trial, Ms. Seuell reviewed the trial transcripts and prepared indexed lists of exhibits marked and admitted in the plaintiffs' and defendant's respective cases in chief; conducted legal research on certain evidentiary issues; and participated in the preparation of filings with the Court regarding same (*e.g.*, ECF No. 429). In 2010, Ms. Seuell performed legal analysis and research with respect to issues likely to be encountered by FEI on appeal.

### Sarah E. Warlick

72.     Sarah E. Warlick received her J.D., *cum laude*, from Georgetown University Law Center in 2004 where she was a member of the *Georgetown Immigration Law Journal*. She received an A.B., *cum laude*, in Honors Government from Dartmouth College in 2001. Ms. Warlick is admitted to the Bars of the District of Columbia and New York.

73.     Ms. Warlick was employed by Fulbright in 2004 as an associate in the litigation group of Fulbright's Washington, D.C., office. Her practice focused on civil litigation. While at Fulbright, Ms. Warlick served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Ms. Warlick left Fulbright in 2008 and currently is an associate at Arnold & Porter LLP in Washington, D.C.

74.     Ms. Warlick performed specifically assigned, discrete legal tasks in the ESA Case. Ms. Warlick was one of three (3) associates (along with Ms. Seuell and Mr. Hartman) who were regularly engaged in the review of documents for production to plaintiffs in pre-trial discovery. In 2007, Ms. Warlick reviewed, analyzed, redacted and coded FEI documents for

production and privilege designation; performed second-level review of documents reviewed by other attorneys; reviewed and analyzed the elephant-related video tapes requested by plaintiffs; and performed legal research on discovery issues and plaintiffs' "pattern and practice" theory. In 2007-08, Ms. Warlick participated in the responses to plaintiffs' numerous discovery "deficiency" letters; reviewed and analyzed FEI documents for production; assembled documents for the preparation of FEI personnel for depositions; assembled video tape evidence for transmission to defense experts; and reviewed and analyzed video tapes produced by plaintiffs.

### *Shameka L. Gainey*

75.     Shameka L. Gainey received her J.D. from Cornell Law School in 2004, where she was a Note Editor for the *Cornell Journal of Law and Public Policy*. She received her B.A., with General Honors, in History from the University of Miami in 2001. Following law school, Ms. Gainey clerked for the Hon. Eric T. Washington, Chief Judge of the District of Columbia Court of Appeals. Ms. Gainey is admitted to the Bars of the District of Columbia and New York and the Bar of this Court.

76.     Ms. Gainey was employed by Fulbright in 2005 as an associate in the litigation group of Fulbright's Washington, D.C., office. Her practice focused on civil litigation. While at Fulbright, Ms. Gainey served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court. Ms. Gainey left Fulbright in 2010 and currently is employed as an attorney by the Federal Trade Commission in Washington, D.C.

77.     Ms. Gainey performed specifically assigned, discrete legal tasks in the ESA Case. In 2006, she conducted legal research for certain of the issues in FEI's motion for summary

judgment (ECF No. 82); she conducted document review and coding with respect to FEI's supplemental document productions and in preparation for depositions of FEI personnel by plaintiffs; and participated in the preparation of supplemental interrogatory answers. In 2007, Ms. Gainey worked on FEI's log of privileged documents; conducted legal research on protective order and other discovery issues; and participated in the legal research for and preparation of FEI's motion to enforce court order (ECF No. 152). In 2008, she reviewed and analyzed plaintiffs' video trial exhibits to assist with FEI's objections and conducted legal research with respect to certain evidentiary issues likely to arise at trial.

### *Joel C. Simon*

78.     Joel C. Simon received his J.D., *magna cum laude*, from the University of Houston Law Center in 2004. He received a B.A., *cum laude*, from Ohio University in 2001. Mr. Simon is a member of the Texas State Bar.

79.     Mr. Simon was employed by Fulbright in 2004 as an associate in the litigation group of Fulbright's Houston, Texas, office. His practice focused on civil litigation. Mr. Simon left Fulbright in 2010 and currently is a member of Fernelius Alvarez PLLC in Houston, Texas.

80.     Mr. Simon performed specifically assigned, discrete legal tasks in the ESA Case. In 2008, he conducted legal research into "pattern and practice" evidentiary issues raised by plaintiffs and participated in the preparation of FEI's motion in limine on that subject. ECF No. 345. He conducted legal research on statutory and other issues addressed in FEI's pre-trial brief and participated in the drafting of that submission. ECF No. 362. In connection with the initial trial setting, Mr. Simon performed legal research and participated in the overnight briefing that the Court ordered in the Final Pretrial Order (ECF No. 373 ¶ 12) with respect to the exhibits that plaintiffs intended to offer as set forth on their "72-hour" lists. *E.g.*, ECF Nos. 377 & 378. In 2009, Mr. Simon participated in the preparation of demonstrative exhibits for FEI's *Daubert*

argument and conducted legal research pertinent to the issues raised in FEI's post-trial brief. ECF No. 536.

### Mark T. Emery

81.     Mark T. Emery received his J.D. from the Notre Dame Law School in 2005.  He received a B.A. from Michigan State University (James Madison College) in 1992.  In 2000, Mr. Emery received a Ph.D. in Political Philosophy from Yale University and was an instructor and teaching fellow in political philosophy and constitutional law at Yale University and the University of Texas.  Mr. Emery is admitted to the Bars of the District of Columbia and Texas and the Bars of the Supreme Court of the United States, the D.C. Circuit and various other federal appellate and district courts.

82.     Mr. Emery was employed by Fulbright as an associate in 2005.  Mr. Emery practices in the Firm's Supreme Court and appellate practice groups and currently is a senior associate.  He has appeared on the briefs in numerous U.S. Supreme Court cases and cases in federal and state appellate courts.  Mr. Emery has argued four (4) appeals in federal and state court.

83.     As a lawyer who focuses on appeals, Mr. Emery's involvement in the ESA Case was when it was on appeal to the D.C. Circuit in 2011 through January 2012.  Mr. Emery participated in the drafting and submission of all of the briefs that FEI submitted to the Court of Appeals and had the primary responsibility for the preparation of the briefing on FEI's cross-appeal.  Mr. Emery represented FEI in the preparation of the appendix on appeal and the submission of FEI's final briefs.  He had primary responsibility for the preparation of FEI's response to the plaintiffs' petition for panel rehearing.  He also consulted on matters of appellate procedure and strategy and in connection with preparation for the D.C. Circuit oral argument.

*Kara L. Petteway*

84.      Kara L. Petteway received her J.D., with honors, from the University of North Carolina School of Law in 2005.  She received her B.A., with highest distinction and highest honors, in Political Science and Music from the University of North Carolina at Chapel Hill in 2002.  Following law school, Ms. Petteway clerked for the Hon. Ronald L. Buckwalter of the United States District Court for the Eastern District of Pennsylvania.  Ms. Petteway is admitted to the Bars of the District Columbia and North Carolina and the Bar of this Court.

85.      Ms. Petteway was employed by Fulbright as an associate in 2006 and was a member of the litigation group of Fulbright's Washington, D.C., office.  In 2008, Ms. Petteway served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court.  In 2010, Ms. Petteway left Fulbright to serve as Assistant General Counsel to the Treasurer of the State of North Carolina.  In that capacity, she had primary responsibility for all legal and policy matters regarding the investments made on behalf of the North Carolina Retirement Systems.  In 2011, Ms. Petteway returned to Fulbright, where she is currently employed as a senior associate in the litigation group of Fulbright's Washington, D.C., office.  Her practice focuses on complex civil litigation and government investigations.

86.      Ms. Petteway participated heavily in most aspects of the ESA Case from October 2006 through January 2010 when she left Fulbright, and from December 2011, when she returned to the Firm, to the present.  Specifically, some of the major tasks that Ms. Petteway performed in the ESA Case are (a) participation in research and briefing on the motions to compel discovery against plaintiff Rider and the organizational plaintiffs (ECF Nos. 126, 144, 149, 159); (b) participating in the research and drafting of the pleading and briefing in

connection with FEI's proposed counterclaim and FEI's response to the Rule 11 motion filed by plaintiffs in response (ECF Nos. 121, 137, 142, 165); (c) supplementing FEI's discovery responses; (d) participating in the drafting of FEI's third-party subpoenas to HSUS, PETA, Archele Hundley, and Robert and Margaret Tom; (e) reviewing and analyzing documents produced by plaintiffs and pursuant to third-party subpoenas; (f) participating in the research and drafting of the briefing in connection with FEI's separate lawsuit to enforce a third-party subpoena against PETA, *Feld Ent., Inc., v. PETA*, No. 2:08:mc04 (E.D.Va.), interfacing with local counsel regarding PETA's compliance with the Virginia district court's order, and reviewing PETA's production of documents and videotapes; (g) in connection with the 2008 evidentiary hearing, preparation of the hearing exhibits and participation in preparation of the post-hearing proposed findings of fact (ECF No. 307); (h) participating in the research and briefing as to plaintiffs' various 2008 discovery-related motions (*e.g.*, ECF Nos. 263, 271, 274 & 296); (i) preparing documents for in camera review pursuant to the Court's June 3, 2008 Minute Order and drafting FEI's response to the Court's August 4, 2008 order and motion for partial reconsideration (ECF No. 332); (j) participation in the preparation of FEI's pre-trial submissions, including the Rule 26(a)(3) pre-trial disclosures (ECF No. 318), the original and amended pre-trial statements (ECF Nos. 342 & 391), FEI's motion in limine (ECF No. 345) and FEI's responses to plaintiffs' motions in limine (ECF Nos. 354 & 356) and the pre-trial brief (ECF No. 362); (k) handling the argument for FEI on plaintiffs' motions in limine to exclude witnesses and exhibits (ECF Nos. 345 & 349) at the pre-trial conference; (l) reviewing and analyzing videotape footage for trial exhibits, for use in FEI's case in chief and for impeachment and rebuttal purposes; (m) reviewing and analyzing evidentiary challenges to USDA documents obtained by plaintiffs pursuant to a related lawsuit, No. 05-00840-EGS (D.D.C.), and negotiating the

production of unredacted copies of those documents; (n) at trial, cross-examining Robert Tom and Louis Gedo, handling the adverse direct examinations of Michael Markarian and Cathy Liss, presenting the testimony of WAP (Eric Glitzenstein), Margaret Tom and Angela Martin by deposition, and handling certain of the evidentiary arguments and evidentiary briefs (e.g., ECF Nos. 429 & 450); (o) during the trial, principal responsibility for the Court-ordered "72-hour" notices of witnesses and exhibits (*e.g.*, ECF No. 440) and notices of admitted and marked exhibits and impeachment materials (*e.g.*, ECF No. 448); (p) participating in the preparation of FEI's proposed findings of fact and conclusions of law and responding to the like documents submitted by plaintiffs (ECF Nos. 535, 540); (q) participating in the preparation of FEI's post-trial chart summarizing examples of Rider's inconsistent statements (ECF No. 549) and Court-ordered brief regarding the applicability of the primary jurisdiction doctrine; (r) participating in the research and drafting required for the briefing on FEI's 2012 motion for entitlement to attorneys' fees (ECF No. 593); and (s) the research and drafting of documents required in connection with collecting the costs awarded in 2013 pursuant to FEI's Bill of Costs. *See* ECF No. 613.

### *Mark L. Jensen*

87.     Mark L. Jensen received his J.D. from Harvard Law School in 2007.  He received a B.A., *summa cum laude*, from Bates College in 1999, and an M.A. from the University of Minnesota in 2004.  Mr. Jensen is admitted to the Bars of the District of Columbia and New York and to the Bar of this Court.

88.     Mr. Jensen was employed by Fulbright in 2007 as an associate in the litigation group of Fulbright's Washington, D.C., office where his practice focused on civil litigation and international trade controls.  While at Fulbright, Mr. Jensen served, on a voluntary basis, as a Special Assistant Attorney General of the District of Columbia, and gained additional trial and

other litigation experience by assisting the Office of the Attorney General in the trial of cases involving the D.C. government in federal district and superior court.  Mr. Jensen left Fulbright in 2011 and currently is an associate at Sheppard, Mullin, Richter & Hampton LLP in Washington, D.C.

89.     Mr. Jensen performed specifically assigned, discrete legal tasks in the ESA Case. In 2006, he conducted legal research and wrote memoranda on permit issues arising under the Fish and Wildlife Service ESA regulations; he prepared and submitted a Freedom of Information Act request with respect to rulemaking comments potentially relevant to the ESA Case, and he reviewed and analyzed video tapes for production to plaintiffs in discovery.  In 2007, Mr. Jensen conducted legal research and wrote memoranda with respect to *Daubert* and other expert witness evidence admissibility standards in the D.C. Circuit.  In 2008, Mr. Jensen performed document review for purposes of expert witness discovery and expert witness interviews and conducted legal research and wrote memoranda on the pertinent provisions of the ESA and the Animal Welfare Act.

### Jesse M. Coleman

90.     Jesse M. Coleman received his J.D., *magna cum laude*, from George Mason University in 2007 where he was the Articles Editor of the *George Mason Law Review*.  He received a B.A., *magna cum laude*, in Communications from Brigham Young University in 2002.  Following law school, Mr. Coleman clerked for the Hon. Kathleen Cardone of the United States District Court for the Western District of Texas and for the Hon. Thomas Reavley of the United States Court of Appeals for the Fifth Circuit.  Mr. Coleman is admitted to the Texas State Bar and to various federal district courts in Texas.

91.     Mr. Coleman was employed by Fulbright in 2006 through 2008 as a summer associate and law clerk in the Firm's Washington, D.C., office and in 2010 as an associate in the

Firm's Houston, Texas, office where he currently is a senior associate and member of the litigation group. Mr. Coleman's practice focuses on litigation, primarily in the life sciences, pharmaceutical and health care areas.

92.      Mr. Coleman performed specifically assigned, discrete legal tasks in the ESA Case. In 2006, he researched privilege issues in connection with the preparation of motions to compel discovery against third-party WAP and plaintiff Rider. ECF No. 85, 126. In 2007, he conducted legal research as to certain of the issues relevant to FEI's proposed counterclaim (ECF No. 121); reviewed and analyzed FEI documents for production to plaintiffs in discovery; and reviewed, analyzed and indexed documents produced by plaintiffs.

### *Casey Batchelor*

93.      Casey Batchelor received his J.D., *cum laude*, from the Catholic University of America, Columbus School of Law in 2008 where he was a member of the *Catholic University Law Review*. He received a B.S., with Merit, in Economics from the United States Naval Academy in 1998. Mr. Batchelor is admitted to the Texas State Bar.

94.      Mr. Batchelor was employed by Fulbright in 2007 as a law clerk in the Firm's Washington, D.C., office and in 2008 as an associate in the Firm's Dallas, Texas, office where he currently is a member of the litigation group. Mr. Batchelor's practice focuses on litigation, real estate and insurance.

95.      Mr. Batchelor performed specifically assigned, discrete legal tasks in the ESA Case. In 2007, he reviewed and redacted FEI documents for production to plaintiffs in discovery and compiled discovery documents for use in preparing for and taking depositions. In 2008, Mr. Batchelor reviewed FEI documents and video tapes for production to plaintiffs in discovery, reviewed and organized elephant-related documents for use in expert discovery and reviewed and analyzed documents cited in the reports of plaintiffs' expert witnesses.

### Rebecca E. Bazan

96.     Rebecca E. Bazan received her J.D. from Harvard Law School in 2009 where she was a co-chair of the Article Selection Committee for the *Harvard Journal of Law & Gender*. She received her B.A. in Political Science from Emory University in 2006 where she was a member of Phi Beta Kappa.  Ms. Bazan is admitted to the Bars of the District of Columbia and Texas and the Bar of this Court.

97.     Ms. Bazan was employed by Fulbright as a summer associate in 2008 and as an associate in 2010 and currently is in the litigation group of the Firm's Washington, D.C., office. Ms. Bazan's practice focuses on civil litigation in federal and state court.

98.     Since January 2010, Ms. Bazan has participated heavily in most aspects of the ESA Case.  In 2010, prior to the order staying the case pending mediation, she researched issues in connection with FEI's potential motion for attorneys' fees and issues pertinent to the mediation.  She assisted with the briefing in the D.C. Circuit in 2011-12 and, on remand, participated in the research and drafting required for the briefing on FEI's motion for entitlement to attorneys' fees (ECF Nos. 593, 603, 605) and the research and drafting of documents required in connection with collecting the costs awarded in 2013 pursuant to FEI's Bill of Costs.  *See* ECF No. 613.

### Tracy DeMarco

99.     Tracy DeMarco received her J.D., with honors, from the University of North Carolina at Chapel Hill School of Law in 2009 where she was an Articles Editor of the *University of North Carolina Law Review*.  She received an A.B. in English from Duke University in 2005.  Ms. DeMarco is admitted to the Bars of the District of Columbia and North Carolina and the Bar of this Court.

100.    Ms. DeMarco was employed by Fulbright in 2010 as an associate in the Firm's Washington, D.C., office where she currently is an associate and member of the litigation and intellectual property groups.    Ms. DeMarco's practice focuses on complex civil litigation, government and internal investigations, corporate compliance matters, and trademark matters.

101.    Ms. DeMarco assisted with the preparation of FEI's 2010 Bill of Costs in the district court. ECF No. 567.  She conducted legal research concerning the items recoverable by a prevailing party and concerning the issues raised in plaintiffs' opposition to FEI's Bill of Costs (ECF No. 570) and wrote memoranda memorializing her analysis.

### Mary Fritz

102.    Mary Fritz is a special consultant in the litigation group of Fulbright's Minneapolis, Minnesota office.  Ms. Fritz received her J.D. from the University of Minnesota Law School in 1987 and received a B.A. from the University of Minnesota.  Ms. Fritz was employed by Fulbright in 2003.  Ms. Fritz is admitted to the Minnesota State Bar.

103.    During the ESA Case, Ms. Fritz was assigned to the team tasked with handling the expert witness issues.  In 2008, she developed and submitted state open records requests as to one of plaintiffs' experts; reviewed and analyzed the evidentiary material cited in plaintiffs' expert reports and the articles cited in or authored by plaintiffs' expert witnesses to assist with the preparation for expert depositions and for cross-examination of plaintiffs' experts at trial; reviewed and analyzed evidentiary material and scientific literature to support FEI's *Daubert* objections and the *Daubert* arguments that the Court indicated in the Final Pretrial Order would be considered during or after trial.  ECF No. 373, ¶ 6.  In 2009, during trial, Ms. Fritz reviewed the trial transcripts to incorporate evidentiary citations into working drafts of FEI's proposed findings of fact (ECF No. 535); continued that task post-trial as to expert-related proposed

findings; and analyzed and participated in preparing responses to plaintiffs' expert-related proposed findings of fact (ECF No. 540).

### Pamela J. Jackson

104.     Pamela J. Jackson is a senior paralegal in the litigation group of Fulbright's Minneapolis, Minnesota office. Ms. Jackson received a B.A. from the University of Minnesota in 1979. Ms. Jackson was employed by Fulbright in 2005.

105.     During the ESA Case, Ms. Jackson was assigned to the team tasked with handling the expert witness issues.   In 2008, Ms. Jackson researched and compiled background information on plaintiffs' experts as well as articles and books authored by plaintiffs' experts and the evidentiary documents cited in plaintiffs' experts' reports and resumes for use in developing deposition questions and cross-examination points at trial; she compiled articles written by defense experts for use in deposition preparation and preparation for cross-examination at trial; and she reviewed and summarized expert depositions for use at trial.   In 2009, she researched and compiled recent articles by both plaintiff and defense experts for use at trial; reviewed documents and trial testimony for cross-examination points; and checked the accuracy of the record citations in plaintiffs' proposed findings of fact (ECF No. 533).

### Chad A. Thompson

106.     Chad A. Thompson received his B.A. from Vanderbilt University in 2004, an M.A. in Applied Economics from Johns Hopkins University in 2006, and a J.D. from New York University School of Law in 2010. Mr. Thompson was employed by Fulbright as a paralegal in the Firm's Washington, D.C., office in 2006 through 2008. Mr. Thompson also was a summer associate in Fulbright's New York, New York, office in 2009. Mr. Thompson left Fulbright in 2009. Mr. Thompson currently is an associate in the International Trade and Regulatory group in the Washington, D.C. office of Alston & Bird LLP.

107.    In 2006-07, Mr. Thompson provided paralegal support services during the ESA Case in pre-trial discovery, including reviewing, coding and redacting documents for production to plaintiffs; handling the logistics of document production; producing and supervising plaintiffs' extended on-site review of elephant-related video tapes at Fulbright's offices; assembling documents for use in depositions and deposition preparation: and reviewing and indexing documents and other materials produced by plaintiffs.

### Patrick D. Fuller

108.    Patrick D. Fuller received his B.A. from the University of Virginia in 2008. Mr. Fuller was employed by Fulbright as a paralegal in the Firm's Washington, D.C., office in 2008 and 2009. Mr. Fuller left Fulbright in 2009.

109.    During the ESA Case in 2008, Mr. Fuller provided paralegal support services in discovery and pre-trial preparation, including assembling documents for review by defense experts; assembling documents for expert depositions; analyzing plaintiffs' transportation order exhibits; assisting with FEI's deposition designations and assembly of FEI's trial exhibits; and organizing the materials produced by PETA pursuant to a third-party subpoena. In 2009, Mr. Fuller provided paralegal support services during the trial and post-trial periods, including assisting with FEI's deposition designations; assembling documents for use in direct and cross-examination; compiling facts for FEI's proposed findings of fact and checking the accuracy of the record citations in plaintiffs' proposed findings of fact (ECF No. 533).

### Heather A. Nearhoof

110.    Heather A. Nearhoof was employed in the Firm's Practice Support group in 2002. Ms. Nearhoof received a B.A. from Pennsylvania State University in 2001. Ms. Nearhoof left Fulbright in 2011.

111.    Ms. Nearhoof performed specifically assigned, discrete tasks in the ESA Case.  In 2006, Ms. Nearhoof handled the processing of electronically stored information for review and production to plaintiffs; assisted with the production of documents to plaintiffs; and coordinated use of, and handled technical issues with respect to, the litigation database.  In 2007, she performed database searches in connection with document productions to plaintiffs and organized video tape materials for use by FEI's expert witnesses.  In 2008, Ms. Nearhoof participated in supplemental document production, gathering and organizing expert deposition preparation materials and the conversion of VHS and video tapes for use as potential trial exhibits.

## IV.

## COURSE OF PROCEEDINGS IN THE ESA CASE

112.    Paragraphs 114 through 161 provide a general description of the course of proceedings in the ESA Case during Fulbright's representation, organized as follows:  (i) pre-trial fact discovery and pre-trial motions during the period from March 2006 through January 30, 2008, when fact discovery ended; (ii) the period from February through May 2008 prior to the orders setting the case for trial; (iii) the period when the case was prepared for trial, from June 2008 through February 3, 2009; (vi) the trial of the case from February 4, 2009 through March 18, 2009; (v) the post-trial proceedings from March 19, 2009 through the entry of judgment on December 30, 2009; (vi) 2010, when the case was in mediation; (vii) November 2010 through January 11, 2012 when the case was on appeal to the D.C. Circuit; and (viii) proceedings after the appellate remand, January 13, 2012 through March 31, 2013.

113.    Attached hereto as Ex. 22 is a true and accurate copy of a document that I prepared that identifies and presents visually the major events in the ESA Case. The chronology of the time line presented is organized into the same time segments as the discussion in

paragraphs 114-161 of this declaration.  For each time segment, the chronology also states the approximate number of hours worked by Fulbright timekeepers that were billed to FEI and that FEI paid for, together with the aggregate value of those billed hours.  The billed hours and value of billed hours data on the chronology is taken from Ex. 21 hereto, which is described in greater detail in paragraphs 159 & 187 below.

## A.

### Fact Discovery and Pre-Trial Motions:
### March 10, 2006 through January 30, 2008

114.     When Fulbright entered the ESA Case on March 10, 2006, the parties were in the process of document production; of the forty-six (46) depositions that ultimately would be taken in the case, eleven (11) had been completed; and apart from the original Rule 12 motions filed by Covington in 2000 and 2003, FEI had not yet filed any dispositive motions.  During this 22-month period (03/10/06 through 01/30/08), the parties completed fact discovery in the case and engaged in an extensive motions practice, including dispositive motions.

115.     As the Court has observed, the discovery process in the ESA Case was "complicated and demanding."  ECF No. 239 at 1.  Plaintiffs sought and were given a wide scope of discovery in the ESA Case with respect to documents and other materials that concerned FEI's Asian elephants.  From May 2006, through the Court-ordered deadline for completing fact discovery on January 30, 2008, FEI made twenty-eight (28) separate document productions to plaintiffs, totaling nearly 54,000 separately Bates-numbered pages or items, which included electronic and paper documents, photographs, x-rays and video tapes.  This was in addition to the more than 30,000 separately Bates-numbered pages of material that Covington already had produced to the plaintiffs.  These productions required significant attorney and paralegal time in order to collect and review documents and to redact and log them for privileged

information where applicable. FEI's supplemental privilege log ultimately contained 321 items representing two (2) boxes of materials.

116. Part of the effort expended by Fulbright in document review or production stemmed from court ordered-deadlines or other time sensitivity. For example, the Court's order of September 26, 2006 (ECF No. 94) gave FEI ten (10) days to produce elephant-related documents in sixteen (16) separate categories from 1994 through September 2006 and required declarations from the relevant custodians, which ultimately resulted in twenty-nine (29) declarations being filed. ECF No. 98. Some of the time sensitivity stemmed from plaintiffs' actions. Plaintiffs' counsel sent several letters outlining alleged "deficiencies" in FEI's document production that required multiple separate reviews of the documents to either find items that needed to be produced or to confirm that they already had been produced or did not even exist. FEI's detailed responses were typically met with plaintiffs' refusal to settle the purported issues and inquiries into areas that FEI already had explained and further efforts to broaden the initial scope of discovery even further. From March 2006 through March 2008 the parties exchanged more than thirty-five (35) letters, totaling more than 140 single-spaced pages, concerning the purported "deficiencies" in FEI's document productions. Similarly, plaintiffs unexpectedly noticed and took the deposition of co-plaintiff Tom Rider in October 2006, before FEI had even filed its motion to compel against him for the documents he had yet to produce. Although plaintiffs had no basis for deposing Mr. Rider under Fed. R. Civ. P. 32, which the deposition ultimately confirmed, Fulbright had to engage in a substantial review of the documents to participate in this deposition as the cross-examining party. Fulbright had to largely repeat this preparation process when it took its own deposition of Mr. Rider in December 2007. The work required in the various document reviews was affected by the fact that most of the

documents were in paper form, as that is how they had originated and/or been maintained and produced by the parties, and the case began in 2000 prior to the 2006 amendments to the Federal Rules. Fulbright did establish an electronic database for certain custodians' documents obtained from FEI in an electronic format which were subsequently reviewed and produced by Fulbright.

117.    During this period, FEI served two (2) additional third-party subpoenas on WAP, and separate third-party subpoenas on HSUS, PETA, MGC, Archele Hundley and Robert and Margaret Tom. These parties and the plaintiffs produced documents during this period that FEI had to review and analyze. Plaintiffs, HSUS and PETA all failed to make substantial production of the documents that FEI sought without the court orders that FEI obtained through four (4) separate motions to compel.

118.    During this period, the parties took seventeen (17) fact depositions. Nine (9) were taken by the plaintiffs (Jim Andacht, Kenneth Feld, Joe Frisco, Gary Jacobson (individually and as FEI's Rule 30(b)(6) witness), Troy Metzler, Gerald Ramos, Tom Rider, Robert Ridley and Alex Vargas), and eight (8) were taken by FEI (Eric Glitzenstein (WAP Rule 30(b)(6) witness), Sasha Houcke, Archele Hundley, D'Arcy Kemnitz, Nicole Paquette (API Rule 30(b)(6) witness), Tom Rider, Margaret Tom and Robert Tom).

119.    During this period, Rule 34 inspections of the Asian elephants at issue in the case were conducted. These inspections, which both required an entire day, occurred on November 13 and 29, 2007 on the Blue Unit in Auburn Hills, Michigan, and at FEI's Center for Elephant Conservation ("CEC") in Polk County, Florida. These inspections required substantial advance preparation and also precipitated substantial briefing and proceedings (*e.g.*, ECF Nos. 99, 105, 116, 182, 195, 200, 205, 219, 228; 11/09/07 Minute Order) because plaintiffs had no expertise themselves with Asian elephants, were vague about what they wanted to accomplish and were

attempting to do the inspections before they had even disclosed their expert witnesses. Furthermore, to my knowledge and based upon the research conducted at the time, this was the first time that Asian elephants had been presented for inspection under Fed. R. Civ. P. 34 in litigation.

120.    During this period, the parties filed twenty-seven (27) contested substantive motions, thirteen (13) by plaintiffs (ECF Nos. 64, 69, 99, 103, 106, 131, 161, 163, 181, 185, 200 & 234)) and fourteen (14) by FEI (ECF Nos. 82, 85, 90, 101, 121, 126, 133, 149, 152, 171, 183, 192, 223 & 247).  FEI's motions included five (5) that had a major bearing on the ultimate outcome of this case.  FEI's motion for summary judgment and motion for reconsideration of the initial summary judgment ruling (ECF Nos. 82, 183) were both granted in major part (ECF Nos. 172, 173, 212, 213) and, in theory, narrowed the case from fifty-four (54) to seven (7) Asian elephants.    FEI's motions to compel discovery against Rider (ECF No. 101, 126), the organizational plaintiffs (ECF No. 149), WAP (ECF No. 85), and HSUS (ECF No. 192), all of which were granted in major part (ECF Nos. 178, 231), led to the production of critical evidence on the payments to Tom Rider and the efforts that had been undertaken by plaintiffs and their counsel to conceal those payments in discovery.   The payments and the concealment of the payments were central aspects of the Court's findings in the final decision and judgment in the case in favor of FEI as well as the subsequent ruling that FEI is entitled to recover attorneys' fees. *E.g.*, ECF No. 559 at 36-37 (FOF 57) ("[t]he true nature and extent of the payments the organizational plaintiffs had made to Mr. Rider directly or through MGC or WAP were not fully disclosed until after the Court's order of August 23, 2007, granting FEI's motion to compel disclosure of such information"); *id.* at 37 (FOF 59) ("the Court concludes that the primary purpose of the funding provided by the organizational plaintiffs was to secure and maintain Mr.

Rider's participation in this lawsuit ... based on ... (ii) the fact that they were not disclosed initially in discovery, both by omissions and affirmatively false statements ... ."); ECF No. 620 ("Rider, the organizational plaintiffs, and plaintiffs' counsel sought to conceal the nature, extent and purpose of the payments from FEI during the litigation ..."). For example, the MGC invoices for payments to Rider, the tax documents issued to Rider by MGC and PAWS, and Mr. Rider's tax returns (ECF No. 484-2, Def. Tr. Exs. 55-57, 60 & 61) were first produced in response to the Court's August 23, 2007 Order (ECF No. 178). Similarly, HSUS's cover letters enclosing its "donations" to WAP, which were signed by counsel of record, Mr. Lovvorn (ECF No. 484-2, Def. Tr. Exs. 68), were produced by HSUS in response to the Court's December 3, 2007 Order (ECF No. 231). All of these documents were relied upon in the Court's 12-30-09 Memorandum Opinion. *E.g.*, ECF No. 559 at 28 (FOF 35) (citing Def. Tr. Ex. 61), 30 (FOF 38) (citing Def. Tr. Ex. 67), 31 (FOF 40) (citing DX 67) & 36 (FOF 55-56) (citing Def. Tr. Exs. 55-57 & 60). FEI also successfully opposed several significant motions by plaintiffs, including two motions by Rider for protective orders (ECF Nos. 106, 141), a Rule 11 motion for having filed a proposed counterclaim (ECF No. 163), and a motion by plaintiffs to add three new plaintiffs – Archele Hundley and Robert and Margaret Tom (ECF No. 181). *See* ECF Nos. 178, 212.

121. In February 2007, FEI filed a motion (ECF No. 121) for leave to assert a counterclaim under, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and to assert the affirmative defense of unclean hands based upon the revelation in discovery that Rider had been receiving significant, regular payments from the organizational plaintiffs and WAP, an organization run by (then) lead plaintiffs' counsel Ms. Meyer and Mr. Glitzenstein. Although the Court denied the motion (ECF No. 175), most of the work expended on the briefing on this motion dovetailed with work necessary ultimately to try

the case.  The facts pleaded in the proposed counterclaim about the Rider payments, the efforts

that plaintiffs and plaintiffs' counsel took to conceal them in discovery and the false statements

of fact that plaintiffs and counsel for plaintiffs had made to the courts in this case about Mr.

Rider's "aesthetic injury" standing became highly relevant at trial and became central aspects of

the Court's December 30, 2009 decision that Mr. Rider had no credibility as a witness and no

standing to sue.  ECF No. 559 at 49 (Conclusion of Law ("COL") No. 19).  Many of the

documents that FEI used to support the proposed counterclaim (and to defeat plaintiffs' Rule 11

motion (ECF Nos. 165-169)) were admitted into evidence at trial without objection (*e.g.*, ECF

No. 484-3 (Def. Exs. 16-21, 37, 46, 49-58A, 62-68)), and subsequently were relied upon in the

Court's 12/30/2009 Memorandum Opinion.  See ECF No. 559 at 25-38 (Finding of Fact ("FOF")

Nos. 21-62).  Further, many of the allegations in the proposed RICO counterclaim concerning

the amount, source, timing, characterization and purpose of the Rider payments and the

credibility of Mr. Rider's standing allegations became actual findings of fact of the Court in the

December 30 , 2009 decision. *Id.*

122.    The briefing on the parties' motions was often lengthy and complex.   For

example, FEI's motion for summary judgment (ECF Nos. 82-84), the opposition (ECF No. 96-

97), the reply (ECF No. 100) and the various supplemental filings (ECF No. 113, 122, 123, 145)

totaled 1,008 pages of briefs, declarations and other exhibits.  Plaintiffs' Rule 11 motion (ECF

No. 163) and FEI's response (ECF Nos. 165-169) totaled 2,365 pages of briefs, declarations and

other exhibits.   The discovery motions against plaintiffs and WAP concerning the Rider

payments required extended factual development and analysis as well as legal research because

the subject matter was something the plaintiffs and plaintiffs' counsel were attempting to, and

initially did, conceal. *See* paragraph 172 *infra*.  The pre-motion attempt to resolve the issues

likewise was protracted, lasting several weeks and requiring a lengthy exchange of correspondence, and in at least one instance, involved a false statement from plaintiffs' counsel regarding the existence of payments documents. *See id.* The discovery motions also were complex. *See* ECF Nos. 126-127, 138, 144 (566 pages of briefs and exhibits on the Rider motion to compel truthful interrogatory answers and production of documents); ECF Nos. 149, 156, 159 (908 pages of briefs and exhibits on the motion to compel against the organizational plaintiffs); ECF Nos. 85-87, 93 95 (461 pages of briefs and exhibits on the motion to compel against WAP).

## B.

### *Evidentiary Hearing and Expert Discovery:*
### *February through May 2008*

123.    After the plaintiffs, WAP and HSUS produced documents in response to the orders compelling discovery, FEI filed motions arguing that these parties had not fully complied with the Court's orders. ECF Nos. 223 & 247. FEI had not requested a hearing, but the Court determined it would convene an evidentiary hearing. ECF No. 240; Minute Order (02/19/08). The hearing took place over three (3) days: February 26, March 6 and May 30, 2008. FEI submitted ninety-three (93) exhibits which filled three (3) three-inch notebooks. Plaintiffs submitted exhibits that filled four (4) three-inch notebooks. Ten (10) witnesses testified in the three (3) days of hearings (Lisa Weisberg, Nicole Paquette, D'Arcy Kemnitz, Michelle Sinnott, Leslie Mink, Tracy Silverman, Michael Markarian, Cathy Liss, Jonathan Lovvorn and Katherine Meyer). FEI also submitted post-hearing proposed findings of fact and plaintiffs responded. ECF Nos. 307 & 314. Although the hearings did not lead to the sanction of contempt (ECF No. 374), the motions that precipitated the hearing (ECF Nos. 223, 247) were granted in part, and additional material that had been withheld from FEI was ordered produced. ECF No. 325. These documents were collectively marked at trial as Defendant's Exhibit 209 (Documents Produced by Plaintiffs on 08/11/08), which was admitted without objection (ECF No. 484-2) and

relied upon in the Court's 12/30/09 Memorandum Opinion. *E.g.*, ECF No. 559 at 29 (FOF 36) (citing Def. Tr. Ex. 209). Since the hearings focused on the Rider payments and plaintiffs' actions in discovery concerning those payments, much of the work in connection with the hearings coincided with what ultimately became relevant at trial and the basis for the outcome of the ESA Case. Several of FEI's evidentiary hearing exhibits were trial exhibits and were admitted (without objection) into evidence at the trial (*e.g.*, ECF No. 484-3 (Def. Exs. 16-21, 37, 46, 49-58A, 62-68)), and three (3) of the evidentiary hearing witnesses (Weisberg, Markarian and Liss) also testified at the trial about the Rider payments and the discovery process concerning those payments.

124.    Shortly before the end of fact discovery, plaintiffs served subpoenas on six (6) different railroad companies, to which FEI objected. Motions practice continued following the close of discovery. From February to May 2008, plaintiffs filed seven (7) motions, including plaintiffs' motion for preliminary injunctive relief (ECF Nos. 250/265, 260, 266, 282, 287, 294, 297). Plaintiffs' motions were filed while the evidentiary hearing and expert discovery (*see* paragraphs 123, 126-27, *infra*) were ongoing, and opposing them consumed a significant amount of attorney time. Ultimately, all of these motions were denied (in large part) or withdrawn (ECF Nos. 306, 324, 325, 329-330, 334, 387, Minute Order (6/02/08)), with the exception of plaintiffs' motion to quash subpoenas to counsel of record (ECF No. 282). However, in lieu of FEI questioning counsel of record at the evidentiary hearing, the Court did so. ECF No. 300.

125.    In March 2008, plaintiffs served their expert reports. The submission was voluminous. Plaintiffs submitted eight (8) separate reports totaling more than 400 pages of text, exclusive of the exhibits and appendices. One report, that of Philip Ensley, was 290 pages long, contained more than 650 citations to discovery documents and had a 164-page single-spaced

appendix listing the discovery documents allegedly relied upon which, when printed out, would have occupied approximately twelve (12) boxes of documents.

126.    Dealing with these expert reports for purposes of preparing the defense reports as well as preparing to take expert depositions required significant effort in several respects. *First*, the reports contained hundreds of citations to discovery documents that had to be checked and reviewed.  Many of the witnesses had extended biographies listing hundreds of books, articles and other materials that also had to be reviewed at least in part for relevant information. *Second*, the plaintiffs' experts had attempted to expand the scope of the case with issues and claims that had not been stated in the 60-day notice letters preceding the filing of the ESA Case or pleaded in the complaint.  For example, Ensley spent significant time discussing his belief that elephant toenail cracks were the result of hard substrates, when that subject had neither been included in the notice letters nor pleaded in the complaint. *Third*, the reports raised significant issues as to the admissibility of the purported expert evidence under *Daubert*.  For example, Ben Hart's report opined on elephant behavior even though his specialty was small animals and writing articles on subjects such as why dogs eat grass or why house cats engage in urine marking.  To my knowledge and based upon the research conducted at the time, none of the theories that surfaced in the plaintiffs' expert reports had ever been tested in court under *Daubert* standards, nor had they been recognized legally as a "take" pursuant to the ESA.

127.    FEI produced reports by five (5) experts (Mike Keele, Kari Johnson, Gary Johnson, Ted Friend and Dennis Schmitt).  A sixth expert, Gary Jacobson, the head of FEI's elephant department and the CEC, was designated as an expert without the necessity of a report.  During the expert discovery period (which extended into September 2008), plaintiffs took five (5) expert depositions (Mike Keele, Kari Johnson, Gary Johnson, Ted Friend and Dennis

Schmitt), and FEI took seven (7) expert depositions (Ben Hart, Joyce Poole, Carol Buckley, Gail Laule, Colleen Kinzley, Ros Clubb and Philip Ensley). Plaintiffs' eighth expert was Ajay Desai who resided in India. Although Mr. Desai did a report and FEI spent time preparing a response and preparing to take his deposition and to cross-examine him at trial, Mr. Desai was never produced for a deposition and did not appear to testify at trial.

128. During this period, the parties filed additional contested substantive motions. Plaintiffs filed seven (7) motions (ECF Nos. 295, 260, 265/250, 266, 282, 289, 294), and FEI filed two (2) (ECF Nos. 256 & 257). Both parties ultimately each withdrew two of the motions before they were decided (ECF Nos. 259 & 260 (plaintiffs); ECF Nos. 256 & 257 (FEI)).

129. During this period, FEI served a third-party subpoena on PETA. After extensive correspondence with PETA, FEI initiated a separate lawsuit to enforce the subpoena. *Feld Ent., Inc., v. PETA*, No. 2:08:mc04 (E.D.Va.). This separate case took nine (9) months to conclude and generated a docket with fifty-one (51) entries, including PETA's separate motion for a protective order. A true and accurate copy of the docket sheet from this litigation is attached hereto as Ex. 29. FEI retained Troutman Sanders, LLP, to litigate this matter and conduct an on-site review of video materials made available for inspection by PETA pursuant to the Virginia district court's order. Those video materials were instrumental in the cross-examination at trial of plaintiffs' witness Archele Hundley. A separate declaration from the lead partner at Troutman Sanders, detailing the litigation of FEI's motion to compel and subsequent review of the material produced, is submitted contemporaneously with FEI's petition.

### C.

### *Preparing the Case for Trial: June 2008 through January 2009*

130. On May 21, 2008, plaintiffs unexpectedly filed a motion for what they described as a "preliminary" injunction to enjoin the use by FEI of chains to tether its Asian elephants.

ECF No. 297. As the Court observed, the timing and scope of this motion was "curious" given that it addressed "one very precise issue" – tethering – that plaintiffs had known about for more than eight years (8) and which had been specifically challenged in their original July 11, 2000 complaint in No. 00-1641. Hearing Tr. at 2 (05/22/08). Moreover, the motion ultimately was withdrawn (ECF No. 387 at 2), and the only plaintiffs who remained in the case (Rider and API) ultimately dropped injunctive relief at trial (ECF No. 559 at 8 n.6). Whatever the real purpose of the motion may have been, it set in motion a series of events that set the ESA Case for trial.

131. In a minute order issued after the emergency status hearing held the day after the preliminary injunction motion was filed, the Court ruled that it would try the case in October, 2008, and directed the parties to confer on a schedule for doing so. Minute Order (05/23/08). On June 11, 2008, the Court set a trial date (10/07/08) and a deadline (07/18/08) for filing the initial pre-trial disclosures of witnesses and exhibits. Minute Entry (06/11/08). On July 24, 2008 the Court issued the initial Pretrial Order which set tight deadlines for submitting pretrial statements, responses to pretrial statements, pretrial briefs, motions in limine, oppositions, proposed findings of fact and conclusions of law, stipulations on documentary admissibility, *Daubert* objections and deposition designations for witness testimony by deposition – all of which had to be accomplished by September 15, 2008. ECF No. 321 at 2, 5-6. These deadlines ultimately were extended by the Court, but for only about two (2) weeks. See ECF No. 373 at 2, 5-6 (Final Pretrial Order).

132. The events described in paragraph 130, stemming from plaintiffs' preliminary injunction motion, immediately and significantly multiplied the amount of work that had to be done by the parties. On May 22, 2008, the date of the first status hearing where the Court stated that the case would be tried in October, the parties had not finished expert disclosures or expert

discovery.  FEI had not yet served any of its expert reports, and no expert depositions had been

taken.  In addition, the parties had not completed the evidentiary hearing described in paragraph

123 above.  These tasks now had to be completed simultaneously with the pretrial preparation

schedule.

133.    Preparation of the pretrial disclosures required a significant amount of work over

a period of about five (5) weeks.  All potential witnesses or documents to be introduced at trial

(other than for impeachment) had to be listed or the party would risk exclusion at trial.  LCvR

26.2(a).  Therefore, Fulbright had to conduct a thorough review of all documents produced by

FEI and by plaintiffs and third parties, as well as any documents to be used that had not been

requested, to ensure that the submission was complete.  The parties filed their pretrial disclosures

on July 18, 2008.  ECF Nos. 318 & 319.  Plaintiffs listed fourteen (14) witnesses that they

expected to call at trial, and fifteen (15) may call witnesses.  ECF No. 319.  As exhibits,

plaintiffs listed thousands of un-indexed items, most of which were simply listed in single-

spaced strings of Bates numbers with no description.  ECF No. 320.  FEI listed nine (9) will call

witnesses and thirty-three (33) specifically identified may call witnesses.  As exhibits, FEI listed

seventy (70) specifically described items that it intended to introduce, and another 130

specifically described items that it might introduce.  Plaintiffs filed thirty-two (32) pages of non-

sequentially numbered proposed findings of fact and conclusions of law.  FEI filed 202 proposed

findings of fact and 62 proposed conclusions of law, totaling 97 pages.

134.    The parties filed their original pretrial statements on August 29, 2008.  ECF Nos.

341 & 342.  Plaintiffs listed fourteen (14) will call witnesses, thirteen (13) may call witnesses,

deposition designations for fifteen (15) witnesses, 161 exhibits that plaintiffs expected to offer

and 72 exhibits that plaintiffs might offer.  Plaintiffs' pre-trial statement failed to include any

description of the witnesses' proposed testimony and the projected amount of time that each witness would testify, both of which are required by LCvR 16.5(b)(5) and which made preparation for trial more difficult. FEI listed nine (9) will call witnesses, 34 may call witnesses, deposition designations for fourteen (14) witnesses, 71 exhibits that FEI expected to offer and 195 exhibits that FEI might offer. The parties had two (2) weeks to object to the respective pretrial statements, and such objections were filed on September 16, 2008. ECF Nos. 357 & 358. This required substantial and crucial work in a compressed time frame because most objections not made by the opposing party in its objections to the pretrial statement generally would be considered waived at trial. Fed. R. Civ. P. 26(a)(3)(B). A significant factor affecting the work required was the manner in which plaintiffs organized their exhibits. Although not necessarily numerically voluminous, many of plaintiffs' individual exhibits were voluminous in themselves. For example, Exhibit 1 was the documents reviewed by plaintiffs' expert Philip Ensley which, in turn, was approximately twelve (12) boxes of documents. *See* ECF No. 357-1 at 2. Similarly, plaintiffs listed multiple exhibits comprised entirely video material, some of which contained hours of unrelated, multiple video snippets that were run together, in non-chronological order and that inexplicably duplicated the material on other exhibits. *See, e.g.*, ECF No. 357-7 at 23 (Pl. Ex. 121).

135.    In addition to the pretrial statements and objections thereto, in the three (3) month period from July 24, 2008, the date of the first Pretrial Order, through October 24, 2008, the date of the final pretrial conference, the parties filed and fully briefed four (4) motions in limine, three (3) by plaintiffs (ECF Nos. 343, 344, 349), and one (1) by FEI (ECF No. 345); *Daubert* objections (ECF Nos. 352, 371); and trial briefs (ECF Nos. 360 & 362). The parties also commenced the process of identifying, objecting to and briefing the objections to the trial

exhibits listed by plaintiffs on the various 72-hour lists, required by the Final Pretrial Order. ECF Nos. 381, 384, 385. The Court later vacated the overnight briefing part of this procedure due to its complexity and burdensomeness. Hearing Tr. at 31 (10/24/08).

136.   During this same three (3) month period from July 24, 2008 through October 24, 2008, the parties took ten (10) of the thirteen (13) expert depositions (Buckley, Clubb, Ensley, Friend, the Johnsons, Kinzley, Laule, Poole and Schmitt) and filed four (4) other contested motions, three (3) by FEI (ECF Nos. 336, 370, 375) and one (1) by plaintiffs (ECF No. 383). On top of these tasks, Fulbright worked on preparing its cross-examinations of the twenty-seven (27) witnesses on plaintiffs' list; its own nine (9) witnesses for direct examination; counter deposition designations; the opening statement and potential *Daubert* arguments and all of the many other tasks necessary to try the case. In addition, the Court directed that the presentation of documentary evidence would be entirely electronic (*e.g.*, no marking of paper exhibits for identification, *etc.*) and directed the parties to become conversant with, and provide personnel capable of utilizing, the technology with which the courtroom was equipped. The Fulbright attorneys and their litigation support consultant (Mr. Palisoul) undertook such training in order to accurately and effectively present paper, electronic and videotaped evidence at trial.

137.   On October 24, 2008, the Court held the final pretrial conference, three (3) days prior to the (then) scheduled commencement of trial on October 27. One of the actions taken at the hearing was the denial in substantial part of plaintiffs' motion to exclude witnesses (including several of the plaintiffs themselves). The Court excluded only one (1) of the nineteen (19) witnesses at issue. ECF No. 387 at 1; Hearing Tr. at 23-29 (10/24/08). As a result, although FEI reported that it was ready to proceed to trial, *id.* at 36, plaintiffs sought a continuance of the trial, *id.* at 29, and trial was rescheduled for February 3, 2009, ECF No. 387 at 2.

138.    In September 2008, the Virginia district court ordered PETA to comply with FEI's third-party subpoena and denied PETA's request for a protective order. *See* ECF No. 363. Only then did FEI obtain access to the bulk of the information that it had sought. Although the Virginia federal court had ordered PETA to comply, PETA chose to comply by making documents and videotapes available for inspection only. Local counsel performed the review onsite in Norfolk, Virginia. The process was slow and time-consuming. PETA ultimately produced a substantial volume of material, particularly video tapes (in a variety of different formats), that had to be reviewed and analyzed by local counsel and Fulbright in a compressed time period. The PETA materials proved to be useful in the trial cross-examinations of Tom Rider, Carol Buckley, Archele Hundley and Robert Tom. FEI filed motions for leave to amend its exhibit list to add the PETA materials, which were granted by the Court. ECF Nos. 364, 375, 376, 387.

139.    During the period from October 24, 2008 through the commencement of trial in February 2009, Fulbright continued to prepare its case for trial, including extensive witness preparation and preparation to respond to the plaintiffs' case. The parties filed final, amended pretrial statements on January 5, 2009. ECF Nos. 391 & 392.

## D.
### Trial: February 4, 2009 through March 18, 2009

140.    The ESA Case was tried to the Court from February 4, 2009 through March 18, 2009. Although the Court limited the parties' trial time (forty-eight (48) hours for plaintiffs and forty-two (42) hours for FEI, ECF No. 373 at 4), due to the Court's other cases, the trial sessions occurred on twenty-three (23) separate days. The Court required that any witness called and any exhibit to be offered into evidence be listed seventy-two (72) hours in advance with any objections filed by 8:00 p.m. on the ECF system that same day. ECF No. 373 at 8. Compliance

with this procedure required significant effort and coordination.  Ultimately, thirty (30) witnesses testified live (although preparation for the cross-examination of all witnesses on plaintiffs' pre-trial statement was undertaken), and the testimony of twelve (12) witnesses was presented or admitted by deposition.  The Court admitted 391 exhibits into evidence, 221 for plaintiffs and 170 for FEI.  ECF No. 484.  In addition to oral arguments on numerous objections to the evidence, the Court directed that certain of the evidentiary issues be briefed, and ten (10) briefs were filed.  ECF Nos. 426, 431, 435, 438, 450, 545, 465, 469, 470, 471.  In addition, the Court directed that two additional substantive briefs be filed, one on the applicable regulatory framework and the other on API's standing to sue.  ECF Nos. 417, 418, 432, 433.

141.    Throughout the trial, Fulbright had to remain prepared to argue the *Daubert* objections that it had to plaintiffs' expert evidence.  The Final Pretrial Order had ordered that such issues would be considered during or after the trial (ECF No. 373 at 5), but on the first day of trial the Court ruled that it would hear such arguments at the close of the case.  Trial Tr. at 73 (02/04/09 a.m. session).  However, prior to the commencement of the March 18, 2009 closing arguments, the Court ruled that it would consider *Daubert* issues in a second hearing after the post-trial submissions had been made.  Trial Tr. at 6 (03/18/09 a.m. session).

142.    The process of completing the final trial preparation and trying the case to conclusion required an intensive and sustained effort by the Fulbright trial team.  During the nearly ten (10) week period from January 11, 2009 (approximately three (3) weeks from the start of the trial) through March 18, 2009 (the date of closing arguments), Mr. Simpson, Ms. Joiner, Mr. Shea, Ms. Pardo and Ms. Petteway each worked on almost every single calendar day, averaging, as a group, more than twelve (12) hours per day, with some work days exceeding eighteen (18) hours.  *See* Ex. 31 hereto (time entries for 01/11/09 through 03/18/09).

### E.

### Post-Trial Proceedings:
### March 19, 2009 through December 30, 2009

143.    Following the closing arguments, the parties were required to submit amended proposed findings of fact and conclusions of law to conform to the evidence presented.   The Final Pretrial Order had given the parties seven (7) days to accomplish this, but through extensions it was extended to four (4) weeks.   ECF No. 373 at 15; Minute Order (04/02/09). Fulbright had gotten somewhat of a head start on this project because two lawyers (Andre Hanson and Mary Fritz) had been reviewing the trial record to obtain citations for the proposed findings.   But even with this advance work and the extension, the task required significant effort. The trial record to be reviewed had been voluminous, and multiple additional proposed findings of fact and conclusions of law were needed.   Furthermore, the Court directed that the submissions be formatted so that each citation to the record was a live electronic link to the exact page of the trial transcript or the exact page number of the trial exhibit or legal authority, a result that could not be achieved without time-consuming precision and detail.   FEI's submission was 212 pages long, consisting of 368 proposed findings of fact with multiple, linked record citations and 97 proposed conclusions of law, with multiple linked record and legal citations.   ECF Nos. 535-2 through 535-5.   As to the standing to sue of plaintiffs Rider and API, the Court ultimately adopted, with modification, FEI's proposed findings of fact and conclusions of law.   See ECF No. 559 at 19-57.   The parties also filed their post-trial briefs on the same schedule.   ECF Nos. 534 & 536.

144.    The parties had three (3) weeks to respond in writing to the proposed findings and conclusions and trial brief of the other side.   Given the voluminous nature of the plaintiffs' submission, this also was a significant undertaking.   Plaintiffs' proposed findings of fact totaled 239 pages, consisting of 456 separate proposed findings with multiple citations and twenty-one

(21) additional single-spaced pages of "endnotes" containing hundreds of additional citations and assertions of fact. ECF No. 533. Plaintiffs' proposed conclusions of law were fifty-one (51) pages long, containing 116 separate proposals with multiple record and legal citations. ECF No. 533-1. The citations in each proposed finding and conclusion had to be checked for accuracy and particularized objections and arguments, with electronically linked record and legal citations, had to be made to demonstrate that the proposed finding or conclusion should be rejected. FEI's objections were 626 pages long. ECF No. 540.

145. The Court had indicated to the parties that, once the post-trial submissions had been made, it would have two (2) further arguments. Trial Tr. at 6 (03/18/09 a.m. session). Those arguments were scheduled for July 14 and July 28, 2009. Minute Order (06/12/09). The July 14, 2008 argument lasted an entire day. Preparing for this argument required substantial work, as the Court advised the parties to be prepared on standing and the relief sought by plaintiffs. *Id.* The arguments in the July 14, 2009 hearing prompted the Court to call for additional briefing on primary jurisdiction and issues as to declaratory and injunctive relief. Four (4) such briefs were filed (ECF Nos. 550, 551, 553, 554) as well as a chart by FEI, also requested by the Court, on Rider's inconsistent statements and plaintiffs response thereto (ECF Nos. 549, 552).

146. The second argument which was to focus on *Daubert* issues, the regulatory scheme as well as anything else the parties or the Court might raise, was moved to July 28 then again to September 16, 2009. Minute Orders (07/02/09, 07/21/09). After time had been devoted in preparation, the final argument was ultimately vacated on September 14, 2009 by the consent of the parties when they were advised by the Court that the argument would have to be rescheduled again. Minute Order (09/14/09).

147.   On December 30, 2009, the Court entered judgment for FEI, dismissing the case on the grounds that no plaintiff had standing to sue.  ECF Nos. 558 & 559.

### F.

### Proceedings in 2010

148.   Plaintiffs' noticed their appeal of the December 30, 2009 decision on January 25, 2010.  ECF No. 563.  FEI noticed a cross-appeal on February 4, 2010 of certain interlocutory rulings in the case solely as a protective measure in the unlikely event that the Court's decision against the plaintiffs was reversed.  ECF No. 565.

149.   In early 2010, FEI submitted its Bill of Costs.  This was a substantial undertaking because the Company had incurred nearly $1,000,000.00 in actual litigation costs (exclusive of attorneys' fees) during the course of the nearly ten (10) year history of the litigation.  Document collection, review and analysis and legal research had to be performed to determine which of these costs were recoverable.  FEI's Bill of Costs ultimately claimed $236,068.92 in costs pursuant to Fed R. Civ. P. 54(d)(1) and LCvR 54.1.  ECF No. 567.  During this period, FEI also commenced the process for seeking its attorneys' fees by invoking the 60-day consultation period under LCvR 54.2.  Minute Order (01/12/10).  That consultation process with plaintiffs' counsel produced no resolution of the issue.

150.   In March 2010, following a status call, the Court referred the case by consent of the parties to mediation, under both the auspices of the appellate and district court mediation programs.  Minute Order (03/24/10).  The mediation included the RICO Case.  No. 07-1532-EGS/JMF (D.D.C.).  The D.C. Circuit also held the appeals in abeyance pending mediation on March 31, 2010.  From April through September 2010, the parties attempted to mediate these cases.  This process proved to be protracted and required substantial effort.  The mediator required the submission of mediation statements and replies, and the parties met with the

mediator or with each other at least six (6) separate times with considerable gaps of time in between. Extensive drafts of documents also were exchanged. In September 2010, the mediation ended with no resolution. On October 20, 2010, the Court ruled that the determination of FEI's costs and entitlement to attorneys' fees would be held in abeyance pending the outcome of proceedings on appeal. Minute Order (10/20/10).

### G.

### Proceedings on Appeal to the D.C. Circuit:
### November 2010 through January 11, 2012

151. Upon the conclusion of mediation with no resolution, the D.C. Circuit activated the appeals on November 5, 2010. From January through June 2011, the parties prepared and submitted their briefs. The briefing process was a substantial undertaking. Plaintiffs retained a renowned Supreme Court practitioner, Carter Phillips, and three (3) other lawyers from Sidley Austin LLP in addition to the two (2) MGC lawyers who entered appellate appearances. In several respects, plaintiffs shifted the emphasis of their position on organizational and "aesthetic injury" standing, not only from what they had argued in the district court, but also from what they argued in their opening appellate brief. The principal organizational standing argument that the D.C. Circuit ultimately spent a substantial amount of its opinion on was not made by plaintiffs in any detailed way until the oral argument itself.

152. The briefing on appeal was extended and complex. Appellants' brief was sixty-eight (68) pages with a seventy (70) page addendum; the brief of appellee/cross appellant was sixty-three (63) pages; the response and reply brief of appellants/cross-appellees was sixty-nine (69) pages; and the reply brief of cross-appellant was twenty-six (26) pages. The joint appendix on appeal was 3,317 pages. Substantial time also was required to prepare for the oral argument. The appeals were argued on September 12, 2011, and decided by the Court of Appeals on

October 28, 2011, in an opinion affirming the trial court. *ASPCA v. Feld Ent., Inc.*, 659 F.3d 13 (D.C. Cir. 2011).

153.   Plaintiffs filed a petition for panel rehearing consisting of a thirteen (13) page brief, forty-four (44) pages of evidentiary exhibits and a DVD with three (3) video tapes. FEI's response was a fifteen (15) page brief with twenty-nine (29) pages of record excerpts. The rehearing petition was denied on January 11, 2012 by *per curiam* order.

## *H.*

### *Proceedings on Remand from the D.C. Circuit:*
### *January 12, 2012 through March 31, 2013*

154.   After the case was remanded to the district court, the parties briefed the issue of FEI's entitlement to attorneys' fees. This process was extended and complex. FEI advanced three (3) theories, one of which was adopted in its entirety by the Court (unreasonable and frivolous litigation under *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)), one of which was adopted in part (vexatious litigation under 28 U.S.C. § 1927) and one of which the Court did not reach (inherent authority to police a fraud on the court). Substantial legal research and factual development were required to develop arguments under all of these theories as none of them is very frequently or successfully invoked at the behest of a defendant.

155.   The briefing on the attorneys' fee entitlement issue was complex. FEI's motion, brief and accompanying exhibits totaled 417 pages (ECF No. 593); plaintiffs' opposition and declarations and exhibits totaled 486 pages plus a DVD with three (3) video tapes (ECF Nos. 599 & 600); and FEI's reply and exhibits totaled 197 pages (ECF No. 605). HSUS also filed a motion to strike (ECF No. 598) that FEI was required to oppose (ECF No. 603) and which was denied as moot since FEI's request to determine HSUS's liability at this stage ultimately was denied without prejudice to being renewed at a later date. ECF No. 620 at 49; ECF 619.

156.    In November and December 2012, FEI negotiated a settlement with ASPCA of the ESA Case and the related RICO Case for, among other things, payment of $9.3 million in cash, paid by ASPCA in a single, wire-transferred payment.  The settlement required extensive work over a period of approximately six (6) weeks in terms of the negotiations themselves, preparation of the relevant documentation and implementation of the terms of the settlement agreement.  The process culminated in the filing of a stipulation of dismissal on December 28, 2012 (ECF No. 608) which was approved by the Court in an order filed on January 3, 2013 (ECF No. 609).

157.    On February 19, 2013, the Clerk of the Court awarded FEI $156,356.40 in taxable costs.  ECF No. 613.  Although plaintiffs did not file a motion to re-tax, they refused initially to pay the taxed costs which required an extended exchange of correspondence and communications with counsel for plaintiffs, as well as the preparation and service of interrogatories and document requests in aid of execution on Rider, FFA AWI and API (now known as Born Free U.S.A.), before plaintiffs ultimately paid the costs.

158.    On March 29, 2013, the Court granted FEI's motion for entitlement to attorneys' fees under the ESA and ruled that Ms. Meyer and MGC should be sanctioned under 28 U.S.C. § 1927.  ECF No. 620.

159.    Attached hereto as Ex. 21 is a true and accurate copy of a Microsoft Excel spreadsheet, prepared at my direction by Fulbright accounting personnel that reflects data extracted from the Firm's accounting database pertaining to the ESA Case.  This exhibit states, by calendar month and by calendar year, during the period from December 1, 2005 through March 31, 2013, the number of hours recorded by timekeepers working on the ESA Case that were billed by Fulbright to FEI.  This exhibit also states, by calendar month and by calendar

year, during the period from December 1, 2005 through March 31, 2013, the value of the hours billed to FEI.

160.     Attached hereto as Exs. 23 and 24 are true and accurate copies of two (2) Microsoft Excel spreadsheet graphs that I prepared using the information contained in the spreadsheet described in paragraph 159.  The first graph (Ex. 23) plots the fees that Fulbright billed to FEI paid by the calendar month in which the hours billed were actually worked.  The second graph (Ex. 24) plots the number of hours that Fulbright billed to FEI by the calendar month in which the hours were actually worked.  Both graphs are for the period from December 1, 2005 through March 31, 2013.  The information stated in Exs. 21, 23 and 24 correlates with the narrative of the course of proceedings in the ESA Case set forth above.  In terms of billed hours and the value of billed hours by the timekeepers working on the ESA Case, the periods of greatest activity were the periods in which FEI was engaged in document review and production and preparing its summary judgment and certain discovery motions against plaintiffs (third and fourth quarters of 2006); preparing the case for trial in anticipation of the initially established trial date (June through October 2008); and actually trying the case (February through March 2009).

161.     The trial phase itself was a major time-consuming phase of the litigation.  Almost half of the work performed by Fulbright on the entire case during its more than 7 ½ year representation, occurred during the sixteen (16) month period in which the case was prepared for trial, tried to the Court, and the post-trial submissions and arguments completed.  During the period from June 2008, the month in which the Court set the first pre-trial filing deadline (Minute Entry (06/11/08)) through September 2009 when the last final argument was cancelled (Minute Order (09/14/09)), Fulbright worked 18,417.79 hours that were billed to FEI at a value

of $8,788,162. This represents, respectively, **39.66 percent** of the total hours billed by Fulbright to FEI for work during the period from December 1, 2005 through March 31, 2013, and **44.81 percent** of the total amount that FEI paid to Fulbright during that same period. The calculation of these values is shown on Ex. 25 hereto which is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared based upon the monthly billed hours and billed value totals stated on Ex. 21 for the period from June 2008 through September 2009.

### V.
### FACTORS BEARING ON THE AMOUNT OF WORK REQUIRED TO DEFEND THE ESA CASE

162.     As this Court opined, litigation of the ESA Case was "extraordinary." ECF No. 620 at 2. Attached hereto as Ex. 27 is a true and accurate copy of Microsoft Excel spreadsheets, prepared at my direction, that accurately reflect statistical information with respect to the activities in the ESA Case. As these spreadsheets indicate, during the litigation, there were forty-four (44) substantive Court orders and opinions; 296 substantive motions and filings; seventy-seven (77) hearings, including twenty-three (23) days of trial; three (3) days of evidentiary hearings; forty-six (46) depositions; and thirty-four (34) third-party subpoenas. See Ex. 27; *see also* Ex. 26. In terms of the intensity, amount and difficulty of the legal work required, defending the ESA Case was one of the most arduous experiences of my more than thirty-five (35) year legal career. Based upon my experience as a trial lawyer and litigator handling complex cases in federal court and my personal participation in the ESA Case as the lead counsel for FEI, paragraphs 163 through 182 describe the major factors that, in my opinion, contributed to the amount of work required and to the ultimate cost of defending the ESA Case.

*A.*

### *High Stakes Nature of the Case*

163.     FEI regarded the ESA Case as abusive and as constituting a significant threat of

harm to its lawful business that had to be vigorously defended and defeated.  This view stemmed

from the relief that plaintiffs sought.  Plaintiffs' complaint sought forfeiture of FEI's elephants

and/or to enjoin two husbandry practices used by FEI in managing its Asian elephants:  use of

the guide (also known as a "bullhook") and tethering the animals with chains overnight and

during transportation.    Both forfeiture and an injunction would have resulted in the same

outcome:  the removal of FEI's Asian elephants from its traveling performances as well as

preventing the use of free contact handling and care of FEI's elephants.  The evidence at trial –

both from plaintiffs' and defendant's experts – showed that, without the guide and tethers, Asian

elephants cannot be safely managed in a traveling circus or other traveling exhibition.  ECF No.

535-3 at 88, 115.  Enjoining use of those husbandry tools therefore would have been the end of

elephants in the Circus.  FEI's Chief Executive Officer, Kenneth J. Feld, testified at trial that

Ringling Bros. had exhibited Asian elephants in its shows since 1872, regards the Asian elephant

as the symbol of the "Greatest Show on Earth" and that, without the elephants, the Ringling

Bros. Circus would not be the Ringling Bros. Circus.  Trial Tr. at 8 (03/03/09).  Mr. Feld's

testimony was not contradicted by plaintiffs.

164.     The testimony at trial, which plaintiffs did not contradict, also showed that the

guide and tethers are central to the Company's success in breeding Asian elephants in captivity,

through both natural and artificial insemination means.  ECF No. 535-3 at 88.  From 1992

through the time of trial, twenty-two (22) Asian elephants had been born and bred in captivity to

FEI.  *Id.* at 11.  Four (4) more Asian elephants have been born to FEI since the trial.  Enjoining

the use of the guide and tethers therefore would have undermined the vitality of FEI's captive

elephant breeding program, would have threatened the Company's investment in that program and would have seriously weakened, if not eliminated, one of the few successful breeding programs in the United States that actually combats the potential worldwide extinction of the species.

165.    An injunction against the guide and tethers also would have been an adverse precedent affecting other institutions in the United States holding elephants. The evidence at trial, which was not contradicted by plaintiffs, showed that ninety percent (90%) or more of the institutions that keep elephants in the United States use the guide, tethers or both. ECF No. 535-3 at 78, 95.

### B.
### *Ideological Zeal in the Plaintiffs' Case*

166.    There was an ideological or philosophical cause in the plaintiffs' case that, in my experience, even with an allowance for the ethical obligation of zealous advocacy, differentiated the ESA Case, in terms of intensity of litigation, from other commercial cases between private parties that I have participated in. All of the organizational plaintiffs had issued policy statements or testified at trial that they unconditionally opposed the exhibition of elephants in a circus and, in some instances, were against any form of exhibition or holding exotic animals in captivity generally. ECF No. 535-2 at 8-12. A central premise of Rider's own standing claim was that the elephants he allegedly were attached to would be removed from the Circus to a sanctuary where he allegedly would go visit them. At no point prior to trial was this case ever proposed by plaintiffs to be resolved on any basis that did not require FEI to remove the elephants from its Circus. The anti-circus animus manifested itself in several ways. For example, Joyce Poole's trial testimony characterized elephant circus performances as "ridiculous stuff" which should not be allowed because "[t]his is the United States of America." Tr.

Transcript at 81, 83 (02/04/09 p.m. session). In the closing argument, counsel for plaintiffs differentiated between a purportedly legal use of the guide – for veterinary procedures – from an alleged illegal one – using it to perform "circus tricks." Tr. Transcript at 10-11 (03/18/09 a.m. session). In terms of actual effect on the animal, there is no difference between the two uses of the guide, but one use involves the circus, which plaintiffs opposed, and one does not. So, under the plaintiffs' theory, the circus use was a "take" but the veterinary use was not.

167.    Plaintiffs' goals in the ESA Case differentiated this litigation from other civil litigation between private parties in two other respects that, in my view, contributed to the protracted nature of the case. First, the organizational plaintiffs used the ESA Case and discovery materials obtained in the litigation to publicize their views against circuses, and, in at least one instance documented in the trial record and found by the Court (ECF 559 at 30 (FOF No. 39)), used the ESA Case to raise money from donations. Second, the significant payments to Rider impacted the tenor of the litigation. As the Court has found, Rider had a "motive to falsify" his testimony because he was paid by his co-plaintiffs and counsel to participate in the litigation as a plaintiff and testified that he expected to get paid as long as the ESA Case was pending. *Id.* at 33-34 (FOF's 48-51) & 43-44 (COL 4). Rider's nine (9) year engagement for money as a plaintiff in the ESA Case had been the steadiest form of employment in his life, so he had no incentive to see the litigation concluded in a prompt fashion. *See* ECF No. 484-3 (Def. Tr. Ex. 19 at 5-6 (Rider answer to Interrogatory No. 2)). Furthermore, as the Court also has found, paying Rider to stay involved with the litigation "advance[d] the organizational plaintiffs' purposes" for the case. ECF No. 559 at 35 (FOF 52).

## C.

### *Novelty of the Issues*

168.    As set forth in paragraph 169 below, several aspects of the ESA Case were issues of first impression or otherwise unique.  In my experience, matters with no legal or factual precedent often are more difficult to handle because greater effort is required to identify the actual elements of, and proof related to, the claim and to devise and implement a litigation strategy than is the case where the factual and legal scenarios presented have been considered and decided by the courts in prior cases.  In this particular case, the difficulty was compounded by the fact that there were no established elements for the "taking" claim that plaintiffs pursued; a "take" turned out ultimately to be whatever plaintiffs said it was.  In my view, the matters identified in paragraph 169 contributed to the protracted nature of the ESA Case, and the effort required to defend the litigation on behalf of FEI.

169.    To my knowledge, and based upon the research that was conducted at the time, the ESA Case was novel in the following respects:  (a)  No case had applied the "taking" prohibition of ESA § 9 to *captive* endangered species such as the elephants that FEI lawfully owns.  (b)  No case had determined the contours of the "pre-Act" exemption in the ESA or had decided the issue whether a district court has the authority, in an ESA citizen suit, to determine a private party's compliance with a Fish & Wildlife Service Captive Bred Wildlife permit.  Both issues were addressed by the Court in deciding FEI's summary judgment motion.  ECF No. 172. (c)  No case had involved the regulatory intersection between the ESA and the Animal Welfare Act as to captive exotic animals presented for exhibition – a matter the Court required briefs on during trial.  ECF No. 417 & 418.  (d)  No case had ever entertained a legal attack on free contact elephant handling or generally accepted methods of captive elephant husbandry, reproduction and veterinary care as "takes' in purported violation of the ESA.  (e)  The views expressed by

plaintiffs' expert witnesses on elephant behavior, handling, husbandry and related topics had not been evaluated by a court under *Daubert* or a similar standard.  (f)  No case had involved the presentation of Asian elephants for inspection under Fed. R. Civ. P. 34.  (g)  The legal validity of the actual standing theory that Rider pursued in this case – "aesthetic injury" based upon a personal or emotional attachment to a particular animal – was decided for the first time by the D.C. Circuit in the 2003 appeal in the ESA Case.  (h)  No ESA citizen suit had gone to trial where it ultimately was determined as a result of the trial that, from the inception of the litigation, not only did none of the plaintiffs have Article III standing to sue, but also that their theories of standing, and thus, the foundations of their case, were in fact frivolous, vexatious and unreasonable from the beginning.  (i)  No individual acting as an ESA citizen suit plaintiff had ever been paid nearly $190,000 over a period of nine (9) years by his co-plaintiffs and his own counsel to be a plaintiff and witness in an ESA case.  (j)  Until Rider testified, no citizen suit plaintiff's testimony had been so thoroughly discredited at trial as to be formally found by the court to have been "pulverized."  (k)  No private defendant, until FEI in the ESA Case, had ever been ruled entitled to recover attorneys' fees from a private plaintiff under the ESA.  (l)  No animal welfare organization, animal rights organization or 501(c)(3) public charity had ever entered into a settlement agreement with a private party and paid $9.3 million in order to resolve, *inter alia*, a claim against it for legal fees arising out of its actions as a plaintiff in an ESA citizen suit and the related RICO, conspiracy and intentional tort claims against it arising out of the same conduct.

### D.

### Certain of Plaintiffs' Actions Contributed to the Protracted Nature and Cost of the ESA Case

170.    In its March 29, 2013 decision, the Court determined that certain actions by plaintiffs caused the ESA Case to be protracted.  *E.g.*, ECF No. 620 at 27, 33-34, 35 ("[p]laintiffs

prolonged the litigation by raising new theories of standing during the case, and, worse, by attempting to conceal the nature and extent of Rider's funding.  Finally, after the litigation had dragged on for nine years, the plaintiffs abandoned parties and claims to relief during the trial;" "[a]s set forth in the 2009 Opinion and above, there is overwhelming evidence that the plaintiffs satisfy the vexatiousness standard.  They deliberately delayed the proceedings by (1) providing false or incomplete information about the financial arrangements between Rider and the other plaintiffs for years, and (2) forcing FEI and the court to spend time and resources litigating against organizational plaintiffs and requests for relief which plaintiffs abandoned during the trial.  They raised new allegations in the 2003 complaint, claiming Rider was injured because he continued to see his 'girls' because the original allegations that he was injured by 'refraining from' seeing them were demonstrably false;" "Rider's standing hinged on his credibility, which only a trial could resolve.  That the case lasted as long as it did 'was attributable not to the closeness of the questions,' but to plaintiffs' willingness to make standing claims which are 'easy to allege and hard to disprove, and therefore . . . require substantial discovery and litigation, even when they are groundless from the outset'") (quotation omitted).  In addition to these findings of the Court with respect to plaintiffs' and their lawyers' conduct, plaintiffs took other actions in the ESA Case that, in my view, also contributed to the protracted nature of the ESA Case and the amount of effort required to defend the litigation on behalf of FEI.  Those actions are described in paragraphs 171 through 182 below.

171.    Plaintiffs themselves noticed the deposition of Tom Rider when such a deposition could be used by plaintiffs under Fed. R. Civ. P. 32(a)(4) only if the witness is dead, more than 100 miles from trial, cannot attend trial due to illness, infirmity or imprisonment, or could not be subpoenaed by the deposing party.  Plaintiffs never established during the deposition that any of

these conditions applied to Tom Rider. As a result, FEI had to prepare not only to take the Rider deposition noticed by plaintiffs but also the one that FEI itself noticed and took a year later.

172.    As the Court found, plaintiffs and plaintiffs' counsel deliberately sought to conceal the Rider payments, both through omissions and affirmatively false statements in interrogatory responses, at deposition, and in document productions. ECF No. 559 (FOF 55-59). The efforts to conceal permeated payment discovery. For example, plaintiffs' counsel, Ms. Meyer, made a false representation in meet-and-confer correspondence regarding the existence of non-privileged portions of MGC invoices showing payments to or for Mr. Rider. ECF No. 126-12, at 4 (12/15/06 Letter from Meyer to Gasper). Nearly (seventy) 70 pages of such invoices were ultimately produced pursuant to the Court's August 23, 2007 order and subsequently were admitted at trial without objection (ECF No. 484-2 (Def. Exs. 61 & 209). Plaintiffs' counsel likewise made misleading statements to the Court, both oral and written, regarding the amount, source and purpose of the Rider payments. *See* ECF No. 165 at 15 n.12 (plaintiffs' changing representations about the "average" amount of funding Rider received -- significantly less than the amounts Rider had received in the three preceding years) & 55 (Ms. Meyer's misleading statement regarding the payments to the Court at a September 2005 status hearing). Plaintiffs' and plaintiffs' counsel's conduct made the payment discovery significantly more time intensive than it would have been had plaintiffs and plaintiffs' counsel produced the Rider payment information when it was initially requested in March 2004. To obtain such information, FEI had to issue three (3) third-party subpoenas to WAP (an entity formed by MGC and operated out of MGC's office) as well as third-party subpoenas to HSUS, MGC and PETA. FEI also had to file four (4) motions to compel.

173.   During discovery, plaintiffs refused to agree to a blanket protective order for discovery material and only consented to protection for a small range of information produced by FEI. *E.g.*, ECF Nos. 75-77.   At the same time, plaintiffs distributed FEI's discovery information to the media and other outlets, actually using one discovery document to make a billboard.  Plaintiffs' refusal to accept the large majority of produced documents under protective order (prior to Magistrate Judge Facciola entering a blanket protective order on 09/25/2007 (ECF No. 195)) contributed to the labor-intensive exercise of redacting irrelevant material from the documents prior to production due to plaintiffs' repeated release of pre-trial discovery documents into the public domain through websites, mailings and other formats.  FEI had to spend more time and effort objecting to items in discovery and redacting non-responsive information than would have been the case if an order had been in place permitting material obtained through discovery to be used for legitimate litigation purposes rather than disseminating it to the public at large as plaintiffs were doing.  Once the 9/25/2007 Order was in place, supplemental productions became more efficient.

174.   Despite FEI's repeated attempts to narrow discovery, plaintiffs vigorously pursued the production of all information and documents that had any connection to FEI's elephants, whether or not such materials had any actual relevance to the issues in the ESA Case. In addition to motions, counsel for plaintiffs sent a number of lengthy, minutely detailed alleged "deficiency" letters to counsel for FEI taking issue with FEI's document production or what plaintiffs claimed were failures to produce certain documents.  Responding to these letters was burdensome and time-consuming in terms of the document review necessary to respond to the demands as well as the effort required to write the response itself and to deal with the follow-up correspondence which often occurred as well.

175. Plaintiffs expanded the issues to be litigated beyond the allegations in their complaint and the issues raised in their pre-suit sixty (60) day notice letters to FEI and the government. Such notice letters serve not only as notice to the alleged violator of what is being challenged but also define the subject matter jurisdiction of the court under the ESA. In their sixty (60) day notice letters and complaint, plaintiffs claimed that FEI's use of the guide and tethers and the separation of Asian elephant mothers from their babies (*i.e.*, weaning) were "takes" in violation of the ESA. However, through their expert reports and at trial, plaintiffs submitted evidence on the following issues, none of which was listed in the pre-suit letters or the pleadings, and all of which FEI had to respond to at trial and through its own experts: (a) standing on hard, unyielding surfaces; (b) elephant "toenail cracks;" (c) transportation by railcar; (d) use of electric prods or "hot shots;" (e) forced defecation; (f) performing "circus tricks;" (g) learned helplessness; and (h) tuberculosis. *See* ECF No. 535-2 at 9.

176. Plaintiffs continued to advocate for a wide scope of discovery even after the Court's summary judgment rulings narrowed the case to the seven (7) Asian elephants that Rider claimed he was attached to. ECF Nos. 172, 212. Contrary to FEI's request that discovery be limited to only the seven (7) Rider elephants, plaintiffs argued (i) that discovery should proceed as to FEI's treatment of other elephants, *i.e.*, the Red Unit elephants, because it was illustrative of a "pattern and practice;" and (ii) the alleged "informational" and "resource" injuries of API and the other organizational plaintiffs, which plaintiffs never proved at trial, meant that all of the FEI elephants were still at issue. ECF Nos. 229 & 230. Pursuant to the Court's December 18, 2007 order (ECF No. 239), discovery as to all fifty-four (54) of FEI's elephants continued. FEI again attempted to narrow the evidence at trial to the seven (7) Rider elephants through its motion in limine. ECF No. 345. FEI's motion, which was opposed by plaintiffs, was denied

(ECF No. 387). Thus, despite the summary judgment rulings, FEI had to be prepared to defend at trial its treatment of all fifty-four (54) elephants; to cross-examine plaintiffs' Red Unit witnesses (including Lanette Williams Durham, Archele Hundley, Robert Tom and Robert Tom); and to call its own Red Unit witnesses (Sasha Houcke (by video deposition) and Carrie Coleman). Significant attorney time could have been saved had discovery and trial been limited to the seven (7) Rider elephants at issue, as FEI twice requested and plaintiffs twice defeated.

177.    Plaintiffs filed a Rule 11 motion in response to FEI's motion for leave to file a RICO counterclaim and assert the affirmative defense of unclean hands. ECF No. 163. The Rule 11 motion was summarily denied by the Court without waiting for plaintiffs to submit a reply (ECF No. 178), but not until after FEI had expended considerable time and resources responding to the motion. ECF Nos. 165-169 (1,928 pages of briefing and exhibits).

178.    After the Court's summary judgment ruling against them, plaintiffs sought to expand the lawsuit less than three (3) months before fact discovery was scheduled to conclude with three (3) new plaintiffs, all of whom claimed an emotional attachment to, and alleged "aesthetic injuries" stemming from FEI's treatment of, Red Unit elephants. The Court denied this motion. ECF No. 212. Although all three proposed plaintiffs (Archele Hundley, Robert Tom and Margaret Tom) testified as witnesses at trial and had submitted their own sixty (60) day notice letters, none of them has ever filed his/her own action under the ESA against FEI.

179.    Plaintiffs' May 21, 2008 motion for a preliminary injunction (ECF No. 297) was withdrawn after filing. ECF No. 387 at 2. Plaintiffs' ultimate claim for any form of immediate injunctive relief was abandoned. ECF No. 559 at 8 n.6. But the motion led to events that precipitously put the case into pre-trial preparation before expert discovery had even begun.

180.   Although the Court's August 23, 2007 summary judgment ruling precluded it, plaintiffs did not drop their weaning claim until the initial pretrial statement filed on August 29, 2008. ECF No. 341 at 3 n.1; ECF No. 559 at 4 n.4. Plaintiffs ASPCA, AWI and FFA attempted to exclude themselves as trial witnesses and when that did not succeed, abandoned any claim to relief during the closing argument after FEI had spent the entire litigation defending the case as to the three (3) organizations. ECF No. 559 at 17 n.10.

181.   The pre-trial and trial proceedings were multiplied by plaintiffs' attempt to authenticate incomplete and unreliable documents through declarations and/or as business records. For example, at trial, plaintiffs moved for the admission of various USDA records they received pursuant to a settlement in a related action against the USDA to which FEI was not a party, No. 05-00840-EGS (D.D.C.). Plaintiffs received unredacted copies of various inspections and investigations of FEI from the USDA. Plaintiffs, however, produced the documents to FEI in redacted form after plaintiffs themselves performed the redactions. Plaintiffs redacted key information, including the names of potential witnesses complaining of elephant abuse, in the set of documents produced to FEI, even though this same information was provided by the USDA to plaintiffs. FEI brought this issue to the Court's attention on several occasions after the prohibition on filing of motions, but the issue was never resolved. *See* Hearing Trs. (11/20/07, 02/07/08, 03/06/08, 10/14/08). FEI attempted to negotiate a compromise with the USDA, which ultimately provided it with copies of some, but not all, of the unredacted documents. At trial, plaintiffs argued that the redacted documents should be admitted as business records of the USDA even though they did not exist in such redacted form within the USDA. Further, plaintiffs argued that incomplete USDA investigation files, which omitted documents favorable to FEI but included documents favorable to plaintiffs, should be admitted as USDA business

records. While in a typical case the parties may be able to stipulate to the admission of business records, here, it was made impossible by plaintiffs' refusal to provide the documents to FEI in the same form that plaintiffs had received them and by plaintiffs' request that redacted and incomplete documents be admitted into the record, without any witness available for cross-examination. FEI expended a considerable amount of time negotiating the production of the unredacted documents with plaintiffs and the USDA, researching evidentiary issues and preparing for argument concerning the admissibility of the documents at trial. The USDA documents are just one example. Plaintiffs likewise requested that FEI stipulate to the admission of edited video tape "clips" through eight (8) declarations on the eve of the first trial date. FEI reviewed the "clips" and declarations and determined the video tapes needed to be authenticated through live testimony, including cross-examination. FEI therefore expended time and effort to prepare to cross-examine these witnesses at trial. Many of the declarants did not materialize at trial as witnesses.

182. FEI demanded a jury trial in its answer to the supplemental complaint based upon plaintiffs' claim that they were entitled to forfeiture of the elephants. ECF No. 64 at 5. When the prospect arose that the forfeiture claim would require a jury trial, plaintiffs abandoned the claim for forfeiture in open court, but not until June 11, 2008, after the process of preparing for trial had begun. Minute Entry (06/11/08). Trying the case to the Court versus a jury contributed to the work required and the cost in at least the following respects: (a) A bench trial enabled the Court to defer or carry with the case all objections to evidence, and the *Daubert* issues in particular, as opposed to having to rule definitively on such issues either in motions in limine prior to trial or at the time of proffer. This, in turn, meant that FEI had to be prepared to respond to all such evidence on its own terms throughout the trial and to address the admissibility of such

evidence in the post-trial filings.   (b) A bench trial required proposed findings of fact and conclusions of law which, in this case, were voluminous and required considerable time and effort to prepare.   The filings were particularly voluminous given the expansive trial record, which included a significant number of paper exhibits that were admitted without any witness testimony (*e.g.*, the USDA records).   A jury trial would have required jury instructions and a verdict form which would not have been as time-consuming to prepare, and plaintiffs' ability to dump large volumes of documents into evidence as exhibits would have been curtailed.

## VI.
## FULBRIGHT'S TIMEKEEPING AND BILLING PRACTICES AS THEY PERTAIN TO THE ESA CASE

### A.

### *Timekeeping*

183.   During the period from December 1, 2005 through March 31, 2013, the Fulbright attorneys, paralegals and other professional personnel who worked on the ESA Case were required by Firm policy to make contemporaneous, daily records describing the work that was performed for the client and stating the amount of time that was expended on the work performed.   Such personnel are referred to as "timekeepers."   Firm policy is to enter time on a daily basis but, in any event, no later than 9:00 p.m. central time on the Monday following the conclusion of the week in which the work was performed and, for a particular month, no later than 10:00 p.m. central time on the first business day of the following month.   This, or a similar Firm policy, was in effect throughout the period in which Fulbright handled the ESA Case. Timekeepers recorded their time by use of a computer-based timekeeping program accessible by the timekeeper or an assistant through her/his Firm computer, either in the office or by remote access. Each timekeeper was assigned a unique identifier (attorney or timekeeper number). Time worked on a particular case was recorded using a unique matter number assigned only to that

particular case. Three timekeeping systems were utilized between December 1, 2005 and March 31, 2013 (Time Trax, Elite Time Entry and Web View Time Entry), but they functioned essentially the same way and all had fields on the input form for name and identification number of the timekeeper, client, matter and matter number, number of hours or fractions thereof worked and narrative description of the work performed. When a bill for a particular matter is prepared, these individual time entries for the matter are aggregated into a single document reflecting the time entries for all timekeepers working on the matter for the period selected by the person preparing the bill. From that information the bill is prepared in accordance with the understanding that the Firm has with the particular client about format of the bill and the degree of detail desired in the bill as to the work performed.

184. During the period from December 1, 2005 through March 31, 2013, the policy of the Firm was that timekeepers should account for time worked on client matters in increments of fifteen (15) minutes or one-quarter (.25) hour unless the Firm and the client agreed to use a different increment. The timekeeping increment was established when the particular matter was opened. In addition, unless the client specified a different method, timekeepers were permitted to aggregate the time spent working on all activities for a particular client matter for a given day into a single total amount of time, together with a single narrative for all of the tasks performed, without specifying how much time the timekeeper spent performing each such task, a practice that the case law on attorneys' fee claims has termed "block billing." During my entire career with Fulbright, block billing has been the standard practice for recording time in the vast majority of the cases that I have participated in. The exceptions generally have been cases in which an insurance carrier has specified that specific tasks be broken out and described individually with separate time increments and separate narratives.

185.   When the file on the ESA Case was opened, Fulbright followed the longstanding practice that it had followed in prior cases for FEI.  The timekeeping increment was one-quarter (.25) hour, and timekeepers were permitted to use block billing in describing the work performed for a given day.  The block billing approach was used by timekeepers working on the ESA Case from December 1, 2005 through April 30, 2010.  From May 2010 through the present, block billing was discontinued, and each timekeeper has recorded each task performed on the ESA Case on a given day separately with a separately stated amount of time for each such task. Beginning in March 2011, the increment of time recorded on the ESA Case changed from one-quarter (.25) hour to six (6) minutes or one-tenth (.10) of an hour.  The one-tenth (.10) hour measure has been used by ESA Case timekeepers from March 2011 through the present.

## B.

### Billing

186.   Fulbright's basic accounting program is a system called Elite Enterprise ("Elite") and contains the basic financial information with respect to the work by Fulbright timekeepers and the billing and collection of legal fees and disbursements.  I have been a billing partner since 1986 when I became a partner in the Firm and have personal knowledge of the operation of Elite, the data that the system contains, the functions that the system performs and the accuracy of the records and data contained in the system and the accuracy of the reports that are generated from the system.  When the time entries of individual timekeepers are input into the system, the data goes to Elite where it resides until a bill is prepared.  Once a bill is prepared using the financial and other information derived from the time entries, the amount to be billed to the client is confirmed and an unique invoice number is assigned to the invoice that is used to track payment and to monitor accounts receivable.  When a payment is made, the amount is credited back to the account using the matter number for the client matter and the invoice number.  The data that

Fulbright maintains in Elite contains records of transactions or events (*i.e.*, time records, billed amounts to clients and payments by clients of billed amounts) that were made at or near the time of the transaction or event by individuals with personal knowledge of the transactions or events (*i.e.*, the timekeepers, the partners and other Firm personnel billing the files and the Firm personnel receiving, crediting and depositing the client payments); the records maintained in Elite are the records of Fulbright's regularly conducted business of practicing law; and the making of the records maintained in Elite is a regular practice of the Firm.

187.   Data Vision is a program used by Fulbright to prepare spreadsheets based upon the data contained in Elite.   In my experience, the spreadsheets prepared with Data Vision accurately reflect the data that is extracted from Elite and accurately perform the calculations, sorting or other functions that are specified by the user.   The Microsoft Excel spreadsheets that are attached hereto as Exs. 3-7 and 21 are spreadsheets that were prepared at my direction by Firm accounting personnel using Data Vision and accurately reflect the data from Elite that is shown on the spreadsheets and accurately perform the calculations, sorting and other functions that are exhibited on the spreadsheets.

188.   At the time that Fulbright was engaged to handle the ESA Case, the understanding between the Firm and FEI was that FEI would be billed approximately twice annually for work performed on the matter.   Furthermore, the practice and understanding between Fulbright and FEI was that the law firm would not send to the client a detailed description of the work performed but, instead, would send the client a brief invoice stating "for professional services rendered" through a specific date in connection with a particular case, with a total amount stated for attorneys' fees and a total amount stated for disbursements.   The client did not require further detail because Fulbright kept FEI fully informed of all developments in the ESA Case on

virtually a daily basis, obtained client input on all decisions in the case, and copied the client on all correspondence and filings related to the case. A true and accurate copy of an example of such an invoice that was sent by Fulbright to FEI in connection with the ESA Case is attached hereto as Ex. 30. Both of these practices were continued with the ESA Case, and, as noted below in paragraph 190, both practices were changed during the course of the litigation.

189. For work performed on the ESA Case during the period from December 1, 2005 through June 30, 2010, Fulbright billed FEI twelve (12) separate times on various dates with separately numbered invoices in working period increments ranging from five to seven months. In each such instance, Fulbright utilized a "for professional services" type invoice of the kind described in paragraph 188 (Ex. 30) that contained no narrative of the work performed.

190. From and after July 2010, Fulbright prepared monthly invoices that contained a detailed narrative of the work performed each month by the timekeepers working on the ESA Case. For worked performed in the months of July through December 2010, Fulbright aggregated and sent FEI monthly invoices for each such month on February 28, 2011 under a single invoice number (11162066). For work performed in the months of January through March 2011, Fulbright aggregated and sent FEI monthly invoices for each such month on May 6, 2011 under a single invoice number (11171662). For work performed in the months of April through June 2011, Fulbright aggregated and sent FEI monthly invoices for each such month on July 20, 2011 under a single invoice number (11202668). For work performed from July 2011 through the present, Fulbright sent FEI monthly invoices for each such month separately with a separate invoice number generally during the month following the month in which the work was performed.

191.    Attached hereto as Ex. 7 is a true an accurate copy of a Microsoft Excel spreadsheet, prepared at my direction by Fulbright accounting personnel, that reflects data extracted from the Firm's accounting database pertaining to the ESA Case.  This exhibit lists all of the invoices that are described in paragraphs 189 and 190 above for work on the ESA Case during the period from December 1, 2005 through March 31, 2013, by invoice number and date of the invoice and, among other things, states the dates of the work performed covered by each invoice, the amount that was actually billed by Fulbright to FEI, the amount that was paid by FEI to Fulbright and the date of payment.  As this exhibit shows, FEI paid Fulbright $19,611,771.00 for 46,573 hours that Fulbright worked between December 1, 2005 and March 31, 2013.

192.    In order to document the activities of the lawyers working on the ESA Case for whose work FEI seeks to recover attorneys' fees during the period from December 1, 2005 through June 30, 2010 in which Fulbright used "for services rendered" invoices as described in paragraph 188 above, FEI is providing the time records that each attorney prepared and entered into the Fulbright system.  Attached hereto as Ex. 31 are true and accurate copies of the ESA Case time records of all timekeepers who charged time to the ESA Case during the period from December 1, 2005 through June 30, 2010.  The time records are organized into the periods of time corresponding to the time periods covered by the invoices that Fulbright sent.  These time records were prepared by the respective timekeepers contemporaneously with the work that was performed and recorded in the time records pursuant to the policy and practice described in paragraphs 183-184 above.

193.    Using my own time record for June 15, 2006 as an example, the format of the time records attached hereto as Ex. 31 is as follows, reading left to right.  The first date, "06/15/2006" is the date that the work was performed.   The second date underneath,

"08/23/2206," is the date of the invoice that was sent to FEI billing this particular time entry.  In the next column, "431" is my attorney number which is unique to me in the Fulbright system.  In the next column under my name, "Invoice = 10682531" is the invoice number assigned to the invoice that Fulbright sent to FEI billing for this time.  In the next column, the top "7.5" indicates that I recorded seven and one half (7 ½) hours of time worked on the ESA Case that day, and the bottom "7.5" indicates that all of those hours were billed to FEI.  In the next column the top "3,787.50" indicates that the hours I recorded that day had a value of $3,787.50 and the second "3,787.50" indicates that, before any discounts were applied, the hours billed to FEI had a billed value of $3,787.50.  (When Fulbright actually billed this time with Invoice No. 10683531 for the period December 1, 2005, through June 30, 2006, the Firm applied an across-the-board discount to all timekeepers of 12.95%, and that discount is reflected by the negative values for each timekeeper listed in the entries for June 30, 2006 which roll collectively into the total value shown as actually billed to FEI.)  The block text in the next column is a description (prepared contemporaneously with the work) that I wrote of the work that I performed that day during those 7.5 hours.  In the next column, "10513410" is the matter number assigned by Fulbright to the ESA Case, which is unique to the ESA Case.  In the final column, "30058465" is an index number assigned by Fulbright to this particular time entry which is unique to this entry.

194.    The June 15, 2006 time entry discussed in the preceding paragraph was billed by an invoice that covered the period from December 1, 2005 through June 30, 2006 which corresponds to the first section of time records in Ex. 31.  That section is preceded by a summary.  The summary lists for each timekeeper during the particular period, the number of hours recorded as worked on the ESA Case, the recorded value of those hours, the number of the hours worked that FEI was billed for and the value of the hours that were actually billed.  Using

myself as an example, I recorded 487.25 hours worked during this period, all of which were billed by Fulbright to FEI. The recorded value of this time was $246,061.25, but it was billed to FEI at $214,193.18 and therefore at a discount. This information appears on each of the summaries in the time records for the period from December 1, 2005 through June 30, 2010 in Ex. 31.

195.   When a timekeeper's time was written off, it is reflected in the time records summary and in the person's time record. For example, the summary for the period from January 1, 2009 through June 30, 2009 shows that Rebecca Furnia, a librarian, recorded 9.5 hours worked on the ESA Case at an aggregate value of $2,090.00, but all 9.5 hours were written off, *i.e.*, billed to FEI at zero ("0"). Ms. Furnia's time records show the same thing with the zeroes ("0's") underneath the number of hours recorded and the recorded value of the time. *See* Ex. 31 (Furnia time entry for 01/26/2009).

196.   In order to document the activities of the lawyers working on the ESA Case for whose work FEI seeks to recover attorneys' fees during the period from July 1, 2010 through March 31, 2013 in which Fulbright used monthly invoices with detailed narratives as described in paragraph 190 above, FEI is submitting the monthly invoices. Attached hereto as Ex. 32 are true and accurate copies of the monthly invoices that Fulbright sent to FEI for work performed on the ESA Case during the period from July 1, 2010 through March 31, 2013. The detailed narratives of work in these invoices were taken directly from the contemporaneously made time entries of the timekeepers involved. The invoices have been redacted to remove taxpayer identification, bank account and related financial privacy information.

197.   Using the invoice in Ex. 32 dated February 28, 2011 for work during the month of August 2010 and the first entry for me as an example, the format of the invoice is as follows.

The "08/02/10" in the column "DATE" is the date that the work was performed. "JM Simpson" in the column "NAME" is the name of the timekeeper, here John M. Simpson. The ".50" in the column "TIME" indicates that the work was recorded as one-half (1/2) an hour. Under "SERVICES" the text describes the work that was performed during that thirty minutes. At the end of the invoice, the timekeepers who recorded time on the ESA Case that month are listed, with the hours that each recorded, the timekeeper's respective rate per hour and the total fee billed to FEI based upon the hours stated at the rate indicated.

## VII.
## THE RATES CHARGED BY FULBRIGHT
## FOR WORK ON THE ESA CASE

### A.
### *Fulbright's Method of Determining Rates*

198.   The general historic practice and policy of Fulbright, including during the period from December 1, 2005 through March 31, 2013, has been that the work that Fulbright attorneys and other timekeepers perform for Firm clients will be billed to the client by the hour. Although different methods of billing can be utilized upon approval by the appropriate Firm committee, such as contingency fees or alternative fees (*e.g.*, a fixed fee), the billable hour is the standard method.

199.   I am familiar with the manner in which Fulbright establishes standard hourly rates, both through the regular information flow that partners in the Firm receive, as well as through my capacity as partner in charge of the litigation group in the Firm's Washington office in which I have participated in the rate-setting process as well as approval of the rates that are assigned to new litigation matters. Fulbright establishes standard hourly rates for all timekeepers in the Firm based upon several factors, including job classification of the timekeeper, class year, geographic location, practice area and economic and competitive factors in the legal

marketplace. Partner standard hourly rates generally are individualized to the partner. Non-partner standard hourly rates are more lock-step in approach. The Firm considers two basic factors in setting standard hourly rates: (i) recovering the costs of running the business and thereby generating a profit; and (ii) remaining competitive in the marketplace for legal services. The latter factor is assessed by studying surveys and other similar sources of information.

200.    Standard hourly rates generally are reviewed and adjustments deemed appropriate by Firm management are made at the end of each calendar year, with the new standard rates generally taking effect in January of the following calendar year. Absent an exception agreed to between the Firm and a client, Fulbright's standard hourly rates are what the Firm's clients are charged and actually and customarily pay for the legal work performed by Fulbright attorneys and other timekeepers.

201.    When a file is opened for a particular Fulbright matter or case, it is assigned a rate at which the time of the timekeepers will be valued. Whether the rate assigned is the standard hourly rate or a lesser or in some instances a higher rate, the rate actually assigned is known as the "matter rate." A matter rate is assigned to each timekeeper who works on the case or matter. When billing a file, a partner has some discretion to make discounts off a particular matter rate or, in appropriate instances, to enhance that rate. The rate that is actually used to value the hours that are actually billed to the client is called the "billed rate." A billing partner can implement discounts to a client off the matter rate in a number of different ways, including across-the-board discounts on all timekeepers' time, discounting only selected timekeepers' time, valuing at zero (*i.e.*, writing off) certain timekeepers' time, or combinations of such methods.

202.    When Fulbright was retained to represent FEI in the ESA Case, the understanding between the Firm and the client was that the client would be charged by the hour for the work

performed, valued generally at rates equal to a one (1) year lag in standard hourly rates.  In other words, work performed this year generally would be valued at last year's standard hourly rates. Thus, for example, my standard hourly rate for the calendar year 2013 is $850.00 per hour, but my matter rate on the ESA Case in 2013 is $825.00 per hour, which was my standard hourly rate for calendar year 2012.  Although there were some exceptions and variations, this one (1) year lag approach generally was followed by Fulbright throughout its representation of FEI in setting matter rates for the ESA Case.

203.   The matter rates that Fulbright set for the ESA Case resulted in substantial discounts to FEI off the Fulbright standard rates for the timekeepers working on the ESA Case. Furthermore, Fulbright also frequently gave FEI further discounts off the matter rates when the Firm billed the file.  Ex. 7 hereto (previously identified in paragraphs 187 & 191) summarizes the invoices that Fulbright sent to FEI for work performed on the ESA Case from December 1, 2005 through March 31, 2013.  For each invoice, the number of hours actually billed to the client during the invoice period is stated along with the value of those hours at the standard hourly rates, at the matter rates and at the rates at which the hours were actually billed to FEI, with a calculation of the differences between standard and billed rate and matter and billed rate.  Thus, using the first invoice (No. 10682531) as an example, FEI was billed for 4,279 hours of work on the ESA Case for the period from December 1, 2005 through June 30, 2006.  The aggregate value of those hours at Fulbright's then applicable standard hourly rates was $1,568,676; the aggregate value of those hours at the ESA Case matter rates was $1,480,215; but the aggregate value of those hours as actually billed to, and paid for by, FEI was $1,288,508.  Thus, for the work performed during the period from December 1, 2005 through June 30, 2006, FEI received

an overall discount of **17.86** percent off Fulbright's standard hourly rates and an overall discount of **12.95** percent off the matter rates for the ESA Case.

204.   As shown by Ex. 7, for work performed on the ESA case throughout the period from December 1, 2005 through March 31, 2013, overall discounts by Fulbright to FEI off standard hourly rates ranged from **3.03** percent to **40.49** percent with an average overall discount for the entire period of **11.16** percent.   During that same period, the overall discounts by Fulbright to FEI off ESA Case matter rates ranged from no discount to **34.77** percent with an average overall discount of **3.93** percent.

205.   Attached hereto as Ex. 6 is a true and accurate copy of a Microsoft Excel spreadsheet, prepared at my direction by Fulbright accounting personnel that reflects data extracted from the Firm's accounting database pertaining to the ESA Case.  This exhibit states, for each calendar year from 2005 through 2013, the standard hourly rates, the ESA Case matter rates, and the ESA Case billed rates for each of the twenty-five (25) lawyers and four (4) non-attorney professionals who worked on the ESA Case between December 1, 2005 and March 31, 2013 and whose work forms the basis for FEI's claim in the instant petition.

206.   Using the portion of Ex. 6 pertaining to me as an example, the document states my name, current title and the year I graduated from law school.  The column "Year Worked" lists each calendar year in which I recorded time worked on the ESA Case.  Taking 2006 as an example for the remaining columns, the document shows the following:  (i) My standard hourly rate for 2006 was $575.00 per hour, but my matter rate for the ESA Case in 2006 was $505.00 per hour. (ii) I recorded 1,141.50 hours worked on the ESA Case in 2006, and all of those hours were billed to FEI. (iii) Those 1,141.50 hours had an aggregate recorded value at the ESA Case matter rate of $576,457.50.  (iv)  However, those 1,141.50 hours were billed to FEI at a

discounted aggregate value of $527,487.79.  (v)  The discount on my time that was given to FEI for 2006 translates into a billed rate for me in 2006 of $462.10 per hour.  This same information is stated in Ex. 6 for each of the other timekeepers whose work on the ESA Case is the basis for FEI's claim.

207.    The row of information at the bottom of the section in Ex. 6 pertaining to me shows the following for the period from December 1, 2005, through March 31, 2013:  (i)  I recorded 7,572.70 hours worked on the ESA Case, and all of those hours were billed by Fulbright to FEI. (ii)  The recorded aggregate value of the 7,572.70 hours that I worked, at the matter rate, was $4,771,518.00, but those hours were billed to, and paid for by, FEI at an aggregate value of $4,670,101.91.  (iii)  My average standard hourly rate for this period was $687.94 per hour, my average matter rate was $630.09 per hour and my average billed rate, which is what FEI actually paid, was $616.70 per hour.  This same information is stated in Ex. 6 for each of the other timekeepers whose work on the ESA Case is the basis for FEI's claim.

## B.
### The Reasonableness of Fulbright's Rates

208.    In my opinion, the standard hourly rates, matter rates and billed rates that are set forth on Ex. 6 with respect to the twenty-nine (29) timekeepers whose work is covered by the instant petition are reasonable.  These rates all fall within the range of rates prevailing in the District of Columbia during 2005 through 2013 for similar services by lawyers and other professionals of reasonably comparable skill, experience and reputation.  In particular the standard hourly rates, matter rates and billed rates set forth on Ex. 6 fall within, or in some instances are below, the prevailing District of Columbia market rates for experienced counsel handling complex civil litigation in federal court, as well as the prevailing market rates in the District of Columbia for associates, other non-partner attorneys, paralegals and other hourly

billed professional personnel at large Washington litigation firms or national or international firms with D.C. offices with complex federal court litigation practices. I base this opinion on my more than thirty-five (35) years of practice in complex federal court litigation in the District of Columbia, which has included submitting and defending claims for attorneys' fees in litigation, as well as the facts stated in paragraphs 209-221 below.

209. During the period from December 1, 2005 through March 31, 2013, Fulbright was a law firm with more than 800 attorneys and offices in seventeen (17) locations in the United States and abroad. By revenue and by timekeeper headcount, generally more than forty (40) percent of Fulbright's overall practice, and the Firm's practice in Washington, D.C., has focused historically on the trial and litigation of complex business and other civil cases. Pursuant to a combination effective June 3, 2013, Fulbright became a member of Norton Rose Fulbright, a global law practice with more than 3,800 lawyers in 54 offices in 28 countries. By number of lawyers and revenue, Norton Rose Fulbright currently is ranked third in the world. For purposes of comparison of rates, Fulbright is comparable to other U.S. national or international law firms with significant practices in complex federal court litigation nationally and in the District of Columbia, and is comparable as well as to Washington-based firms with complex federal court civil litigation practices.

210. During the period from December 1, 2005 through March 31, 2013, when Fulbright set standard hourly rates for the timekeepers in the Firm's Washington office, it reviewed, among other things, surveys of the rates of other law firms in the District of Columbia. Such information was available through several sources, including a financial and operational benchmarking product called "Peer Monitor" to which the Firm subscribed pursuant to a licensing agreement with West Publishing Corporation ("West"), the company that offers the

Peer Monitor product.  One Peer Monitor survey group of firms that Peer Monitor and the Firm

considered relevant was a group that included Redacted per motion for sealing order.

Redacted per motion for sealing order.

Thus, the survey included two (2) national or international firms that, like Fulbright, are based in

Texas and have complex federal court litigation practices generally and in D.C. Redacted

Redacted ); large national or international East Coast (Redacted ), West Coast Redacted

and two (2) Midwest Redacted firms with complex federal court

practices generally and in D.C.; and two (2) Washington-based firms Redacted

Redacted with complex federal court litigation practices.  The Peer Monitor Survey

and the data contained therein are explained in the Declaration of Cory Branden.  A true and

accurate copy of Mr. Branden's declaration and a true and accurate copy of the Peer Monitor

Survey are attached hereto collectively as Ex. 8.  (As explained in Mr. Branden's declaration, his

declaration and the Peer Monitor Survey are being submitted with FEI's petition under seal in

accordance with the requirements of the licensing agreement between Fulbright and West.)  The

Peer Monitor Survey contains data for the firms listed above for the years 2005 through 2013 for

the category litigation.  The discussion in paragraphs 211 through 214 below is based upon my

knowledge of Peer Monitor as supplemented by Mr. Branden's declaration.

211.    The Peer Monitor Survey reports hourly rate data by years of experience for

equity partners, non-equity partners, associates, of counsel, paralegals and other professionals.

The hourly rate data reported is standard hourly rates, agreed rates per hour (which correspond to

Fulbright's matter rates) billed rates per hour (which correspond to Fulbright's billed rates) and collected rates (which correspond to Fulbright's collected rates). Since FEI usually paid what was billed to it by Fulbright in the ESA Case, the ESA Case billed rate and the ESA Case collected rate are essentially the same. By agreement with participating firms, Peer Monitor collects the data directly from the participating firms' time and billing systems and therefore uses essentially the same information that the firms themselves rely on for internal financial accounting purposes.

212.    The Peer Monitor Survey reports the various rates by three measures:  25th percentile, median and 75th percentile.  A rate that equals or is less than the rate reported at the 25th percentile falls into the bottom quarter of the rates in that category of the survey.  A rate that equals or exceeds the rate reported at the 75th percentile falls into the top quarter of rates in that category of the survey.  The median rate is rate at which fifty (50) percent of the rates in the survey are below and fifty (50) percent of the rates in the survey are above.

213.    Attached hereto as Ex. 9 are true and accurate copies of Microsoft Excel spreadsheet graphs that I prepared based upon the data on Fulbright standard hourly rates and ESA Case matter and billed rates contained in Ex. 6 and the survey data contained in the Peer Monitor Survey attached hereto with Mr. Branden's declaration as Ex. 8. (Because it makes specific reference to the Peer Monitor Survey data in Ex. 8, Ex. 9 also is being submitted with FEI's petition under seal.) For each of the twenty-nine (29) timekeepers listed on Ex. 6, Ex. 9 plots that timekeeper's standard hourly rates and his/her ESA Case matter and billed rates and compares them graphically with the Peer Monitor Survey 25th percentile, median and 75th percentile standard hourly, agreed, billed and collected rates. For each timekeeper listed on Ex. 6, Ex. 9 contains a single graph comparing all of that timekeeper's Fulbright rates to the three

Peer Monitor measures and then separate graphs comparing that timekeeper's individual Fulbright standard hourly, matter and billed rates on the ESA Case to the 25th percentile, median and 75th percentile Peer Monitor measures for standard hourly, agreed, billed and collected rates. Unless there are at least five (5) attorneys or peers in a particular category, Peer Monitor will not report the data on that category to preserve the anonymity of the survey.  For Lisa Zeiler Joiner and Julie A. Hardin, there was no corresponding Peer Monitor Survey data for 2006 through 2009, so their rates are compared to the average for all partners in the survey.  Andre T. Hanson is a senior counsel and Mary Fritz is a special consultant, neither of which category is in the Peer Monitor Survey.  Because both of these non-partner attorneys have in excess of seven (7) years' experience, their rates are compared to associates in the Peer Monitor survey with more than seven (7) years' experience.  The Peer Monitor Survey had no data for litigation support personnel such as Heather A. Nearhoof, so her rates are compared to the survey rates for "other specialists."

214.    As the graphs contained in Ex. 9 demonstrate, the standard hourly, matter and billed rates of the Fulbright timekeepers listed on Ex. 6 are all within the range of the rates reported by the Peer Monitor Survey for litigation lawyers at firms comparable to Fulbright with complex federal court litigation practices in the District of Columbia in the period from 2005 through 2013.  In many instances, the respective Fulbright rates fall well below the median Peer Monitor rates or fall into the bottom 25 percent of the surveyed rates.  Given that the Fulbright rates that do correspond to the survey categories are within the reported ranges and at or below the market, it is likely, in my opinion, that the rates of attorneys Joiner, Hardin, Hanson and Fritz and non-attorney Nearhoof, for whom precise comparative data is not reported by the survey, likewise were at or below the prevailing market during the period in question.

215.    In addition to the Peer Monitor Survey, I reviewed hourly rates that have been approved and found to be reasonable and/or within the prevailing market in federal district court litigation in the District of Columbia in connection with claims for legal fees asserted in complex civil litigation by law firms comparable to Fulbright during the period in which Fulbright represented FEI in the ESA Case.  As with the rates contained in the Peer Monitor survey, Fulbright's standard hourly rates and the ESA Case matter and billed rates were comparable to, and in most instances less than, the rates that were approved by the courts in these other federal cases.  The cases that I reviewed and the rate comparison that I undertook are described in paragraphs 216-221 below.

216.    *Miller v. Holzmann*, No. 95-cv-01231-RCL (D.D.C.), was a False Claims Act case in which the Hon. Royce C. Lamberth awarded more than $7.5 million in legal fees to the private party and prevailing plaintiff Miller who had been represented by Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") (counsel for Jonathan Lovvorn and Kimberly Ockene in the RICO Case and in the ESA Case as to section 1927 sanctions).  575 F. Supp. 2d 2 (D.D.C. 2008).  The *Miller* case was complex, lasting more than a decade and also required a trial to resolve.  Judge Lamberth found reasonable, and approved for purposes of calculating the lodestar amount, the 2007 and 2008 standard hourly rates of multiple WilmerHale timekeepers, including ten (10) timekeepers in the same job classifications and class years as Fulbright timekeepers listed on Ex. 6 hereto.  Judge Lamberth's determination was based, in part, on the declaration and supplemental declaration of Stephen Braga, currently counsel for Ms. Meyer and MGC in the ESA Case and the RICO Case, who was, at the time of his declarations, a partner in Baker Botts LLP Redacted per motion for sealing order.

Redacted True and accurate copies of Mr. Braga's declarations are attached hereto collectively as

Ex. 10. Mr. Braga opined that the WilmerHale standard hourly rates at issue were within the prevailing D.C. market and, in some instances, below the market based upon, among other things, the rates of Baker Botts LLP. *Id.* at 9-12 (first declaration).

217.    Attached hereto as Ex. 11 is a true and accurate copy of Microsoft Excel spreadsheet graphs that I prepared that compare the 2007 and 2008 standard hourly rates that were judicially approved in *Miller v. Holzmann* with the 2007 and 2008 Fulbright standard hourly rates and ESA Case matter and billed rates for timekeepers on the ESA Case in the same job classifications and/or class years as the WilmerHale timekeepers whose standard hourly rates were approved in *Miller*. The information in the graphs for the Fulbright timekeepers was taken from Ex. 6 hereto. The information in the graphs for the WilmerHale timekeepers was taken from the declarations of Robert Bell. No. 95-cv-01231-RCL, ECF No. 930-2 at 38; ECF No. 980-1 at 8. True and accurate copies of relevant excerpts from these judicial records in *Miller* are attached hereto collectively as Ex. 14. As the graphs show, the Fulbright 2007 and 2008 standard hourly rates in the comparison generally were less than the court-approved 2007 and 2008 WilmerHale standard hourly rates. Moreover, for all of the timekeepers in the comparison, the ESA Case billed rates (the rates at which FEI actually paid for the Fulbright work in the ESA Case) were significantly less than the WilmerHale standard hourly rates (the rates at which Judge Lamberth awarded legal fees to Miller).

218.    *McKesson Corp. v. Islamic Republic of Iran*, No. 82-cv-00220-RJL (D.D.C.), was a case centering on the expropriation of private assets by a foreign government in which the Hon. Richard J. Leon awarded more than $10 million in legal fees to the prevailing plaintiff McKesson which had been represented by Morgan Lewis & Bockius (counsel for HSUS in the ESA Case and the RICO Case). 2013 U.S. Dist. LEXIS 43266 (D.D.C. Mar. 27, 2013). The

*McKesson* case was complex and protracted, having lasted more than thirty (30) years. Judge Leon approved and found reasonable the rates at which the time of multiple Morgan Lewis timekeepers had been billed to and paid for by McKesson during the period from 2005 through 2011, including five (5) timekeepers in the same job classifications and class years as Fulbright timekeepers listed on Ex. 6 hereto.

219.   Attached hereto as Ex. 12 is a true and accurate copy of Microsoft Excel spreadsheet graphs that I prepared that compare certain of the 2005-2011 billed rates per hour that were judicially approved in *McKesson* with certain of the 2005-2011 Fulbright standard hourly rates and ESA Case matter and billed rates for timekeepers on the ESA Case in the same job classifications and/or class years as the Morgan Lewis timekeepers whose billed rates per hour were approved in *McKesson*. The information in the graphs for the Fulbright timekeepers was taken from Ex. 6 hereto. The information in the graphs for the Morgan Lewis timekeepers was taken from the declarations of Mark N. Bravin. No. 82-cv-00220-RJL, ECF No. 889-1 at 1-8; ECF No. 946-1 at 1-2; 946-2 at 1; ECF No. 971-1 at 3-11. True and accurate copies of relevant excerpts from these judicial records in *McKesson* are attached hereto collectively as Ex. 14. As the graphs show, the Fulbright 2005-2011 standard hourly rates and ESA Case matter and billed rates in the comparison were uniformly less than the court-approved 2005-2011 Morgan Lewis billed rates per hour. Moreover, for all of the timekeepers in the comparison, the ESA Case billed rates (the rates at which FEI actually paid for the Fulbright work in the ESA Case) were significantly less than the Morgan Lewis billed rates (the rates at which Judge Leon awarded legal fees to McKesson).

220.   The third case that I reviewed was *Woodland v. Viacom, Inc.*, No. 05-1611-PLF/JMF (D.D.C.), in which the Hon. John M. Facciola entered a discovery sanction against the

plaintiff in favor of the defendant Viacom who was represented by Morgan Lewis & Bockius (counsel for HSUS in the ESA Case and the RICO Case).   255 F.R.D. 278 (D.D.C. 2008). Magistrate Judge Facciola approved and found reasonable the 2008 standard hourly rates of two (2) Morgan Lewis timekeepers with job classifications and class years corresponding to two (2) Fulbright lawyers listed on Ex. 6 hereto.

221.   Attached hereto as Ex. 13 is a true and accurate copy of Microsoft Excel spreadsheet graphs that I prepared that compare the 2008 standard hourly rates that were judicially approved in *Woodland* with the 2008 Fulbright standard hourly rates and ESA Case matter and billed rates for timekeepers on the ESA Case in the same job classifications and/or class years as the Morgan Lewis timekeepers whose standard hourly rates were approved in *Woodland.* The information in the graphs for the Fulbright timekeepers was taken from Ex. 6 hereto.   The information in the graphs for the Morgan Lewis timekeepers was taken from the affidavit of John S. Ferrer.   No. 05-1611-PLF/JMF, ECF No. 34.   True and accurate copies of relevant excerpts from these judicial records in *Woodland* are attached hereto collectively as Ex. 14.   As the graphs show, the Fulbright 2008 standard hourly rates generally were comparable to the court-approved 2008 Morgan Lewis standard hourly rates.   While the standard rate of Ms. Joiner (class of 1996) exceeds the standard rate of Mr. Ferrer (also class of 1996), Ms. Joiner was a partner in 2008, while Mr. Ferrer was an associate in 2008.   Moreover, for all of the timekeepers in the comparison, the ESA Case billed rates (the rates at which FEI actually paid for the Fulbright work in the ESA Case) were less than the Morgan Lewis standard hourly rates (the rates at which Magistrate Judge Facciola awarded legal fees to Viacom).

## VIII.

## CALCULATION OF THE LODESTAR AMOUNT
## FOR THE FULBRIGHT WORK ON THE ESA CASE

222.    FEI seeks to recover **$22,630,043.24** in attorneys' fees for the work that Fulbright

performed on the ESA case from December 1, 2005 through March 31, 2013.  *See* Ex. 1 hereto.

Paragraphs 223 through 255 below explain how this amount was calculated.   Paragraphs 223

through 249 describe the items that FEI is excluding from its claim, and paragraphs 250 through

255 describe how the lodestar amount was calculated after the exclusions are taken into account.

### A.

### *Items Excluded from FEI's Claim*

223.    As Ex. 3 hereto (previously identified in paragraphs 24 & 187) shows, during the

period from December 1, 2005 through March 31, 2013, the Fulbright timekeepers who recorded

hours on the ESA case worked an aggregate total of 49,250.45 hours which had an aggregate

value, at the applicable matter rates, of $21,084,747.75.  Ex. 3 at 3.  Of those amounts, however,

Fulbright billed FEI for 46,573.09 hours at an aggregate billed value of $19,612,183.21.  *Id.*  As

Ex. 7 hereto (previously identified in paragraphs 24, 187 & 191) shows, FEI has paid essentially

the full billed amount, *i.e.*, $19,611,771.00.[5]  Thus, FEI was not billed by Fulbright for **2,677.36**

hours with an aggregate value at matter rates of **$1,472,564.54**.  Although these 2,677.36 hours

were not billed to FEI, the timekeeper narratives or invoice descriptions for this non-billed or "no

charge" time are contained in the time records and monthly invoices that are being submitted to

support FEI's claim.  Exs. 31 & 32 hereto.  The narratives or descriptions of these "no charge"

amounts are highlighted with pink highlighting in the time records and monthly invoices.

224.    Based upon my experience as lead counsel for FEI in the ESA Case since the

inception of the engagement through the present, as well as my more than thirty-five (35) years

---

[5]   The difference between the value of the total hours billed (as shown on Exs. 3 & 7) and the value of the total hours paid for (as shown on Ex. 7) is $412.21.  FEI's claim uses the lower number.

of practice in complex federal court litigation, and in view of the complexity of the ESA Case, what was at stake in the litigation for FEI, the manner in which plaintiffs litigated the case, how long it lasted, the findings of fact that the Court has made about the actions of plaintiffs and their counsel during the litigation, and all of the other factors I have described above, 46,573.09 hours was a reasonable number of hours expended in defense of the ESA Case by Fulbright, and the $19,611,771.00 that FEI paid for that work was a reasonable sum to pay for that defense.

225.     Nevertheless, in an effort to narrow the areas of disagreement with respect to the instant petition, FEI does not seek to recover for all of the hours that it actually paid Fulbright for in the ESA Case.  As described in paragraphs 226 through 249, FEI does not seek to recover for (i) any time recorded to the ESA Case by any Fulbright timekeeper who charged fewer than one hundred (100) hours to the case; (ii) the time charged by the temporary attorneys who were hired to work on some of the document productions and other projects collecting and organizing exhibits; (iii) the time that Fulbright spent transitioning the ESA Case from Covington to Fulbright; and (iv) the time that Fulbright spent dealing with the issues concerning the production of elephant veterinary records.  Moreover, certain of the narratives of work in the time records and invoices that are being provided to show the day-to-day activities of the timekeepers working on the ESA Case make references to information that would tend to reveal either attorney-client communications or attorney opinion or other work product or both.  FEI has redacted such items from these records and, accordingly, with a few exceptions which are specifically identified in paragraph 242, does not seek to recover for them.   Any travel time certain of the attorneys may have recorded to the file is identified and is valued and claimed at half the rate at which it was billed to FEI.  Finally, FEI has reduced the number of hours it seeks to recover that are attributable to Joseph Small.  As discussed in paragraph 35 above, Mr. Small

served as a senior advisor and client liaison to the case and also participated directly in the 2010 mediation. In an effort to narrow the areas of disagreement with respect to the instant petition, FEI has adjusted the claim as to Mr. Small as follows. FEI is claiming the 227.50 hours that Mr. Small devoted to the case in 2010 when the matter was in mediation (*see* Ex. 6 hereto at 3 (2010)), and, of the remaining hours billed by Mr. Small, FEI is claiming 900 hours, which (net of the 84 hours excluded for him for other reasons, *see* Ex. 16 hereto at 2) amounts to approximately ten (10) hours per month for his participation as a senior advisor and client liaison during the seven (7) year period in which Mr. Small was involved with the ESA Case (816 hours ÷ 7 years ÷ 12 months = 9.71 hours per month). This exclusion represents a total of **1,164.75 hours** that were billed to FEI at an aggregate value of **$689,641.58**.

### 1.

### Timekeepers With Fewer Than 100 Hours

226.     During the period from December 1, 2005 through March 31, 2013, a total of 107 attorneys, paralegals, librarians, project assistants and other professionals recorded hours worked on the ESA Case. Ex. 3 hereto (previously identified in paragraphs 24 & 187) lists all of the Fulbright timekeepers who recorded time to the ESA Case during the period from December 1, 2005 through March 31, 2013, listed in rank order by the number of hours that were billed to FEI, and, for each timekeeper, states the number of hours recorded as worked, the value of that time at the matter rate, the number of hours that were billed to FEI and the value at which those hours were billed to FEI. All such values are then totaled at the bottom of their respective columns. Exs. 4 and 5 hereto (previously identified in paragraph 187) take the same data stated on Ex. 3 and separate it into two (2) groups of timekeepers: those with one hundred (100) or more hours billed to FEI on the ESA Case (Ex. 4) and those with fewer than one hundred (100) hours billed to FEI on the ESA Case (Ex. 5). The 100-or-more-hour group include the twenty-

five (25) attorneys and four (4) non-attorney professionals whose hours are being claimed by FEI in the present petition.   In order to narrow the areas of potential disagreement on the instant petition, the remaining fewer-than-100-hour group of seventy-nine (79) timekeepers are excluded in their entirety from FEI's claim.  This exclusion represents a total of **1,328.25 hours** that were billed to FEI at an aggregate value of **$292,558.10**.

227.    Although FEI is not claiming any of the hours for the fewer-than-100-hour group of seventy-nine (79) timekeepers, the timekeeper narratives or invoice descriptions for these excluded timekeepers are included in the time records and monthly invoices that are being submitted to support FEI's claim.  Exs. 31 & 32 hereto.  The narratives or descriptions for the fewer-than-100-hour group of seventy-nine (79) timekeepers are highlighted with purple highlighting in the time records and monthly invoices.

## 2.
### Temporary Attorneys

228.    During the period from December 1, 2005 through March 31, 2013, Fulbright retained temporary contract attorneys to assist with certain of the document reviews and some of the evidence collection and organization in preparation for trial.  These attorneys did not prepare detailed narratives of their activities, but the hours that they worked were recorded at the value at which Fulbright agreed to pay the providing agency for the cost of the temporary attorneys' services.  The temporary attorneys as a group recorded more than one hundred (100) hours that were billed to FEI on the ESA Case, so they are listed as a group in Ex. 4  in the row with the Timekeeper Name "Washington Temporary."   In order to narrow the areas of potential disagreement on the instant petition, the hours worked on the ESA Case by temporary attorneys are excluded in their entirety from FEI's claim.  This exclusion represents a total of **1,160.50 hours** that were billed to FEI at an aggregate value of **$164,526.29**.  Ex. 4 at 1.

**3.**

**Law Firm Transition Costs**

229.    Fulbright was retained to represent FEI in the ESA Case in December 2005, and begun working in that same month to transition the case from Covington.  In March 2006, Fulbright entered appearances in the case, and Covington withdrew.  The transition work by Fulbright included basic orientation to the matter through the review of pleadings and other case documents and conferences with the client and with Covington to understand the posture of the case, impending deadlines and tasks that were in the process of being completed.  In order to narrow the areas of potential disagreement on the instant petition, the hours that Fulbright worked and billed to FEI for transitioning the case from Covington are excluded in their entirety from FEI's claim.  This exclusion represents a total of **343.25 hours** that were billed to FEI at an aggregate value of **$130,621.57**.

230.    The amounts stated in the preceding paragraph that are excluded for law firm transition costs were determined as follows.  In preparing this declaration, I personally reviewed and analyzed all of the Fulbright time records and invoices for the ESA Case from December 1, 2005 through March 31, 2013.  In that review, I isolated those time entries that, in my judgment, constituted time spent by a Fulbright timekeeper in transitioning the ESA Case representation from Covington to Fulbright.  Using my time record for December 12, 2005 as an example (Ex. 31), I recorded five and one-half (5.5) hours for that day on the ESA Case with the following narrative:  "Review of pleadings, other docket materials and tasks in preparation for meeting with client representatives regarding background of case and transition of representation.  Travel to client offices for meeting.  Meeting with client representatives.  Return travel from client offices."  All of this work is transition work.  Therefore all of this time is excluded from FEI's

claim. I performed the same analysis on the time entries for all of the other timekeepers who recorded time on the ESA Case.

231.   Ex. 17 hereto is a true and accurate copy of a Microsoft Excel Spreadsheet that I prepared to memorialize the analysis of excluded law firm transition costs that I performed as described in the preceding paragraph. The spreadsheet is divided into two sections. The first section lists the excluded time entries in chronological order. The second section lists the same excluded time entries by attorney and by calendar year.

232.   Using the December 12, 2005 entry for me on page 1 of the first section as an example, "Date" is the date of the time entry and "Timekeeper" is the name of the attorney associated with the time entry. "Recorded Amount Excluded" is the value, as stated in the time record, of the time that is being excluded. "Hours Excluded" are the number of hours being excluded. Thus, in this example, 5.5 of my hours, with a recorded value of $2,777.50, are being excluded. However, this recorded value of $2,777.50 was the value of this time at my matter rate in 2005. Since FEI was not always billed at the matter rate, but usually at a discount from the matter rate, it is necessary to determine the extent to which this time was discounted when Fulbright billed it to FEI. The discount information is derived from the summary page in the Fulbright time records for the invoice period that includes this time entry. That invoice period was from December 1, 2005 through June 30, 2006. Ex. 31 hereto (summary for 12/01/05 through 06/30/06). As that summary page shows, I recorded 487.50 hours for this time period, and all of them were billed to FEI. The recorded value of the time at matter rates was an aggregate amount of $246,061.25, but it was billed to FEI at an aggregate amount of $214,193.18. The aggregate difference between recorded matter rate and billed rate amount is $31,868.07 which represents a discount to FEI on my time of 12.95 percent for this invoice

period.  Thus, this percentage is stated in the "Billing Discount" column of the spreadsheet for

my December 12, 2005 entry in order to reflect the billing discount that the client received on the

amount that is being excluded as a law firm transition cost.  The final column, "Discounted

Exclusion" is the value of the excluded amount as reduced by the discount that Fulbright gave

FEI (here $2,777.50 x (1.00 - .1295) = $2,417.81).  I performed this same calculation for each of

the time entries listed on Ex. 17.  The bottom row of the first section of Ex. 17 totals the

exclusion for the entire time period and the second section of Ex. 17 totals the exclusion by

attorney by year.

233.    Although FEI is not claiming any of the time that was billed by Fulbright for law

firm transition, the timekeeper narratives for these excluded items are included in the time

records that are being submitted to support FEI's claim.  Ex 31 hereto.  The narratives for the

work that constitutes law firm transition work are highlighted with orange highlighting in the

time records.

### 4.

### Elephant Veterinary Records

234.    At the time that Fulbright entered its appearance in this case, there had been

substantial litigation between the parties concerning the production by FEI of elephant veterinary

medical records to plaintiffs.  Elephant veterinary records had been the subject of two (2) orders

in 2005, one requiring FEI to show cause why it should not be held in contempt for failure to

produce and another granting the plaintiffs' motion to compel.  Minute Order (09/19/05); ECF

No. 50.  In 2006, veterinary records were the subjects of plaintiffs' motion to enforce court order

as well as two (2) motions for attorneys' fees.  ECF Nos. 64, 69, 103.  In order to narrow the

areas of potential disagreement on the instant petition, the hours that Fulbright worked and billed

to FEI for dealing with the elephant veterinary records issue are excluded in their entirety from

FEI's claim.  This exclusion represents a total of **585.00 hours** that were billed to FEI at an aggregate value of **$216,211.86**.

235.    The amounts stated in the preceding paragraph that are excluded for the elephant veterinary records issue were determined as follows.  In preparing this declaration, I personally reviewed and analyzed all of the Fulbright time records and invoices for the ESA Case from December 1, 2005 through March 31, 2013.  In that review, I isolated those time entries that, in my judgment, constituted time spent by a Fulbright timekeeper dealing with the elephant veterinary records issue, including work to collect and produce such documents and work responding to the motions filed by plaintiffs related to that subject.  Using my time record for April 17, 2006 as an example (Ex. 31), I recorded half an hour (.50) for that day on the ESA Case with the following narrative:   "Conference with L. Joiner and M. Pardo regarding opposition for motion to attorneys fees.  Review and revise further draft of opposition to motion for attorneys fees."  All of this work concerns the elephant veterinary records issue as this was work opposing the first of plaintiffs' motions for attorneys' fees (ECF No. 64) described above.  Therefore all of this time is excluded from FEI's claim.  I performed the same analysis on the time entries for all of the other timekeepers who recorded time on the ESA Case.

236.    Not all of the work that a Fulbright timekeeper did on a particular day may have concerned the elephant veterinary records issue.  Since Fulbright timekeepers used block billing during this time period, there were some time entries as to which an allocation had to been made between work on the elephant veterinary records issue and work on other subjects.  To make that allocation, I generally divided the time recorded by the number of tasks described in the narrative and then excluded that part of the entry that related to the elephant medical records issue, rounding the result to the nearest quarter hour.  For example using my time record of June 22,

2006 as an example (Ex. 31), I recorded 5.00 hours for that day on the ESA Case with the following narrative:  "Analysis of issue regarding production of elephant necropsy photos. Memorandum regarding same.  Review and revise draft of protective order regarding production of video tapes.  Conference with M. Pardo regarding same. Review correspondence regarding review of electronic documents for production. Conference with firm attorneys regarding issues to address in response to motion to enforce court order."  In my judgment, three of these six tasks related to the elephant veterinary records (the first, second and sixth), so 2.50 of the 5.00 hours were excluded as related to that issue.  I generally followed this allocation approach for all of the other time entries containing work related to the elephant veterinary records issue unless the narrative, surrounding circumstances or both suggested that a different allocation be used in which event I used my best judgment as to how much of the work concerned the issue to be excluded.

237.   Ex. 18 hereto is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared to memorialize the analysis of excluded time for the elephant veterinary records issue that I performed as described in the preceding paragraph.  The spreadsheet is divided into two sections.  The first section lists the excluded time entries in chronological order.  The second section lists the same excluded time entries by attorney and by calendar year.

238.   Using the June 22, 2006 entry for me on page 2 of the first section of Ex. 18 as an example, "Date" is the date of the time entry and "Timekeeper" is the name of the attorney associated with the time entry.  "Recorded Amount" is the value, as stated in the time record, of the total time stated in the time entry at issue, in this case, $2,525.00.   "Recorded Amount Claimed" is the portion of the recorded amount of the time entry that FEI is seeking to recover from the plaintiffs, and "Recorded Amount Excluded" is the portion of the recorded amount of

the time entry that FEI is excluding because it related to the elephant veterinary records issue. Since in this particular example, as discussed in paragraph 236, half of the 5.00 hours that I recorded that day related to the elephant veterinary issue and half related to other issues, the recorded amount claimed is $1,262.50 and the recorded amount excluded is $1,262.50. "Hours Excluded" are the number of hours being excluded because they related to the elephant veterinary records issue, here, 2.50 of the 5.00 hours recorded. "Billing discount" is the amount by which the time that is the subject of the exclusion was discounted when it was billed to FEI. This percentage was calculated in the same manner as described in paragraph 232 above, and in this particular example it was 12.95 percent. The final column, "Discounted Exclusion" is the value of the excluded amount as reduced by the discount that Fulbright gave FEI (here $1,262.50 x (1.00 - .1295) = $1,099.01). I performed this same calculation for each of the time entries listed on Ex. 18. The bottom row of the first section of Ex. 18 totals the exclusion for the entire time period and the second section of Ex. 18 totals the exclusion by attorney by year.

239.     Although FEI is not claiming any of the time that was billed by Fulbright for time spent on the elephant veterinary records issue, the timekeeper narratives for these excluded items are included in the time records that are being submitted to support FEI's claim. Ex 31 hereto. The narratives for the work that constitutes work as to the elephant veterinary records issue are highlighted with light blue highlighting in the time records.

**5.**

**Privileged Matters**

240.     During the course of the ESA Case, some of the narratives in the time records or service descriptions on the invoices made reference to information that would tend to reveal attorney client communications between Fulbright and FEI or Fulbright opinion or other work product.  Fulbright has redacted this information from the time records and invoice work

descriptions with a white redaction box labeled "privilege." In order to narrow the areas of potential disagreement on the instant petition, the hours that Fulbright worked and billed to FEI that are represented by redacted time entries or invoice work descriptions are, with the exceptions noted in paragraph 242 below, excluded in their entirety from FEI's claim. This exclusion represents a total of **781.80 hours** that were billed to FEI at an aggregate value of **$390,359.46**.

241. The amounts stated in the preceding paragraph that are excluded on privilege grounds were determined as follows. In preparing this declaration, I personally reviewed and analyzed all of the Fulbright time records and invoices for the ESA Case from December 1, 2005 through March 31, 2013. In that review, I isolated those time entries that, in my judgment, tended to reveal privileged attorney client communications or opinion or other work product. Using my time entry for March 28, 2006 as an example, I recorded thirty minutes (.50 hour) on the ESA Case that day for certain work, half of which concerned a matter the description of which would reveal privileged information and half of which would not. Therefore, the part of the time narrative reflecting privileged information has been redacted. Although the work performed that is subject to the redaction was necessary and appropriate to the ESA Case, because FEI has redacted the narrative, FEI is not claiming the amount of time represented by the redaction, in this instance, half of the time recorded. The amount of time entry narratives or invoice work descriptions that have been redacted for privilege is small: 781.80 hours out of the 41,126.66 hours ultimately claimed, representing **1.90 percent** of the total.

242. The only exceptions to the exclusions from FEI's claim of the value associated with items redacted for privilege are a small group of time entries in which the attorney was interviewing or speaking with a potential witness who was never called to testify at trial and

therefore, whose identity is a matter of opinion work product; or communication with an individual in a settlement context as to which not all plaintiffs were privy.  Those privileged and redacted time entries that FEI is claiming are as follows:  01/05/07 (Simpson); 02/13/07 (Pardo); 02/16/07 (Gasper, Pardo & Simpson); 10/29/07 (Pardo); 01/10/08 (Simpson); 04/10/08 (Simpson); 07/03/08 (Simpson); 07/07/08 (Shea & Simpson); 01/24/09 (Simpson); 02/12/09 (Shea); 03/04/13 (Pardo & Simpson).

243.    Ex. 19 hereto is a true and accurate copy of a Microsoft Excel Spreadsheet that I prepared to memorialize the analysis of excluded time for the privileged items that I performed as described in paragraph 241.  The spreadsheet is divided into two sections.  The first section lists the excluded time entries in chronological order.  The second section lists the same excluded time entries by attorney and by calendar year.  The spreadsheet has the same format as the elephant veterinary records spreadsheet discussed above.  Allocations that were made for privileged matters that appear in block billing time entries were made in the same manner as described in paragraph 236 above.

244.    Using the March 28, 2006 entry for me on page 1 of the first section of Ex. 19 as an example, "Date" is the date of the time entry and "Timekeeper" is the name of the attorney associated with the time entry.  "Recorded Amount" is the value, as stated in the time record, of the total time stated in the time entry at issue, in this case, $252.00.  "Recorded Amount Claimed" is the portion of the recorded amount of the time entry that FEI is seeking to recover from the plaintiffs, and "Recorded Amount Excluded" is the portion of the recorded amount of the time entry that FEI is excluding because the description would reveal privileged information. Since in this particular example, as discussed in paragraph 241, half of the thirty (30) minutes (.50) hour that I recorded that day related to matters the description of which is privileged and

113

half related to matters the description of which is not privileged, the recorded amount claimed is $126.25 and the recorded amount excluded is $126.25. "Hours Excluded" are the number of hours being excluded because they would reflect privileged information, here, .25 of the .50 hour recorded. "Billing discount" is the amount by which the time that is the subject of the exclusion was discounted when it was billed to FEI. This percentage was calculated in the same manner as described in paragraph 232 above, and in this particular example it was 12.95 percent. The final column, "Discounted Exclusion" is the value of the excluded amount as reduced by the discount that Fulbright gave FEI (here $126.25 x (1.00 - .1295) = $109.90). I performed this same calculation for each of the time entries listed on Ex. 19. The bottom row of the first section of Ex. 19 totals the exclusion for the entire time period and the second section of Ex. 19 totals the exclusion by attorney by year.

## 6.
### Travel Time

245.    Certain of the Fulbright attorneys who worked on the ESA Case recorded the time they spent traveling in connection with the work that they performed on the case. FEI is excluding from its claim one-half of the hours that were recorded as travel time by the timekeepers working on the ESA Case and billed by Fulbright to FEI. This exclusion represents a total of **82.88 hours** that were billed to FEI at an aggregate value of **$38,047.65**.

246.    The amounts stated in the preceding paragraph that are excluded for travel time were determined as follows. In preparing this declaration, I personally reviewed and analyzed all of the Fulbright time records and invoices for the ESA Case from December 1, 2005 through March 31, 2013. In that review, I isolated those time entries that made reference to travel time. To narrow the areas of potential disagreement on the instant petition, I generally excluded time recorded as travel time even if the timekeeper recorded having worked on the ESA Case during

114

the travel time (*e.g.*, during an airline flight).  For local trips by car or on foot, I based the amount of travel time on personal knowledge.  For trips by air,  I used an internet reference service (www.travelmath.com) for flight times to establish the flying time and then added on ground transportation at an assumed amount of thirty (30) minutes onto each flight.

247.    Ex. 20 hereto is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared to memorialize the analysis of excluded travel time that I performed as described in the preceding paragraph.  Using the entry pertaining to me for April 14, 2006 as an example, "Timekeeper" is the name of the timekeeper, "Date" is the date on which the trip occurred and "Description of Travel" describes the trip.  "Travel Hours" states the total amount of time spent traveling.  This trip to and from FEI's corporate headquarters in Vienna, Virginia, based upon my personal knowledge, took approximately thirty (30) minutes each way by automobile.  (In the case of travel by air, such as my trip on November 12, 2007 to Auburn Hills, Michigan for the Rule 34 elephant inspection, I used the flight time stated by the internet flight time reference source, which was one (1) hour and seventeen (17) minutes, which I rounded up to 1.25 hours and added half an hour for ground transportation.)  "Amount Charged for Travel" is the recorded value of the travel time.  Since this was an hour trip and my matter rate for 2005 was $505.00 per hour, the amount charged for travel is $505.00.  "Travel Hours Excluded" is the amount that is being excluded from FEI's claim against the plaintiffs, *i.e.*, fifty (50) percent of all travel time which, in this example, is .50 hour.  "Amount Excluded for Travel" is the recorded value of the excluded travel time, here, $252.50.  "Billing Discount" is the amount by which this time was discounted to FEI when it was billed by Fulbright to FEI and is calculated in the manner described in paragraph 232 above.  "Discounted Exclusion Amount" is the value of the excluded travel time as reduced by the discount that Fulbright gave FEI (here $252.50 x (1.00 - .1295) =

$219.80). I performed this same calculation for each of the time entries listed on Ex. 20. The travel time totals are summed for each lawyer listed by year with a grand total of excluded travel time for all lawyers at the end.

## 7.

### Summary

248.   Ex. 15 hereto is a true and accurate copy of a Microsoft Excel Spreadsheet that I prepared that tabulates the voluntary exclusions from FEI's attorneys' fee claim discussed above for (i) timekeepers with fewer than 100 billed hours; (ii) temporary attorneys; (iii) law firm transition costs; (iv) the elephant veterinary records issue; (v) privileged matters; (vi) travel time; and (vii) the other adjustment explained in paragraph 225. The total number of hours voluntarily excluded by FEI is **5,446.43** which, as discounted by the billing discounts that Fulbright gave FEI, have an aggregate value of **$1,921,966.51**. The total number of hours excluded (5,446.43) represents **11.69 percent** of the total number of hours that Fulbright billed to FEI on the ESA Case (46,573.09). The discounted value of the exclusions ($1,921,966.51) represents **9.80** percent of the total fees that FEI paid to Fulbright during the period from December 1, 2005 through March 31, 2013 ($19,611,771.00).

249.   Ex. 16 hereto is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared that states, by timekeeper and by calendar year, the number of billed hours excluded and the discounted value of the excluded hours in the categories discussed above for (i) law firm transition costs; (ii) the elephant veterinary records issue; (iii) privileged matters; (iv) travel time; and (v) the other adjustment in paragraph 225. The information on this exhibit for each timekeeper listed is taken from the spreadsheets that I prepared for each of these categories, Exs. 17-20 hereto.

### B.

### *Calculation of the Lodestar Amount for the Fulbright Time*

250.    Under applicable case law, the lodestar is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.   The starting point for the lodestar calculation is to identify the timekeepers whose time is the subject of FEI's attorneys' fee claim.  As stated previously, the claim is based on the timekeepers who had one hundred (100) or more billed hours on the ESA Case from December 1, 2005 through March 31, 2013, which are the timekeepers listed on Ex. 4 hereto.  Starting with this list automatically excludes, at the outset and in their entirety, the seventy-nine (79) timekeepers who had fewer than one-hundred (100) billed hours and who are listed on Ex. 5.  From the 100-plus-hour list, I further excluded the temporary contract attorneys listed as a group under "Washington Temporary." The remaining twenty-five (25) attorneys and four (4) non-attorney professionals are the timekeepers subject to FEI's claim and are the basis for the lodestar calculation that I performed and which is reflected on Ex. 1 hereto.  Ex. 1  is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared to calculate the amount of attorneys' fees that FEI is seeking in this case for Fulbright's work on the ESA Case from December 1, 2005 through March 31 2013. Paragraphs 251 through 255 explain the calculations on this spreadsheet.

251.    Ex. 1 divides the timekeepers into two groups.  The first group, the "Current Timekeepers" are those timekeepers who are still with Fulbright as partners or employees or in some other capacity or who, although departed, had standard hourly rates established for calendar year 2012.  The second group, the "Former Timekeepers," are those timekeepers who are no longer with Fulbright.  This division was made in order to apply that part of the lodestar analysis that accounts for the time delay in payment/reimbursement of attorneys' fees incurred by the claiming party.

252.   For the Current Timekeepers, the columns on the spreadsheet are as follows. "Timekeeper Name" is the person's name, "Title" is the person's current position or status with Fulbright, and "Employment Terminated" states "Current" if the person is still with Fulbright or, if the person has left Fulbright, the date of departure. "Hours Billed" is the total number of hours attributable to the timekeeper that were billed to, and paid for by, FEI. This information is taken from Ex. 4 (previously identified in paragraphs 187 & 226). "Hours Excluded" are the number of hours attributable to the timekeeper that are being voluntarily excluded from FEI's claim in the categories discussed above for (i) law firm transition costs; (ii) the elephant veterinary records issue; (iii) privileged matters; (iv) travel time; and the adjustment in paragraph 225. This information is taken from Ex. 16 (previously identified in paragraph 249) and from paragraph 225. "Billed Hours Net of Exclusions" is derived by subtracting "Hours Excluded" from "Hours Billed." "Current (2012) Rate" is the timekeeper's standard hourly rate for calendar year 2012. This information is taken from Ex. 6 (previously identified in paragraphs 187 & 205-207). Lodestar calculation precedent supports valuation of the hours claimed at the lawyers' current rates to account for the delay in reimbursement to the claiming party. Since, as discussed above, the matter rate for FEI on the ESA Case is the previous year's standard hourly rate, the current rate in 2013 for the lodestar calculation would be the 2012 standard hourly rate. The final column, "Value of Net Billed Hours at Current Rates" is derived by multiplying "Billed Hours Net of Exclusions" by "Current (2012) Rate" and is the amount that FEI is claiming for the timekeeper. Using the entry for me as an example, during the period from December 1, 2005 through March 31, 2013, I worked 7,572.70 hours on the ESA Case that were billed to FEI; 462.50 of those hours are being excluded under one of the four (4) exclusions described above, leaving a net of 7,110.20 hours of my time being claimed by FEI; my current rate for purposes of

the lodestar is $825.00 per hour (my 2012 standard rate) because my 2013 matter rate is my 2012 standard hourly rate; so the value of my time that FEI seeks to recover is $5,865,915.00 (7,110.20 hours x $825.00 per hour).  I performed this calculation for each of the timekeepers listed in the "Current Timekeepers" group on Ex. 1 hereto.

253.   For the "Former Timekeepers," the columns on the spreadsheet are as follows. "Timekeeper Name" is the person's name, "Title" is the last position that the person had with Fulbright prior to departure, and "Employment Terminated" states the date of departure. Because none of these timekeepers was with Fulbright in 2012, none of them has an established standard hourly rate for 2012 for purposes of valuing their claimed hours at current rates to account for the delay in reimbursement.   Although a 2012 standard rate for some of these timekeepers might be capable of extrapolation, such an exercise could be speculative and generate an unnecessary complication.  Therefore, in order to narrow the areas of potential disagreement on the instant petition, the current rate aspect of the lodestar analysis will not be applied to "Former Timekeepers."   In other words, the amount claimed for "Former Timekeepers" is valued at the billed rate.

254.   The amount claimed by FEI for the "Former Timekeepers" is shown by the remaining columns on Ex. 1.  "Fees Billed" is the amount of fees that Fulbright billed to FEI and that FEI paid for the timekeeper's work.  This information is taken from Ex. 4 (previously identified in paragraph 187 & 226).  "Billed Value of Excluded Amounts" is the recorded value of the amounts attributable to the timekeeper in the exclusion categories of (i) law firm transition costs; (ii) the elephant veterinary records issue; (iii) privileged matters; and (iv) travel time that are discussed above, as discounted by the discounts that Fulbright gave FEI. This information is taken from Ex. 16 (previously identified in paragraph 249).  "Billed Fees Net of Exclusions" is

derived by subtracting "Billed Value of Excluded Amounts" from "Fees Billed" and is the amount that FEI is claiming for the timekeeper. Using the entry for Lisa Zeiler Joiner as an example, during the period from December 1, 2005 through March 5, 2010, the hours that Ms. Joiner worked on the ESA Case were billed to, and paid for by, FEI in the aggregate amount of $2,720,550.12; of that amount, $76,282.14 represents hours that are being excluded under one of the four (4) exclusions described above, leaving a net of $2,644,267.98 being claimed by FEI for Ms. Joiner's work. I performed this calculation for each of the timekeepers listed in the "Former Timekeepers" group on Ex. 1 hereto.

255.    The total lodestar amount for the "Current Timekeepers" is $17,989,997.65. The total lodestar amount for the "Former Timekeepers" is $4,640,045.59. Therefore, the total amount claimed by FEI for the work performed by Fulbright on the ESA Case from December 1, 2005 through March 31, 2013 is **$22,630,043.24**. In my opinion, based on my experience as lead counsel for FEI in the ESA Case since the inception of the engagement through the present, as well as my more than thirty-five (35) years of practice in complex federal court litigation, and in view of the complexity of the ESA Case, what was at stake in the litigation for FEI, the manner in which plaintiffs litigated the case, how long it lasted, the findings of fact that the Court has made about the actions of plaintiffs and their counsel during the litigation, and all of the other factors I have described above, $22,630,043.24 is a reasonable attorneys' fee for the defense of FEI by Fulbright in the ESA Case from December 1, 2005 through March 31, 2013. The number of hours expended net of the exclusions discussed above – 41,126.66 hours over nearly eight (8) years, essentially worked by a core, augmented team of fifteen (15) lawyers who completed the entire pre-trial, trial, appellate and attorneys' fee entitlement processes – was reasonable. The rates at which these hours were billed to, and paid for by, FEI, as well as the current rates by

which the delay in reimbursement is accounted for, as discussed above in paragraphs 208-221, also were and are reasonable.

## IX.
### THE SECTION 1927 SANCTION AGAINST
### KATHERINE MEYER AND MGC

256.    The Court ruled on March 29, 2013 "that plaintiffs' counsel Katherine Meyer and Meyer, Glitzenstein & Crystal are jointly and severally liable for FEI's attorneys' fees incurred in litigating the portion of its Motion to Compel (ECF No. 101) which sought information about Tom Rider's financial relationship with animal rights advocates." ECF No. 619.  This order was later corrected to refer to ECF No. 126, the motion to compel Tom Rider to truthfully answer interrogatories and to produce documents related to the payments that he received from plaintiffs and plaintiffs' counsel.  Minute Order (05/02/13).  Pursuant to the Court's order, FEI seeks a sanction of **$133,712.60** against Ms. Meyer and MGC, jointly and severally, for the attorneys' fees expended for the work related to ECF No. 126.  Paragraphs 257-261 below describe the manner in which the amount sought by FEI was calculated.

257.    In order to determine the time that Fulbright spent on work related to ECF No. 126, I personally reviewed the time records of the Fulbright lawyers who worked on that matter attached hereto as Ex. 31.  The work occurred during the period from October 23, 2006 through August 23, 2007. The work performed included the factual and legal research that was necessary to uncover the deficiencies in Rider's discovery responses and to engage in correspondence and discussions with plaintiffs' counsel to resolve the issue (which were not successful); the additional factual and legal research and drafting necessary to prepare the motion, brief and accompanying exhibits; the time spent reviewing and analyzing Rider's opposition to the motion (ECF No. 138); the factual and legal research and drafting necessary to prepare FEI's reply (ECF No. 144); and the time involved in reviewing the Court order granting FEI's motion (ECF No.

121

178). This motion was a substantial undertaking because, as discussed above in paragraph 172, plaintiffs and plaintiffs' counsel had concealed the payments to Rider in discovery and considerable effort was required to uncover the information leading to the motion to compel. In addition, the motion was factually complex and the briefing was extensive. ECF Nos. 126-127, 138, 144 (566 pages total of briefs and exhibits)).

258.    In my review, I isolated the work that related to the Rider motion to compel and separated the time spent on that task from the time spent on other tasks. In the Fulbright time records that are being submitted herewith as Ex. 31, the portions of the time narratives that related to the Rider motion to compel are highlighted in yellow. I prepared a Microsoft Excel spreadsheet that memorializes the results of my review, a true and accurate copy of which is attached hereto as Ex. 33. The information is presented by lawyer and organized into three (3) periods, A, B and C, which correspond to the three (3) periods of time covered by the invoices in which Fulbright billed FEI, and FEI paid Fulbright, for this work: July 1, 2006 through November 30, 2006; December 1, 2006 through June 30, 2007; and July 1, 2007 through November 30, 2007. *See* Ex. 7 (Invoice Nos. 10718086, 10778472 & 10827124). Organizing the information by invoice period was necessary because Fulbright gave FEI three (3) different discounts on these invoices, namely, 5.69 percent, 5.23 percent and 8.84 percent, respectively. *Id.* Such discounts were taken into account in calculating a portion of the sanction amount, as explained in paragraph 260 below.

259.    Using myself as an example to explain Ex. 33, the first line in Period A, "Date," is the date on which the work related to ECF No. 126 was performed; "Timekeeper" is the attorney who performed that work; "Gross Amt." is the total recorded value of the work that I performed that day on the ESA Case (here, $2,020.00); "Sanction Amt." is the portion of the work that day

that related to ECF No. 126 (here, $505.00); "Gross Hrs." are the total hours that I recorded that day on the ESA Case (here, four (4) hours); and "Sanction Hours" is the portion of the total time spent on work related to ECF No. 126 (here, one (1) hour).   In performing this analysis, I followed the same methodology described in paragraph 236 above, generally by dividing the total time by the number of tasks to determine the amount related to ECF No. 126 unless surrounding circumstances suggested that such an approach was inaccurate.   Thus, using my time entry for November 3, 2006 as an example (Ex. 31), I had four tasks that day but only one of them related to the Rider motion to compel, so only one (1) of my four (4) hours is included in the sanction amount.   I performed this analysis for each of the timekeepers who performed work related to ECF No. 126.

260.    Attached hereto as Ex. 34 is a true and accurate copy of a Microsoft Excel spreadsheet that I prepared that shows the calculation of the amount that FEI seeks as a sanction against Ms. Meyer and MGC.   The data for this exhibit is drawn from the data in Ex. 33.   The methodology that I used is the same that was used to calculate the lodestar attorneys' fee amount described in paragraphs 250-255 above, including the lodestar factor of delay in reimbursement. For the "Current Timekeepers," the amount of the sanction is the number of hours of their time related to ECF No. 126 that was billed to FEI, multiplied by the respective timekeepers' current rates for the ESA Case, *i.e.*, their Fulbright standard hourly rates for 2012.   For the "Former Timekeepers" who have no current Fulbright standard hourly rates, the amount of the sanction is the billed value of their time related to ECF No. 126, as reduced by the discount that Fulbright gave FEI on the invoice billing for this time.   Thus, using the first line pertaining to Lisa Zeiler Joiner as an example, she recorded $266.25 in work related to ECF No. 126 during invoice

Period A, but Fulbright gave FEI a discount of 5.70 percent on that invoice, so the sanction amount is $251.07 ($266.25 x (1.00 - .0570 = $251.07).

261.   The total sanction amount for the "Current Timekeepers" is $53,108.75, for the "Former Timekeepers" it is $83,022.60, and the total sought for both groups together is **$133,712.60.** In my opinion, based upon the complexity of the motion to compel discovery against Mr. Rider with respect to the payments he received, the lengths to which the other plaintiffs and plaintiffs' counsel went over a period of more than three (3) years to conceal those payments in the ESA Case discovery, and the significance of the payment information, once it was revealed, in the final decision and judgment in favor of FEI as well as the decision ruling FEI entitled to recover its attorneys' fees, $133,712.60 is an amount of attorneys' fees that was "reasonably incurred" within the meaning of 28 U.S.C. § 1927 as a result of Ms. Meyer's and MGC's conduct.   The number of hours that Fulbright expended in obtaining the payment information from Rider – **363.25 hours** in litigation over nearly an eight (8) month period from October 2006 through May 2007, Ex. 33 hereto – was reasonable.  This is so particularly in view of the facts that FEI actually expended additional hours dealing with other Rider discovery issues that also related to the payment issue but which are not being sought by FEI's petition, namely, the motion to compel Rider to answer deposition questions (ECF No. 101) which was granted in major part (ECF No. 178) and Rider's two motions for protective order (ECF Nos. 106 & 141) which, as to his purported financial "privacy," were denied (ECF No. 178).  The rates at which the hours comprising the sanction were billed to, and paid for by, FEI, as well as the current rates by which the delay in reimbursement is accounted for, as discussed above in paragraphs 208-221, also were and are reasonable.

## IX.

## EXPERT WITNESS AND OTHER FEES

262.    Pursuant to section 11(g)(4) of the ESA, a prevailing party is entitled to recover reasonable attorneys' as well as expert witness fees. 16 U.S.C. § 1540(g)(4). FEI had six (6) expert witnesses who testified in the ESA Case:  Dennis Schmitt, Mike Keele, Kari Johnson, Gary Johnson, Ted Friend and Gary Jacobson. All of these witnesses were deposed and all of them testified at trial. All of these witnesses also prepared expert reports, except Mr. Jacobson who is an employee of FEI who was not specifically retained as an expert and not required to do a report. Of these six (6) witnesses only Mr. Keele and Dr. Friend charged FEI a fee for their services. The total fees charged by Mr. Keele were $34,731.25. The total fees charged by Dr. Friend were $66,475.00. Attached hereto as Exs. 35 & 36 are true and accurate copies of the invoices submitted by Mr. Keele and Dr. Friend for the fees they charged as expert witnesses in the ESA Case. The total of the invoices submitted by Mr. Keele and Dr. Friend sought by FEI pursuant to the instant petition is **$101,206.25**.  Through counsel, FEI also has retained the services of two (2) expert witnesses on the attorneys' fee issues. The expenses that FEI has incurred in connection with the work of these expert witnesses will be submitted with FEI's supplemental petition for attorneys' fees incurred in the ESA Case after April 1, 2013.

263.    FEI also is including within its present claim the cost of the services provided by Derek Palisoul. As discussed in paragraphs 14, 21 and 136 above, during the trial of the ESA Case, FEI was assisted by Mr. Palisoul, a trial technology consultant and independent contractor employed by Resonant Legal Media. The Court had directed that the trial be conducted entirely electronically with no paper exhibits, and directed counsel on both sides to be familiar with, and to have the capability to operate, the state-of-the-art systems and equipment that had been installed in the courtroom. Mr. Palisoul prepared and organized the electronic trial exhibits and

operated the computers and other equipment necessary for presentation of the exhibits, video tapes, photographs and other materials that FEI used (1) to cross-examine plaintiffs' witnesses; (2) to present FEI's own witnesses and exhibits; and (3) to present the opening statement, the Rule 52(c) argument and the final arguments. The complexity of the case and the evidence that was presented required a trial technology specialist such as Mr. Palisoul who had extensive trial experience. Mr. Palisoul performed other pre-trial preparation tasks for FEI, such as capturing video images from an internet camera of the elephants of one of plaintiffs' expert witnesses – material that was important in the cross-examination of that witness. *See* ECF No. 559 at 47 (COL 15: citing to the Carol Buckley testimony that her unchained sanctuary elephants nonetheless sway (elicited with video footage captured by Mr. Palisoul)). However, FEI is only claiming the portion of Mr. Palisoul's work that relates directly to the preparation for and trial of the case. From November 23, 2008 through March 19, 2009, Mr. Palisoul worked 553 hours at a rate of $250.00 per hour, for a total of **$138,375.00**. A true and accurate copy of the portion of the invoice detailing Mr. Palisoul's work during the referenced period is attached hereto as Ex. 37. FEI has paid this amount. Mr. Palisoul's 2009 hourly rate was within the range of 2009 billed and collected rates in the Peer Monitor Survey for "other specialist." *See* Ex. 8 hereto. In my opinion, the rate that was charged for Mr. Palisoul's work and the number of hours that he expended were reasonable. Mr. Palisoul functioned seamlessly in the courtroom and provided material assistance to the FEI trial team. His work was particularly instrumental in the cross-examination of Tom Rider. Key elements of that cross were photographs and video tapes used to impeach Mr. Rider that Mr. Palisoul helped me present and that were cited in the Court's decision. *See* ECF No. 559 at 24, 38, 41 (FOF 20: Rider photographed using a bullhook on one of his "girls" (Def. Tr. Ex. 32); FOF 65: Rider unable to identify his "girls" on video tape (Def.

Tr. Ex. 173A, 324A); FOF 73: Rider referring on video tape to elephant Karen (one of his "girls") as a "bitch" (Def. Tr. Ex. 30B)). *See also ASPCA v. Feld Ent. Inc.*, 659 F.3d at 20 (appellate court specifically citing to the "bitch" comment and other Rider impeachment exhibits).

264.    I declare under penalty of perjury that the foregoing is true and correct. Executed on October **19**, 2013.

John M. Simpson

## INDEX OF EXHIBITS TO DECLARATION OF JOHN M. SIMPSON

| Exhibit No. | Description |
|---|---|
| 1 | Lodestar Calculation as to Timekeepers With 100 or More Billed Hours: December 1, 2005 through March 31, 2013. |
| 2 | Core Team and Augmented Core Team Timekeepers:  Hours and Fees Worked and Billed from December 1, 2005 through March 31, 2013. |
| 3 | List of All Timekeepers Who Worked on the Matter from December 1, 2005 through March 31, 2013:  Sorted By Hours Billed in Descending Order. |
| 4 | List of All Timekeepers With 100 or More Billed Hours Who Worked on the Matter from December 1, 2005 through March 31, 2013:  Sorted By Hours Billed in Descending Order. |
| 5 | List of All Timekeepers With Fewer Than 100 Billed Hours Who Worked on the Matter from December 1, 2005 through March 31, 2013:  Sorted By Hours Billed in Descending Order. |
| 6 | Timekeepers With More Than 100 Hours Billed:  Standard, Matter and Billed Rates by Year:  2005 through 2013. |
| 7 | Summary of Fulbright Invoices for ESA Case:  December 1, 2005 through March 31, 2013. |
| 8 | Declaration of Cory Branden and Rate Survey by Peer Monitor for D.C. Litigation (2005 through 2013) **[Filed Under Seal]**. |
| 9 | Graphs Comparing Fulbright Timekeeper Standard Hourly, ESA Case Matter and ESA Case Billed Rates to Rates In Peer Monitor Survey **[Filed Under Seal]**. |
| 10 | Declaration and Supplemental Declaration of Stephen L. Braga in *Miller v. Holzmann*, No. 95-1231-RCL (D.D.C.), ECF No. 930-17 & ECF No. 957-26. |
| 11 | Graphs Comparing ESA Case Timekeeper Standard Hourly and ESA Case Matter and Billed Rates to WilmerHale Standard Hourly Rates Approved in *Miller v. Holzmann*, No. 95-1231- RCL (D.D.C.). |
| 12 | Graphs Comparing ESA Case Timekeeper Standard Hourly and ESA Case Matter and Billed Rates to Morgan Lewis Billed Rates Per Hour Approved in *McKesson Corp. v. Islamic Republic of Iran*, No.82-00220-RJL (D.D.C.). |
| 13 | Graphs Comparing ESA Case Timekeeper Standard Hourly and ESA Case Matter and Billed Rates to Morgan Lewis Standard Hourly Rates Approved in *Woodland v. Viacom, Inc.*, No.05-1611-PLF/JMF (D.D.C.). |
| 14 | Excerpts from court records in *Miller*, *McKesson* and *Woodland* from which the data on WilmerHale and Morgan Lewis rates in Exhibits 11 through 13 was drawn. |
| 15 | Total Amounts of Fees and Hours Billed by Fulbright & Jaworski LLP That Are Excluded From FEI's Claim. |

| 16 | Exclusions by Individual Attorney. |
|----|-----------------------------------|
| 17 | Exclusions for Law Firm Transition Costs (Chronological and by Attorney). |
| 18 | Exclusions for Veterinary Records Issue (Chronological and by Attorney). |
| 19 | Exclusions for Privileged Matters (Chronological and by Attorney). |
| 20 | Excluded Travel Time. |
| 21 | Summary of Billed Hours and Billed Fees by the Month and Year in Which the Hours Were Worked. |
| 22 | Chronology of Major Events in the ESA Case from December 1, 2005 through March 31, 2013. |
| 23 | Graph of Fulbright & Jaworski LLP Fees (By Month) December 1, 2005 through March 31, 2013. |
| 24 | Graph of Fulbright & Jaworski LLP Billed Hours (By Month) December 1, 2005 through March 31, 2013. |
| 25 | Hours Billed and Value of Hours Billed During the Period from June 2008 through September 2009. |
| 26 | Staffing of Outside Counsel Personnel at Depositions. |
| 27 | ESA Case Statistics on Orders, Motions, Trial Days, Hearings and Third-Party Subpoenas. |
| 28 | Compendium of Fulbright Timekeeper Biographies. |
| 29 | Docket Sheet in *Feld Ent., Inc. v. PETA*, No. 2:08-mc-00004-JBF-FBS (E.D. Va.). |
| 30 | Example of Invoice to Feld Entertainment, Inc. from Fulbright & Jaworski LLP (08/23/06). |
| 31 | Time Records of Fulbright & Jaworski LLP for ESA Case for the Period from December 1, 2005 through June 30, 2010. |
| 32 | Monthly Invoices for the ESA Case from Fulbright & Jaworski LLP to Feld Entertainment, Inc. for the Months from July 2010 through March 2013. |
| 33 | Time Spent on Work Related to ECF No. 126 (By Timekeeper). |
| 34 | Time Spent on Work Related to ECF No. 126: All Timekeepers (Claimed Sanction Amount). |
| 35 | Expert Witness Invoices for Mike Keele. |
| 36 | Expert Witness Invoices for Ted Friend. |
| 37 | Invoice for Courtroom Technology Support Services Performed by Derek Palisoul. |