## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIMAL WELFARE INSTITUTE, <u>et al.</u>,<br><br>Plaintiffs,<br><br>v.<br><br>FELD ENTERTAINMENT, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  **Case No: 03-2006 (EGS/JMF)**<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF EUGENE D. GULLAND IN SUPPORT OF DEFENDANT FELD ENTERTAINMENT, INC.'S PETITION FOR ATTORNEYS' FEES

1.     My name is Eugene D. Gulland. I am more than twenty-one (21) years of age and am competent to make this declaration. Unless indicated otherwise, I have personal knowledge of the facts stated in this declaration.

2.     From October 1980 through September 2013 I was a partner in the law firm of Covington & Burling LLP ("Covington" or "the Firm"), and am now a Senior Counsel continuing to practice law. Covington represented defendant Feld Entertainment, Inc. ("FEI") in the above-captioned matter and the predecessor matter, Civil Action No. 00-1641-EGS (D.D.C.) (collectively the "ESA Case") from July of 2000 through March 13, 2006. During this time, I was the Firm's partner in charge of the litigation for this client and lead counsel of record for the FEI in the ESA Case.

3.     I have been requested by FEI to prepare this declaration to provide a foundation for recovery of Covington's attorneys' fees incurred by FEI in connection with the ESA Case and sought by FEI's motion. I make this declaration based upon my

knowledge of the representation of FEI in the ESA Case, the tasks performed by Covington during that representation, the billing information related thereto, and the assistance of Covington staff and lawyers with Fulbright & Jaworski L.L.P. ("Fulbright") who are now counsel of record for FEI.  With the assistance of Covington staff, I have reviewed the invoices, billing data, and biographical information of timekeepers available in the Firm's records and base this declaration on the same.  The information relied upon to prepare this declaration and the accompanying exhibits are based on Covington's invoices and the calculations and exhibits referenced in my declaration were prepared at my request.  With the assistance of Covington staff and Fulbright personnel, I have reviewed and deem accurate the charts and calculations referenced herein.  In connection with the preparation of this declaration and the accompanying exhibits, FEI has requested the exclusion of certain categories of time that was billed and paid for by FEI from its claim.  Those exclusions are summarized below in paragraphs 66 through 79.  With the assistance of Covington staff and Fulbright personnel, I have also reviewed each of those exclusions and accompanying calculations to verify their accuracy.

**ESA Case Background**

4.    The ESA Case was filed on July 11, 2000 as Civil Action No. 00-1641-EGS and Covington began handling the case for FEI shortly thereafter.  Plaintiffs amended their original Complaint in August of 2000.  After initial evaluation and analysis of the case, and as detailed in the monthly invoices (Ex. 1 hereto), Covington performed a factual and legal analysis and developed a litigation strategy and thereafter moved to dismiss Plaintiffs' Complaint in September of 2000.  The Court dismissed Plaintiffs' claims in June of 2001 for lack of standing.  Plaintiffs filed a motion for reconsideration which was briefed in July through August of 2001.  Plaintiffs appealed

2

the Court's decision on FEI's Motion to Dismiss.   In January of 2002 the parties participated in mediation.   The briefing of the appeal to the D.C. Circuit took place from July through August of 2002.   Covington handled the oral argument in the D.C. Circuit in November of 2002.   The case was essentially dormant thereafter until the D.C. Circuit's decision in February of 2003.

5.      The case was remanded in March of 2003 and FEI thereafter submitted a supplemental brief in support of its motion to dismiss Plaintiffs' Second Amended Complaint (May-June of 2003), which was denied in July of 2003.   FEI answered the Second Amended Complaint in August of 2003.   FEI then filed a Motion for Judgment on the Pleadings, which was briefed in August and September of 2003.   Prior to its consolidation, Case No. 00-1641 had 57 docket entries.   Thereafter, the Court consolidated Case No. 00-1641 with Case No. 03-2006.   FEI's opposition to the consolidation, and reconsideration of the Court's decision, occurred in October of 2003.

6.      The parties briefed issues related to protective orders in the fall of 2003. The parties thereafter commenced affirmative and defensive discovery, including written discovery and party and third-party depositions.   In total, Covington handled depositions of eight (8) third- party witnesses and four (4) party witnesses under Fed. R. Civ. P. 30(b)(6) from August 2004 through July 2005.   Various discovery issues were briefed throughout 2005.   Throughout 2005, Covington continued to engage in affirmative and defensive discovery as well as the development of facts and case strategy and identifying and selecting fact and expert witnesses. In the fall of 2005, Covington prepared FEI's response to API's supplemental complaint.   From December of 2005 through its date of

withdrawal on March 13, 2006, Covington assisted in the transition of the case to Fulbright as well as other discovery tasks.

7.      Although FEI regarded Plaintiffs' claims as lacking any merit, Plaintiffs made many inflammatory allegations that FEI employees mistreated performing elephants and sought relief that could impair or even destroy FEI's circus business.  It also became apparent that Plaintiffs were prepared to conduct scorched-earth litigation tactics against FEI involving extensive demands for discovery and a concurrent media campaign aimed at injuring FEI's reputation.  Faced with such an attack on its core business and reputation, FEI required a vigorous and determined defense delving deeply into all potentially relevant matters.

**ESA Case Staffing**

8.      During the period that Covington worked on the ESA Case (approximately 5 years, 9 months), a core group of five (5) attorneys handled the matter (Eugene Gulland, Jeannie Perron, Joshua Wolson, Maura Dalton Calsyn, Harris Weinstein). Additional attorneys worked on the appeal to the D.C. Circuit (Kevin Newsom, Elliott Schulder).  The core group was augmented with additional associates and legal support personnel (paralegals, litigation specialists) during periods of high activity requiring additional support, such as document review and productions.

9.      We assembled the core group of lawyers based on experience making them well-suited for the case.  Harris Weinstein and I had long experience in complex litigation having high financial stakes for our clients.  He and I first worked together in 1976 representing the Penn Central Transportation Company in its claim for compensation resulting from what Penn Central contended was the taking of its rail assets for the benefit of Conrail and Amtrak.  (After four years of litigation, Penn Central and

4

the United States settled for $2.1 billion in 1980.)  Mr. Weinstein and I worked very well together and teamed up on several other cases after that.  Jeannie Perron, both a lawyer and veterinarian, brought both legal and scientific expertise to the case.  Joshua Wolson and Maura Dalton Calsyn were each well-regarded associates with civil litigation experience and records of demonstrated ability to conduct discovery and draft motion papers.  Elliott Schulder and Kevin Newsom, each of whom specialized in appellate practice, worked on plaintiffs' appeal of the first dismissal of the case for lack of standing.

10.     Attached hereto as Ex. 2 is a chart which reflects timekeeper data compiled from Covington's invoices in the ESA Case.  This chart lists all 54 Covington timekeepers who worked on the ESA Case from July 1, 2000 through March 14, 2006, ranked in descending order by the number of hours billed to FEI.  For each timekeeper, this exhibit states the person's position, current employment status, the total number of hours billed to FEI, and the total fees collected, including all discounts.  During the period from July 1, 2000 through March 14, 2006, Covington timekeepers billed **6,585.30 hours** to the ESA Case.   The total fees collected including all discounts was **$1,907,972.91.**  However, as discussed further below, in order to narrow the areas of disagreement, FEI's motion seeks to recover for the fees it paid for the work of thirteen (13) attorneys and eight (8) non-attorney legal professionals who worked on the ESA Case between July 1, 2000 and March 14, 2006.  That group of timekeepers accounts for nearly **90% (89.99%)** of the fees that FEI paid to Covington during the referenced period.

**Qualifications and Responsibilities of Covington Timekeepers**

11.     Paragraphs 12 through 44 below describe the qualifications and respective duties of the thirteen (13) attorneys and eight (8) non-attorney legal professionals who worked on the ESA Case between July 1, 2000 and March 14, 2006, and whose work is the basis for FEI's fee submission (timekeepers excluded from FEI's claim are addressed *infra,* paragraphs 66 through 79).   The daily time narratives for each timekeeper are set forth in the invoices (Ex. 1), explained and identified in paragraph 52 below.   True and accurate copies of currently available biographical data on the attorney timekeepers is attached hereto as Ex. 3.

### *Eugene D. Gulland*

12.     I attended Yale Law School and graduated with a J.D. degree in 1972. While at Yale, I served as a Moot Court Commissioner.   As an undergraduate, I attended Princeton University and graduated Phi Beta Kappa with an A.B. degree in 1969.   While at Princeton I was both a Princeton University and a Woodrow Wilson School Scholar.   I served as a captain in the U.S. Army.

13.     I am a member of the Bars of the District of Columbia and Virginia and the U.S. Court of Appeals for the District of Columbia Circuit.   I also am a member of the Bars of the Supreme Court of the United States and the bars of the D.C. Circuit, First Circuit, Second Circuit, Third Circuit, Fourth Circuit, Fifth Circuit, Sixth Circuit, Seventh Circuit, Ninth Circuit, Tenth Circuit, Eleventh Circuit and Federal Circuit.

14.     I became employed as an associate with Covington in 1973 and became a partner in 1980.   My practice, which has spanned forty (40) years, has concentrated on complex litigation in federal courts, and domestic and international arbitrations.   Many of the cases that I have handled or participated in have involved disputes whose favorable

resolution is important to the viability of the client.  Recent examples at the trial and appellate level in which I served as lead counsel include the successful defense of leading Philippine business owners in litigation seeking to enforce a billion-dollar judgment against them (*In Re Estate of Ferdinand Marcos Human Rights Litigation*, 536 F.3d 980 (9th Cir. 2009)) and a successful defense of the owner of the Stolychnaya vodka trademarks against a Russian Federation state company that has attempted to claw back the marks.  (*Federal Treasury Enterprise v. Spirits Int'l Ltd.*, ____ W.L. ____, No. 11-4109 (2d Cir. Aug. 5, 2013.)  I have practiced before many federal district courts, state courts and administrative agencies.  I have extensive arbitration experience including practice before (or under the rules of) the American Arbitration Association, International Chamber of Commerce, London Court of Arbitration, UNCITRAL, CPR Institute for Dispute Resolution, and International Centre for the Settlement of Investment Disputes and the Court of Arbitration for Sport.  Recent arbitration cases include representing Exxon Mobil against Venezuela in relation to the expropriation of oil and refining facilities.

15.     I have received, *inter alia*, the following awards and rankings: *Chambers USA—America's Leading Business Lawyers*, International Arbitration (2013); *Best Lawyers in America* (2013); *The International Who's Who of Commercial Arbitration Lawyers* (2008); *The International Who's Who of Commercial Litigation Lawyers* (2008).

16.     As the lead attorney on the ESA Case, in addition to daily tasks detailed on the invoices, I was responsible for development of the ESA Case strategy, staffing decisions, and the supervision of other attorneys on the ESA Case team.  My partner Harris Weinstein (now retired) was responsible for preparing bills and generally did so in

consultation with me. In my role as lead attorney on the ESA Case I regularly communicated with FEI and I was consulted on strategic and tactical decisions.

17. While my role as lead counsel required me to focus on nearly every aspect of the ESA Case, specifically, some of the major tasks that I performed in the ESA Case were as follows: (a) case investigation and development; (b) case strategy; (c) supervising the preparation and drafting of portions of the motion to dismiss; (d) supervising and/or drafting other discovery motions and oppositions; (e) supervising the D.C. Circuit briefings; (f) communications and interactions with FEI regarding case strategy and progress of the case; (g) settlement negotiations; (h) mediation; (i) preparation of initial disclosures; (j) preparation and supervising of affirmative and defensive written discovery; (k) lead counsel for FEI in court hearings and conferences; (l) oral argument on discovery motions; (m) evaluation, selection, and management of expert witnesses; (n) interviewing and evaluation of fact witnesses; (o) strategy and supervision of third party discovery; (p) handling the deposition of fact witness Frank Hagan; and (q) supervision of the brief in opposition to Plaintiffs' motion to file a supplemental complaint.

### Harris Weinstein

18. Harris Weinstein graduated from the Massachusetts Institute of Technology with an S.B. in 1956, and an S.M. in 1958. He earned a J.D. from Columbia Law School in 1961 and served as Editor-in-Chief of the *Columbia Law Review*. Mr. Weinstein was a partner at Covington until 2004, when he became a senior counsel, and he retired in 2011. His practice focused on complex civil litigation. He appeared in federal district courts throughout the country and argued appeals in a majority of the United States Courts of Appeals. He also argued nine (9) cases in the United States Supreme Court. Mr. Weinstein is a member of the District of Columbia bar. Prior to

practicing at Covington, Mr. Weinstein served as Assistant to the Solicitor General of the United States Department of Justice (1967-1969).  He has served as a lecturer at several law schools, including as a Distinguished Lecturer at the Catholic University of America, Columbus School of Law.

19.     Mr. Weinstein was a core member of the ESA Case team from the beginning of Covington's representation of FEI in this matter.  His work on the ESA Case focused on the following: (a) development of the overall litigation strategy; (b) case background and analysis; (c) communications with FEI regarding the ESA Case; (d) supervision and preparation of the D.C. Circuit appeal; (e) oral argument in the D.C. Circuit appeal; (f) participation in the opposition to Plaintiffs' motion for reconsideration; (g) participation in mediation; (h) discovery strategy; and (i) analysis and review of affirmative and defensive discovery.

### *Jeannie Perron*

20.     Jeannie M. Perron D.V.M. graduated from Purdue University with a B.S. in 1979.  She earned her J.D. from the George Washington University Law School in 1985.  Dr. Perron earned a D.V.M. from Texas A&M University College of Veterinary Medicine in 1997 and practiced veterinary medicine part time from 1997-2001.  Dr. Perron is a partner at Covington where she is a member of the firm's Food and Drug Practice Group in Washington, D.C.  She is admitted to the District of Columbia Bar and is licensed to practice veterinary medicine in Virginia and Maryland.

21.     Dr. Perron was a core member of the ESA Case team since the beginning of the ESA Case representation and participated heavily in all aspects of the litigation. She was extensively involved in all issues involving animal health, well-being and veterinary care.  Specifically, some of the major tasks that Dr. Perron performed were the

following: (a) case investigation and development; (b) case strategy; (c) communication with client on strategy and discovery matters; (d) supervising the preparation and drafting of the reply in support of FEI's motion to dismiss; (e) preparation of D.C. Circuit briefs; (f) supervising and/or drafting other discovery motions and oppositions; (g) supervising Freedom of Information Act ("FOIA") requests related to litigation issues; (h) communications and interactions with FEI regarding case strategy and progress of the case; (i) preparation of mediation statement; (j) fact witness interviews; (k) preparation and supervising of affirmative and defensive written discovery; (l) evaluation, selection, and management of expert witnesses; (m) review of expert materials; (n) interviewing and evaluation of fact witnesses; and (o) strategy and supervision of third party discovery.

### *Joshua D. Wolson*

22.     Joshua D. Wolson graduated from the University of Pennsylvania in 1996 with a B.A. in Economics.  He earned his J.D. from Harvard Law School in 1999.  Mr. Wolson served as a law clerk to the Honorable Jan E. DuBois of the U.S. District Court for the Eastern District of Pennsylvania.  Mr. Wolson was employed as an associate at Covington & Burling from 2000-2008.  He is admitted to the District of Columbia and other state and federal court bars.  Mr. Wolson currently is a partner at Dilworth Paxson in Philadelphia, PA.

23.     Mr. Wolson began working on the ESA Case in March of 2003.  Mr. Wolson was a core timekeeper on the ESA Case.  He participated heavily in the matter and his responsibilities and tasks included the following: (a) research and preparation of FEI's Motion to Dismiss the Second Amended Complaint; (b) research regarding the ESA and regulatory framework; (c) preparation of the Answer to the Second Amended

Complaint; (d) communications and meetings with FEI regarding case strategy and discovery; (e) participating in all aspects of affirmative and defensive discovery; (f) document review, analysis, and production; (g) preparation of initial disclosures; (h) privilege review and development of privilege log; (i) preparation of briefs in connection with discovery motions; (j) negotiation and briefings related to protective orders; (k) handling third party discovery; (l) handling the party depositions of Animal Welfare Institute ("AWI") and the Fund for Animals ("FFA"); (m) handling the depositions of fact witnesses Miyun Park, Lauren Silverman, Ed Stewart, and the MCI Center; (n) preparation of the opposition brief to Plaintiffs' Motion to Consolidate; (o) fact witness interviews and investigation; (p) communications and interactions with FEI regarding case strategy and progress of the case; (q) participating in settlement negotiations; (r) participation in court hearings and conferences; (s) interviewing and evaluation of fact witnesses; and (t) participation in case strategy and development.

### *Maura A. Dalton Calsyn*

24.     Maura A. Dalton Calsyn received her B.A. in Government, *summa  cum laude*, from Hamilton College in 1995, where she was elected to Phi Beta Kappa.  She earned her J.D., *cum laude,* from Harvard Law School in 2001.  While at Harvard, she served as an editor of the *Journal on Legislation*.  Ms. Calsyn (nee Dalton) was employed as an associate by Covington from 2001 through 2005 and practiced in the litigation and health care groups.  She currently is the Associate Director of Health Policy at American Progress.

25.     Ms. Calsyn was a core member of the ESA Case team and worked heavily on many aspects of the case including the following: (a) preparation of affirmative and defensive written discovery; (b) evaluation, selection, and management of expert

witnesses; (c) review of expert materials; (d) preparation for and handling of the depositions of Elizabeth Swart, Angela Martin, and the 30(b)(6) depositions of the American Society for the Prevention of Cruelty to Animals ("ASPCA") and third party Madison Square Garden; (e) participation in the deposition of Miyun Park; (f) preparation of FEI's briefing on the motion to compel; (g) strategy and management of third party discovery; (h) preparation of witness interview materials; and (i) review of expert and fact witness documents.

### Kimberly A. Strosnider

26.     Kimberly A. Strosnider received her B.A., *summa cum laude*, from Otterbein College in 1989.  She graduated *cum laude* from Harvard Law School in 2001. Ms. Strosnider served as a judicial clerk for the Honorable J. Frederick Motz, U.S. District Court, District of Maryland.  She is a member of the bar of the District of Columbia.  Ms. Strosnider is currently a partner at Covington, having held the position of associate from 2002 to 2009.  Her practice focuses on litigation, international trade controls and insurance coverage.

27.     Ms. Strosnider participated in various phases of the ESA Case.  She was responsible for a variety of tasks primarily focused on: (a) participating in multiple phases of affirmative and defensive discovery, including but not limited to drafting and responding to discovery requests; (b) reviewing, analyzing and preparing documents for production; (c) reviewing and analyzing videotapes produced by plaintiffs; (d) assisting with third party discovery; (e) conducting research on evidentiary issues; (f) participating in factual investigation of the claims and case background; and (g) reviewing expert and potential expert materials.

*Elliott Schulder*

28.     Elliott Schulder graduated with a B.A. from Yale University in 1968 and a J.D. from New York University School of Law in 1973.  He served as Assistant to the Solicitor General, United States Department of Justice, where he argued eleven (11) cases in the Supreme Court of the United States.  Previously, he served as an appellate attorney at Department of Justice and the Brooklyn, New York District Attorney's Office.  Mr. Schulder is Of Counsel at Covington where his practice focuses on appellate litigation, environmental, international arbitration and insurance coverage.

29.     Mr. Schulder's role in the ESA Case centered on the plaintiffs' appeal of the Motion to Dismiss.  He assisted in the formulation of the appellate strategy and preparation of the appellate briefings.

*Kevin Newsom*

30.     Kevin Newsome graduated *summa cum laude* from Samford University with a B.A. in 1994.  He graduated *magna cum laude* from Harvard Law School in 1997. At Harvard Law School he served as an Articles Editor of the *Harvard Law Review*.  Mr. Newsom clerked for Judge Diarmuid F. O'Scannlain, United States Court of Appeals, Ninth Circuit, from 1997 to 1998.  He also clerked for Justice David H. Souter, Supreme Court of the United States, from 2000-2001.  Mr. Newsome was an associate at Covington from 1998 through 2000 and 2001-2003 concentrating in appellate litigation. Mr. Newsom left Covington to become the Solicitor General of Alabama and currently is a partner at the law firm of Bradley Arant Boult Cummings in Birmingham, Alabama.

31.     Mr. Newsom's role in the ESA Case centered on the appeal to the D.C. Circuit of the order granting  the motion to dismiss.  He assisted in the research for and preparation of the appellate briefings.

### Catherine E. Long

32.     Catherine E. Long received her B.A. in Rhetoric and Communication Studies form the University of Virginia in 1986.  She earned her J.D., *magna cum laude*, from Boston University School of Law in 1995.  Ms. Long served as a judicial clerk for the Honorable Francis D. Murnaghan, Jr. of the U.S. Court of Appeals for the Fourth Circuit.  She was employed as an associate at Covington from 1996 through 2003.  Ms. Long performed discrete tasks in the ESA Case.  She performed legal research related to the Endangered Species Act, including but not limited to the "takings" provision, and the legislative history of the same, in connection with the motion to dismiss briefing.

### Andrew D. Levy

33.     Andrew D. Levy received his B.S. in Psychology from Emory University in 1980.  He received a Ph.D. in Physiological Psychology from the University of California, Los Angeles in 1987 and he received a J.D., *cum laude*, from the University of Pennsylvania in 1998.  He was employed as an associate at Covington in the litigation practice group from 1998 through 2002.  Mr. Levy performed discrete tasks in the ESA Case.  He performed research for FEI's Motion to Dismiss and drafted portions of the briefs related thereto.  He also assisted in preparing the opposition brief to Plaintiff's Motion for Reconsideration of the Motion to Dismiss.

### David G. McIntosh

34.     David G. McIntosh received his A.B. in American History, *magna cum laude*, from Harvard College in 1994 where he was elected to Phi Beta Kappa.  He earned his J.D. from Harvard Law School in 1998.  Mr. McIntosh was employed as associate at Covington from 1998 through 2001.  Mr. McIntosh performed discrete tasks on the ESA

Case.  He was responsible for researching and drafting arguments for FEI's Motion to Dismiss.

### Silvio A. Krvaric

35.     Silvio A. Krvaric received his B.A. from Vesalius College in Brussels, Belgium in 1996 and his J.D. from Santa Clara University in 2000.  He is a staff attorney at Covington.  Mr. Krvaric  performed discrete legal tasks in the ESA case including document review, analysis, redaction and the preparation of document productions.  He prepared document files on elephants.  Mr. Krvaric reviewed videotapes and prepared an index of the same to assist in discovery and case preparation.

### Brenda Y. Oakes

36.     Brenda Y. Oakes received her B.A. in History from Howard University in 1991.  She received her J.D. from the University of Utah College of Law in 1995 and her M.B.A. from the University of Colorado-Denver in 2001.  She was a staff attorney at Covington from 2005 to 2009.  Ms. Oakes performed discrete legal tasks in the ESA Case related to the review and analysis of elephant veterinary documents for document production and preparation of elephant files to assist in discovery and case preparation.

### Margaret Burton

37.     Margaret R. Burton graduated from Bryn Mawr College in 2004 with a B.A. in Political Science.  She was employed as a paralegal at Covington from 2004 to 2006.  Ms. Burton served as one of the primary paralegals on the ESA Case and performed various tasks including (a) research on party and fact witnesses; (b) review of documents and creation of document indices; (c) preparation of witness charts and files; (d) review and indexing of videotapes for affirmative and defensive discovery; (e) review of documents and creation of key document binders; (f) deposition preparation, including

review and analysis of documents for use in depositions; (g) creation of deposition digests; (h) research on elephant issues and articles; assisting in the review of privileged documents and preparation of a privilege log; (i) document translation; (j) assisting with third party discovery; (k) document review, analysis, and preparation for production; and (l) assisting with case development and administration.

### Elizabeth M. Crosby

38.     Elizabeth M. Crosby graduated from the University of Maine with a B.S. in Business Administration and Marketing and a B.A. in Economics.  She was employed as a paralegal at Covington from 2002 to 2004.  Ms. Crosby was one of the primary paralegals assigned to the ESA Case and performed various tasks including: (a) preparation of initial disclosures; (b) analysis of documents and materials for the preparation of witness files; (c) assistance with fact gathering and case investigation; (d) review and indexing of documents for affirmative and defensive discovery; (e) review and analysis of documents for productions; and (f) preparing charts summarizing fact witness information; and (g) assisting with case development and administration.

### Jadranka Poljak

39.     Jadranka Poljak graduated from Stanford University with a B.A. in Latin American Studies in 2003. She was employed as a paralegal at Covington from 2004 to 2007.  Ms. Poljak served as one of the primary paralegals on the ESA Case and performed various tasks including (a) review and preparation of videotapes for discovery; (b) document translation; (c) document review, analysis, and preparation for production; and (d) supervision of plaintiffs' review of videotapes produced in discovery.

### Bradford J. Siegele

40.     Bradford J. Siegele graduated from Duke University in 1999 with an A.B. degree in Philosophy and English.  He was employed as a paralegal at Covington from 2000 to 2001.  Mr. Siegele performed discreet tasks on the ESA Case: he worked on checking and editing citations and rendered other assistance in connection with FEI's Motion to Dismiss briefings.

### Kristina H. Kaluza

41.     Kristina H. Kaluza graduated from Colgate University in 2004 with a B.A. in Political Science and Spanish.  She was employed as a paralegal at Covington from 2004 hrough 2006.  Ms. Kaluza performed discrete tasks on the ESA Case.  She assisted with document review, analysis, redaction and the preparation of document productions.

### Carla C. Holmes (formerly Carla Holmes Winbush)

42.     Carla C. Holmes graduated from the University of Maryland, College Park, in 1985 with a B.S. in Chemistry.  She obtained her Paralegal Certificate from the University of San Diego in 1987.  She was employed as a paralegal specialist at Covington from 2001 to 2009.  Ms. Holmes performed discrete tasks on the ESA Case. She was responsible for assisting in the preparation of the briefing in connection with FEI's Motion to Dismiss and checking citations for the briefs in connection with the opposition to the Plaintiffs' Motion for Reconsideration and FEI's appellate brief in the D.C. Circuit.

### Allison Spangler

43.     Allison Spangler graduated from Wake Forest University in May of 2005 with a B.A. in Political Science.  She was employed as a paralegal at Covington from 2005 to 2006.  Ms. Spangler performed discrete tasks on the ESA Case.  She was

responsible for reviewing and assembling exhibits related to depositions and the preparation of exhibits for use in the case.

### *Patricia D. Johnson*

44.     Patricia D. Johnson graduated from Duke University with a B.A. in Political Science and Public Administration. She subsequently obtained her Paralegal Certificate from Adelphi University.   She currently is employed at Covington as a paralegal.  Ms. Johnson was responsible for document review and production.

### Covington's Billing Practices:  ESA Case

45.     Covington timekeepers followed the customary firm procedures in recording and reporting the time that they spent on the ESA Case.  These procedures called for each lawyer, paralegal and other timekeeper to record in a diary or calendar each day the amount of time he or she spent on the case, with a brief narrative description of the tasks he or she performed.  During the time Covington worked on the ESA Case for FEI, timekeepers were required to report to the accounting department their time and narrative descriptions no later than Monday for the preceding week.  Within several business days of the end of each calendar month, the accounting department sent summary reports for the preceding month to the billing partner (Harris Weinstein).  Those reports listed for each day the number of hours spent by each timekeeper and the narrative description that the timekeeper had provided.  The reports also multiplied the hours spent by each timekeeper times his or her hourly rate to arrive at totals for each timekeeper and in the aggregate.

46.      In accordance with firm policy, the billing partner is expected to examine each report from the accounting department in order to verify that no mistakes have been made and to consider whether some time charges should be "written off." The chief

reason for writing off time charges is that work was performed inefficiently (*e.g.,* too many hours spent on the task, the timekeeper pursued unproductive lines of legal or factual research, or the time exceeded estimates provided to the client).  I know that Mr. Weinstein performed this analysis because he regularly sent me copies of the accounting reports and asked me to review them and provide comments, which I did.

47.     Consistent with firm procedures, Mr. Weinstein then prepared the bill based on the accounting department reports as modified by any corrections and writeoffs. The bills were then sent to FEI in the form of the bills included in Ex. 1.

48.     Covington billed FEI for the fees and expenses incurred on the ESA Case on a monthly basis beginning in November of 2000, with occasional exceptions.   In several instances, the firm sent an invoice to include multiple months of fees and expenses.  *See* Ex. 1 at COV00000001-COV00000013 (aggregating billed time from July 1, 2000 through September 30, 2000).  Each invoice states the time period for which professional services associated with the ESA Case were incurred (*e.g.* "For professional services rendered in connection with the above referenced matter for the period July 1, 2000 through September 30, 2000, as follows:").

49.     The invoices contain the following categories of information: "Date" (date the particular legal service was performed); "Description" (a narrative description of the work performed); "Hours" (the amount of time spent on the work performed in the description, in quarter hour increments); "Timekeeper" (the Covington attorney or professional who performed the work in the description).  A "Timekeeper Summary," which follows the individual time narratives, lists each timekeeper whose time appears on the invoice, together with the timekeeper's title (*e.g.* Partner, Associate, Paralegal,

Litigation Specialist); the timekeeper's hourly rate, the hours billed, and the amount (rate x hours).

50.     The invoice also contains a "client charges summary" of expenses and disbursements associated with the file such as duplication, computer research, and travel expenses.  The "client charges" are not being claimed by FEI in connection with the attorney fee submission.

51.     At various time periods during our handling of the ESA Case discounts were applied against attorney and non-attorney professional time.  Such discounts appear as deductions off the "total fee" reflected in the invoice calculations.  The July 17, 2003 Covington invoice reflects a discount of $2000 (or approximately 7.75% of the fees).  Ex. 1 at COV00000092.  Beginning with the November 22, 2004 invoice and continuing through the invoice dated April 25, 2006, the Covington invoices reflect a 5% discount on all fees.  The April 15, 2005 Covington invoice reflects an additional discount of $2500 (or approximately 6% of the fees).  Where certain time is excluded and not being claimed by FEI, those exclusions reflect any applicable discounts that were taken off of the billed fee.

52.     Attached as Ex. 1 are true and accurate copies of invoices prepared for, and sent by Covington to, FEI in connection with the ESA Case, from November 2000 through April of 2006.

**Redactions to Covington Invoices**

53.     The invoices generated in connection with the ESA Case contain redactions which are labeled "financial privacy", "privilege", and "potential witness". These redactions appear as a white box on the invoices.  Space permitting, labels appear inside the redaction box that describe the reason for the redaction.

20

54.     "Financial privacy" redactions have been applied to those places on the invoices in which financial information such as bank account and federal tax identification numbers appear (such as in the letterhead, footer, or on the remittance page).  Due to the repetition of financial information throughout the remittance page, and the labor-intensive nature of line-by-line redactions, the entire remittance page has been redacted for efficiency purposes.   The remittance page contains no substantive information relevant to the attorneys fee submission.

55.     "Privilege" redactions have been applied to information that is subject to the attorney-client privilege and/or work product protections.  The legal fees associated with any time narrative that has been redacted for "privilege" have been excluded from the Covington legal fees that FEI claims in the instant motion.  Individual entries not being claimed due to "privilege" are listed separately on Ex. 11 to this declaration.

56.     "Potential witness" redactions have been applied to names of potential fact or expert witnesses that FEI and Covington considered or communicated with, but that ultimately did not appear as fact or expert witnesses in the ESA Action.  In such cases where a potential witness was identified in a narrative, a white box redaction has been applied to obscure only the name or other identifying information or descriptors that would reveal the identity of such persons.  In these instances, where only the identifying information is redacted, the fees associated with the billable task are still being claimed by FEI.

**Covington's Method of Determining Rates**

57.     The agreement between Covington and FEI called upon FEI to pay Covington fees based on the standard hourly rate normally charged to all clients for each timekeeper.  (Starting in November 2004, Covington and FEI agreed that FEI should

receive a five percent (5%) discount on all hourly rates in view of the volume of work that Covington was performing for FEI.)

58.     During my 33 years as a partner, and during 2000-2006 period in which we worked on the ESA case, Covington based its hourly rates for associates on seniority, with rates rising for each "class" of associates (first year through eighth year), and adjustments for differences in the cost of living in different cities where the firm has offices.  The firm followed similar practices in setting the rates for staff lawyers and paralegals.  Hourly rates for partners varied much more, depending on many factors including the partner's seniority, area of specialization, record of success, reputation and client demand for his or her services.

59.     During my years as a partner and during 2000-2006, Covington reviewed its standard rates annually to determine whether they should be adjusted based on economic conditions (such as inflation), the costs of operating the firm, the demand for legal services in the subject areas of the firm's practice, and the firm's assessment of the market value of the legal services we provide.  In assessing the market value of Covington's services, the firm would make use of public information about legal fees being charged by other large firms, market survey information, and feedback from clients.  Generally partners were consulted each year about how they would expect clients to react to increases in their personal hourly rates.

**The Reasonableness of Covington & Burling's Rates**

60.     The rates of Covington's timekeepers in the ESA case are reasonable and well in line with the rates charged by leading firms in Washington, D.C.  The case was led by two Covington partners (Weinstein and Gulland) with long experience in complex and high-stakes civil litigation.  A senior associate with a D.V.M. degree (Perron)

provided unique legal and scientific  expertise relevant to the issues of the case.  Two senior associates experienced in civil litigation (Wolson and Dalton) handled the day-to-day demands of discovery.   And two superb appellate lawyers (including a former Assistant to the U.S. Solicitor General (Schulder) and a former U.S. Supreme Court clerk who became Alabama's Solicitor General (Newsom) worked on the appeal in 2003. Each of these core members of the team had distinguished academic and professional practice credentials.

61.     Perhaps the best confirmation of the reasonableness of Covington's rates is the fact that FEI selected Covington and actually paid the fees that it is now seeking to recover.  This is not a case in which the Court is asked to set reasonable fees in hindsight in a matter that was handled on a contingency or similar basis, but a case in which the client agreed on the reasonableness of the rates.  The market for legal services is highly competitive, and knowledgeable clients have broad choice in selecting counsel to represent them.   It is those clients who establish the market value of legal services through their willingness to pay the fees of the lawyers they engage.

62.     To provide additional confirmation of the reasonableness of Covington's rates, I asked one of Covington's research librarians to obtain data on legal fees charged by major firms in Washington, D.C. during the period 2000-2006.  She consulted the National Law Journal ("NLJ") Billing Survey, prepared each year by American Lawyer Media ("ALM").  Covington subscribes to the NLJ Billing Survey and uses it in the regular course of business as one of the sources of data for determining the standard rates for billing clients.  ALM (acting through its General Counsel, Elisa Miller) consented to

my use of its survey data in this declaration, which for the years 2000-2005 is now available to LEXIS subscribers (LEXIS copy attached hereto as Ex. 4).

63.     The NLJ compiles the Billing Survey data from responses it receives from its annual survey of the nation's largest law firms (the "NLJ 250"), which includes questions about the ranges of fees charged by the firms.     (*See* http://www.almlegalintel.com/SurveyDescription.aspx?id=jEM7Q/5Lelo=&type=fEFgIa D+grg= ).  The Survey reports "high and low rates" for partners and associates of large firms for fiscal years 2000-2005 in many different markets in the United States.  In each of those years, the NLJ Billing Survey reports high and low rates for multiple (7-12) Washington law firms.  Those data show that the rates charged to FEI by the core Covington timekeepers during FY2000-2005 were in the higher range of fees reportedly charged by Washington firms during those years, but were consistently below the highest reported fees for partners and associates.  Ex. 4 hereto also includes bar graphs which illustrate for each fiscal year 2000-2005 the actual rates charged for core Covington timekeepers (partners and associates) working on the ESA case and compares them to the high and low rates for the Washington law firms whose rates were reported in the NLJ Billing Survey for that year.  In my opinion, Covington is able to charge reasonable fees in the high range for partners and associates because it has a proven record of success, and a reputation for performing at the highest levels of the legal profession.  That enables Covington to attract both clients and highly skilled lawyers.

64.     NLJ Billing Survey data are not available for 2013 billing rates.  In order to assist me in providing further confirmation of the reasonableness of the 2013 billing rates of the Covington lawyers who were partners or associates in the core group working

on the ESA Case and who continue practice law with Covington currently (Gulland, Perron, Strosnider, and Schulder), FEI and Fulbright provided me with a copy of the Declaration of Cory Branden of Peer Monitor and accompanying Peer Monitor data that is being submitted under seal.  Ex. 16 hereto.  The Peer Monitor data report covers five law firms with large litigation practices in the Washington, D.C.  Once again the data confirm that Covington's standard billing rates for these lawyers are in line with the comparable rates of the other firms.

### Calculation of the Lodestar Amount
### for the Covington Work on the ESA Case

65.     FEI seeks to recover **$2,308,407.27** in attorneys' fees for **5,913.83** hours of work that Covington performed on the ESA Case (the "lodestar amount").  Paragraphs 80 through 84 and Ex. 5 to this declaration detail how the lodestar amount was calculated.  Paragraphs 66 through 79 describe the items that FEI is excluding from its claim.

### Items Excluded from Covington Fees Claimed by FEI

66.     In an effort to narrow the areas of disagreement with respect to FEI's fee claim, FEI does not seek to recover for all of the hours it paid Covington to handle the ESA Case.  FEI does not seek to recover for (a) any time billed to the ESA Case by any Covington timekeeper who billed fewer than ten (10) hours to the case; (b) the time spent transitioning the case from Covington to Fulbright; (c) the time Covington spent addressing the issues concerning the production of elephant veterinary records; (d) the time incurred by summer associate timekeepers; and (e) time spent by timekeepers which was necessary to the ESA Case but, according to prevailing caselaw, could be construed as being primarily administrative in nature; (f) time descriptions that would reveal

activities which are covered by the attorney-client privilege, and/or work product protections; and (g) a portion of any travel time recorded by timekeepers in connection with the ESA Case.

67.     It was a customary billing practice at Covington during the time period in which we handled the ESA Case and currently for timekeepers to use the conventional "block billing" method, which aggregates various tasks spent on a matter in a single time entry.  Where a single entry references work done on a task which FEI is claiming and another task which FEI is excluding, *see infra*, allocations were made to reflect the excluded task.  Generally, if a single task from the time entry included one of the excluded categories detailed herein, the total time spent was divided by the number of tasks listed in the entry.  For example, using my time record of March 8, 2004 (Ex. 1 at COV00000123) I recorded .75 hours to the ESA Case in a single time entry: "[PRIVILEGE redaction], discovery matters." In my judgment, one of these two tasks tends to reveal privileged information, so half of the .75 hour entry was therefore excluded.  This procedure was generally followed for all the exclusions unless the nature of the task or the circumstances surrounding that task or both suggested a different allocation should be used.

**Covington Timekeepers With Fewer Than 10 Billed Hours**

68.     During the period of time that Covington handled the ESA Case, a total of fifty-eight (58) attorneys, paralegals, litigation specialists and library professionals billed hours to the ESA matter.  In order to narrow the areas of disagreement, FEI is not claiming fees for Covington timekeepers who billed fewer than ten (10) hours to the ESA Case.  The time descriptions for such timekeepers have been highlighted in purple on the Covington invoices.  A summary of the timekeepers with fewer than 10 hours billed is

included as Ex. 6.  Ex. 6 was compiled using Covington's ESA Case invoices.  This exclusion represents a total of **94.55 hours** that were billed to FEI at an aggregate value of **$17,900.38.**

## Transition Time

69.     In December of 2005, Covington began to transition the ESA Case to Fulbright.  On March 13, 2006, Covington withdrew from the ESA Case.  Transition consisting of transferring files and information to Fulbright was billed by a non-attorney legal professional.  In order to narrow the areas of potential disagreement in the instant motion, the hours that Covington billed to FEI for transitioning the case to Fulbright are excluded from FEI's claim.  Transition time has been highlighted in orange in the Covington invoices (Ex. 1).  A summary of the time entries excluded as transition time is included as Ex. 7, which was compiled using Covington's invoices.  The exclusion represents a total of **2.38 hours** that were billed to FEI at an aggregate value of **$394.84.**

## Elephant Veterinary Records

70.     Substantial attorney and non-attorney legal professional time was spent addressing discovery issues that arose surrounding elephant medical records.  In order to narrow the potential areas of disagreement in the instant motion, hours spent by Covington timekeepers on the elephant veterinary records issue in the September-October 2005 time frame are being excluded from FEI's claim.  Such time entries have been highlighted in blue in the Covington invoices.  A summary of the time entries excluded under this category is included as Ex. 8, which was compiled from Covington invoices.  This exclusion represents a total of **159.16 hours** that were billed to FEI at an aggregate value of **$50,159.67**.

**Summer Associate Time**

71.     In order to narrow the potential areas of disagreement in the instant motion, to the extent summer associate timekeepers who performed work on the ESA Case were not otherwise excluded in the "under 10 hours" category, they were separately excluded.  Such exclusions have been highlighted in tan in the Covington invoices.  A summary of the summer associate time exclusions is included as Ex. 9, which was compiled from Covington invoices.  This exclusion represents a total of **66 hours** that were billed to FEI at an aggregate value of **$10,608.84.**

**Administrative Time**

72.     In order to narrow the potential areas of disagreement in the instant motion, to the extent that a timekeeper performed a task that, although necessary to the ESA Case, could be construed as primarily administrative in nature, such time is excluded from FEI's claim.  Administrative time entries have been highlighted in gray in the Covington invoices.  A summary of the administrative time exclusions is included as Ex. 10, which was compiled using Covington invoices.  This exclusion represents a total of **104.77 hours** that were billed to FEI at an aggregate value of **$16,003.05**.

**Privileged Time Entries**

73.     Some of the narratives in the "Description" section of the Covington invoices contain details that would tend to reveal attorney-client communications between Covington and FEI, work product or other Covington opinion that is protected from disclosure.  As such, FEI has elected not to claim the fees associated with these entries.  Those entries have been redacted using a white box redaction with a label of "privilege" where space permits.  In order to narrow the areas of disagreement regarding redacted time entries or work descriptions, with certain other exceptions noted in

paragraph 75 below, the hours associated with such redacted descriptions are excluded from FEI's claim.  A summary of the privileged time entries being excluded from FEI's claim is included as Ex. 11, which was compiled from Covington's invoices.  This exclusion represents a total of **226.62 hours** that were billed to FEI at an aggregate value of **$85,902.59.**

74.     Where a time entry included multiple tasks ("block billing"), and only a portion of the entry tends to reveal privilege or work product (and therefore are not being claimed), the same methodology described in paragraph 67 was applied for excluding portions of a time entry.

75.     The exception to this methodology for privilege applies to a small number of time entries in which a timekeeper was interviewing or speaking with or about a potential witness, or referencing identifying information about a potential witness that would reveal his/her identity.  Such witnesses were never deposed or called to testify at trial, and therefore their identities are a matter of opinion work product and thus protected from disclosure.  Such white box redactions are labeled as "Potential Witness" (space permitting).   In these instances, the remaining surrounding text still identifies the timekeeper's task, and therefore, the entries are included in FEI's claim.

### Travel Time

76.     Certain Covington attorneys who worked on the ESA Case recorded the time they spent traveling in connection with work that they performed on the case.  FEI is excluding from its claim 50% of the hours that were recorded as travel time by the timekeepers working on the ESA Case and billed by Covington to FEI.  This exclusion represents a total of **19.5 hours** for a total exclusion amount of **$6,438.63.**  Ex. 12, which was compiled from Covington invoices, details the travel time exclusions.  The amount

of travel time is based on my own personal knowledge of travel time (*e.g.* trips from Covington to FEI in Vienna, VA or the federal courthouse) and by internet searches for flights and train travel.

### Total Exclusions

77.     The total amounts excluded from fees billed by Covington are detailed in a series of charts which were compiled from Covington invoices.  Ex. 13 details the total fee excluded for each category of exclusion by timekeeper.  Using myself as an example, Ex. 13 indicates that $17,264.12 of my fees was excluded under the "privilege" exclusion; $280.00 of my fees was excluded under the "travel" exclusion; and $11,934.38 of my fees was excluded under the "veterinary records issue" exclusion, for a total exclusion of $29,478.50 in fees.

78.     Ex. 14 details the total amount excluded from fees and hours billed by Covington by exclusion category.  For all excluded categories, the total billed hours excluded is **672.97 hours** and the total billed amount excluded (which includes applicable discounts) is **$187,407.99**.

79.     Ex. 15 reflects the exclusion data in a slightly different manner, and lists by timekeeper the total amount of excluded hours and excluded fees (including applicable discounts).

### Calculation of the Lodestar Amount for Covington Time

80.     Under applicable caselaw, the lodestar is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  After identifying the timekeepers who billed time to the ESA Case, and excluding the aforementioned timekeepers who billed fewer than 10 hours (Ex. 6), thirteen (13) attorneys and eight (8)

non-attorney professionals, or a total of twenty-one (21) timekeepers remain.  These 21 timekeepers are listed in Ex. 5.

81.     Ex. 5, which was prepared using the Covington invoices, divides the 21 timekeepers into two groups.  The first group, labeled "Current Timekeepers" are those timekeepers who are still employed at Covington.  The second group, labeled "Former Timekeepers," are those timekeepers who are no longer with Covington.  The division was made in order to apply that part of the lodestar analysis that accounts for the time delay in payment/reimbursement of attorneys' fees incurred by FEI.

82.     For the Current Timekeepers, the columns on the chart are as follows: "Timekeeper Name" is the person's name;  "Title" is the position the person currently holds at Covington; "Employment Status" is populated in each case with "current" as each person is still at Covington; "Hours Billed & Collected" represents the amount of hours that were billed to FEI for the ESA Case and paid for by FEI; "Hours Excluded" represents the hours excluded for each timekeeper as detailed in Ex. 15; "Billed and Collected Hours Net of Exclusions" is derived from subtracting "Hours Excluded" from "Hours Billed & Collected"; "Current (2013) Rate" represents the 2013 hourly rate of each current Covington timekeeper; and "Value of Net Billed & Collected Hours at Current Rate" is the result of multiplying "Current (2013) Rate" x "Billed & Collected Hours Net of Exclusions."  Following this computation methodology, and as reflected in Ex. 5, the six (6) current Covington timekeepers' "Billed & Collected Hours Net of Exclusions" is valued at a total of **$1,272,937.45**.

83.     For the Former Timekeepers, the columns on the chart are as follows: "Timekeeper Name" is the person's name;  "Title" is the position the person held when

he/she separated from Covington; "Separation Date" reflects the date of the timekeeper's separation from employment at Covington; "Fees Billed & Collected" represents the value of the hours that were billed to FEI for the ESA Case and paid for by FEI; "Billed Value of Excluded Amounts" represents the value of the time that was excluded for each timekeeper as detailed in Ex. 15; "Billed and Collected Hours Net of Exclusions" is derived from subtracting "Billed Value From Excluded Amounts" from "Fees Billed & Collected".   Following this computation methodology, and as reflected in Ex. 5, the thirteen (13) former Covington timekeepers' total Billed and Collected Hours Net of Exclusions is **$1,035,469.82**.

84.     The total lodestar amount for the "Current Timekeepers" is **$1,272,937.45**. The total lodestar amount for the "Former Timekeepers" is **$1,035,469.82**.   Therefore, the total amount claimed by FEI for **5,913.83 hours** of work performed by Covington on the ESA Case is **$2,308,407.27**.   In my opinion, based upon 40 years of experience, the complexity of the case, the potentially high stakes of litigation, the duration of the case, the manner in which the case was litigated by plaintiffs, the exclusions voluntarily made by FEI, and other factors discussed above, **5,913.83 hours** were reasonably expended by Covington for the defense of the ESA Case.   The rates at which Covington performed the work and Covington's current rates are reasonable and, therefore, **$2,308,407.27** is a reasonable attorneys' fee for the defense of the ESA Case by Covington.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Eugene D. Gulland

October 18, 2013

**INDEX OF EXHIBITS TO DECLARATION OF EUGENE GULLAND**

| Exhibit | Description |
|---------|-------------|
| EG, Ex. 1 | Covington & Burling LLP Invoices. |
| EG, Ex. 2 | List of All Covington Timekeepers Who Worked on the ESA Case. |
| EG, Ex. 3 | Timekeepers' Biographical Data. |
| EG, Ex. 4 | National Law Journal Billing Survey (2000-2005) and Graphs:  Covington and NLJ Billing Survey Comparisons. |
| EG, Ex. 5 | Lodestar Calculation for Covington Timekeepers with 10 or more billed hours on the ESA Case. |
| EG, Ex. 6 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Under 10 Hours. |
| EG, Ex. 7 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Transition Costs. |
| EG, Ex. 8 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Veterinary Records Issue. |
| EG, Ex. 9 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Summer Associate. |
| EG, Ex. 10 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Administrative. |
| EG, Ex. 11 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Privileged Matters. |
| EG, Ex. 12 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category—Travel. |
| EG, Ex. 13 | Total Amounts Excluded from Fees Billed by Covington by Individual Attorney and Exclusion Category. |
| EG, Ex. 14 | Total Amounts Excluded from Fees Billed by Covington by Exclusion Category. |
| EG, Ex. 15 | Total Amounts Excluded from Fees Billed by Covington by Individual Attorney. |
| EG, Ex. 16 | Declaration of Cory Branden and Peer Monitor Data  (**FILED UNDER SEAL**). |